UNITED STATES DISTRICT COURT
SOUTHERN DISTICT OF NEW YORK

---

RITCHIE CAPITAL MANAGEMENT, L.L.C.,
RITCHIE SPECIAL CREDIT INVESTMENTS, LTD.,
RHONE HOLDINGS II. LTD., YORKVILLE
INVESTMENT I, L.L.C., RITCHIE CAPITAL
STRUCTURE ARBITRAGE TRADING, LTD., RITCHIE
CAPITAL MANAGEMENT, LTD.,

                                           Plaintiffs,

-against-

JPMORGAN CHASE & CO., JPMORGAN CHASE
BANK, N.A., J.P. MORGAN PRIVATE BANK,
RICHTER CONSULTING, INC., WELLS FARGO &
CO., AS SUCCESSOR BY MERGER TO WACHOVIA
CAPITAL FINANCE (CENTRAL), WELLS FARGO
BANK, N.A., WACHOVIA CAPITAL FINANCE
CORPORATION CENTRAL, UBS LOAN FINANCE,
L.L.C., UBS AG, UBS AG STAMFORD BRANCH,
MERRILL LYNCH BUSINESS FINANCIAL SERVICES,
INC., LASALLE BUSINESS CREDIT, L.L.C., BANK OF
AMERICA BUSINESS CAPITAL, BANK OF AMERICA
CORP., THE CIT GROUP INC., THE CIT
GROUP/BUSINESS CREDIT, INC., PNC BANK N.A.,
FIFTH THIRD BANK, WEBSTER BUSINESS CREDIT
CORPORATION, ASSOCIATED COMMERCIAL
FINANCE, INC., CHASE LINCOLN FIRST
COMMERCIAL CORPORATION,

                                         Defendants.

Case No. 14 Civ. 2557 (LGS)

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

       Plaintiffs, Ritchie Capital Management, L.L.C., Ritchie Special Credit Investments, Ltd.,

Rhone Holdings II. Ltd., Yorkville Investment I, L.L.C., Ritchie Capital Structure Arbitrage

Trading, Ltd., and Ritchie Capital Management, Ltd. (collectively "Plaintiffs" or "Ritchie"), by

and through their undersigned counsel, hereby allege as follows:

## NATURE OF THE ACTION

1.      This is an action to recover fraudulent conveyances and for damages of at least

$158 million caused by Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P.

Morgan Private Bank (collectively "JPMorgan") and Richter Consulting, Inc. ("Richter") aiding

and abetting one of the largest frauds in history—the Ponzi scheme and other frauds committed

by Thomas Petters ("Petters").

2.      JPMorgan has previously admitted to assisting some of the largest Ponzi schemes

in the world, including the scheme orchestrated by Bernard Madoff.

3.      In 2004, JPMorgan was the indirect, majority owner of Polaroid Corporation

("Polaroid").   JPMorgan acquired Polaroid when it merged with Bank One and then-CEO of

Bank One, Jamie Dimon, became president and CEO of the combined JPMorgan and Bank One

company.   The private-investment equity arm of then-Bank One, One Equity Partners, had

previously purchased a majority interest in Polaroid during a Polaroid bankruptcy proceeding for

$65 million and, thus, when JPMorgan and Bank One merged, JPMorgan became the majority

owner of Polaroid.

4.      JPMorgan wanted to make a large profit on this investment.  It approached Petters

about purchasing Polaroid and, in 2005, JPMorgan was ultimately able to sell Polaroid to Petters

for $426 million.

5.      In order to complete the 2005 sale to Petters, JPMorgan, on behalf of itself and as

agent of the other Defendant banks who acted as syndicated lenders, loaned hundreds of millions

of dollars to Petters and companies he controlled.   During the sale process, if not sooner,

JPMorgan learned, or, when faced with overwhelming evidence, consciously avoided

confirming, that Petters was conducting a multi-billion dollar Ponzi scheme at another company he controlled, Petters Company, Inc. ("PCI").

6.    JPMorgan's knowledge that Petters and PCI were engaged in fraud did not stop JPMorgan from assisting Petters in buying Polaroid and then propping Petters up long enough to be repaid.

7.    As a result of JPMorgan's sale of Polaroid to Petters and JPMorgan and the other Defendant banks' loans to finance that sale, JPMorgan knew that it and the syndicated lenders were over exposed to Petters and, knowing that Petters was committing a fraud at PCI, decided to get repaid before the fraud was exposed to others.

8.    In 2007, JPMorgan started pressuring Petters to find another financing source to repay JPMorgan and the other Defendant banks.  At that time, JPMorgan required that Polaroid use Richter as a consultant to provide JPMorgan with any information it requested, that Richter be given complete access to Polaroid's personnel, books, and records, and that Richter provide regular reports to JPMorgan.  In December 2007, JPMorgan and the syndicated lenders caused the terms of Richter's engagement to be expanded to include assisting Polaroid in soliciting a new lender to repay JPMorgan and the other Defendant banks.

9.    With JPMorgan and Richter's knowing assistance, through fraud, Petters was able to find a source to repay Defendants, as well as others.  That source was Plaintiffs.

10.    From February to May 2008, Petters defrauded Ritchie out of approximately $189,000,000 in order to repay loans Defendants had extended to Polaroid and its parent, Polaroid Holding Company, Inc. ("PHC"), as well as to repay lenders to his Ponzi scheme at PCI and to fund his extravagant lifestyle.

11.     Ritchie was a large account holder at JPMorgan.  JPMorgan wired this money out of Ritchie's accounts to a PCI account controlled by Petters knowing PCI was a fraud.  Then, Petters wired that same money through numerous bank accounts in the United States and abroad, including JPMorgan accounts in London, to launder the money and disguise its source.  Finally, Petters wired those same funds that originated in Ritchie's accounts back to JPMorgan accounts in the United States to repay debts to Defendants.  Petters was later convicted of 20 counts of wire fraud, mail fraud, conspiracy to commit mail and wire fraud, money laundering and conspiracy to commit money laundering and is currently serving a 50 year sentence for those crimes.

12.     Defendants were made nearly whole by Petters and pocketed large fees and profits during the relationship.  Defendants, however, intentionally left the latest victims of Petters' frauds, including Ritchie, to suffer the consequences.

## JURISDICTION AND VENUE

13.     Plaintiffs initially brought this action in the New York Supreme Court for the County of New York.  Venue was proper in that court based on the residence of Defendant JPMorgan Chase & Co., among other reasons.

14.     On April 11, 2014, several Defendants filed a Notice of Removal removing the case to this Court from state court.  As such, the burden is on Defendants to establish jurisdiction in this Court.

## PARTIES

15.     Plaintiff Ritchie Capital Management, L.L.C. ("Ritchie Capital") is a Delaware limited liability company.

16.    Plaintiff Ritchie Special Credit Investments, Ltd. is a Cayman Islands exempted company.

17.    Plaintiff Rhone Holdings II. Ltd. is a Cayman Islands exempted company.

18.    Plaintiff Yorkville Investments I, L.L.C. is a Delaware limited liability company organized.

19.    Plaintiff Ritchie Capital Structure Arbitrage Trading, Ltd. is a Cayman Islands exempted company.

20.    Plaintiff Ritchie Capital Management, Ltd. ("RCM Ltd.") is a Cayman Islands exempted company.  RCM Ltd. and Ritchie Capital served as administrative agents for the other Ritchie entities in connection with their loans to Petters.

21.    Defendant JPMorgan Chase & Co. is a Delaware corporation with its principal place of business in New York.

22.    Defendant JPMorgan Chase Bank, N.A., sued herein as JPMorgan Chase Bank, N.A. and as J.P. Morgan Private Bank, is a national banking association with its principal place of business in Ohio.

23.    Defendant Richter Consulting, Inc. is a Delaware corporation with its principal place of business in Illinois.

24.    Defendant Wells Fargo & Co., as the successor by merger to Wachovia Capital Finance Central, is a Delaware corporation with its principal place of business in California.

25.    Defendant Wells Fargo Bank, N.A. is a national banking association with its principal place of business in South Dakota.

26.    Defendant UBS Loan Finance, L.L.C. is a Delaware limited liability company with its principal place of business in Connecticut.

27.    Defendant UBS AG is a corporation incorporated in the country of Switzerland, with its principal place of business in Zurich, Switzerland.

28.    Defendant UBS AG, Stamford Branch is a banking branch of UBS AG located in Stamford, Connecticut.

29.    Defendant Merrill Lynch Business Financial Services, Inc. is now known as GE Business Financial Services Inc. and is a Delaware corporation with its principal place of business in Illinois.

30.    Defendant LaSalle Business Credit, L.L.C. was a Delaware limited liability company with its principal place of business in Illinois. Upon information and belief, LaSalle Business Credit, L.L.C. is now part of Bank of America, N.A., a national banking association with its principal place of business in North Carolina.

31.    Defendant Bank of America Business Capital is a North Carolina corporation with its principal place of business in North Carolina.

32.    Defendant Bank of America Corporation is a Delaware corporation with its principal place of business in North Carolina.

33.    Defendant The CIT Group Inc. is a Delaware corporation with its principal place of business in New York.

34.    Defendant The CIT Group/Business Credit, Inc. is a New York corporation with its principal place of business in New York.

35.    Defendant PNC Bank N.A. is a national banking association with its principal place of business in Pennsylvania.

36.    Defendant Fifth Third Bank is an Ohio corporation with its principal place of business in Ohio.

37.     Defendant Webster Business Credit Corporation is a New York corporation with its principal place of business in New York.

38.     Defendant Associated Commercial Finance, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin.

39.     Defendant Chase Lincoln First Commercial Corporation is a Delaware corporation with its principal place of business in New York.

40.     Defendants Well Fargo & Co., Wells Fargo Bank, N.A., UBS Loan Finance, L.L.C., UBS AG and its Stamford Brach, Merrill Lynch Business Financial Services, Inc., LaSalle Business Credit, L.L.C., Bank of America Business Capital, Bank of America Corporation, The CIT Group Inc., The CIT Group/Business Credit, Inc., PNC Bank N.A., Fifth Third Bank, Webster Business Credit Corporation, Associated Commercial Finance, Inc., and Chase Lincoln First Commercial Corporation are referred to herein as the "Syndicated Lenders."

## PETTERS COMPANY, INC. AND PETTERS GROUP WORLDWIDE

41.     Petters' Ponzi scheme started in approximately 1998 when, through his accomplices and PCI, he purported to act as a middle man between wholesale suppliers and large discount retailers such as Sam's Club and Costco. Petters would provide potential lenders false commitments from retailers to buy products and claim that he only needed a loan, generally for a short duration, to purchase the merchandise from the wholesalers and that he would repay the loan after selling the merchandise to the retailers pursuant to the false commitment. The money to repay these loans would, in fact, come from other, later lenders defrauded under similar pretenses.

42.    Upon information and belief, in approximately September 2002, PCI acquired licenses from Polaroid which allowed a Petters affiliate to use the Polaroid brand name on electronic equipment such as DVD players and televisions.

43.    At all times relevant hereto, the liabilities of Petters and PCI were millions of dollars, if not tens or hundreds of millions of dollars greater than their assets. Petters was insolvent in that: (i) his assets were worth less than the value of his liabilities, (ii) he could not meet his obligations as they came due by legitimate means, and (iii) at the time of the transfers at issue in this matter, Petters was left with insufficient capital.

44.    In addition to PCI, Petters had additional companies as well. One of his larger companies was Petters Group Worldwide, LLC ("PGW"). PGW was not operated as a Ponzi scheme and had legitimate business operations. After the acquisition of Polaroid, PGW became the indirect owner of the Polaroid companies.

## JPMORGAN'S RELATIONSHIPS WITH PETTERS

45.    Starting in 2001, Petters opened at least six personal investment accounts at JPMorgan. In the role as Petters' banker, representatives of JPMorgan met with Petters and his associates at least annually. Between 2002 and September 2007, more than $83 million flowed into these investment accounts.

46.    PCI's license agreements with Polaroid, and JPMorgan's merger with Bank One, expanded the relationship between JPMorgan and Petters.

47.    In 2001, an entity called One Equity Partners, the private-investment equity arm of then-Bank One, purchased a majority interest in Polaroid during a Polaroid bankruptcy proceeding for $65 million. A managing director of One Equity Partners, Jacques Nasser

("Nasser"), was appointed as Polaroid's chairman and received over one million shares of Polaroid as compensation.

48.    In July 2004, JPMorgan and Bank One Corporation merged and One Equity Partners became part of JPMorgan. As a result, JPMorgan became the indirect, majority owner of Polaroid, owning approximately 65% of the company.

49.    Polaroid was struggling at the time. Polaroid had failed to adapt to the emerging digital camera market and its business model at the time, which was based on instant film, was no longer viable. As a result, JPMorgan wanted an exit from its Polaroid investment.

50.    In late 2004, PCI was in default under the license agreements it had with Polaroid. PCI owed Polaroid over $1 million in unpaid royalties.

51.    JPMorgan, Nasser, and Polaroid were able to use Petters' debt to devise a strategy to rid themselves of Polaroid at a profit.

52.    Polaroid threatened to terminate the license agreements between PCI and Polaroid unless Petters agreed to purchase all of the shares of Polaroid. JPMorgan agreed to provide the financing for Petters' purchase of the company.

53.    Despite the fact that PCI could not even pay the $1 million in royalty fees it owed to Polaroid, JPMorgan agreed to sell Polaroid to Petters for $426 million and loaned Petters millions of dollars so he could purchase 100% of Polaroid's stock from JPMorgan, Nasser, and the remaining shareholders.

54.    JPMorgan arranged to provide $125 million in financing from itself, and an additional $250 million syndicated loan (the "Syndicated Loan") through the Syndicated Lenders, to Petters after the acquisition.

55.    As a result of their licensing relationship and due diligence in connection with JPMorgan's sale of Polaroid to Petters using loans they provided to Petters, JPMorgan learned Petters was not conducting a legitimate business at PCI.  In order to address this obvious credit risk, JPMorgan placed the extremely unconventional condition on the financing that Petters was required to create escrow accounts and fund the accounts, in advance of the closing of the acquisition, using short-term loans equal to the full amount of the purchase price.

56.    Petters was able to "raise" the necessary capital to fund the escrow accounts.  One or more of the sources of the funds were also victims of Petters' Ponzi scheme at PCI.

57.    On approximately January 7, 2005, the Petters acquisition of Polaroid was announced as a merger between Polaroid and one of Petters' companies, Petters Consumer Brands, LLC.  Polaroid became a subsidiary of PGW as a result of the acquisition.

58.    JPMorgan served as Polaroid's investment advisor throughout the acquisition, earning a $4 million fee.  This role was in addition to the millions JPMorgan earned and would earn in the future as lender and agent for the Syndicated Lenders

59.    With respect to the sale of Polaroid to Petters, JPMorgan's wholly-owned subsidiary, One Equity Partners, received $224 million and Nasser himself received $12.8 million.

60.    From its roles as seller, investment advisor to Polaroid, lender, and agent to the Syndicated Lenders, as well as personal investment advisor to Petters, JPMorgan knew that Petters and PCI were not conducting a legitimate business and that their funding had been obtained by fraudulent means.

61.    In addition to the loans to finance the acquisition of Polaroid, JPMorgan also extended a $40 million line of credit to PGW.

## JPMORGAN KNEW PETTERS WAS CONDUCTING A PONZI SCHEME OR CONSCIOUSLY AVOIDED CONFIRMING PETTERS' FRAUD

62.    At a minimum, JPMorgan learned information from which JPMorgan knew or should have known that Petters was conducting a Ponzi scheme and consciously avoided confirming the fraud to ensure that it would profit from its relationships with Petters to the detriment of others—principally Ritchie.

63.    With respect to the due diligence JPMorgan conducted throughout its relationship with Petters, JPMorgan uncovered or should have uncovered numerous red flags that did or should have put JPMorgan on notice of the Petters Ponzi scheme.  Nevertheless, the windfall that JPMorgan earned on the various transactions, both from Petters' acquisition of Polaroid and subsequently, gave JPMorgan an incentive to ignore these red flags.  The red flags included: (i) evasive emails from the Petters team in response to due diligence inquiries; (ii) lack of tax returns and audited financial statements for PCI, which operated the Ponzi scheme; (iii) that no Petters-controlled business was profitable; (iv) eleven judgments had been entered against Petters; and (v) that Petters had previously been convicted and jailed for crimes involving dishonesty and theft.

64.    In addition, JPMorgan was informed that its profit from the sale of Polaroid to Petters could be set aside as a fraudulent conveyance.  As quoted in other complaints against JPMorgan alleging fraudulent conveyances related to Petters, one of the lenders that JPMorgan solicited to participate in the Syndicated Loan sent an email to JPMorgan stating "it appears that certain fraudulent conveyance issues may arise out of the acquisition, merger and loan and security transactions contemplated here."  *See, e.g., Kelley v. JPMorgan Chase & Co. (In re Petters Co., Inc)*, Case No. 10-04444, Compl. ¶ 92 (D. Minn. Oct. 10, 2010).  JPMorgan knew that such concerns over "fraudulent conveyance issues" could prevent JPMorgan from selling its

investment in Polaroid at a substantial profit, or force JPMorgan to return the profit even after the transaction closed. As a result, JPMorgan chose not to investigate these issues further.

65.     During due diligence, JPMorgan asked Petters' companies for "all Petters debt documents." The response from in-house counsel for Petters was quoted as follows in another complaint against JPMorgan: "the lenders have a long and deep relationship with Petters. We use them in many parts of our enterprise. As of today they do NOT know that they will be paid off at closing. When we tell them, there will be great pain." *See, e.g.*, *Kelley v. JPMorgan Chase & Co. (In re Petters Co., Inc)*, Case No. 10-04444, Compl. ¶ 95 (D. Minn. Oct. 10, 2010).

66.     JPMorgan knew or should have known this answer from Petters' in-house counsel was false. JPMorgan was aware of the identity of several of the lenders and their knowledge that the lenders would be paid off. Yet, JPMorgan consciously avoided pursuing its inquiry regarding the debt documents and the answer from in-house counsel because it knew that Petters' companies, and the purported revenue streams therefrom, could not stand up to scrutiny.

67.     As part of the merger of Polaroid and Petters Consumer Brands, the Petters side was required to contribute $150 million in equity. JPMorgan asked the CEO of one of Petters' companies about the source of the $150 million in equity. The CEO stated "The $150 million of equity put into this transaction is the result of built in equity in Petters Company, Inc. There are no individuals (other than Tom Petters himself) that own the equity put into this transaction."

68.     In fact, PCI had no true equity, no audited financial statements for most years of its existence and none that were current, and had not filed tax returns since 2002. But JPMorgan chose not to follow up on the source of equity upon learning it was from Tom Petters alone because it knew Tom Petters would not be able to verify his operations and those of PCI.

69.    JPMorgan's unwillingness to follow-up on these due diligence red flags is particularly inappropriate here because it was going to provide financing to the company post-merger and it was also purportedly acting as Polaroid's investment advisor.

70.    JPMorgan originally required that Petters obtain a "firm commitment" letter from a major bank to fund the merger. Petters was not able to obtain such a letter which is not surprising given the lack of audited financial statements, lack of tax returns, and obvious credit risk. But JPMorgan chose not investigate Petters' failure to secure a firm commitment letter and, instead, concocted the extremely unconventional solution described above requiring Petters to fund two escrow accounts with the entire $426 million purchase price without conducting an investigation into the source of the funds.

71.    The sale of Polaroid to Petters occurred and JPMorgan received a large profit on its investment in Polaroid.

72.    The day after the closing of the Polaroid sale, as planned, JPMorgan loaned Polaroid $125 million and the Syndicated Lenders that JPMorgan arranged extended the $250 million Syndicated Loan. Petters used almost all of this money immediately to repay the lenders that had loaned money to fund the escrow accounts.

73.    JPMorgan was the agent of the Syndicated Lenders with respect to the Syndicated Loan.

74.    The $125 million loan from JPMorgan to Polaroid was secured by Polaroid's assets and gave JPMorgan first priority to any proceeds from those assets.

75.    After the merger, Petters and his companies conducted numerous fraudulent transactions that JPMorgan was aware of or should have been detected through its Bank Secrecy Act/anti-money laundering ("BSA/AML") compliance program. For example, JPMorgan

opened ten bank accounts in London for three Polaroid subsidiaries in the Netherlands after Polaroid had sold its Dutch operations. These accounts received millions of dollars in payments (including approximately $43 million from Plaintiffs' loans) from Petters-controlled bank accounts in the United States and rerouted these millions back to JPMorgan accounts in New York and then Chicago in the name of other Polaroid affiliates, where the funds were used to repay JPMorgan and the Syndicated Lenders. This structure was designed and used in violation of JPMorgan's BSA/AML obligations and tax reporting obligations. It also resulted in inappropriate commingling of funds from purportedly separate Dutch entities and other Polaroid affiliates without any legitimate purpose.

76.    The Department of the Treasury has since determined that JPMorgan's internal controls and anti-money laundering detection were deficient. "Some of the critical deficiencies in the elements of the Bank's BSA/AML compliance program, resulting in a violation of 12 U.S.C. § 1818(s)(3)(A) and 12 C.F.R. § 21.21, include the following:

(a)    The Bank has an inadequate system of internal controls and independent testing.

(b)    The Bank has less than satisfactory risk assessment processes that do not provide an adequate foundation for management's efforts to identify, manage, and control risk.

(c)    The Bank has systemic deficiencies in its transaction monitoring systems, due diligence processes, risk management, and quality assurance programs.

(d)    The Bank does not have enterprise-wide policies and procedures to ensure that foreign branch suspicious activity involving customers of other bank branches is effectively communicated to other affected branch locations and applicable AML operations staff. The Bank also does not have enterprise-wide policies and procedures to

ensure that on a risk basis, customer transactions at foreign branch locations can be assessed, aggregated, and monitored.

(e)     The Bank has significant shortcomings in SAR decision-making protocols and an ineffective method for ensuring that referrals and alerts are properly documented, tracked, and resolved."

Consent Order, Department of the Treasury, Comptroller of the Currency, AA-EC-13-04, at pp. 3-4 (http://www.occ.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf).

77.     As one JPMorgan employee put it—in an email encouraging JPMorgan to learn its lesson and conduct additional due diligence of Bernie Madoff's purported businesses—"The [due diligence] done by all counterparties seems suspect.  Given the scale and duration of the Petters fraud it cannot be sufficient that there's simply trust in an individual and there's been a long operating history . . . .  Let's go see Friehling and Horowitz [Bernie Madoff's auditors] the next time we're in NY . . . to see that the address isn't a car wash at least."  This reference to a "car wash" relates to the fact that Petters' Ponzi scheme included conspiring with others to create a company that was purported to be the main supplier and warehouse for the electronic equipment he was allegedly buying and selling.  That purported supplier was nothing more than a sham company with no legitimate business and with a business address *located above a car wash*.  Thus, JPMorgan acknowledged that its conduct with respect to Petters was inappropriate.

**JPMORGAN FORCES PETTERS TO DEFRAUD RITCHIE
TO REPAY DEFENDANTS**

78.     Under the terms of both the JPMorgan loan to post-merger Polaroid and the credit facility from the Syndicated Lenders, Polaroid was required to provide audited financial statements to JPMorgan.

79.    Polaroid was unable to provide audited financial statements for 2005.  Rather than declare the loans in default, or even inquire as to why Polaroid could not provide audited financial statements, JPMorgan repeatedly waived Polaroid's failure to provide audited financial statements.

80.    By February 2007, Polaroid still had not provided audited financial statements for 2005 or 2006 and, in fact, Deloitte & Touche abandoned the audit it was conducting of Polaroid because it would not be able to provide an audit opinion about the integrity of Polaroid's financial statements.

81.    This time JPMorgan declared a default but, instead of starting litigation to obtain the assets securing the loans, JPMorgan entered into a series of forbearance and other extension agreements with Polaroid, at least ten such agreements in all, over the next year.   Upon information and belief, JPMorgan has policies and procedures, as well as regulatory requirements, that each loan extension be reviewed by various committees within JPMorgan prior to execution.

82.    The first such extension, in February 2007, required that Polaroid use Defendant Richter as a consultant.   The agreement required that Richter be given complete access to Polaroid's books and records and that Richter be allowed to make reports to JPMorgan regarding Polaroid's financial condition.   The requirement that Polaroid retain Richter was outside of JPMorgan's customary lending practices.

83.    In later forbearance agreements, JPMorgan required Petters to personally guarantee a portion of the money Polaroid owed to JPMorgan.

84.    On August 27, 2007, JPMorgan as Administrative Agent for the Syndicated Lenders sent Polaroid a Notice of Default on the Syndicated Loan.  A true and correct copy of

the August 2007 Notice of Default ("August 27, 2007 Default Notice") is attached hereto as Exhibit A.

85.    The August 2007 Default Notice stated that under the previous forbearance agreement between the parties, Polaroid was obligated to secure a loan commitment, by August 15, 2007, from Jefferies & Company to refinance the Syndicated Loan and that Polaroid had failed to obtain such a loan commitment from Jefferies & Company.  The August 27, 2007 Default Notice also listed several other events of default, including the failure to deliver audited financial statements and described them as "Existing Defaults."

86.    As of August 27, 2007, JPMorgan and Richter had actual knowledge that Polaroid was not able to legitimately obtain a conventional loan commitment to refinance the debts owed to the Syndicated Lenders, in part because Polaroid had no audited financial statements.

87.    As of September 2007, JPMorgan and Syndicated Lenders wanted to exit from their financing of Polaroid and Petters and they were unwilling to increase the amount of credit available to Polaroid.

88.    At that time, JPMorgan and Richter knew that: (1) Petters was not conducting a legitimate business at PCI; (2) PGW was not a bona fide equity sponsor; (3) neither Polaroid nor PGW could legitimately obtain a loan from Jefferies & Company in order to refinance the Syndicated Loan; and (4) the only way to avoid a forced liquidation was fraudulently to induce a third party to provide refinancing.

89.    Furthermore, JPMorgan knew that if they forced liquidation the following would have occurred: (a) they would have been forced to disgorge the windfall profits they made on the 2005 sale of Polaroid stock to Petters; (b) Petters' fraud would have been publicly disclosed and they would have liability to the Syndicated Lenders from their role as agent for the Syndicated

Loan; and (c) they would have had to potentially disgorge millions in fees and other compensation it earned as lender and advisor.

90.    In an additional forbearance agreement between JPMorgan and Polaroid, in November 2007, JPMorgan gave Petters and Polaroid a deadline of early February 2008 to repay $75 million.  The forbearance agreement also required that Polaroid continue to utilize Richter and that JPMorgan "be kept fully informed of any future refinancing, equity contribution or other recapitalization efforts and . . . participate in any scheduled bank calls."  Richter continued to report its findings to JPMorgan.

91.    The November 2007 forbearance agreement also provided that, if Polaroid did not repay the full amount of a revolving credit agreement by December 8, 2007, Polaroid would be required to retain an investment bank to assist Polaroid in monetizing its trademark and brand.

92.    The credit facility was not repaid but, instead of retaining an investment bank, on December 17, 2007, JPMorgan and Polaroid agreed to amend Richter's engagement agreement "in order to expand the scope of the services to be provided by [Richter] to Polaroid."  Richter "agreed to assist Polaroid in connection with its efforts to solicit interest from certain third parties, as such parties may be identified from time-to-time by the Company in providing the Company with a secure line of credit or other financing facility utilizing the 'Polaroid' brand and/or other Company intellectual property as collateral."  Pursuant to the agreement, to provide such assistance, Richter was required to "assist the Company in its preparation of appropriate due diligence materials for dissemination to interested third parties, (ii) assist and facilitate Polaroid management in connection with the Company's due diligence activities and related communications with third parties, and (iii) consult with the Company and its other advisors and counsel in connection with these financing-related activities and efforts."

93.   Richter acted at JPMorgan's direction and compiled reports as JPMorgan saw fit. Despite being retained by Polaroid, Richter was JPMorgan's agent with respect to the Polaroid engagement.

94.   Richter provided JPMorgan with reports of Polaroid's cash flow and borrowing availability.  As a result, Richter and JPMorgan were fully aware of the funds passing through Polaroid's multiple accounts, whether at JPMorgan or otherwise, as of January and February 2008.

95.   As of September 11, 2007, PGW owed JPMorgan approximately $20 million under the PGW $40 million line of credit.

96.   JPMorgan did not enforce its rights under the $40 million line of credit.  Instead, it continued to provide credit to PGW under that credit line with actual knowledge that PGW would use the money to hide Petters' fraud.

97.   Upon information and belief, between September 2007 and July 2008, JPMorgan made loans to PGW under the $40 million line of credit in order to enable Petters to fraudulently transfer those loan proceeds to JPMorgan and the Syndicated Lenders to repay the Syndicated Loan.

**JPMORGAN AND RICHTER AID AND ABET PETTERS TO DEFRAUD RITCHIE**

98.   Petters first solicited a loan from Ritchie on January 31, 2008—just days before the deadline to repay JPMorgan.

99.   Petters did not disclose any of his numerous frauds to Ritchie.  Instead, he induced Ritchie to extend loans to him and his companies based on the false representations and material omissions that led Ritchie to believe he was entirely a legitimate businessman.

100.    Petters failed to disclose that PCI was not conducting a legitimate business and was, in fact, conducting a Ponzi scheme.

101.    Petters also misrepresented the financial condition of one of the borrowers, PGW, and stated that it had no other debt when, in fact, PGW owed approximately $20 million at the time under its $40 million credit facility from JPMorgan.

102.    Petters further provided Ritchie with due diligence materials that failed to disclose Petters' and PCI's fraud, failed to disclose JPMorgan's outstanding loan to PGW, and included purported "draft" audit reports by Deloitte & Touche without disclosing that the audit was abandoned and that the reports would never be finalized.

103.    Pursuant to Richter's agreement with Polaroid, Richter was responsible for the due diligence materials that were provided to Ritchie.

104.    Petters told Ritchie he would repay the loan within 90 days, however, Petters actually had no intention to repay the loan.

105.    As Richter and JPMorgan were aware, Polaroid needed long-term capital to complete a restructuring from its prior business model based on instant film. JPMorgan was not willing to provide such long-term capital and knew that a 90-day loan from Ritchie clearly would not be sufficient for Polaroid's needs.

106.    On February 1, 2008, based on the false representations and material omissions from Petters about the business of Petters and PCI and his intent to repay the loan, assisted by JPMorgan and Richter, Ritchie instructed JPMorgan to wire $31 million to a PCI account controlled by Petters.

107.    Petters agreed to be a co-obligor of the loan from Ritchie.

108.    Ritchie understood that the $31 million loan would be secured by Polaroid's assets. Ritchie never received this security interest.

109.    This $31 million was transferred numerous times through bank accounts of several shell entities associated with Petters, before being wired to the JPMorgan bank accounts in London, New York, and Chicago.  These numerous transfers served no legitimate purpose other than to obscure the source of the funds and constitute money laundering.

110.    Within approximately four days, the $31 million was transferred to JPMorgan to repay Polaroid's remaining debt to JPMorgan and the Syndicated Lenders.

111.    As further evidence of JPMorgan's aiding and abetting, even after JPMorgan finally succeeded in its plan to find another lender to repay its loan to Polaroid, it immediately re-loaned $12 million to Polaroid, secure in the knowledge that Petters was obtaining other loans from Plaintiffs by fraudulent means.

112.    On February 7, 2008, JPMorgan extended a short-term loan to Polaroid of $12 million.  Later that day, Ritchie instructed JPMorgan to wire $16 million to a PCI account controlled by Petters based on similar misrepresentations by Petters that induced the original $31 million loan.

113.    On or about February 12, 2008, Petters used $12 million of Plaintiffs' February 7, 2008 loan to repay the new loan JPMorgan made to Polaroid just five days prior.  Given the regular reports JPMorgan received from Richter about Polaroid's finances, it is apparent that JPMorgan was aware that Ritchie would be the source of repayment days later.  There was no legitimate purpose for this short-duration loan.

114.    In addition to the $31 million loan on February 1, 2008 and the $16 million loan on February 7, 2008, Ritchie loaned Petters and his companies an additional $99 million in

February 2008 in reliance on Petters' intentional misrepresentations.  Again, Ritchie instructed JPMorgan to wire the amounts to a PCI account controlled by Petters.  Petters then transferred this money through numerous shell companies controlled by Petters in furtherance of his Ponzi scheme.

115.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million at least in part for the purpose of repaying JPMorgan.  The loan was purportedly for PCI to purchase electronic equipment but was actually used, in part, in furtherance of Petters' Ponzi scheme.  In an email describing the March 21, 2008 loan, Petters stated to one of his co-conspirators, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit." Ritchie instructed JPMorgan to wire $21 million of the $31 million from a Ritchie accounts at JPMorgan to a PCI account controlled by Petters.

116.    Petters had no intention to repay any of the money Ritchie loaned to Petters in February or March 2008.

117.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on March 21, 2008, Petters transferred $6.5 million of that amount to JPMorgan so that JPMorgan would renew the $40 million line of credit to PGW.  Upon information and belief, the remainder of the $31 million Ritchie loaned on March 21, 2008 was used to pay earlier lenders to the Ponzi scheme.

118.    At least $20 million of the money Ritchie loaned to Petters and his companies also was transferred into Petters' personal accounts.  Petters then, on March 21, 2008, pledged his personal assets to secure additional funding from JPMorgan.

119.    In May 2008, Petters represented to Ritchie that he had another opportunity to engage in a transaction backed by electronic equipment, and offered Ritchie a chance to

participate in the profits. Those representations were again false. There was no transaction, and Petters, as he intended all along, used the money he received from Ritchie illegally to further his frauds.

120.   Based on those representations, in May 2008, Ritchie made $12 million in loans pursuant to two promissory notes signed by Petters, PCI and PGW. Ritchie would not have made any loans to Petters, PCI or PGW had it known that there was no merchandise or the truth about PCI and Petters' activities.

121.   Due to JPMorgan's knowledge of Petters' and PCI's fraudulent activities and Richter's involvement with Polaroid, JPMorgan was aware that the repayment JPMorgan and the Syndicated Lenders received was highly suspicious. JPMorgan and Richter knew that JPMorgan had not released its security interests to permit Petters and Polaroid to pledge the underlying collateral to another lender. Further, JPMorgan and Richter knew that no new sales of Polaroid's intellectual property or other assets had occurred. However, rather than investigate, JPMorgan and Richter chose to accept, or consciously chose to ignore, the source of funds fraudulently obtained from Plaintiffs by Petters for repayment of JPMorgan's loans to Petters.

122.   At the time of Ritchie's loans to Petters and Petters' use of the funds to repay JPMorgan, Richie was a banking customer of JPMorgan and had over $300 million in JPMorgan accounts. In fact, all of the money Ritchie loaned to Petters originated in Ritchie's JPMorgan accounts and was transferred to a PCI account controlled by Petters, by wires executed by JPMorgan, from the JPMorgan accounts.

## JPMORGAN'S ACTIONS TO ASSIST PETTERS' FRAUDS

123.    JPMorgan failed to disclose to Ritchie or any regulatory entity the myriad of falsehoods perpetrated by Petters in connection his Ponzi scheme and other frauds, including with respect to the loans from Ritchie.

124.    Before Petters approached Ritchie, JPMorgan and the Syndicated Lenders failed to accelerate its loans to Polaroid and PGW or take legal action against Petters in order to avoid public disclosure of the information learned from JPMorgan's own due diligence and from Richter's reports to JPMorgan.

125.    JPMorgan deferred any enforcement action and, instead, forced Petters' to refinance his obligations to JPMorgan through other replacement lenders.

126.    JPMorgan failed to foreclose on the Polaroid Corporation assets pledged to JPMorgan.

127.    JPMorgan accepted personal guarantees of Petters even though it knew he was engaged in fraud and could not stand behind the guarantees.

128.    JPMorgan structured Polaroid accounts in London, New York, and Chicago by commingling funds purportedly from different entities and sweeping them daily into other accounts to assist Petters in laundering his money and obscuring the source and true nature of funds JPMorgan ultimately accepted as loan repayments from Petters.

129.    JPMorgan assisted Petters' transfers of money through his accounts in the name of Polaroid and his other companies, as well as his personal accounts, including by not filing Suspicious Activity Reports ("SARs") and violating its Know Your Customer responsibilities.

130.    JPMorgan loaned Petters $12 million on February 7, 2008 until Petters was able to access funds Ritchie loaned later that day.  There is no legitimate business reason for this short-term loan other than propping up Petters' fraud.

131.    If JPMorgan had disclosed Petters' numerous frauds, Petters would not have been able to purchase Polaroid by acquiring the stock from JPMorgan's subsidiary, One Equity Partners, and would not have been able to repay JPMorgan or the other Syndicated Lenders.

## PETTERS IS ARRESTED AND CONVICTED

132.    On September 24, 2008, the Federal Bureau of Investigation searched Petters' home and the offices of his companies.  They arrested Petters days later.

133.    Upon learning of the raid, JPMorgan declared Petters' companies in default of the remaining loans and seized and liquidated the approximately $25 million in Petters' personal investment account held at JPMorgan to satisfy this debt.

134.    Thus, yet again, JPMorgan knowingly satisfied its own self interest and ignored the victims of Petters' fraud.

135.    In December 2009, a federal jury convicted Petters of 20 counts of wire fraud, mail fraud, conspiracy to commit mail and wire fraud, money laundering and conspiracy to commit money laundering for his actions related to the Ponzi scheme.  Petters was sentenced to 50 years in prison for those crimes and is currently serving that sentence.

## FIRST CAUSE OF ACTION

## AIDING AND ABETTING FRAUD – THE FEBRUARY LOANS

### (Against JPMorgan and Richter)

136.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

137.    As alleged above, Petters fraudulently induced Ritchie to make loans to Petters and PGW between February 1 and 19, 2008. Petters, who has now been convicted of mail fraud, wire fraud, money laundering and conspiracy, made material misrepresentations and omissions in connection with those loans, intended to induce Ritchie to loan $146 million to Petters and his companies purportedly for the benefit of Polaroid, including:  (i) false statements that made it appear as if PCI was a legitimate business, when it fact was a fraud; (ii) failing to tell Plaintiffs that PCI was a sham and used to conduct frauds; (iii) failing to tell Plaintiffs that in addition to the JPMorgan loan to Polaroid that was repaid with the first loan from Plaintiffs, JPMorgan also had an outstanding $20 million loan to PGW; (iv) false statements that the proceeds of Ritchie's loans would be used for legitimate business purposes, when in fact Petters intended to use the proceeds illegally to further his frauds; and (v) false statements that the proceeds of Ritchie's March and May loans would be used to acquire electronic equipment, when in fact Petters never intended to purchase electronic equipment but rather intended to use, and in fact did use, the proceeds illegally to further his frauds.

138.    Ritchie had no knowledge of the falsity of the misrepresentations or of the facts that were omitted – including that Petters was engaged in massive criminal fraud and money laundering, and was using JPMorgan bank accounts to perpetuate both – and reasonably relied on the misrepresentations and omissions. Ritchie suffered damages because only a small portion of Ritchie's loans were repaid before Petters' fraud was exposed.

139.    Defendants had actual knowledge of Petters' fraudulent activity and money laundering operations, and therefore knew that the conduct of Petters and the Petters-owned entities constituted tortious fraudulent conduct, or, at a minimum, when it gained knowledge of

multiple facts that highly suggested fraud, the defendants consciously avoided investigating knowing that Petters and his business could not withstand scrutiny.

140.    Defendants knew that Deloitte & Touche abandoned its audit of Polaroid. Defendants knew that Polaroid was unable to obtain a loan from Jefferies & Company by August 15, 2007 as required the forbearance agreements. The Defendants further knew that the only alternative to foreclosing on their loans to Polaroid—which would have revealed Petters' frauds—was to assist Petters in fraudulently inducing a third party to make loans to refinance the debt of Defendants.

141.    Defendants were motivated to assist Petters in finding additional funding to ensure that Polaroid could repay its debts to JPMorgan and the Syndicated Lenders. JPMorgan knew that if it foreclosed on the loans to Polaroid, it would be required to disgorge those ill-gotten gains and fees and would have been exposed to liability from the Syndicated Lenders from its role as agent to the Syndicated Loan. Accordingly, JPMorgan knowingly assisted Petters in defrauding Ritchie.

142.    Among other things, JPMorgan earned substantial fees and profits for the multiple roles it played in the Polaroid transaction. JPMorgan was the: (i) seller, as it was the majority owner and controlled Polaroid; (ii) financier, as it loaned more than $185 million to Polaroid immediately following the Merger; (iii) syndicate manager, as it formed and managed a syndicate of banks that would participate in JPMorgan's loans to Polaroid; and (iv) financial advisor, as it served as investment advisor on the transaction, generating millions in fees that were paid at the closing of Petters acquisition of Polaroid, out of Polaroid's available cash. Although its roles as lender and investment advisor generated as much as $40 million in fees and

interest for JPMorgan, that figure is dwarfed by the profits JPMorgan earned by selling its Polaroid ownership stake to Petters.

143.    Defendants are liable for all of the losses suffered by Ritchie on account of the loans made to Petters and his companies in February 2008 --$146 million in loans, only a small portion of which Ritchie was ever able to recover..

## SECOND CAUSE OF ACTION

### AIDING AND ABETTING WRONGFUL DIVERSION OF FUNDS –

### THE FEBRUARY 2008 LOANS

### (Against JPMorgan and Richter)

144.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

145.    As alleged herein, JPMorgan and the Syndicated Lenders knowingly completed acts – including but not limited to encouraging, assisting, and enabling (including by allowing Petters and his companies to illegally use JPMorgan's international banking facilities without investigating any of the numerous suspicious activities); and failing and refusing to thoroughly investigate red flags that would have exposed Petters' fraud on Ritchie and others – with the purpose of aiding and abetting the accomplishment of Petters' illegal scheme.

146.    As a result of the conduct of Defendants, Ritchie suffered damages, including the loss of $146 million, which was loaned to Petters and his companies and used by Petters in furtherance of this illegal scheme during February 2008, only a small portion of which has been recovered by Ritchie.

### THIRD CAUSE OF ACTION

### AIDING AND ABETTING FRAUD – THE MARCH AND MAY 2008 LOANS

### (Against JPMorgan and Richter)

147. Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

148. Petters fraudulently induced Ritchie to make loans to Petters and his companies on or about March 21, 2008 and in May 2008. The March and May 2008 loans were part of Petters' Ponzi scheme in that they were based on alleged purchases and sales of electronic equipment by PCI that did not exist.

149. Petters made material misrepresentations and omissions in connection with those loans and intended to induce Ritchie to loan money to Petters and his companies, and to use a significant portion of the loan proceeds not for legitimate business purposes, but in part to pay JPMorgan. Ritchie had no knowledge of the falsity of the misrepresentations or of the facts that were omitted – including that Petters was engaged in massive fraud and money laundering, and was using JPMorgan bank accounts to perpetuate both – and reasonably relied on the misrepresentations and omissions. Ritchie suffered damages because only a small portion of the loans were repaid before Petters' fraudulent schemes and money laundering operation was exposed and his companies were placed into bankruptcy.

150. Defendants either had actual knowledge of Petters' fraudulent activity and money laundering operations, and therefore knew that the conduct of Petters and the Petters-owned entities constituted tortious fraudulent conduct, or, at a minimum, when faced with multiple facts that highly suggested fraud, consciously avoided investigating knowing that Petters and his business could not withstand scrutiny.

151.    JPMorgan was motivated to assist Petters in finding additional funding to ensure that Polaroid could repay its debts to JPMorgan and the Syndicated Lenders.

152.    JPMorgan is liable for all of the losses suffered by Ritchie, including the loss of $43 million, on account of the loans made to Petters and PCI on or around March and May 2008.

## FOURTH CAUSE OF ACTION

### AIDING AND ABETTING WRONGFUL DIVERSION OF FUNDS - THE MARCH AND MAY 2008 LOANS

### (Against JPMorgan and Richter)

153.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

154.    As alleged herein, JPMorgan knowingly completed acts – including but not limited to encouraging, assisting, and enabling (including by allowing Petters and his companies to illegally use JPMorgan's international banking facilities without investigating any of the numerous suspicious activities) and failing and refusing to thoroughly investigate red flags that would have exposed Petters' fraud – with the purpose of aiding and abetting the accomplishment of Petters' illegal scheme.

155.    As a result of the conduct of JPMorgan, Ritchie suffered damages, including the loss of $43 million, which was loaned to Petters and PCI in furtherance of this illegal scheme on or around March and May 2008.

## FIFTH CAUSE OF ACTION

**CONSTRUCTIVE FRAUDULENT CONVEYANCE – FEBRUARY 5, 2008 TRANSFER FROM PETTERS TO JPMORGAN OF RITCHIE'S $31 MILLION LOAN ON FEBRUARY 1, 2008**

**(Against All Defendants)**

156. Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

157. As described herein, on or about February 1, 2008, Ritchie loaned Petters and PGW $31 million (the "February 1 Loan"). Petters transferred that $31 million to numerous different bank accounts and then, on or about February 5, 2008, to JPMorgan to repay JPMorgan's loan to Polaroid.

158. At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

159. Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

160. Petters was insolvent at the time of the transfers.

161. Accordingly, Petters' transfer of $31 million to JPMorgan on or around February 5, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

162. As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $31 million to JPMorgan on or about February 5, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount of $31 million, and (iii)

31

ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## SIXTH CAUSE OF ACTION

### KNOWING FRAUDULENT CONVEYANCE – FEBRUARY 5, 2008 TRANSFER FROM PETTERS TO JPMORGAN OF RITCHIE'S $31 MILLION LOAN ON FEBRUARY 1, 2008

### (Against All Defendants)

163.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

164.    As described herein, on or about February 1, 2008, Ritchie loaned Petters and PGW $31 million.  Petters transferred that $31 million to numerous different bank accounts and then, on or about February 5, 2008, to JPMorgan to repay JPMorgan's loan to Polaroid.

165.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

166.    Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

167.    Petters was insolvent at the time of the transfers.

168.    Petters made the transfers to the numerous bank accounts and ultimately to JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to repay.  JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

169.   Within days Petters transferred the February 1 Loan through multiple accounts in the United States and abroad, and many of them at JPMorgan, before transferring this money to JPMorgan as part of an effort to delay and hinder Ritchie's ability to collect Petters' debt.

170.   Accordingly, Petters' transfer of $31 million to JPMorgan on or around February 5, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

171.   As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $31 million to JPMorgan on or about February 5, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount of $31 million, and (iii) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## SEVENTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUDULENT CONVEYANCE – TRANSFER OF $31 MILLION

### FROM JPMORGAN TO THE SYNDICATED LENDERS

#### (Against All Defendants)

172.   Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

173.   As described herein, on or about February 8, 2008, JPMorgan transferred $31 million of the February 1 Loan to the Syndicated Lenders.

174.   At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

175. Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

176. Petters was insolvent at the time of the transfers.

177. Within approximately one week, Petters transferred the February 1 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan, and all of which Petters controlled, before this money was transferred to the Syndicated Lenders.

178. Accordingly, JPMorgan's transfer of $31 million to the Syndicated Lenders on or around February 8, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

179. As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $31 million to the Syndicated Lenders on or about February 8, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan and the Syndicated Lenders in an amount of $31 million, and (iii) ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## EIGHTH CAUSE OF ACTION

## KNOWING FRAUDULENT CONVEYANCE – TRANSFER OF $31 MILLION FROM JPMORGAN TO THE SYNDICATED LENDERS

### (Against All Defendants)

180. Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

181. As described herein, on or about February 8, 2008, JPMorgan transferred $31 million of the February 1 Loan to the Syndicated Lenders.

182.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

183.    Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

184.    Petters was insolvent at the time of the transfers.

185.    Within approximately one week, Petters transferred the February 1 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan, and all of which Petters controlled, before this money was transferred to the Syndicated Lenders as part of an effort to defraud, delay, and hinder Ritchie's ability to collect its debts.

186.    Petters made the transfers to the numerous bank accounts and ultimately to JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to repay. JPMorgan accepted the transfers and then transferred the funds to the Syndicated Lenders with actual intent to hinder, delay, or defraud Ritchie.

187.    Accordingly, JPMorgan's transfer of $31 million to the Syndicated Lenders on or around February 8, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

188.    As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $31 million to the Syndicated Lenders on or about February 8, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan and the Syndicated Lenders in an amount of $31 million, and (iii) ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## NINTH CAUSE OF ACTION

**CONSTRUCTIVE FRAUDULENT CONVEYANCE – $12 MILLIONTRANSFER FROM
PETTERS TO JPMORGAN OF PART OF RITCHIE'S LOAN ON FEBRUARY 7, 2008**

**(Against All Defendants)**

189.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

190.    As described herein, on or about February 7, 2008, Ritchie loaned Petters and PGW $16 million (the "February 7 Loan").  Petters transferred $12 million of that amount to numerous different bank accounts and then, on or about February 12, 2008, to JPMorgan to repay an additional loan JPMorgan made to Polaroid.

191.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

192.    Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

193.    Petters was insolvent at the time of the transfers.

194.    In addition, Petters transferred the February 7 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan, and all of which Petters controlled, before transferring this money to JPMorgan.

195.    Accordingly, Petters' transfer of $12 million to JPMorgan on or around February 12, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

196.    As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $12 million to JPMorgan on or about February 12, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount of $12 million, and (iii) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## TENTH CAUSE OF ACTION

### KNOWING FRAUDULENT CONVEYANCE – $12 MILLIONTRANSFER FROM PETTERS TO JPMORGAN OF PART OF RITCHIE'S LOAN ON FEBRUARY 7, 2008

### (Against All Defendants)

197.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

198.    As described herein, on or about February 7, 2008, Ritchie loaned Petters and PGW $16 million (the "February 7 Loan"). Petters transferred $12 million of that amount to numerous different bank accounts and then, on or about February 12, 2008, to JPMorgan to repay an additional loan JPMorgan made to Polaroid.

199.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

200.    Petters and PGW did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

201.    Petters was insolvent at the time of the transfers.

202.    In addition, Petters transferred the February 7 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan, and all of which Petters controlled,

before transferring this money to JPMorgan as part of an effort to delay and hinder Ritchie's ability to collect Petters' debt.

203.   Petters made the transfers to the numerous bank accounts and ultimately to JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to repay. JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

204.   Accordingly, Petters' transfer of $12 million to JPMorgan on or around February 12, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

205.   As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $12 million to JPMorgan on or about February 12, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount of $12 million, and (iii) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## ELEVENTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUDULENT CONVEYANCE – TRANSFER OF $12 MILLION FROM JPMORGAN TO THE SYNDICATED LENDERS

#### (Against All Defendants)

206.   Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

207.   As described herein, on or about February 12, 2008, JPMorgan transferred $12 million of the February 7 Loan to the Syndicated Lenders.

208.    Within approximately one week, Petters transferred the February 12 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan, and all of which Petters controlled, before this money was transferred to the Syndicated Lenders.

209.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

210.    Petters and PGW did not receive fair consideration in exchange for this transfer to JPMorgan. The repayment to JPMorgan was for a debt of Polaroid, not of Petters or PGW.

211.    Petters was insolvent at the time of the transfers.

212.    Accordingly, JPMorgan's transfer of $12 million to the Syndicated Lenders on or around February 12, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

213.    As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the conveyance of $12 million to the Syndicated Lenders on or about February 12, 2008, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan and the Syndicated Lenders in an amount of $12 million, and (iii) ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## TWELFTH CAUSE OF ACTION

### KNOWING FRAUDULENT CONVEYANCE – TRANSFER OF $12 MILLION FROM

### JPMORGAN TO THE SYNDICATED LENDERS

#### (Against All Defendants)

214.    Ritchie incorporates and realleges all of the foregoing allegations of the
Complaint.

215.    As described herein, on or about February 12, 2008, JPMorgan transferred $12
million of the February 7 Loan to the Syndicated Lenders.

216.    In addition, within approximately one week, Petters transferred the February 7
Loan through numerous accounts in the United States and abroad, many of them at JPMorgan,
and all of which Petters controlled, before this money was transferred to the Syndicated Lenders
as part of an effort to delay and hinder Ritchie's ability to collect its debt.

217.    Petters made the transfers to the numerous bank accounts and ultimately to
JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to
repay.  JPMorgan accepted and then made the transfers to the Syndicated Lenders with actual
intent to hinder, delay, or defraud Ritchie.

218.    Accordingly, JPMorgan's transfer of $12 million to the Syndicated Lenders on or
around February 12, 2008 constitutes a knowing fraudulent conveyance under the New York
Debtor and Creditor Law § 276.

219.    As a result of the foregoing, Ritchie is entitled to a judgment (i) avoiding the
conveyance of $12 million to the Syndicated Lenders on or about February 12, 2008, (ii)
ordering the entry of a money judgment in favor of Ritchie and against JPMorgan and the
Syndicated Lenders in an amount of $12 million, and (iii) ordering JPMorgan and the Syndicated

Lenders to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## THIRTEENTH CAUSE OF ACTION

## CONSTRUCTIVE FRAUDULENT CONVEYANCE – REPAYMENT TO JPMORGAN OF THE $6.5 MILLION IN MARCH 2008 AND PETTERS' SECURITY INTEREST

### (Against All Defendants)

220.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

221.    As described herein, as of December 31, 2007, Petters' companies owed JPMorgan between $20 million and $40 million under the terms of an agreement for a $40 million line of credit that JPMorgan had extended to PGW (the "PGW $40 Million Line of Credit").

222.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million. Shortly before that loan was made, Petters sent an email to one of his co-conspirators, stating, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit."

223.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on March 21, 2008, Petters caused $6.5 million of that amount to be transferred to JPMorgan in consideration for renewing the PGW $40 Million Line of Credit.

224.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

225.    On or about March 25, 2008, Petters executed and delivered a security agreement to JPMorgan granting a security interest in Petters entire right, title, and interest in personal property, including money that had been deposited or was to be deposited in the future in certain bank accounts.

226.    The March 2008 Petters security interest and the $6.5 million transferred to JPMorgan constitute conveyances of Petters' property to JPMorgan under § 270 of the New York Debtor and Creditor law.

227.    Petters did not receive fair consideration in exchange for this transfer.  The loans from JPMorgan were for the benefit of PGW and Polaroid, not of Petters.

228.    Petters was insolvent at the time of the transfers.

229.    By letter dated September 30, 2008, in response to reports of government searches of Petters' home and businesses, JPMorgan declared a default under the PGW $40 Million Line of Credit and demanded payment from PGW and Petters.  When neither Petters nor his company could pay, JPMorgan enforced the security interest and obtained no less than $18 million of Petters' assets, which had been loaned to Petters by Ritchie.

230.    As a result of the foregoing, pursuant to § 273 of the New York Debtor and Creditor Law, Ritchie is entitled to a judgment (i) avoiding the conveyance of the March 2008 security interest and the March 2008 conveyance of $6.5 million of Petters' money to JPMorgan, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount equal to the sum of the value of the March 2008 security interest and $6.5 million, and (iii) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## FOURTEENTH CAUSE OF ACTION

## KNOWING FRAUDULENT CONVEYANCE – REPAYMENT TO JPMORGAN OF THE $6.5 MILLION IN MARCH 2008 AND PETTERS' SECURITY INTEREST

### (Against All Defendants)

231.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

232.    As described herein, as of December 31, 2007, Petters' companies owed JPMorgan between $20 million and $40 million under the terms of an agreement for a $40 million line of credit that JPMorgan had extended to PGW (the "PGW $40 Million Line of Credit").

233.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million.  Shortly before that loan was made, Petters sent an email to one of his co-conspirators, stating, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit."

234.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on March 21, 2008, Petters caused $6.5 million of that amount to be transferred to JPMorgan in consideration for renewing the PGW $40 Million Line of Credit.  Petters transferred this $6.5 million to JPMorgan with the actual intent to hinder, delay, or defraud Ritchie.  JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

235.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds and it was his property as co-obligor of the loan from Ritchie and due to his ability to make decisions regarding the accounts.

236.    On or about March 25, 2008, Petters executed and delivered a security agreement to JPMorgan granting a security interest in Petters entire right, title, and interest to certain personal property, including money that had been deposited or was to be deposited in the future in certain bank accounts.  JPMorgan knew that any money currently in those accounts, or to be deposited in such accounts, was obtained by fraud or consciously avoided such knowledge. Petters granted this security interest with the actual intent to hinder, delay, or defraud Ritchie.

237.    The March 2008 Petters security interest and the $6.5 million transferred to JPMorgan constitute conveyances of Petters' property to JPMorgan under § 270 of the New York Debtor and Creditor law.

238.    Petters transferred the $6.5 million and the security interest to JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to repay.  JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

239.    By letter dated September 30, 2008, in response to reports of government searches of Petters' home and businesses, JPMorgan declared a default under the PGW $40 Million Line of Credit and demanded payment from PGW and Petters.  When neither Petters nor his company could pay, JPMorgan enforced the security interest and obtained no less than $18 million of Petters' assets, which had been loaned to Petters by Ritchie.

240.    As a result of the foregoing, pursuant to § 276 of the New York Debtor and Creditor Law, Ritchie is entitled to a judgment (i) avoiding the conveyance of the March 2008 security interest and the March 2008 conveyance of $6.5 million of Petters' money to JPMorgan, (ii) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount equal to the sum of the value of the March 2008 security interest and $6.5 million, and

(iii) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with avoiding these fraudulent conveyances.

## FIFTEENTH CAUSE OF ACTION

### NEGLIGENCE

### (Against JPMorgan and Richter)

241.    Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

242.    Defendant JPMorgan has a duty to conduct its banking affairs with ordinary care.

243.    Also, due to its special relationship with Petters and Polaroid as: seller, investment advisor to Polaroid, lender, and agent to the Syndicated Lenders, as well as investment advisor to Petters, JPMorgan had an additional duty to the other lenders to Petters.

244.    Further, the extensive, special banking relationship between JPMorgan and Ritchie and the use of the wire transfer system at JPMorgan to move the Ritchie money to Petters, created an additional duty to act with care with respect to Ritchie.

245.    Due to its extensive knowledge of Petters and Polaroid and its involvement in the due diligence process, Richter also had a duty to make appropriate disclosures to the recipients of the due diligence.  Richter knew that third parties such as Plaintiffs would receive the due diligence information and be influenced by the information that Richter supplied.

246.    To their detriment, Plaintiffs justifiably relied upon the misleading due diligence materials that Richter negligently supplied in the course of Richter's professional assistance to Polaroid to obtain a new lender.

247.    JPMorgan had a duty to formulate and follow due diligence and "know your customer" policies concerning customers like Petters and their accounts.

248. JPMorgan had a duty to take reasonable precautions to prevent customers like Petters from using the accounts as conduits for fraud and money laundering activities.

249. JPMorgan had a duty to inquire further into and report to authorities and regulators suspicious banking activity and/or financial transactions to which they were a party. This duty includes making SARs.

250. Before complying with Ritchie's instructions to wire money from Ritchie's JPMorgan accounts to a PCI account controlled by Petters, JPMorgan had a duty to disclose to Ritchie its knowledge of Petters' fraud.

251. The purpose of these duties and regulations are to prevent the sort of foreseeable misuse of bank accounts to divert and launder funds that occurred in this case.

252. JPMorgan and Richter breached these duties and otherwise their duty of care. But for JPMorgan and Richter's breach of their duties, the frauds perpetrated by Petters—including the fraud of Ritchie—could not have been accomplished without detection.

253. JPMorgan and Richter's negligence was a proximate cause of the total loss to Plaintiffs in the amount of at least $158 million.

## SIXTEENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### (Against All Defendants)

254. Ritchie incorporates and realleges all of the foregoing allegations of the Complaint.

255. Between February 1, 2008 and February 15, 2008, JPMorgan and the Syndicated Lenders were enriched at Ritchie's expense in the amount of at least $43 million as a result of

their receipt and acceptance of at least $43 million that Petters fraudulently induced Ritchie to

loan to Petters, and then used to repay Polaroid's debt to JPMorgan and the Syndicated Lenders.

256.    JPMorgan was also enriched, at Ritchie's expense, as a result of its receipt of the

March 2008 Petters security interest, $6.5 million that Ritchie loaned to Petters on March 21,

2008 that Petters conveyed to JPMorgan with the intent to put it beyond Ritchie's reach, and the

approximately $18 million of Petters' assets that JPMorgan obtained after September 30, 2008

by enforcing its security interests against Petters' assets.

257.    The acceptance and retention of the benefits the Defendants received at Ritchie's

expense would be unjust under the circumstances, particularly because (i) Defendants had actual

knowledge of Petters' insolvency or consciously avoided such knowledge, and (ii) Defendants

had knowledge of or consciously avoided such knowledge, and substantially assisted in, Petters'

fraudulent activity and money laundering operations.

258.    The interests of equity require Defendants to disgorge all of the proceeds of the

loans that Ritchie made to Petters that they received after February 1, 2008.


WHEREFORE, Ritchie respectfully requests the following relief:

A. On the First Cause of Action, an award of compensatory damages of at least $115

million, exemplary damages, and punitive damages, plus interest, for all injuries suffered

as a result of JPMorgan and Richter's wrongful conduct, with the specific amount to be

determined at trial;

B. On the Second Cause of Action, an award of compensatory damages of at least $115

million, exemplary damages, and punitive damages, plus interest, for all injuries suffered

as a result of JPMorgan and Richter's wrongful conduct, with the specific amount to be determined at trial;

C. On the Third Cause of Action, an award of compensatory damages of approximately $43 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of JPMorgan and Richter's wrongful conduct, with the specific amount to be determined at trial;

D. On the Fourth Cause of Action, an award of compensatory damages of approximately $43 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of JPMorgan and Richter's wrongful conduct, with the specific amount to be determined at trial;

E. On the Fifth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $31 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

F. On the Sixth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $31 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

G. On the Seventh Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $31 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

H. On the Eighth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $31 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

I. On the Ninth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $12 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

J. On the Tenth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $12 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

K. On the Eleventh Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $12 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

L. On the Twelfth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $12 million, exemplary damages, and punitive damages, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct, with the specific amount to be determined at trial;

M. On the Thirteenth Cause of Action, an order setting aside the fraudulent conveyances and an award of compensatory damages of approximately $24.5 million, exemplary damages,

and punitive damages, plus interest, for all injuries suffered as a result of Defendants'
wrongful conduct, with the specific amount to be determined at trial;

N.  On the Fourteenth Cause of Action, an order setting aside the fraudulent conveyances and
an award of compensatory damages of approximately $24.5 million, exemplary damages,
and punitive damages, plus interest, for all injuries suffered as a result of Defendants'
wrongful conduct, with the specific amount to be determined at trial;

O.  On the Fifteenth Cause of Action, an award of compensatory damages of at least $158
million, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct,
with the specific amount to be determined at trial;

P.  On the Sixteenth Cause of Action, an award of compensatory damages of at least $67.5
million, plus interest, for all injuries suffered as a result of Defendants' wrongful conduct,
with the specific amount to be determined at trial; and

Q.  All other relief that this Court deems just and proper.

### **Jury Demand**

The Plaintiffs demand a jury trial of all issues so triable.

Dated: July 15, 2014
        New York, New York

                        Respectfully submitted,


                        LIDDLE & ROBINSON, L.L.P.


                        _____
                        Jeffrey L. Liddle
                        David M. Marek
                        James W. Halter
                        800 Third Avenue, 8th Floor
                        New York, NY 10022
                        Tel: (212) 687-8500
                        Fax: (212) 687-1505
                        *Attorneys for Plaintiffs*

# EXHIBIT A

BANKONE                                                    v  6 2007  16:36        P.01

# CHASE &#9679;

August 27, 2007

<u>BY FACSIMILE AND OVERNIGHT DELIVERY</u>

Polaroid Corporation
4400 Baker Road
Minnetonka, Minnesota  55343
Attention:  Chief Financial Officer

    Re:    <u>Revolving Credit Facility Default Notice</u>

Ladies and Gentlemen:

The undersigned writes as U.S. Administrative Agent (in such capacity, the "<u>U.S. Administrative Agent</u>") on behalf of the lenders (the "<u>Lenders</u>") under that certain Revolving Credit Agreement, dated as of April 28, 2005, as amended by that certain First Amendment to Revolving Credit Agreement and Consent, dated as of January 9, 2006, that certain Second Amendment to Revolving Credit Agreement and Consent, dated as of January 30, 2006, that certain Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of May 11, 2006, that certain Fourth Amendment to Revolving Credit Agreement and Amendment to Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of June 14, 2006, that certain Consent, Waiver and Fifth Amendment to Revolving Credit Agreement dated as of July 31, 2006, that certain Sixth Amendment to Revolving Credit Agreement, dated as of September 8, 2006, that certain Seventh Amendment to Revolving Credit Agreement, dated as of September 26, 2006, that certain Eighth Amendment to Revolving Credit Agreement, dated as of December 19, 2006, that certain Ninth Amendment to Revolving Credit Agreement, dated as of March 5, 2007, that certain Tenth Amendment to Revolving Credit Agreement, dated as of April 24, 2007, that certain Forbearance Agreement and Eleventh Amendment to Revolving Credit Agreement, dated as of April 24, 2007 and that certain Forbearance Agreement and Twelfth Amendment to Revolving Credit Agreement (the "<u>Forbearance Agreement</u>"), dated as of July 3, 2007 (as amended, supplemented, or otherwise modified from time to time, the "<u>Revolving Credit Agreement</u>"), among Polaroid Holding Company, a Delaware corporation, the subsidiaries of Parent party thereto, the Lenders, the U.S. Administrative Agent and JPMorgan Europe Limited, as European Administrative Agent.  Capitalized terms used and not otherwise defined herein have the meanings given to such terms in the Revolving Credit Agreement.

You have previously informed the U.S. Administrative Agent that an Event of Default has occurred and is continuing under (i) clause (d) of Article VII of the Credit Agreement for

(1) a breach of Section 6.12(a) as of December 31, 2006, for the most recently-ended Fiscal Quarter, (2) a breach of Section 6.12(a) as of March 31, 2007, for the most recently-ended Fiscal Quarter, (3) a breach of Section 6.12(a) as of June 30, 2007, for the most recently-ended Fiscal Quarter, and (4) a breach of Section 6.12(c) and (ii) clause (e) of Article VII of the Credit Agreement for a breach of Section 5.01(a) with respect to the consolidated financial statements for the Fiscal Year of the Parent and its Subsidiaries ended December 31, 2006 (the "Existing Defaults"). Under the terms of the Forbearance Agreement, the Agents and Lenders agreed to forbear during the Forbearance Period (as defined in the Forbearance Agreement; as so defined, the "Forbearance Period") from exercising certain rights and remedies with respect to the Existing Defaults.

Under the terms of the Forbearance Agreement, you agreed to obtain by August 15, 2007 a commitment from Jefferies & Company, Inc. to refinance the Secured Obligations under the Credit Agreement with a new senior credit facility. The U.S. Administrative Agent hereby notifies you that on August 15, 2007 an Event of Default occurred under clause (d) of Article VII of the Credit Agreement as a result of your failure to obtain such a commitment and that such Event of Default is continuing (the "Additional Default"; the Existing Defaults, together with the Additional Default, are the "Applicable Defaults"). The Forbearance Period ended on August 15, 2007 as a result of the occurrence of the Additional Default.

– Effective August 27, 2007, all Loans and other amounts outstanding under the Credit Agreement shall bear interest or accrue, as applicable, at the rates set forth in Section 2.15(f) of the Credit Agreement.

Additionally, the U.S. Administrative Agent reserves the right to exercise all of its rights and remedies at any time pursuant to the terms of any or all of the Loan Documents based on the Applicable Defaults, including, without limitation, the right to limit Availability by establishing additional Reserves. No failure or delay by the any Administrative Agent, any Issuing Bank or any Lender in exercising any right or power under any Loan Document shall operate as a waiver thereof or of any Default or Event of Default, whether known or unknown, now existing or hereafter arising, nor shall any single or partial exercise of any such right or power (including, without limitation, the execution or delivery of this letter), or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power (including, without limitation, any rights or powers in connection with the Applicable Defaults and/or any other Default or Event of Default that may exist and is not described herein), all of which rights and powers the U.S. Administrative Agent hereby reserves. Without limiting the generality of the foregoing, (i) no action taken or omitted to be taken by any Administrative Agent, any Issuing Bank or any Lender (including, without limitation, the execution or delivery of this letter), shall operate as a waiver or modification of any term, condition, obligation, covenant or agreement contained in any Loan Document or

contained in any instrument or agreement referred to therein and (ii) the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of the Applicable Defaults and/or any other Default or Event of Default, regardless of whether any Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time. Nothing herein shall be deemed to be (or to entitle any Loan Party to) a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Loan Documents in similar or different circumstances or of any Default or Event of Default that may have occurred and be continuing.

JPMORGAN CHASE BANK, N.A.,
as U.S. Administrative Agent under
the Revolving Credit Agreement

By: _____
Name: _Teresa M. Behcle_
Title: _Vice President_

cc:    Robert J. McDonough
       David E. Baer, Esq.
       William M. Boyd, Esq.
       Owen C. Marx, Esq.
       Steven E. Fox