## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>Petters Company, Inc., et al. | Bankr. Case No. 08-45257 |
| Ritchie Capital Management, L.L.C.,<br>Ritchie Special Credit Investments, Ltd.[1], Rhone Holdings II. Ltd., Yorkville Investment I, L.L.C., and Ritchie Capital Management SEZC, Ltd. (f/k/a Ritchie Capital Management, Ltd.),<br><br>                                Plaintiffs,<br><br>        -against-<br><br>JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Europe Ltd.., Richter Consulting, Inc., Wells Fargo & Co., as successor by merger to Wachovia Capital Finance (Central), Wells Fargo Bank, N.A., Wachovia Capital Finance Corporation Central, UBS Loan Finance, L.L.C., UBS AG, UBS AG Stamford Branch, Merrill Lynch Business Financial Services, Inc., LaSalle Business Credit, L.L.C., Bank of America Business Capital, Bank of America Corp., The CIT Group Inc., The CIT Group/Business Credit, Inc., PNC Bank N.A., Fifth Third Bank, Webster Business Credit Corporation, Associated Commercial Finance, Inc., Chase Lincoln First Commercial Corporation,<br><br>                                Defendants. | Adv. No. 15-04128<br><br>**Second Amended Complaint**<br><br>**JURY TRIAL DEMANDED** |

---

[1] Ritchie Capital Structure Arbitrage Trading, Ltd. merged with Ritchie Special Credit Investments, Ltd., with Ritchie Special Credit Investments, Ltd. being the surviving entity and successor in interest and holder of all rights and claims of Ritchie Capital Structure Arbitrage Trading, Ltd.,

# Table of Contents

I.    NATURE OF THE ACTION ............................................................................ 1

II.   JURISDICTION AND VENUE .................................................................... 3

III.  PARTIES ....................................................................................................... 3

IV.  STATEMENT OF MATERIAL FACTS ...................................................... 7

  A.    Petters Company, Petters Group Worldwide, and Petters Consumer Brands. .............. 7

  B.    Petters maintained personal investment accounts at JPMorgan. JPMorgan knew that he regularly funneled personal funds to his companies...................................................... 9

  C.    Bank One acquired actual knowledge that the Lancelot funds were operating in fraud. ................................................................................................................. 12

  D.    JPMorgan owed a fiduciary duty to Ritchie because of their long-standing special relationship........................................................................................................ 14

  E.    JPMorgan acquired Bank One, which increased JPMorgan's relationships with Petters. ................................................................................................................. 16

  F.    JPMorgan used Petters's debts under the license agreements between Petters Company and Polaroid to convince Petters to buy Polaroid. ........................................ 17

  G.    Tom Petters was unbankable. ........................................................................ 18

  H.    The Triple Closing. ....................................................................................... 22

  I.    A $125 million fraudulent note was critical to the Polaroid leveraged buyout. ........... 23

  J.    Petters Consumer Brands—An instrument for Tom Petters to further his fraud.......... 25

  K.    As the lender and agent of the Syndicated Lenders, JPMorgan continued to monitor or consciously avoid Petters's fraud. ................................................................. 26

  L.    Polaroid's default on the loans. ..................................................................... 31

  M.   The London blocked-account agreements. ................................................... 31

  N.    JPMorgan forces Polaroid to hire Richter Consulting, who reported directly to JPMorgan. ...................................................................................................... 33

  O.    JPMorgan and Richter Consulting arrange for "structured" repayment from Petters Company and Petters's personal guarantee. ............................................... 36

  P.    JPMorgan forces Polaroid to expand Richter Consulting's role to find a repayment source.......................................................................................................... 37

  Q.    JPMorgan and the Syndicated Lenders inform Petters that they know about his fraud. ................................................................................................................. 40

  R.    JPMorgan forces and encourages Petters to defraud Ritchie....................... 41

  S.    February 1, 2008. .......................................................................................... 42

  T.    Later February loans by Ritchie.................................................................... 50

  U.    The PlayStation deal. .................................................................................... 53

V.      The May 2008 consumer-electronics opportunity. ....................................... 55

W.      JPMorgan knew that Petters was defrauding Ritchie. ................................. 56

X.      JPMorgan substantially assisted Petters's frauds....................................... 56

Y.      Petters is arrested and convicted. ................................................................ 60

V.      CONCEALMENT AND DISCOVERY ISSUES ............................................ 61

VI.     CAUSES OF ACTION ........................................................................................ 66

A.      First Cause of Action: Aiding and Abetting Fraud (Against JPMorgan) ..................... 66

B.      Second Cause of Action: Aiding and abetting fraud (against Richter Consulting and
        vicariously against JPMorgan)................................................................................... 71

C.      Third Cause of Action: Aiding and abetting wrongful diversion of funds (against
        JPMorgan)................................................................................................................. 75

D.      Fourth Cause of Action: Aiding and abetting wrongful diversion of funds (against
        Richter Consulting)................................................................................................... 76

E.      Fifth Cause of Action: Aiding and abetting conversion re March loan (against
        JPMorgan)................................................................................................................. 76

F.      Sixth Cause of Action: Commercial bad faith (against JPMorgan)............................ 78

G.      Seventh Cause of Action: Aiding and abetting breach of fiduciary duty (against
        JPMorgan)................................................................................................................. 79

H.      Eighth Cause of Action: Uniform Fiduciaries Act (against JPMorgan)...................... 81

I.      Ninth Cause of Action: Negligence (against JPMorgan and Richter Consulting) ....... 83

J.      Tenth Cause of Action: Breach of fiduciary duty (against JPMorgan) ....................... 85

K.      Eleventh Cause of Action: Unjust enrichment (against All Defendants) .................... 86

L.      Twelfth Cause of Action: Constructive fraudulent conveyance—February 4–6, 2008
        transfers from Petters to JPMorgan (against all Defendants except Richter Consulting)
        ................................................................................................................................. 88

M.      Thirteenth Cause of Action: Knowing fraudulent conveyance—February 4-6, 2008
        transfers from Petters to JPMorgan (against all Defendants except Richter Consulting)
        ................................................................................................................................. 89

N.      Fourteenth Cause of Action: Constructive fraudulent conveyance—transfer of $31
        million from JPMorgan to the Syndicated Lenders (against all Defendants except
        Richter Consulting)................................................................................................... 91

O.      Fifteenth Cause of Action: Knowing fraudulent conveyance—transfer of $31 million
        from JPMorgan to the Syndicated Lenders (against all Defendants except Richter
        Consulting)................................................................................................................ 93

P.      Sixteenth Cause of Action: Constructive fraudulent conveyance—$12 million transfer
        from Petters to JPMorgan of part of Ritchie's loan on February 7, 2008 (against all
        Defendants except Richter Consulting) ..................................................................... 95

Q.      Seventeenth Cause of Action: Knowing fraudulent conveyance—$12 million transfer from Petters to JPMorgan of part of Ritchie's loan on February 7, 2008 (against all Defendants except Richter Consulting) ...................................................................... 96

R.      Eighteenth Cause of Action: Constructive fraudulent conveyance—transfer of $12 million from JPMorgan to the Syndicated Lenders (against all Defendants except Richter Consulting) ................................................................................................................ 97

S.      Nineteenth Cause of Action: Knowing fraudulent conveyance—transfer of $12 million from JPMorgan to the Syndicated Lenders (against all Defendants except Richter Consulting) ................................................................................................................ 98

T.      Twentieth Cause of Action: Constructive fraudulent conveyance—repayment to JPMorgan of the $6.5 million in March 2008 and Petters's security interest (against JPMorgan) .................................................................................................................. 100

U.      Twentieth-First Cause of Action: Knowing fraudulent conveyance—repayment to JPMorgan of the $6.5 million in March 2008 and Petters's security interest (against JPMorgan) .................................................................................................................. 102

V.      Twenty-Second Cause of Action: Minnesota Uniform Fraudulent Transfer Act ("MUFTA") (against All Defendants except Richter Consulting) ............................ 104

VII.    RELIEF REQUESTED ................................................................................................ 106

VIII.   JURY DEMAND ......................................................................................................... 107

Plaintiffs, Ritchie Capital Management, L.L.C., Ritchie Special Credit Investments, Ltd., Rhone Holdings II. Ltd., Yorkville Investment I, L.L.C., and Ritchie Capital Management, Ltd. (collectively "Plaintiffs" or "Ritchie"), by and through their undersigned counsel, allege as follows:

## I.     NATURE OF THE ACTION

1.     Thomas Petters was a prominent Minnesota businessman who owned numerous businesses. His success was a façade. In reality, Petters used these businesses to perpetrate a $3.65 billion Ponzi scheme mainly through one business, Petters Company, Inc. Under this scheme, investors were told that their money would be used to buy electronic goods that would then be sold for profit to large retailers such as Sam's Club and Costco. During this scheme, Petters's bank, JPMorgan, orchestrated the sale of Polaroid Holding Company (which owned, through subsidiaries, all of the operations of the Polaroid business) by JP Morgan's private equity affiliate to Petters for about $426 million. JPMorgan and a syndicate of lenders (the other banking co-defendants in this case) loaned Petters the purchase price so that JPMorgan could realize a profit of at least $150 million. During Petters's seven-year relationship with JPMorgan, he repeatedly violated his banking (lockbox) agreements and JPMorgan deliberately looked the other way because servicing Petters was lucrative for many separate areas of the bank. But in January 2008, JPMorgan learned from a former employee of GE Capital that Petters had used GE Capital money in a fraudulent-transfer scheme—a Ponzi scheme. Aware that Petters was a fraudster and fearful that Petters may be caught and unable to repay the moneys owed to JPMorgan and the syndicate of lenders, JPMorgan then demanded immediate repayment from Petters. Petters sought out Thane Ritchie, criminally defrauded him and his companies, then laundered the proceeds of the Ritchie loans through a circuitous international chain of bank

1

accounts, including at JPMorgan's London affiliate, to obscure the source of the funds, and used the money to further his frauds.

2.      The Department of the Treasury has since determined that JPMorgan's internal controls and anti-money-laundering-detection programs were deficient during this time period. The Treasury stated: "Some of the critical deficiencies in the elements of the Bank's BSA/AML [Bank Secrecy Act/anti-money-laundering] compliance program, resulting in a violation of 12 U.S.C. § 1818(s)(3)(A) and 12 C.F.R. § 21.21, include the following:

a)  The Bank has an inadequate system of internal controls and independent testing.

b)  The Bank has less than satisfactory risk assessment processes that do not provide an adequate foundation for management's efforts to identify, manage, and control risk.

c)  The Bank has systemic deficiencies in its transaction monitoring systems, due-diligence processes, risk management, and quality assurance programs.

d)  The Bank does not have enterprise-wide policies and procedures to ensure that foreign branch suspicious activity involving customers of other bank branches is effectively communicated to other affected branch locations and applicable AML [Anti Money Laundering] operations staff. The Bank also does not have enterprise-wide policies and procedures to ensure that on a risk basis, customer transactions at foreign branch locations can be assessed, aggregated, and monitored.

e)   The Bank has significant shortcomings in SAR [Suspicious Activity Report]

decision-making protocols and an ineffective method for ensuring that referrals

and alerts are properly documented, tracked, and resolved."[2]

## II.    JURISDICTION AND VENUE

3.       Plaintiffs initially brought this action in the New York Supreme Court for the

County of New York. Venue was proper in that court based on the residence of Defendant

JPMorgan Chase & Co., among other reasons.

4.       On April 11, 2014, several Defendants filed a Notice of Removal removing the

case from New York state court to the United States District Court for the Southern District of

New York.

5.       By order dated November 10, 2014, the United States District Court for the

Southern District of New York transferred the case to the United States District Court for the

District of Minnesota. (Dkt. No. 65.) Then, at the request of Defendants, over the objection of

Plaintiffs, on July 2, 2015, the United States District Court for the District of Minnesota

transferred this matter to this Court.

6.       The burden is on Defendants to establish jurisdiction in this Court.

## III.    PARTIES

7.       Plaintiff Ritchie Capital Management, L.L.C. is a limited liability company with

dual registration in Delaware and the Cayman Islands. At all relevant times, until 2015, Ritchie

Capital Management had offices in Illinois and New York.

---

[2] Consent Order, Department of the Treasury, Comptroller of the Currency, AA-EC-13-04, at pp.
3-4 (http://www.occ.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf).

8.      Plaintiff Ritchie Special Credit Investments, Ltd., is a Cayman Islands exempted company. Ritchie Special Credit Investments, Ltd. had registered offices in the Cayman Islands and had directors in the Cayman Islands involved in all significant decisions. In approximately April 2014, Ritchie Capital Structure Arbitrage Trading, Ltd. merged with Plaintiff Ritchie Special Credit Investments, Ltd., with Plaintiff Ritchie Special Credit Investments, Ltd. being the surviving entity and successor in interest and holder of all rights and claims of Ritchie Capital Structure Arbitrage Trading, Ltd. Ritchie Capital Structure Arbitrage Trading, Ltd. was a Cayman Islands exempted company. Ritchie Capital Structure Arbitrage Trading, Ltd. had registered offices in the Cayman Islands and had directors in the Cayman Islands involved in all significant decisions.

9.      Plaintiff Rhone Holdings II. Ltd. is a Cayman Islands exempted company. Rhone Holdings II. Ltd. had registered offices in the Cayman Islands and had directors in the Cayman Islands involved in all significant decisions.

10.     Plaintiff Yorkville Investments I, L.L.C. is a Delaware limited liability company.

11.     Plaintiff Ritchie Capital Management SEZC, Ltd. is a Cayman Islands exempted company. Ritchie Capital Management SEZC, Ltd. had registered offices in the Cayman Islands and had directors in the Cayman Islands involved in all significant decisions. Ritchie Capital Management SEZC, Ltd. was formerly known as Ritchie Capital Management, Ltd. until it changed its name in 2015. Ritchie Capital Management, L.L.C. and Ritchie Capital Management SEZC, Ltd. served as administrative agents for the other Ritchie entities in connection with their loans to Petters.

12.     Defendant JPMorgan Chase & Co. is a Delaware corporation with its principal place of business in New York.

13.     Defendant JPMorgan Chase Bank, N.A. is a national banking association with its principal place of business in Ohio.[3]

14.     Defendant J.P. Morgan Europe Ltd. is a United Kingdom company with its principal place of business in London, England. JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and J.P. Morgan Europe Ltd. are collectively referred to herein as "JPMorgan."

15.     Defendant Richter Consulting, Inc. is a Delaware corporation with its principal place of business in Illinois.

16.     Defendant Wells Fargo & Co., as the successor by merger to Wachovia Capital Finance Central, is a Delaware corporation with its principal place of business in California.

17.     Defendant Wells Fargo Bank, N.A. is a national banking association with its principal place of business in South Dakota.

18.     Defendant UBS Loan Finance, L.L.C. is a Delaware limited liability company with its principal place of business in Connecticut.

19.     Defendant UBS AG is a corporation incorporated in the country of Switzerland, with its principal place of business in Zurich, Switzerland.

20.     Defendant UBS AG, Stamford Branch is a banking branch of UBS AG located in Stamford, Connecticut.[4]

---

[3] J.P. Morgan Private Bank was initially named as a Defendant in this matter. The JPMorgan Defendants moved to dismiss the JPMorgan Private Bank on the grounds that it is not a separate legal entity but a division of JPMorgan Chase Bank, N.A.

[4] Some of the documents relevant to this matter contain signature blocks purportedly signed by "UBS A.G., Stamford Branch." UBS A.G., Stamford Branch was served on March 19, 2014 along with Defendant UBS A.G. UBS A.G., Stamford Branch has not appeared in this matter. UBS A.G. has appeared in this matter. Plaintiffs continue to plead USG, A.G., Stamford Branch as a Defendant, in the alternative, should it be found to have acted as a separate entity in this matter.

21.     Defendant Merrill Lynch Business Financial Services, Inc. is now known as GE Business Financial Services Inc. and is a Delaware corporation with its principal place of business in Illinois.

22.     Defendant LaSalle Business Credit, L.L.C. was a Delaware limited liability company with its principal place of business in Illinois. LaSalle Business Credit, L.L.C. is now part of Bank of America, N.A., a national banking association with its principal place of business in North Carolina.

23.     Defendant Bank of America Business Capital is a North Carolina corporation with its principal place of business in North Carolina.[5]

24.     Defendant Bank of America Corporation is a Delaware corporation with its principal place of business in North Carolina.

25.     Defendant The CIT Group Inc. is a Delaware corporation with its principal place of business in New York.

26.     Defendant The CIT Group/Business Credit, Inc. is a New York corporation with its principal place of business in New York.

27.     Defendant PNC Bank N.A. is a national banking association with its principal place of business in Pennsylvania.

28.     Defendant Fifth Third Bank is an Ohio corporation with its principal place of business in Ohio.

29.     Defendant Webster Business Credit Corporation is a New York corporation with its principal place of business in New York.

---

[5] Plaintiffs served Bank of America Business Capital on March 20, 2014. Bank of America Business Capital has not appeared in this matter but Bank of America, N.A. has appeared in this matter on behalf of Bank of America Business Capital.

30.     Defendant Associated Commercial Finance, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin.

31.     Defendant Chase Lincoln First Commercial Corporation is a Delaware corporation with its principal place of business in New York.

32.     Syndicated Lenders: Defendants Wells Fargo & Co., Wells Fargo Bank, N.A., UBS Loan Finance, L.L.C., UBS AG and its Stamford Brach, Merrill Lynch Business Financial Services, Inc., LaSalle Business Credit, L.L.C., Bank of America Business Capital, Bank of America Corporation, The CIT Group Inc., The CIT Group/Business Credit, Inc., PNC Bank N.A., Fifth Third Bank, Webster Business Credit Corporation, Associated Commercial Finance, Inc., and Chase Lincoln First Commercial.

## IV.     STATEMENT OF MATERIAL FACTS

**A.     Petters Company, Petters Group Worldwide, and Petters Consumer Brands.**

33.     Petters Company Inc. was formed as a Minnesota corporation on April 28, 1994.

34.     Petters Group Worldwide, LLC is a Delaware limited liability company that registered to do business in Minnesota on May 5, 2002.

35.     Petters Consumer Brands, LLC was formed as a Delaware limited liability company on January 17, 2003 and registered to do business in the State of Minnesota on January 24, 2003. Following the merger of Petters Consumer Brands, LLC and Polaroid Holding Company, Tom Petters continued to use the name "Petters Consumer Brands" as a personal alter-ego and as the name of a series of other legal entities.

36.     Petters Capital, Inc. was formed on March 4, 1998 as a Minnesota corporation.

37.     Petters's fraudulent purchase-order-financing scheme started in 1995 when, through his accomplices and Petters Company, he purported to be in the business of diverting:

purchasing brand-name consumer goods from authorized distributors and reselling the goods to wholesale-warehouse-club merchants such as Costco and Sam's Club.

38.     With the intent to induce potential lenders to make a loan, Petters Company provided them with counterfeit purchase orders representing that Petters Company had an opportunity to purchase inventory that had been "pre-sold" to Costco or Sam's Club. In fact, there was no inventory and no resale agreement.

39.     Petters Company offered to execute and deliver a promissory note purportedly secured by a security interest in the purchase orders in exchange for a short-term loan that would be repaid from the proceeds of the sale to Costco or Sam's Club. Petters Company paid the promissory notes as they came due. The money for repayment, however, often came from other purchase-order-financing loans made by later lenders. These later lenders had been fraudulently induced to make the loans in reliance on similarly false transaction documents and intentional misrepresentations of the material facts of these transactions.

40.     At all relevant times, the liabilities of Petters and Petters Company were millions of dollars, if not tens or hundreds of millions of dollars, greater than their assets. While engaging in the Ponzi scheme both became insolvent and never recovered, likely as early as the 1990s.

41.     Petters owned equity interests in other companies. One of his larger companies was Petters Group Worldwide which was not operated as a Ponzi scheme. It was a holding company that owned equity interests in many legitimate businesses, including Polaroid Holding

Company. Petters had complete dominion and control over Petters Group Worldwide[6]—"Petters was basically calling the shots."[7]

42.     As of January 31, 2008, as JPMorgan and Richter Consulting knew, Petters was irretrievably insolvent. The value of his assets was far less than the amount of his liabilities. He could not meet his obligations as they came due by legitimate means. When the transfers at issue in this matter took place, Petters was engaged in transactions for which his liabilities far exceeded his assets—he was left with insufficient capital.

**B.     Petters maintained personal investment accounts at JPMorgan. JPMorgan knew that he regularly funneled personal funds to his companies.**

43.     Starting in 2001, Petters opened at least six personal investment accounts at JPMorgan. In the role of Petters's personal and business banker, representatives of JPMorgan met with Petters and his associates on a regular basis.

44.     Between 2002 and September 2008, more than $83 million was transferred from an account at M&I Bank held in the name of Petters Company into Petters's personal accounts at JPMorgan.

45.     The Ponzi funds credited to Petters's personal JPMorgan accounts were routinely used by Petters to further Petters Company's fraudulent purchase-order-financing scheme and to pay the debts that Petters Group Worldwide, Polaroid Holding Company, and Petters's other companies owed to JPMorgan and related parties.

---

[6] *U.S.A. v. Petters Group Worldwide*, Case No. 08cr364 (D. Minn), Plea Agreement and Sentencing Stipulation, p. 2 ("Thomas Petters served as the Chief Executive Officer of PGW and Petters Company, Inc. ("PCI")").

[7] *In re Petters Company, Inc.*, Bky. Case No. 08-45257, Hrg. Tr. 169 (Bankr. D. Minn. Apr. 12, 2016).

46.     Theodore Martens of PricewaterhouseCoopers testified that, "[M]oney was moved around and it seemed like whatever it was needed for at a given point in time the funds were made available at Tom's direction and used accordingly."[8] Petters exercised complete control and dominion over the funds of his companies. Mark Donald Laumann, controller at Petters Group Worldwide testified that Petters would "personally be involved in the approval of funding requests."[9] He kept the funds flowing and continuously transferred money between himself and entities to keep the Ponzi scheme afloat.

47.     Shortly after Petters was arrested, Deanna Coleman (one of Petters's coconspirators) told the FBI that on October 30, 2006 Petters had instructed her to wire $60 million from an account at Petters Company into Petters's personal investment accounts at JPMorgan Private Bank. JPMorgan had a duty to know the source of these funds. Petters then used these investment accounts as collateral to get a credit line from JPMorgan in favor of Petters Group Worldwide.

48.     Courtney Cavatoni, Petters's JPMorgan Private Bank banker, administered Petters's system for funneling money from Petters Company's accounts into his personal investment accounts for the purpose of laundering the proceeds from Petters Company's fraudulent purchase-order-financing scheme before the funds in the accounts were used to pay off JPMorgan-owned debts owed by Petters's legitimate companies.

---

[8] *In re Petters Company, Inc.*, Bky. Case No. 08-45257, Hrg. Tr. 266 (Bankr. D. Minn. Apr. 12, 2016).

[9] *In re Petters Company, Inc.*, Bky. Case No. 08-45257, Hrg. Tr. 190 (Bankr. D. Minn. Apr. 12, 2016).

49.     For example, on March 13, 2006, Cavatoni set up a JPMorgan $8 million credit line to Petters Group Worldwide. Cavatoni arranged for the payments of principal and interest on that credit line to be made from Petters's personal accounts at JPMorgan—which were originally funded by Ponzi money from Petters Company.[10]

50.     In May 2006, Petters Group Worldwide overdrew its $8 million line of credit to provide "urgent" funding for Zink (a Polaroid printing process under development). JPMorgan increased the credit line to $20 million to accommodate the overdraft.

51.     Similarly, on September 19, 2006, Cavatoni traveled to Minnesota to meet with Petters and other Petters Group Worldwide officers, including Mary Jeffries. Shortly after this meeting, on May 2, 2006, JPMorgan increased Petters Group Worldwide's line of credit from $20 million to $40 million.

52.     Many arrangements like this enabled Petters to funnel money from the Petters Company Ponzi scheme, through his personal accounts, to pay off debts of other companies, including Petters Group Worldwide and Polaroid.

53.      "Petters did not observe any of the corporate formalities or niceties" in the operation of his business including failing to keep funds separate.[11] Petters transferred money back and forth between Petters Company and Petters Group Worldwide without appropriate accounting records or appropriate evidence of the indebtedness by way of note and repayment obligations.

---

[10] Coleman, D. 7-28-10 EXS 18-87 at p. 225, re Gov't Exhibit 0329, fax from DL instructing wire transfer from Petters Company to Petters's personal account (see also 0329.pdf ).

[11] *In re Petters Company, Inc.*, Bky. Case No. 08-45257, Hrg. Tr. 148 (Bankr. D. Minn. Apr. 12, 2016).

54.     Petters's personal and business banking accounts were also monitored by

JPMorgan employee David Mook, a Capital Advisor. Mook communicated regularly with

Petters and with Mark Laumann, former controller of Petters Group Worldwide, about Petters's

personal accounts, the value of the investment accounts that were collateral for the JPMorgan

loans made to Petters Group Worldwide, and the transfers in and out of the accounts. When

called before the grand jury regarding Petters, Laumann refused to testify on Fifth Amendment

grounds. Mook and others at JPMorgan had personal knowledge of all facts regarding the use of

Petters's accounts to pay Petters Group Worldwide's debts to JPMorgan.

55.     Petters was openly comingling his personal funds with the funds of the several

businesses over which he had control.

**C.    Bank One acquired actual knowledge that the Lancelot funds were operating in
fraud.**

56.     In September 2001, Greg Bell opened an initial account at Bank One (predecessor

bank to JPMorgan) for Granite Investors Fund, L.P. (predecessor company to Lancelot Investors

Fund, L.P.), which was subject to an account-control ("lockbox") agreement. Lockbox accounts

are generally set up for the efficient collecting of funds from customers. Here, the accounts were

purportedly set up to receive payments from retailers like Costco and direct the funds to the

investors, so as to preserve the security of the funds as payment for goods. The lockboxes in this

case are "hard lockboxes," which maintain the relationship between the deposited funds and their

providence, thereby maintaining the integrity of UCC-based security interests in the funds. At

the point these lockbox relationships Bank One (predecessor to JPMorgan) were established,

Bank One acquired actual knowledge of fraud at Petters's companies.

57.     In March or April 2002 the money deposited into the Granite lockbox account originated from Petters Company's account at Marshall & Ilsley bank instead of from retailers such as Costco. At that time, Bank One acquired actual knowledge that the flow of funds into the lockbox account was not as Greg Bell represented to Bank One and to outside investors—the money was not from retailers such as Costco.

58.     In October 2002, Lancelot Investors Fund, L.P. (the successor to Granite Investors Fund, L.P.), Lancelot Investors Fund, Ltd. (the Cayman Islands affiliate of Lancelot Investors Fund L.P.) opened up hard lockbox accounts at Bank One N.A. Tom Petters also opened up lockbox accounts for Thousand Lakes LLC at Bank One N.A.

59.     When the money deposited into these lockbox accounts in February or March 2003 originated from Petters Company's account at M&I bank instead of from retailers such as Costco, Bank One acquired actual knowledge that Greg Bell and Tom Petters had misrepresented the flow of funds to Bank One and to outside investors. Bank One additionally understood that, because the funds were received as commingled payments from Petters Company, the lender's security interest in the funds as "payment for goods" no longer existed and that Bell's investors had been falsely told that the bank's procedures had kept Granite's UCC security interests intact.

60.     Greg Bell worked with Bank One's middle-market bankers, Michael McCracken and Ben Van Vierah, to get a credit facility that would increase Lancelot's leverage in funding purchase-order financing. Between December 2002 and April 2003, Bank One ran extensive due-diligence on the Lancelot Funds in support of the credit facility. Michael Golemis was the Bank One credit underwriter during the due diligence. Ultimately, Bell met with Bank One's counsel at the Bank One Law Department in the First National Bank building in downtown Chicago, where counsel questioned him about details of the purchase order transaction structure,

13

the purpose for each of the multiple accounts, the flow of funds, and the relationship between the

Lancelot accounts and Petters's Thousand Lakes lockbox account. They discussed that Petters's

companies were counterparts on Lancelot's purchase-order-financing transactions. The next day,

without any advanced notice, Bank One abruptly terminated all three of Bell's Lancelot

accounts, Petters's Thousand Lakes account and the deposit-account-pledge agreement.


**D.**    **JPMorgan owed a fiduciary duty to Ritchie because of their long-standing special relationship.**

61.    Ritchie (the Plaintiff companies) established, maintained, and expanded a banking

relationship with JPMorgan from 2002 onward. Because of the growing relationship, in 2005,

Ritchie began consolidating its funds at JPMorgan. Ritchie's account balances grew to exceed

$300 million on deposit across more than 70 accounts by 2007.

62.     Ritchie maintained a multi-faceted relationship with JPMorgan through their

Chicago Private Wealth Management Group, their New York Financial Institutions Group, and

their New York Corporate Client Banking group. Through these relationships, JPMorgan

provided Ritchie with extraordinary banking services above and beyond those associated with an

ordinary retail depository account.

63.    Ritchie's representatives met with JPMorgan on at least a semi-annual basis

(followed up by numerous telephone conferences) to provide additional services to Ritchie.

64.    JPMorgan provided financial-advisory services to both Ritchie's corporate and

family offices, including investment research, performance reviews, execution of securities

transactions, coordination of syndicated investments, and handling general operations for Ritchie

investments.

65.     JPMorgan offered the sale of multiple complex investment products, some of which were purchased by Ritchie.

66.     JPMorgan provided Ritchie with daily cash-management services for Ritchie's 63 corporate accounts. JPMorgan analyzed Ritchie's spending patterns and moved Ritchie's money in and out of a variety of accounts, both on-shore and off-shore, to maximize Ritchie's return on deposits.

67.     JPMorgan arranged a nonstandard foreign mortgage for Thane Ritchie to purchase a home in Toronto, Canada.

68.     JPMorgan was not just "one of many" banks used by Ritchie—JPMorgan was Ritchie's *primary* banker and financial advisor.

69.     Because of the extensive services provided to Ritchie above and beyond a simple depository relationship, Ritchie relied on JPMorgan's integrity, with an expectation of good faith and fair dealing in every aspect of Ritchie's relationship with the bank.

70.     Because of the long history of Ritchie's acceptance of JPMorgan's advice and extraordinary banking services, JPMorgan knew that Ritchie relied on its advice.

71.     Because Ritchie's relationship with JPMorgan went above and beyond that of a mere depository relationship, because Ritchie relied on JPMorgan's trust, loyalty, integrity, good faith, and fair dealing, and because JPMorgan knew that Ritchie relied on JPMorgan's advice, JPMorgan owed Ritchie a fiduciary duty of loyalty, good faith and fair dealing in all financial matters, and a duty to disclose all material facts known to them at all times.

**E.    JPMorgan acquired Bank One, which increased JPMorgan's relationships with Petters.**

72.    In 2001, One Equity Partners, the private-investment equity arm of Bank One, purchased the assets of the Polaroid business for $65 million during the Polaroid bankruptcy as well as foreign Polaroid entities (not in bankruptcy). After consolidating these assets into One Equity Partners Imaging Corporation, the company changed its name to Polaroid Holding Company and operated using its bankrupt predecessor's name, Polaroid Corporation. A managing director of One Equity Partners, Jacques Nasser, was appointed as Polaroid's chairman and received over one million shares of Polaroid stock as compensation.

73.    On September 1, 2002, Petters Company acquired a license from Polaroid that allowed it to use the Polaroid brand name on electronic equipment such as DVD players and televisions.

74.    In July 2004, JPMorgan and Bank One merged, so One Equity Partners became part of JPMorgan. As a result, JPMorgan became the indirect, majority owner of Polaroid, owning about 89% of the company—the other 11% remained with the creditors of the bankrupt old Polaroid.

75.    Petters paid the Polaroid licensing fees for Petters Company out of his own JPMorgan personal accounts on multiple occasions. The personal payments of these licensing fees were, at a minimum, highly suspicious and should have raised red flags about the legitimacy of Petters's business operations.

76.    When JPMorgan acquired Bank One, it also acquired Bank One's interest in Petters Company's license of the Polaroid brand name. JPMorgan further acquired a significant banking relationship with Petters since Bank One was the primary bank for Lancelot Investment Management (successor to Granite Investors Fund, L.P. operated by Greg Bell described above),

16

a hedge fund that principally invested with Petters. Lancelot's trustee has admitted to knowingly assisting Petters's Ponzi scheme. Lancelot ran "round trip" banking transactions—where money was wired from Lancelot to Petters and then immediately wired back to Lancelot —to make it appear to investors that Petters Company was making timely payments on its fraudulent notes.

77.    When JPMorgan acquired the majority interest in Polaroid through the acquisition of Bank One, the instant-photography business was in decline. From the beginning, One Equity Partners purchased Polaroid out of bankruptcy with the intention of reselling it at a profit. But Polaroid needed to leverage its brand recognition and intellectual-property portfolio to respond to the emerging digital-photography market. One Equity Partners/JPMorgan found itself unable to find a buyer willing to pay a premium for a business that needed significant restructuring.

78.    One Equity Partners and JPMorgan senior executives had a special and lucrative relationship with Polaroid. Before Petters companies merged into Polaroid as many as five One Equity Partners and JPMorgan executives dominated the Polaroid board including Jacques Nasser, Polaroid's Chairman of the Board.

**F.    JPMorgan used Petters's debts under the license agreements between Petters Company and Polaroid to convince Petters to buy Polaroid.**

79.    JPMorgan, with Nasser's help, was able to use Petters Company's dependence on the Polaroid license to devise a sell-off strategy of Polaroid for a profit.

80.    In August 2004, Petters and J. Michael Pocock, President and CEO of Polaroid, talked by phone about the license agreement between Petters Company and Polaroid dated September 1, 2002. On information and belief, Pocock demanded information about the goods sold by Petters Company in the previous months and the status of Petters Company's royalty payment.

81.     Polaroid threatened to terminate the license agreements between Petters Company and Polaroid unless Petters agreed to purchase 100% of the shares of Polaroid.

82.     On October 27, 2004, Deanna Coleman wrote to Tom Petters:

> Is it time just to give up and hope for the best? Should we change our names and run from everyone, should we go talk to an attorney and see if there's anything we can do to help us out or just keep doing what where [sic] doing and hope for the best, because now we're looking at 20 years plus in prison.[12]

83.     In response to Coleman's letter, Petters told her that he was going to purchase Polaroid, bury the Ponzi debt there, and bankrupt the company. Had Petters not placated Coleman, she was fully prepared to go to the FBI.

84.     In late 2004, Petters Company was in default under the license agreements it had with Polaroid. Petters Company owed Polaroid over $1 million in unpaid royalties.

85.     Pocock and Nassar negotiated the sale of Polaroid to Petters. Pocock and Nassar explained to Petters that they would convince JPMorgan to finance the sale. The original asking price was $800 million. Over a series of face-to-face meetings and phone calls, Pocock, Nassar, and Petters agreed on a deal worth approximately $426 million. Pocock and Nassar presented the deal to JPMorgan for approval.

86.     Pocock and Nassar had significant personal interest in getting the deal done because each owned a large number of exercisable options for Polaroid stock that would net each of them between $5 million and $15 million at closing.

**G.      Tom Petters was unbankable.**

87.     JPMorgan initially declined to do the deal because their due diligence showed that Petters was not bankable. This conclusion is not surprising, given: (1) Petters's criminal history

---

[12] Letter from Deanna Coleman to Tom Petters. *U.S.A. v. Petters*, Case No. 8cr364 (D. Minn) Government Trial Exhibit #25.

involving crimes of dishonesty and theft, for which he had spent time in prison; (2) the
suspicious flow of funds associated with the lockbox held by his company Thousand Lakes at
Bank One; (3) Petters $1.5 million delinquency on Polaroid royalty payments; and (4) the eleven
judgments that had been entered against him. However, as Pocock and Nassar explained to
Petters, they had convinced JPMorgan to move forward with funding the deal if Petters would
first escrow the full purchase price at Wells Fargo, then allow JPMorgan to "refinance" the
completed transaction.

88.     During its due diligence for Petters's Polaroid acquisition, JPMorgan uncovered
numerous red flags that did or should have put JPMorgan on notice of Petters's fraudulent
scheme. The windfall that JPMorgan and its One Equity executives earned on the various
transactions, both from Petters's acquisition of Polaroid and later, gave JPMorgan an incentive to
ignore these red flags. In addition to the red flags that initially showed Petters to be unbankable,
additional red flags during the due-diligence process included: (1) evasive emails from Petters's
team in response to due-diligence inquiries; (2) lack of tax returns and audited financial
statements for Petters Company, which operated the fraudulent purchase-order-financing
scheme; and (3) no Petters-controlled business was profitable.

89.     During its due-diligence review, JPMorgan asked Petters's companies for "all
Petters debt documents." The response from in-house counsel for Petters was as follows: "the
lenders have a long and deep relationship with Petters. We use them in many parts of our
enterprise. As of today they do *not* know that they will be paid off at closing. When we tell them,
there will be great pain."

90.     JPMorgan knew or should have known that this answer from Petters's in-house
counsel was false. JPMorgan was aware of the identity of several of the lenders, served as their

19

custodian, and was fully aware the lenders knew they would be paid off. Yet, JPMorgan consciously avoided pursuing its inquiry about the debt documents and the answer from in-house counsel because it knew that Petters's companies, and the purported revenue streams from them, could not stand up to scrutiny.

91.     Before JPMorgan would fund the term loan to Petters Group Worldwide and the Syndicated Lenders' revolving-credit agreement, Petters Group Worldwide was required to contribute $150 million in equity to Polaroid Holding Company. JPMorgan asked the CEO of one of Petters's companies about the source of the $150 million in equity. The CEO replied: "The $150 million of equity put into this transaction is the result of built-in equity in Petters Company. There are no individuals (other than Petters himself) that own the equity put into this transaction."

92.     Petters Company had no true equity, had no current audited financial statements and none for most of its existence, and had not filed tax returns since 2002—facts that JPMorgan discovered during its due diligence for Petters's acquisition of Polaroid. These facts should have made JPMorgan aware that the representation about "built in equity in Petters Company, Inc." was false when it was made. But JPMorgan chose not to follow up on the source of the alleged $150 million of built-in equity. It knew or should have known that the only source of the equity had to be Petters Company's purchase-order-financing scheme. It also knew or should have known that Petters would not be able to substantiate the representation about built-in equity because Petters had no audited financials to present. But confirming these facts would have prevented the transaction's consummation—JPMorgan would jeopardize its sale of Polaroid stock and the ensuing large profit for JPMorgan.

93.     JPMorgan's conscious avoidance of Petters Company's fraudulent purchase-order-financing scheme and its deliberate choice not to follow up on these due-diligence red flags were wrongful and dishonest for four reasons: (1) JPMorgan and its key executives in the One Equity Division were the primary beneficiary of Petters's purchase of the Polaroid Holding Company stock that was being financed with other people's money; (2) after the merger, the term loan and the revolving-credit agreement were secured by liens on all the Polaroid assets; (3) JPMorgan had arranged the syndicated loans and was the administrative agent for the revolving-credit agreement post-merger; and (4) JPMorgan was Polaroid Holding Company's investment advisor, not Petters's advisor, for the transaction.

94.     When it arranged Petters's purchase of Polaroid, JPMorgan was concerned that Polaroid would fail. If Polaroid did fail, the entire transaction would be voided as a fraudulent transfer. (This clearly foreseeable risk materialized after Polaroid Corporation filed a voluntary petition for chapter 11 bankruptcy relief in December 18, 2008.) In fact, one of the lenders that JPMorgan solicited to participate in the Syndicated Loan sent an email to JPMorgan stating "it appears that certain fraudulent conveyance issues may arise out of the acquisition, merger and loan and security transactions contemplated here." JPMorgan knew that such concerns over fraudulent-conveyance issues could prevent JPMorgan from selling its investment in Polaroid, or could force JPMorgan to return the profit even after the transaction closed. JPMorgan would also face liability from the Syndicated Lenders if the loans failed. JPMorgan knew that its requirement for Petters to acquire Polaroid with escrowed funds would help insulate it from liability in the event that Polaroid went bankrupt.

21

## H.   The Triple Closing.

95.    Structuring Petters acquisition of Polaroid as the refinance of transactions previously accomplished with escrowed funds required that the sale of Polaroid to Petters involve three separate closings in two months.

96.    JPMorgan required Petters to establish the escrow accounts for the purchase of the Polaroid at Wells Fargo Bank, which allowed JPMorgan to consciously avoid its responsibilities to "know your customer" under the Bank Secrecy Act and the USA PATRIOT Act.

97.    Petters was able to raise the necessary capital to fund the escrow accounts using money from victims of Petters Company's fraudulent purchase-order-financing scheme, including two coconspirators, Metro Gem, Inc. and Lancelot.

98.    The required due diligence by JPMorgan would have revealed that Frank Vennes of Metro Gem had previously been convicted of money laundering. Yet JPMorgan allowed Metro Gem's funds to be used in the Polaroid purchase without inquiry. JPMorgan's "Sources and Uses" designated the repayment of this money as "FV," using the initials for "Frank Vennes," as opposed to a designation associated with Vennes's company, Metro Gem.

99.    JPMorgan knew, from the experience of its predecessor Bank One that the Lancelot Funds had a pattern and practice of making fraudulent representations. JPMorgan further knew that the Lancelot Funds were organized for the funding of purchase-order financing activities and that the use of said funds for the purchase of Polaroid constituted a material deviation from those funds' stated purpose—to finance purchase orders, not buy companies.

100.    Petters's acquisition of Polaroid was a merger between Polaroid Holding Company, the parent of Polaroid, and one of Petters's companies, Petters Consumer Brands, a wholly owned subsidiary of Petters Group Worldwide. As a result, Polaroid became a subsidiary of Petters Group Worldwide. Petters Consumer Brands did not survive the merger.

22

101.     On March 7, 2005, Petters Consumer Brands purchased the Polaroid stock owned by parties other than One Equity Partners for $47 million, paid by a transfer from Wells Fargo Escrow Account #2 to the Harbert Distressed Investment Master Fund, Ltd account at Citibank, NA.

102.     On April 27, 2005, Petters Consumer Brands merged with Polaroid. A total of $329.2 million was transferred from a Wells Fargo Trust Wire Clearing account (which had been funded the previous day from Wells Fargo Escrow Account #2 to JPMorgan). An additional $7.90 million was transferred to an account designated by Petters Consumer Brands.

103.     JPMorgan's wholly owned private equity subsidiary, One Equity Partners, received $244 million from the sale of Polaroid to Petters. Nasser himself received $12.8 million. The millions of dollars in transactional profit earned by One Equity Partners and its executives was only a tiny portion of the "benefit" gained by them in the sale. The Polaroid transaction provided both the capital and recognition to launch One Equity Partners into a $10 billion investment operation—ultimately earning hundreds of millions of dollars for the partners.

**I.     A $125 million fraudulent note was critical to the Polaroid leveraged buyout.**

104.     As a condition of the April 27, 2005 closing, Polaroid Corporation was required to issue a subordinated, unsecured term-loan note to Petters Capital, L.L.C. ("Subordinated PC Note"). The note was guaranteed by Polaroid Holding Company.

105.     PricewaterhouseCoopers recently discovered and determined, after the first and amended complaint were filed and served in this action, that there was no economic substance to the $125 million Subordinated PC Note. The note was allegedly issued in return for a $125 million cash infusion from Petters Capital to Polaroid Corporation. But no such infusion ever

took place. JPMorgan, as Polaroid's banker and investment advisor for the transaction, knew that no money was exchanged as consideration for the note.

106.   The manufactured Subordinated PC Note was later used by Petters and Petters Capital as collateral to secure additional funding for the purchase order financing scheme— despite the fact that it had no economic substance.

107.   On March 28, 2005 JPMorgan provided $125 million in term-loan financing from its own coffers, secured by a security interest in all of Polaroid Corporation's assets and providing JPMorgan first priority to any proceeds from those assets.

108.   On March 28, 2005 JPMorgan funded a $250 million revolving-credit agreement that it arranged to provide, funded by the Syndicated Lenders to Polaroid Holding Company. The loan under the revolving-credit agreement was secured by a lien on all of Polaroid Holding Company's assets, including its ownership interest in 100% of the outstanding stock of Polaroid Corporation, the entity that owned the Polaroid registered trademark. In addition, Polaroid Corporation guaranteed payment of Polaroid Holding Company's debts under the revolving-credit agreement.

109.   From the inception of the Syndicated Lenders' revolving-credit agreement with Polaroid, JPMorgan recognized Petters Company to be a "Subordinating Party" and an "Obligor" of Polaroid debts as set forth in the Affiliate Sub Agreement. At a minimum, JPMorgan was on notice by April 28, 2005 that Polaroid Holding Company was making payments on a debt owed to Petters Company.

110.   As determined by PricewaterhouseCoopers, Petters used almost all the money from the JPMorgan loans immediately to repay the lenders that had loaned him money to fund the escrow accounts required by JPMorgan.

111.   In addition to the loans to finance the acquisition of Polaroid, Petters's personal account manager Cavatoni arranged for JPMorgan to extend an $8 million line of credit to Petters Group Worldwide.

### J.   Petters Consumer Brands—An instrument for Tom Petters to further his fraud

112.   Although the Petters Consumer Brands established on January 17, 2003 as a Delaware limited liability company had been merged out of existence in the April 2005 merger with Polaroid Holding Company, Petters continued to use the Petters Consumer Brands name as an instrumentality of fraud—both as a personal alter-ego and through the renaming of other legal entities, such as Asia Procurement Services, LLC, from April 28, 2005 forward and not informing his counterparties.

113.   The purpose of maintaining the purported existence of Petters Consumer Brands as a shadow entity was to hinder, delay, or defraud creditors who might seek to recover debts from Petters Consumer Brands through legal processes.

114.   With knowledge that Petters Consumer Brands had ceased to exist because of its merger with Polaroid Holding Company,[13] JPMorgan maintained bank accounts in the name of Petters Consumer Brands, deposited money into JPMorgan accounts held in the name of Petters Consumer Brands, and transferred money to accounts in the name of Petters Consumer Brands held at other financial institutions.

---

[13] JPMorgan officer Monica Stariha personally conducted due diligence on the merger of Polaroid with Petters Consumer Brands and was fully familiar with the details of that transaction, including the depreciation of Petters Consumer Brands in the merger. Stariha continued to be intimately involved with Polaroid, in association with Richter Consulting, in preparing the due-diligence materials for refinancing of Polaroid in 2008—the due-diligence materials continued to represent Petters Consumer Brands as a legitimate company with assets.

115.    JPMorgan served as Polaroid's investment advisor throughout the acquisition by Petters, earning a $4 million fee. This fee was in addition to its profit on the sale of Polaroid and the millions JPMorgan earned and would earn in the future as lender and administrative agent for the Syndicated Lenders.

116.    Through its roles as seller, investment advisor to Polaroid, lender, and administrative agent to the Syndicated Lenders, as well as personal-investment advisor to Petters, JPMorgan knew or should have known that Petters and Petters Company were not conducting a legitimate business and that their funding had been obtained by fraudulent means.

117.    Between April 2005 and February 2007, JPMorgan routinely allowed Polaroid Corporation to borrow money under the revolving-credit agreement to make monthly interest payments of about $1.5 million to Petters Capital under the fraudulent Subordinated PC Note. These loan requests were processed by JPMorgan's employee Omar Jones, who also arranged to wire those payments directly to Northern Trust (a bank) for the benefit of an account held in the name of Petters Capital, which was controlled by Tom Petters. In this way, JPMorgan knowingly funneled more than $30 million from Polaroid to Petters Capital and then to Petters Company between April 2005 and February 2007.

**K.  As the lender and agent of the Syndicated Lenders, JPMorgan continued to monitor or consciously avoid Petters's fraud.**

118.    JPMorgan Chase Bank, N.A. was the administrative agent for the domestic Syndicated Lenders. JPMorgan Europe Ltd. was the administrative agent for the European portion of the Syndicated Lenders.

119.    JPMorgan also continued a significant banking relationship with Polaroid and Petters and was the sole provider of the $125 million term loan. Thus, after the sale of Polaroid,

JPMorgan was still significantly involved with and knowledgeable about Petters's business

activities. Bob McDonough, Polaroid Vice President of Tax and Treasury, reported weekly to

JPMorgan about Polaroid's cash collections, projected cash inflow, accounts receivable, and

inventory.

120.    After the merger, Petters and his companies conducted numerous fraudulent

transactions that JPMorgan was aware of or that should have been detected through its Currency

and Foreign Transactions Reporting Act of 1970, 31 U.S.C. § 5311 et seq. and related federal

anti-money laundering regulations compliance program. For example, JPMorgan opened or

reopened approximately ten bank accounts at JPMorgan Chase Bank, N.A. London Branch in the

name of three Dutch shell companies.

121.    Under the Bank Secrecy Act, 31 U.S.C. section 5318(a)(2) and related

regulations, JPMorgan Chase Bank, N.A. and JPMorgan Chase Bank N.A. London Branch had

an obligation to monitor customer transactions, report suspicious activities, and guard against

money laundering that gave rise to a duty to the general public as a consequence of the critically

important public interest in detecting and preventing conventional terrorism as well as financial

terrorism in the form of multi-billion dollar Ponzi schemes that could not be operated or

promoted without the knowing and substantial assistance of systemic, global financial

institutions.

122.    Following the September 2006 sale of the Polaroid instant-film manufacturing

facility in Enschede, The Netherlands, there were few or no true operations of the Dutch Polaroid

subsidiaries. With JPMorgan's knowledge, Petters falsely utilized these Dutch Polaroid

subsidiaries as if they were still active. For example, on February 4, 2008, Chinese supplier

ProView invoiced Polaroid Consumer Electronics for 498 LCD television sets that were

27

purportedly shipped to Polaroid Trading BV Europe, FOB Hong Kong, with air shipment to

Amsterdam, then onward to the address of the already-sold Dutch instant-film factory in

Enschede. Television sets were not being shipped to a shuttered instant-film factory in the

Netherlands—the shipments were actually going to the United States. Petters just used the

company's shell to avoid taxes and maintain bank accounts. JPMorgan employees Jenn Hopkins

and Teresa Bolick communicated by fax about the transactions involving ProView, Polaroid

Consumer Electronics, and Polaroid B.V. Trading, Europe.

     123.    The bank accounts of these shell companies received millions of dollars in

payments from wire transfers of funds credited to other Petters-controlled bank accounts in the

United States and JPMorgan Europe Limited. JPMorgan then repatriated these millions back to

an account at JPMorgan Chase Bank, N.A. in New York, New York held in the name of JP

Morgan Europe Limited. From there, they were transferred to an account at JPMorgan Chase

Bank, N.A. in Chicago held in the name of Polaroid Consumer Electronics, LLC. From that

account, the funds were wired back to JPMorgan Chase Bank, N.A in New York. Finally, they

were transferred to the Syndicated Lenders. This structure was designed and used in violation of

JPMorgan's BSA/AML and tax-reporting obligations. It also resulted in inappropriate

commingling of funds from purportedly separate Dutch entities and from other Polaroid affiliates

without any legitimate purpose. In February 2008, JPMorgan would use these accounts to

launder about $43 million from the proceeds of Ritchie's loans to Petters.

     124.    JPMorgan knew from Richter Consulting, discussed in greater detail below, that

the assets of the Dutch entities had already been sold and that the companies were no longer on-

going enterprises. The $18.8 million sales price of the Dutch entities was applied to Polaroid's

$125 million JPMorgan term loan, reducing the balance on that loan to about $40 million. The

fact that funds flowed through the accounts for these Dutch entities at all was highly suspicious and should have been detected by JPMorgan's compliance-and-detection program.

125.    The Bank Secrecy Act, 31 U.S.C. § 5318 (g)(1), (h)(1) required JPMorgan to implement a compliance program to monitor customer transactions, like the transactions that Petters consummated by and through the blocked accounts between October 18, 2006 and the day he was arrested on October 3, 2008 and report suspicious transactions relevant to a possible violation of the law or regulation. JPMorgan should have filed Suspicious Activity Reports for the transactions related to: (1) the blocked accounts discussed below, (2) any other accounts owned or controlled by Tom Petters, Polaroid Consumer Electronics Europe, B.V., Polaroid Consumer Electronics, LLC or Petters Consumer Brands, and (3) any of the 22 Polaroid Holding Company-related "Borrowers" that executed forbearance agreements regarding the Syndicated Loan.

126.    The Department of the Treasury has since determined that JPMorgan's internal controls and anti-money-laundering-detection programs were deficient during this time period. The Treasury stated: "Some of the critical deficiencies in the elements of the Bank's BSA/AML compliance program, resulting in a violation of 12 U.S.C. § 1818(s)(3)(A) and 12 C.F.R. § 21.21, include the following:

(a)    The Bank has an inadequate system of internal controls and independent testing.

(b)    The Bank has less than satisfactory risk assessment processes that do not provide an adequate foundation for management's efforts to identify, manage, and control risk.

(c)    The Bank has systemic deficiencies in its transaction monitoring systems, due-diligence processes, risk management, and quality assurance programs.

(d)      The Bank does not have enterprise-wide policies and procedures to ensure that

foreign branch suspicious activity involving customers of other bank branches is

effectively communicated to other affected branch locations and applicable AML [Anti

Money Laundering] operations staff. The Bank also does not have enterprise-wide

policies and procedures to ensure that on a risk basis, customer transactions at foreign

branch locations can be assessed, aggregated, and monitored.

(e)      The Bank has significant shortcomings in SAR [Suspicious Activity Report]

decision-making protocols and an ineffective method for ensuring that referrals and alerts

are properly documented, tracked, and resolved."[14]

127.     JPMorgan later acknowledged that its conduct regarding Petters was

inappropriate. As one JPMorgan employee put it—in an email encouraging JPMorgan to learn its

lesson and conduct additional due diligence of Bernie Madoff's purported businesses—"The

[due diligence] done by all counterparties seems suspect. Given the scale and duration of the

Petters fraud it cannot be sufficient that there's simply trust in an individual and there's been a

long operating history . . . . Let's go see Friehling and Horowitz [Bernie Madoff's auditors] the

next time we're in NY . . . to see that the address isn't a car wash at least." This refers to

Petters's fraudulent scheme, which included conspiring with others to create a company that was

purported to be the main supplier and warehouse for the electronic equipment he was allegedly

buying and selling. That purported supplier was nothing more than a sham company with no

legitimate business and with a business address located above a car wash. In JPMorgan's own

---

[14] Consent Order, Department of the Treasury, Comptroller of the Currency, AA-EC-13-04, at
pp. 3–4 (http://www.occ.gov/news-issuances/news-releases/2013/nr-occ-2013-8a.pdf).

words, it was simply relying on Petters's own statements and Petters's lengthy operating history rather than meeting its legal obligations to conduct a thorough due diligence.

**L.    Polaroid's default on the loans.**

128.    Under the terms of both the term-loan agreement and the revolving-credit agreement, Polaroid was required to provide audited financial statements to JPMorgan within 90 days after the end of the year.

129.    Polaroid was unable to provide the required audited financial statements for the year ending December 31, 2005. Rather than declare the loans in default, JPMorgan repeatedly waived Polaroid's failure to provide audited financial statements.

130.    Three significant amendments to the loan agreements were made in September and October 2006. First, the Syndicated Lenders again waived the default that would otherwise result from Polaroid's inability to provide the lenders with audited financial statements. Second, the revolving-loan commitment amount was increased from $250 million to $325 million. Third, the parties added a particular $12 million "European Reserve" requirement to the loan documents and permitted several European subsidiaries of Polaroid to access the loan, including Polaroid (UK), Ltd. As discussed above, the Petters Group Worldwide line of credit was additionally increased from $20 million to $40 million.

131.    A $500,000 amendment fee was charged. JPMorgan Securities, Inc. received an additional $750,000 fee for the increase in the loan-commitment amount.

**M.    The London blocked-account agreements.**

132.    JPMorgan and the various Polaroid entities entered into so-called blocked-account agreements (also another term for a lockbox account) so that money funneled into ten different

accounts at JPMorgan Chase Bank, N.A. London Branch held in the name of three different

Petters-controlled shell companies, such as Polaroid Consumer Electronics Europe B.V., would

be swept daily and comingled in an account controlled by JPMorgan Europe Limited at

JPMorgan Chase Bank, N.A. London Branch. Once swept, only instructions from JPMorgan

Europe Ltd.—not any Polaroid or Petters entity—could authorize the blocked-account funds to

be transferred. These blocked-account agreements helped Petters launder his money and obscure

the source and true nature of funds that JPMorgan ultimately accepted from him as loan

repayments. Teresa Bolick of JPMorgan Chase & Co. and Helen Mathie of JPMorgan Europe,

Ltd. were responsible for creating these blocked-account agreements.

133.     By February 2007, Polaroid still had not provided audited financial statements for

2005 or 2006. In fact, Deloitte & Touche abandoned the audit it was conducting because the

auditors would not be able to provide an unqualified audit opinion about the integrity of

Polaroid's financial statements.

134.     JPMorgan declared a default. Instead of starting litigation to obtain the assets

securing the loans, JPMorgan entered into a series of forbearance and other extension agreements

with Polaroid, at least ten such agreements in all, over the next year. JPMorgan's policies and

procedures, as well as regulatory requirements, required that each loan extension be reviewed by

various committees within JPMorgan before execution. Rather than seize the collateral—

Polaroid's assets—those committees permitted JPMorgan to continue to prop up Petters's fraud

in the hopes of getting repaid. Seizing the collateral would have heightened the scrutiny and risk

that the entire structure would be exposed as fraudulent and unwound as a series of fraudulent

conveyances.

**N.    JPMorgan forces Polaroid to hire Richter Consulting, who reported directly to JPMorgan.**

135.    The first loan extension from JPMorgan to Polaroid, in February 2007, required

Polaroid Corporation and related companies to enter into an engagement agreement to use

Defendant Richter Consulting as a consultant. The agreement required them to give Richter

Consulting complete access to Polaroid's books and records and to allow Richter Consulting to

make reports to JPMorgan about Polaroid's financial condition. This arrangement transformed a

"lending" relationship into a participatory workout arrangement.

136.    In JPMorgan's letter dated February 1, 2007 to Polaroid Corporation, written in

the bank's role as U.S. Administrative Agent on behalf of the Syndicated Lenders, JPMorgan

required that:

> On or before February 9, 2007, the Loan Parties retain a consultant
> acceptable to the U.S. Administrative Agent in its discretion to perform
> reviewing and monitoring functions acceptable to it. Such consultant must
> be actively employed by the Loan Parties and be given direct access to all
> information, personnel and other resources necessary to the performance
> of his or her duties and further, such consultant must provide the
> Administrative Agents and Lenders with an initial report.[15]

137.    On March 12, 2007, JPMorgan, through Monica A. Stariha, Regional Portfolio

Manager to Polaroid, invoked its rights under its loan agreements with Petters Capital to prohibit

Polaroid from making any more payments to Petters Capital under the $125 million

Subordinated PC Note.

138.    On May 5, 2007, Richter Consulting reported to JPMorgan that Polaroid's

consumer-electronics business was "currently not viable." The "Activity Detail" by Teresa

Bolick described Richter Consulting's report at the May 25, 2007 Syndicated Lender meeting:

---

[15] *See* 2-1-07 Polaroid Default Letter.

"that the CE [consumer electronics] business as it is being operated currently is not viable with

extremely thin margins and a heavily concentrated customer base. Co does not have any plans

to rationalize operations to reflect the current cash flow situation as it has several new products

soon to be launched (summer '07 to early '08) that are expected to revamp the business with

significant demand and much higher margins. Richter also noted that the 2007 budget given to

the bank group was aggressive in many of its assumptions and together with the report on the

CE business, required significant patient (*i.e.,* equity) funds to ensure adequate liquidity."

139.    On June 19, 2007, Polaroid attorney Steven Fox wrote to JPMorgan: "As you

know, Polaroid has engaged Richter Consulting, Inc. at the Lenders' insistence following

execution by the parties of the 11th amendment to the Credit Agreement." The April 28, 2005

Affiliate Subordination Agreement under review put Richter Consulting on notice that Polaroid

had been making payments to Petters Company.

140.    On August 27, 2007, JPMorgan, as administrative agent for the Syndicated

Lenders, sent Polaroid a Notice of Default on the Syndicated Loan. A true and correct copy of

the August 27, 2007 Default Notice is attached as Exhibit A.

141.    The August 27, 2007 Default Notice stated that, under the previous forbearance

agreement between the parties, Polaroid was obligated to secure a loan commitment by

August 15, 2007 from Jefferies & Company[16] to refinance the Syndicated Loan, and Polaroid

had failed to do so. The Default Notice also listed several other events of default, including the

failure to deliver audited financial statements.

---

[16] Bob Lessin Jefferies & Company, Madison Avenue, 10022 New York, NY—not to be
confused with Mary Jefferies, of Petters Group Worldwide.

142.    As of August 27, 2007, JPMorgan and Richter Consulting had actual knowledge that Polaroid was not able to legitimately obtain a conventional-loan commitment to refinance the debts owed to the Syndicated Lenders, in part because Polaroid had no audited financial statements.

143.    JPMorgan did not enforce its rights under the $40 million line-of-credit agreement with Petters Group Worldwide after declaring default under the revolving-credit agreement in August 2007. Instead, it continued to provide credit to Petters Group Worldwide under that credit line with actual knowledge that the debts owed to JPMorgan by Petters Group Worldwide would be repaid with money taken by JPMorgan from Petters's personal accounts after that money was funneled into those accounts from Petters Company's account at M&I bank.

144.    By September 2007, JPMorgan and the Syndicated Lenders wanted to exit from their financing of Polaroid and Petters. They were unwilling to increase the amount of credit available to Polaroid.

145.    As of September 11, 2007, Petters Group Worldwide owed JPMorgan approximately $20 million under the Petters Group Worldwide $40 million line of credit.

146.    At that time, JPMorgan and Richter Consulting knew that: (1) Petters was not conducting a legitimate business at Petters Company; (2) Petters Group Worldwide was not a bona fide equity sponsor; (3) neither Polaroid nor Petters Group Worldwide could legitimately obtain a loan to refinance the revolving-credit agreement funded by the Syndicated Lenders; and (4) the only way to avoid a forced liquidation was to induce a third party to provide refinancing.

147.    Furthermore, JPMorgan knew that if it forced liquidation the following would take place: (1) it would be forced to disgorge the windfall profits made on the 2005 sale of Polaroid to Petters Group Worldwide as fraudulent conveyances; (2) Petters's fraud would be

publicly disclosed and JPMorgan would be liable to the Syndicated Lenders for its role as the

agent for the Syndicated Loan; and (3) JPMorgan would have to disgorge millions in fees and

other compensation it earned as lender and advisor.

**O.    JPMorgan and Richter Consulting arrange for "structured" repayment from Petters Company and Petters's personal guarantee.**

148.    On October 17, 2007, in a call with JPMorgan and Richter Consulting, Polaroid

discussed a financing option under which, in consideration for additional forbearance and

extensions of credit under the revolving-credit agreement, Petters Group Worldwide would make

repayments of $6 million, $4 million, $5 million, and $5 million each week, beginning on

October 22, 2007. JPMorgan and Richter Consulting both knew or should have known that

Petters was irretrievably insolvent and that the only source of funds available to Petters Group

Worldwide, other than an advance from JPMorgan under Petters Group Worldwide's $40 million

credit line of the remaining $20 million, was Petters Company's fraudulent purchase-order-

financing scheme. At the time, Tom Petters owed more than $140 million to Opportunity

Finance Securitization III, LLC that he would never be able to repay because the primary

obligor, PC Funding, LLC had no "accounts receivable" or other assets. Thus, JPMorgan and

Richter knew that they were receiving payments from the Petters Company Ponzi scheme and

disguising them as small payments rather than a large $20 million payment.

149.    Intending to conceal the source, ownership, and control of the money used to

make these four payments, JPMorgan or Richter Consulting instructed Petters to make sure the

funds were not transferred directly from Petters Company to JPMorgan, but to have Petters

Company funnel the money to Petters Capital's account at Northern Trust and then have

Northern Trust wire the funds to a designated account at JPMorgan.

150.    As a condition to entering into a forbearance agreement on November 6, 2007,
and with the actual intent to hinder, delay, and defraud his present and future creditors, and in
furtherance of Petters Company's fraudulent purchase-order-financing scheme, some time before
November 6, 2007 Petters executed and delivered a guaranty agreement to JPMorgan ("Support
Guaranty") under which Petters personally guaranteed payment of up to $20 million of the debts
owed by Polaroid Holding Company, Polaroid Corporation, and related companies to the
Syndicated Lenders. Petters's personal liability under the Support Guaranty was reduced, dollar
for dollar, to the extent that Petters caused Petters Company or a related party to make the wire
transfers of $6 million, $4 million, $5 million, and $5 million to JPMorgan each week for four
consecutive weeks beginning on October 22, 2007. The Support Guaranty is attached hereto as
Exhibit B.


**P.    JPMorgan forces Polaroid to expand Richter Consulting's role to find a repayment
        source.**

151.    Under the forbearance agreement between JPMorgan and Polaroid dated
November 6, 2007, JPMorgan agreed to withhold from exercising its remedies based on the
default under the revolving-credit agreement until February 10, 2008.

152.    The forbearance agreement also required Polaroid Corporation and related
companies to continue employing Richter Consulting under the February 2007 engagement
agreement.

153.    The forbearance agreement also required that JPMorgan "be kept fully informed
of any future refinancing, equity contribution or other recapitalization efforts and . . . participate
in any scheduled bank calls."

154.    After November 6, 2007, Richter Consulting continued to monitor the financial
affairs of Polaroid Corporation and related companies, and regularly reported to JPMorgan about
cash flow, borrowing-base forecasts, and other financial matters. JPMorgan and Richter
Consulting had bank calls with Polaroid employees at least once a week in November 2007,
December 2007, and January 2008.

155.    The forbearance agreement also provided that if Polaroid did not repay the full
amount of a revolving-credit agreement by December 8, 2007, then Polaroid must retain an
investment bank to help Polaroid in monetizing its trademark and brand.

156.    The debt owed under the revolving-credit agreement was not repaid by December
8, 2007. Polaroid did not retain a reputable investment bank as required by the forbearance
agreement. On December 18, 2007, JPMorgan and Polaroid agreed to amend Richter
Consulting's engagement agreement "in order to expand the scope of the services to be provided
by [Richter] to Polaroid Corporation and related companies." Richter "agreed to assist Polaroid
and related companies in connection with its efforts to solicit interest from certain third parties,
as such parties may be identified from time-to-time by the Company in providing the Company
with a secure line of credit or other financing facility utilizing the 'Polaroid' brand and/or other
Company intellectual property as collateral." Under the agreement, to provide such help, Richter
Consulting was required to: (1) help Polaroid prepare appropriate due-diligence materials for
dissemination to interested third parties, (2) help Polaroid management with Polaroid's due-
diligence activities and related communications with third parties, and (3) consult with Polaroid
and its other advisors and counsel in connection with these financing-related activities and

efforts.[17] Richter Consulting acted under JPMorgan's direction and control and compiled reports according to JPMorgan's expectations. Despite being engaged by Polaroid, Richter Consulting was JPMorgan's agent for the Polaroid engagement.

157.    Richter Consulting provided JPMorgan with reports of Polaroid's cash flow and borrowing availability.[18] As a result, Richter Consulting and JPMorgan were fully aware of the funds passing through the blocked accounts at JPMorgan's London Branch and through Polaroid's multiple accounts, whether at JPMorgan or elsewhere, as of January and February 2008. JPMorgan watched this activity and monitored the reports intently because they knew that these funds would be the source of their repayment.

158.    Between September 2007 and July 2008, JPMorgan made loans to Petters Group Worldwide under the $40 million line of credit to enable Petters to fraudulently transfer those loan proceeds to JPMorgan and the Syndicated Lenders to repay the debts owed to the Syndicated Lenders under the revolving-credit agreement.

---

[17] Letter agreement from Robert J. McDonough (Polaroid) to Stephen Rosenhek (Richter) dated December 18, 2007. *See*: JPM_HC_2001629 Letter Amendment Agreement.

[18] Email Message of 21 December 2007 from Robert M. Gannon to Teresa M. Bolick (JPMorgan) with copies to John W. Nich, Robert J. McDonough, SRosenhek@richterconsulting.com, myedid@richterconsulting.com, RHeneine@richterconsulting.com, Thomas L. Beaudoin and Mary Jeffries ("See attached file of the Polaroid 19 Week Domestic Cash Flow & Borrowing Availability Forecast."); Email Message of 1 February 2008 from Robert M. Gannon to Teresa M. Bolick (JPMorgan) with copies to John W. Nich, Robert J. McDonough, SRosenhek@richterconsulting.com, myedid@richterconsulting.com, RHeneine@richterconsulting.com, Thomas L. Beaudoin and Mary Jeffries (See attached file of the Polaroid 13 Week Domestic Cash Flow & Borrowing Availability Forecast.)

**Q.   JPMorgan and the Syndicated Lenders inform Petters that they know about his fraud.**

159.   JPMorgan and the Syndicated Lenders met with Polaroid's Vice President of Tax and Treasury, Robert McDonough, and a lawyer from the law firm of Dreier LLP representing Petters, Paul Traub, in Chicago around January 7, 2008. Polaroid made a presentation about its financing initiatives to JPMorgan and the Syndicated Lenders. The company needed money to pay off the debt owed under the revolving-credit agreement and asked to extend the forbearance period to March 10, 2008.

160.   At this meeting, Traub explained his work completing a transaction between Polaroid Corporation and Iconix under which Polaroid Corporation would grant an interest in the "Polaroid" trademark to Iconix in exchange for cash and securities worth approximately $338 million. Polaroid expected the transaction to be closed by March 10, 2008.

161.   Polaroid asked JPMorgan and the Syndicated Lenders to extend the forbearance period from February 10, 2008 to March 10, 2008.

162.   JPMorgan and the Syndicated Lenders denied Polaroid's request for an extension and informed Traub that a former employee of General Electric Capital Corp. ("GE Capital"), a lender to Petters in 2000, had let JPMorgan and the Syndicated Lenders know that, in 2000, GE Capital terminated a $50 million revolving-credit agreement with an affiliate of Petters Company named Petters Capital. GE Capital terminated the agreement when it discovered that Petters Capital had fraudulently induced GE Capital to make loans totaling about $45 million after relying on counterfeit Costco purchase orders. GE Capital informed JPMorgan and the Syndicated Lenders about Petters's related intentional misrepresentations about Petters Company's intent to use those loan proceeds to buy consumer goods for resale to Costco—goods

40

that actually did not exist. This was a disclosure to JPMorgan and the Syndicated Lenders of the precise fraudulent purchase-order scheme that formed the basis of Petters's Ponzi scheme.

163.     After gaining this actual knowledge of Petters Company's fraudulent purchase-order-financing scheme from the former GE Capital employee, JPMorgan was no longer willing to enter into any more forbearance agreements regarding the Syndicated Loan and demanded repayment immediately.

164.     Shortly after the conclusion of the meeting with JPMorgan and representatives of the Syndicated Lenders in Chicago, Traub immediately flew to the Bahamas and met with Petters, informing him that JPMorgan was aware of the fraud, knew what GE Capital discovered in 2000, and that JPMorgan was "scared to death" and wanted their money paid back immediately.

165.     In early February, Mary Jeffries, then chief operating officer of Petters Group Worldwide, sent an email to her colleagues expressing annoyance that they had wasted so much time trying to negotiate an extension to March 10, 2008 when, in fact, JPMorgan and the Syndicated Lenders were adamant that they would not do so.

**R.   JPMorgan forces and encourages Petters to defraud Ritchie.**

166.     Traub's report to Petters caused Petters to become desperate to pay the approximately $50 million owed to the Syndicated Lenders before the February 10, 2008 deadline. Petters knew that Polaroid's situation was dire and that unless the debts owed to the Syndicated Lenders were paid by February 10, 2008, JPMorgan could enforce its rights under a stock-pledge agreement with Polaroid Holding Company and take 100% of the stock of Polaroid Corporation in satisfaction of the debt that remained unpaid as of February 10, 2008. This would mean Petters would lose the entire $425 million he paid JPMorgan for Polaroid in 2005.

167.    JPMorgan left Petters no alternatives. He had to find a source of funds before February 10, 2008 or lose Polaroid. And likely the entire Ponzi scheme would collapse as well— at a time when JPMorgan was fully aware that Petters was a criminal.

**S.    February 1, 2008.**

168.    Petters first solicited a loan from Ritchie on January 31, 2008—just days before the deadline to repay JPMorgan.

169.    Petters did not disclose any of his numerous frauds to Ritchie. Instead, he induced Ritchie to extend loans to him and his companies based on false representations and material omissions that led Ritchie to believe he was entirely a legitimate businessman and that Ritchie would have a security interest in Polaroid and its brand.

170.    Petters failed to disclose that Petters Company was not conducting a legitimate business and was, in fact, conducting a fraudulent purchase-order-financing scheme.

171.    Petters also misrepresented the financial condition of one of the borrowers, Petters Group Worldwide, and stated that it had no debt when, in fact, Petters Group Worldwide owed approximately $20 million under its $40 million credit facility from JPMorgan and approximately $396 million to Petters Company. Thus, Petters grossly misrepresented the indebtedness of Petters Group Worldwide and JPMorgan was aware of the misrepresentation.

172.    On February 1, 2008, Polaroid Corporation employee Robert Gannon sent JPMorgan employee Teresa Bolick an Excel spreadsheet containing Polaroid's 13 Week Domestic Cash Flow and borrowing-base-availability forecast. This email and the attached Cash Flow and Borrowing Base Report were also emailed to Petters Group Worldwide's president and chief operating officer Mary Jeffries and to three individuals associated with Richter Consulting.

42

173.    The Cash Flow and Borrowing Base Report showed that Polaroid did not have the liquid assets needed to pay off the amount owed to the Syndicated Lenders as of February 1, 2008 by February 10, 2008.

174.    The Cash Flow and Borrowing Base Report predicted that only about $10 million in "CE receivables" would be collected during the week of February 3–10, 2008.

175.    Ritchie was provided with due-diligence materials that had been ratified by Richter Consulting. At 4:37 p.m. on Friday, February 1, 2008, Camille Chee Awai, an officer of Petters Group Worldwide and other Petters companies, sent an email to Ritchie, cc'd to Jeffries, Baer, Petters, and two individuals at investment-banking firm Calibrax, L.L.P. The documents were purported to include a draft of Polaroid's 2006 audited financial statements, the last financial report sent to JPMorgan purporting to reflect Polaroid's financial performance as of November 30, 2007, a brand valuation by Duff and Phelps, and a summary of Polaroid's historical financials and capital structure. (*See* Exhibit D attached hereto.)

176.    Chee Awai's email represented that the due-diligence materials included a draft of Polaroid's audited financial statements for 2006.

177.    Chee Awai's representation in the email that the attached financial statements were in the process of being audited was intentionally false and misleading. The financial statements attached were falsely labelled "Final Bank Draft" even though, unbeknownst to Ritchie, the audit had already been abandoned by Deloitte & Touche and would never be finalized.

178.    The due-diligence materials further included the November 2007 financial report that Richter Consulting provided to JPMorgan.

179.    The due-diligence material included the following misrepresentations:

a)  falsely claimed that Petters Consumer Brands was a wholly-owned subsidiary of
Petters Group Worldwide;

b)  falsely claimed that Petters Consumer Brands had "reorganized" as "Polaroid
Consumer Electronics";

c)  contained inflated and misleading projections about the likely amount of
Polaroid's future consumer-electronics accounts receivable in that they were
inconsistent with the past operating results of Polaroid's consumer-electronics
business—the very business that Richter Consulting had concluded in May 2007
was "not viable."

d)  fraudulently inflated the assets of Polaroid by including accounts receivable owed
to a separate entity, PNY Technologies, as if they were accounts receivable of
Polaroid. PNY only owed the licensing fees for using the Polaroid trade name on
its products. But Polaroid claimed the entire value of the products, just not the
licensing fees.

e)  included additional false accounts receivables.

180.    The due-diligence materials provided by Polaroid and Richter Consulting:

a)  failed to disclose that Polaroid was deceptively factoring the purchase of
equipment manufactured by ProView, a Chinese electronics manufacturer, but
using sale proceeds of the same equipment to repay JPMorgan;

b)  failed to disclose Petters's and Petters Company's fraud;

c)  failed to disclose that a former disgruntled partner of Tom Petters had sent a letter
to Polaroid and Wells Fargo notifying them of the fraud before the Polaroid sale
and two subsequent injunctions;

44

   d)  failed to disclose JPMorgan's outstanding loan to Petters Group Worldwide;

   e)  failed to show that Petters had already negotiated a $10 million discount on a $40 million Walmart receivable, thereby reducing the value of the Polaroid accounts receivables by $10 million;

   f)  failed to show that Polaroid had entered into a factoring agreement with Lancelot which reduced the value of its receivables by 10%; and

   g)  failed to disclose that JPMorgan was helping Petters funnel money to blocked accounts held by Polaroid shell companies that disguised the source of the funds.

181.    Richter Consulting knew that the representations in the due-diligence materials were false when they were made. Richter knew that falsely inflating the value of receivables materially overstated the value of the company. Richter Consulting was a participant in the negotiation of agreements, the preparation of financials, and the booking of receivables.

182.    Relying on these false representations:

   a)  On February 1, 2008, Ritchie Special Investments Credit, Ltd. loaned $31 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

   b)  Three days later, on February 4, 2008, Ritchie Special Investments Credit, Ltd. loaned another $31 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

   c)  The next day, on February 5, 2008, Yorkville Investments I loaned $13 million to Petters and Petters Group Worldwide, who are listed as Borrowers on the duly executed promissory note.

d) On February 7, 2008, Ritchie Special Investments Credit, Ltd. loaned $4 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

e) Later in the day on February 7, 2008, Rhone Holdings II. Ltd. loaned $12 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

f) On February 15, 2008, Yorkville Investments I loaned an additional $5 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

g) On February 19, 2008, Ritchie Special Investments Credit, Ltd. loaned $9 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

h) Also on February 19, 2008, Rhone Holdings II. Ltd. loaned $16 million to Petters and Petters Group Worldwide, who are listed as Borrowers on a separate duly executed promissory note.

183.    Nowhere is Petters Company Inc. listed as a borrower of these funds. The Court has found that at the time of these loans, Ritchie understood that Petters Group Worldwide and Petters sought the short-term loans to "pay off JPMorgan."[19] It is undisputed that over $100 million was loaned to Petters and Petters Group Worldwide from February 1–5, 2008 by certain of the Plaintiffs with the understanding that the funds would be used to "pay off JPMorgan."

184.    Under Richter Consulting's December 18, 2007 letter agreement with Polaroid Corporation and related companies, Richter Consulting was responsible for "assist[ing] and

---

[19] *In re Polaroid Corporation, et al.*, 472 B.R. 22, 58 (D. Minn. Bankr., 2012).

facilitat[ing] Polaroid management in connection with the Company's due-diligence activities and related communications with third parties."

185.   By electing to make statements of fact regarding Polaroid's financial condition and financial affairs in documents that Richter Consulting knew would be transmitted to prospective lenders, Richter Consulting assumed a duty to ensure that any of its statements were not false or misleading.

186.   Richter Consulting knew third parties such as Ritchie would be relying on these due-diligence materials, and Ritchie did rely upon the accuracy and truthfulness of the due-diligence materials prepared by or ratified by Richter Consulting, before making its February loans.

187.   By making false or misleading statements in the due-diligence materials that were sent to Ritchie by Chee Awai on February 1, 2008 and the following days, or as a result of material omissions to those statements, Richter Consulting breached its duty not to make false or misleading statements to Ritchie. Further, Richter Consulting knew that the accounts-receivable aspect of the due-diligence materials was fraudulently inflated.

188.   Ritchie analyzed these due-diligence materials to determine revenue and valuation figures that it needed and relied on in extending loans to Petters and Petters Group Worldwide.

189.   Petters told Ritchie he would repay the loan within 90 days. But Petters had no intention of repaying.

190.   As Richter Consulting and JPMorgan were aware, Polaroid needed long-term capital to complete a restructuring from its prior business model based on instant film. JPMorgan was not willing to provide long-term capital and knew that a 90-day loan from Ritchie would not be sufficient for Polaroid's needs.

191.     As custodian for twenty of the investors in Petters Company, JPMorgan knew that Petters Company's financing scheme was in distress and that most of the feeder funds had gone into redemption or had frozen redemptions.

192.     The relative knowledge of JPMorgan, Richter Consulting, and Ritchie on February 1, 2008 is summarized in the following table:

| Fact | JPMorgan | Richter Consulting | Ritchie |
|---|---|---|---|
| Thousand Lakes LLC, a Petters company, was intertwined with Greg Bell's fraudulent misrepresentations with the Lancelot Fund at Bank One. | Knew | | Didn't Know |
| Petters had defrauded GE Capital. | Knew | | Didn't Know |
| The Lancelot Fund, provider of $225 million of the money used by Petters in the acquisition of the Polaroid stock, made fraudulent misrepresentations at Bank One. | Knew | | Didn't Know |
| Convicted money launderer Frank Vennes (of Metro Gem) provided $35 million of the money used by Petters in the acquisition of the Polaroid stock. | Knew | | Didn't Know |
| JPMorgan accepted Petters's statement that "you can't look behind the curtain or all Hell will break loose" as a substitute for performing complete due diligence on the Polaroid deal. | Knew | | Didn't Know |
| No cash had been deposited into any Polaroid bank account in exchange for the $125 million note to Petters Company executed at the closing of the Polaroid sale. | Knew | Knew | Didn't Know |
| Petters Company was engaged in fraud. | Knew | | Didn't Know |
| Petters Company was funneling money to Polaroid. | Knew | Knew | Didn't Know |
| Petters Group Worldwide owed $20 million to JPMorgan. | Knew | Knew | Didn't Know |
| The due-diligence materials provided to Ritchie by Chee Awai were false and misleading. | Knew | Knew | Didn't Know |
| The Deloitte & Touche "draft" audit provided to Ritchie had been abandoned by Deloitte. | Knew | Knew | Didn't Know |
| The due-diligence materials contained intentional misrepresentations about Polaroid consumer-electronics accounts receivable that were inconsistent with Polaroid's past operating results. | Knew | Knew | Didn't Know |

| Fact | JPMorgan | Richter Consulting | Ritchie |
|------|----------|--------------------|---------|
| Polaroid had entered into a factoring agreement with Lancelot that reduced the value of its accounts receivables by 10% | Knew | Knew | Didn't Know |
| Petters had already negotiated a $10 million reduction in a $40 million Walmart receivable, thereby overstating the value of the receivables by $10 million. | Knew | Knew | Didn't Know |
| Polaroid was factoring the purchase of equipment manufactured by Proview, but using the sale proceeds of the same equipment to repay JPMorgan. | Knew | Knew | Didn't Know |
| The due-diligence materials fraudulently included accounts receivables of PNY as if they were accounts receivable of Polaroid. | Knew | Knew | Didn't Know |
| A 90-day loan from Ritchie would not be sufficient for Polaroid's needs. | Knew | Knew | Didn't Know |

193.    On February 1, 2008, Ritchie instructed JPMorgan to wire $31 million out of a Ritchie account at JPMorgan to a Petters Company account controlled by Petters based on the false representations and material omissions from Petters about the business of Petters and Petters Company and his intent to repay the loan, assisted by JPMorgan and Richter Consulting through the due-diligence materials and by propping up Petters's scheme. To the present day, Richter Consulting touts the misrepresentations that it made to Ritchie in its marketing materials, "**$1B consumer products manufacturer—Polaroid** Developed a comprehensive liquidity forecasting model and assessed financial forecasts and product line profitability, resulting in a successful refinancing of the Company's senior debt facility." (http://richterconsulting.com/ConsumerProducts.asp)

194.    Petters agreed to be a co-obligor of the promissory note that he executed and delivered as consideration for the $31 million loan made by Ritchie on February 1, 2008.

195.    Ritchie understood that the $31 million loan would be secured by Polaroid's assets. The loan documents indicate Petters would "endeavor . . . to secure [the loan] by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one

49

hundred percent subsidiary the Polaroid Corporation." Ritchie never received the actual

collateral or equivalent value for this security interest.

196.    The $31 million Ritchie loaned to Petters and Petters Group Worldwide was

moved from the Petters Company account through the bank accounts of several shell entities

associated with Petters, before being wired to the JPMorgan bank accounts—including the

blocked accounts—in London, New York, and Chicago. These transfers served no legitimate

purpose other than to obscure the source of the funds. They constitute money laundering.

197.    Within four days, Petters transferred $31 million to JPMorgan to settle Polaroid's

remaining debt to JPMorgan and the Syndicated Lenders.

**T.    Later February loans by Ritchie.**

198.    Chee Awai and other Petters's representatives sent additional due-diligence

materials to the Ritchie team over the following days, again failing to disclose Petters's and

Petters Company's fraud or to correct the earlier misrepresentations. Thane Ritchie attended a

meeting with Petters and others where he was shown additional financial information such as

weekly cash flows. These weekly cash-flow reports were part of Richter Consulting's

responsibility under its engagement agreement with Polaroid.

199.    On February 4, 2008, Ritchie Special Investments Credit, Ltd. loaned Petters and

Petters Group Worldwide another $31 million, who are listed as Borrowers on a separate duly

executed promissory note.

200.    On February 4, 2008, JPMorgan received $3,880,643.78 paid from an account

controlled by Petters.

201.    The next day, February 5, 2008, Yorkville Investments I loaned $13 million to Petters and Petters Group Worldwide, who are listed as Borrowers on the duly executed promissory note.

202.    Then on February 6, 2008, JPMorgan received $28,227,214.40 paid from an account controlled by Petters to JPMorgan.

203.    As further evidence of JPMorgan's aiding and abetting, even after JPMorgan finally succeeded in its plan to find another lender to repay its loan to Polaroid, it immediately loaned Polaroid another $12 million, secure in the knowledge that Petters was obtaining other loans from Ritchie by fraudulent means.

204.    On February 7, 2008, JPMorgan extended this short-term loan to Polaroid of $12 million. At approximately the same time as this $12 million loan, the $12 million "European Reserve" created by the September and October 2006 amendments to the loan agreements, described above, was released. Later that day, Ritchie instructed JPMorgan to wire $16 million out of Ritchie account at JPMorgan to a Petters Company account controlled by Petters based on misrepresentations by Petters similar to the ones that induced the original $31 million loan.

205.    On or about February 8, 2008, JPMorgan transferred $31 million to the Syndicated Lenders. JPMorgan Chase Bank, N.A. received approximately $4,472,259.64; Wachovia Capital Finance received approximately $4,324,007.94; UBS Loan Finance LLC received approximately $3,336,397.54; Merrill Lynch Capital received approximately $3,326,397.54; LaSalle Business Credit received approximately $3,088,577.10; The CIT Group received approximately $3,088,577.10; PNC Bank, N.A. received approximately $2,375,115.79; Fifth Third Bank received approximately $1,899,474.92; Webster Business Credit received approximately $1,426,922.62; Associated Commercial Finance, Inc. received approximately

$1,426,922.62; JPMorgan Europe Ltd. received approximately $1,704,894.56; and Wachovia

Capital Finance (Europe) received approximately $426,223.54.

206.     Specifically, on or about February 12, 2008, Petters used $12 million of Plaintiffs'

February 7, 2008 loan to repay the new loan JPMorgan made to Polaroid just five days earlier.

Given the regular reports JPMorgan received from Richter Consulting about Polaroid's finances,

JPMorgan was aware that Ritchie would be the source of repayment days later. There was no

legitimate purpose for this short-duration loan.

207.     On February 13, 2008, Polaroid Holding Company entered into a Payoff

agreement specifying that Polaroid Holding Company make a payment of approximately $5

million to a specified account. JPMorgan specified that if the amount specified was paid by

Wednesday 11:00 Feb 14, 2005, then JPMorgan will release all of its liens. The letter

memorialized that the principal and interest is zero, after crediting the payments on Monday the

12th and Tuesday the 13th.

208.     On February 14, 2008, JPMorgan received funds in satisfaction of the February

13th payoff letter.

209.     On February 15, 2008 JPMorgan, through its outside counsel, agreed to return the

Polaroid Corporation stock certificates held by JPMorgan as collateral to Petters Group

Worldwide. Petters Group Worldwide, however, was *not* a party to the revolving-credit

agreement. The primary borrower under the revolving-credit agreement was Polaroid Holding

Company—and Polaroid Holding Company was the owner of the stock certificates representing

all outstanding shares of Polaroid Corporation—not Petters Group Worldwide.

210.     Ritchie loaned additional money to Petters during February 2008 bringing the

total to $146 million in reliance on Petters's intentional misrepresentations and the due-diligence

materials ratified by Richter Consulting. Each time, as Ritchie was instructed by Petters, Ritchie instructed JPMorgan to wire the amounts from a Ritchie account at JPMorgan to a Petters Company account controlled by Petters. Petters then transferred this money through the numerous shell companies he controlled to further his fraudulent scheme. JP Morgan did not inform Ritchie that it was wiring funds to what JP Morgan knew at this time to be a fraudulent merchandise financing operation—i.e., the Ponzi scheme.

**U.    The PlayStation deal.**

211.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million to fund Petters Company's purported purchase of Sony PlayStation units to be resold to Costco. The funds were actually used, in part, to further Petters's fraudulent purchase-order-financing scheme—including paying off debts to JPMorgan. In an email describing the March 21, 2008 loan, Petters stated to one of his co-conspirators, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit." Ritchie instructed JPMorgan to wire $21 million of the $31 million from Ritchie accounts at JPMorgan to a Petters Company account controlled by Petters at M&I bank.

212.    The terms of the March 21, 2008 Sony PlayStation agreement provided for Petters Company to pay Ritchie 50% of the Adjusted Net Profits derived from the sale of the merchandise. Furthermore, Petters agreed to subordinate himself to Ritchie.

213.    Petters had no intention to repay any of the money Ritchie loaned to Petters in February or March 2008.

214.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on March 21, 2008, Petters transferred $6.5 million of that amount to JPMorgan so that JPMorgan would renew the $40 million line of credit to Petters Group Worldwide. The remainder of the

$31 million Ritchie loaned on March 21, 2008 was presumably used to pay earlier lenders to the fraudulent scheme.

215.     In connection with the $6.5 million repayment to JPMorgan renewing the $40 million line of credit to Petters Group Worldwide, for the first time ever, Petters also granted a personal security interest to JPMorgan. The UCC Financing Statement reflecting that security interest is attached as Exhibit C.

216.     Chee Awai and Laumann (controller of Petters Group Worldwide), on behalf of Petters, discussed with JPMorgan the March 21, 2008 transfer from Ritchie to confirm that the money was in the process of being transferred from Ritchie's account at JPMorgan to the Petters Company account at M&I bank controlled by Petters, from where the funds were later moved through a series of Polaroid accounts at JPMorgan in London, New York, and Chicago.

217.     On March 21, 2008, Petters pledged his personal assets, including the funds and securities in his JPMorgan investment accounts, to secure additional funding from JPMorgan. At least $2 million of the money Ritchie loaned to Petters and his companies was transferred into Petters's personal accounts.

218.     JPMorgan knew that Ritchie was the ultimate source of at least some of the funds used to repay it. In fact, in at least one instance, JPMorgan knew the particular day that Ritchie was going to transfer money to Petters that would ultimately be used to repay JPMorgan. JPMorgan employees monitored Ritchie's accounts at JPMorgan in real time on that day to determine the precise moment when Ritchie's funds were transferred to Petters, all subsequent to JPMorgan acquiring actual knowledge of Petters' Ponzi scheme.

219.     Through Richter Consulting, JPMorgan was aware of Ritchie's loans to Petters and Petters Group Worldwide and, with knowledge of the true financial condition of Polaroid

and Petters's companies, knew that Petters would never pay off Ritchie's loans made to Petters

and Petters Group Worldwide.

220.    On or about March 25, 2008, Petters executed and delivered a security agreement

to JPMorgan granting a security interest in Petters's entire right, title, and interest to certain

personal property, including money that had been deposited or was to be deposited in the future

in certain bank accounts. JPMorgan knew that any money currently in those accounts, or to be

deposited in such accounts, was obtained by fraud or consciously avoided such knowledge.

Petters had already granted this security interest to Ritchie. This additional move was done with

the actual intent to hinder, delay, or defraud Ritchie.

221.    Defendant LaSalle Bank performed a "liquidity test" of Petters's personal funds

as of March 31, 2008. The purpose of the liquidity test is unclear, but the documentation from

the test shows Petters personally possessing $37,470,569.67, including $24,780,921.52 through

"JP Morgan Investment Management," of which $20,149,999.72 is described as "pledged" and

matches the amount Petters Group Worldwide owed to JPMorgan at that time.


**V.    The May 2008 consumer-electronics opportunity.**

222.    In May 2008, Petters represented to Ritchie that he had another opportunity to

engage in a transaction backed by electronic equipment, and offered Ritchie a chance to

participate in the profits. Those representations were again false. There was no transaction, and

Petters, as he intended all along, used the money he received from Ritchie in furtherance of

Petters's Ponzi scheme.

223.    Based on those representations, in May 2008, Ritchie made $12 million in loans

for two promissory notes signed by Petters, Petters Company, and Petters Group Worldwide.

Ritchie would not have made any loans to Petters, Petters Company, or Petters Group Worldwide

had it known that there was no merchandise or known the truth about Petters Company and Petters's activities.

## W.   JPMorgan knew that Petters was defrauding Ritchie.

224.   Because JPMorgan knew about Petters and Petters Company's fraudulent activities and Richter Consulting's involvement with Polaroid, JPMorgan was aware that the repayment JPMorgan and the Syndicated Lenders received was highly suspicious. JPMorgan and Richter Consulting knew that JPMorgan had not released its security interests to permit Petters and Polaroid to pledge the underlying collateral to another lender. Further, JPMorgan and Richter Consulting knew that no new sales of Polaroid's intellectual property or other assets had occurred. But rather than investigate, JPMorgan and Richter Consulting chose to accept, or consciously chose to ignore that Petters fraudulently obtained funds from Plaintiffs to repay his loans from JPMorgan.

225.   At the time of Ritchie's loans to Petters, Ritchie was a banking customer of JPMorgan and had over $300 million in JPMorgan accounts. All the money Ritchie loaned to Petters originated in Ritchie's JPMorgan accounts and was transferred to a Petters Company account controlled by Petters, by wires executed by JPMorgan, from the JPMorgan accounts.

## X.   JPMorgan substantially assisted Petters's frauds.

226.   JPMorgan earned substantial fees and profits for the multiple roles it played in the Polaroid transaction. JPMorgan was the: (1) seller, as it was the majority owner and controlled Polaroid; (2) financier, as it loaned more than $185 million to Polaroid immediately following the Merger; (3) syndicate manager, as it formed and managed a syndicate of banks that would participate in JPMorgan's loans to Polaroid; and (4) financial advisor, as it served as investment

advisor on the transaction, generating $8.5 million in fees that were paid at the closing of

Petters's acquisition of Polaroid, out of Polaroid's available cash.

227.    Had JPMorgan not sought out Petters to purchase Polaroid and simultaneously

agreed to finance the purchase price, thereby adding to Petters's platform for fraud, Petters

would have been unable to victimize Ritchie.

228.    In violating its duty of good faith and fair dealing with Ritchie,[20] JPMorgan failed

to disclose to Ritchie or any regulatory entity the myriad of falsehoods perpetrated by Petters in

connection with his fraudulent purchase-order-financing scheme and other frauds, including

those for the loans from Ritchie. Had JPMorgan disclosed Petters's falsehoods, Ritchie would

not have loaned money to Petters and would not have been defrauded.

229.    Before Petters approached Ritchie, JPMorgan and the Syndicated Lenders failed

to accelerate its loans to Polaroid and Petters Group Worldwide or take legal action against

Petters. JPMorgan acted to protect the large profit and fees they had earned from being clawed

back should Petters's scheme collapse and his frauds be revealed. JPMorgan knew that legal

action would precipitate the collapse of the fraudulent Petters organization, precluding them

from recovering on their loans. And they wanted to avoid public disclosure of the information

learned from JPMorgan's own due diligence and from Richter Consulting's reports to JPMorgan.

By preventing the public disclosure inherent in legal action, JPMorgan and the Syndicated

Lenders assisted Petters in concealing the fraud. Since 1925, our courts have recognized a duty

on banks to the community in which do they business to use reasonable care in seeing that their

depositors are not committing fraud upon the public.

---

[20] See Paragraph 71, *supra*.

230.    JPMorgan failed to foreclose on the Polaroid Corporation assets pledged to
JPMorgan. JPMorgan knew that foreclosure of the assets would subject them to unwelcome
scrutiny by the Syndicated Lenders and to potential liability for the losses. JPMorgan therefore
assisted Petters's fraud by allowing Petters to offer a pledge of those assets to entice new lenders,
specifically Ritchie—even though JPMorgan had no intention of releasing the assets until
Petters's loans were fully repaid. JPMorgan knew that without the assets to pledge, Petters would
be unable to obtain replacement financing, thus making it impossible for JPMorgan and the
Syndicated Lenders to get repaid.

231.    JPMorgan accepted Petters's personal guarantees even though it knew he was
engaged in fraud and could not stand behind the guarantees. The UCC Financing Statement
recording Petters's guarantees was a public record of JPMorgan's assessment that Petters's
personal guarantee had value.

232.    JPMorgan structured Polaroid accounts in London, New York, and Chicago by
commingling funds purportedly from different entities and sweeping them daily into other,
sometimes blocked, accounts to help Petters launder his money and obscure the source and true
nature of funds JPMorgan ultimately accepted as loan repayments from Petters. The complex
commingling of funds from multiple Polaroid accounts held by multiple Polaroid entities aided
the fraud by making it unconscionably difficult for anyone but JPMorgan (the custodian of many
of the accounts) to track the flow of funds through the various accounts, concealing that
JPMorgan and the Syndicated Lenders are the beneficiaries of Petters's fraud.

233.    JPMorgan loaned Petters $12 million on February 7, 2008 until Petters was able
to access funds Ritchie loaned later that day. There is no legitimate business reason for this

short-term loan other than propping up Petters's fraud. By providing this loan, with no legitimate

business purpose, JPMorgan allowed Petters to perpetuate his fraud and further defraud Ritchie.

234.    If JPMorgan had disclosed Petters's numerous frauds, Petters would not have

been able to buy Polaroid by acquiring the stock from JPMorgan's subsidiary, One Equity

Partners.

235.    Ritchie's loans are depicted in full:

| Date | Lender | Borrower | Amount | Maturity |
|------|--------|----------|--------|----------|
| February 1, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Group Worldwide | $31,000,000 | 90 days |
| February 4, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Group Worldwide | $31,000,000 | 90 days |
| February 4, 2008 | Rhone Holdings II. Ltd. | Petters & Petters Group Worldwide | $16,000,000 | 90 days |
| February 4, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Group Worldwide | $9,000,000 | 90 days |
| February 5, 2008 | Yorkville Investments I, L.L.C. | Petters & Petters Group Worldwide | $13,000,000 | 90 days |
| February 7, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Group Worldwide | $4,000,000 | 30 days |
| February 7, 2008 | Rhone Holdings II. Ltd. | Petters & Petters Group Worldwide | $12,000,000 | 30 days |
| February 15, 2008 | Yorkville Investments I, L.L.C. | Petters & Petters Group Worldwide | $5,000,000 | 30 days |
| February 19, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Group Worldwide | $9,000,000 | 90 days |
| February 19, 2008 | Rhone Holdings II. Ltd. | Petters & Petters Group Worldwide | $16,000,000 | 90 days |
| March 21, 2008 | Ritchie Special Credit Investments, Ltd. | Petters & Petters Company | $21,000,000 | July 14, 2008 |

| March 21, 2008 | Ritchie Capital Management, Ltd. | Petters & Petters Company | $10,000,000 | July 14, 2008 |
| May 9, 2008 | Yorkville Investments I, L.L.C. | Petters, Petters Group Worldwide, & Petters Company | $4,000,000 | May 30, 2008 |
| May 9, 2008 | Ritchie Capital Structure Arbitrage Trading, Ltd. | Petters, Petters Group Worldwide, & Petters Company | $8,000,000 | May 30, 2008 |
| | | | Total: $189,000,000[21] | |

## Y.   Petters is arrested and convicted.

236.     On September 24, 2008, the Federal Bureau of Investigation searched Petters's home and his companies' offices. They arrested Petters days later.

237.     On or about September 30, 2008, upon learning of the raid, JPMorgan declared Petters's companies in default of the remaining loans and seized and liquidated the approximately $25 million in Petters's personal investment account held at JPMorgan to satisfy this debt. At the time, JPMorgan claimed that Petters Group Worldwide owed $19,641,000 on its credit line.

238.     As of October 6, 2008, JPMorgan had seized and liquidated $18.1 million of the assets in Petters's investment accounts reducing the balance on the Petters Group Worldwide credit line to $1.5 million. Some of the asset sales by JPMorgan were not completed until after the October 3, 2008 Freeze Order was issued in the receivership case.

---

[21] Ritchie sold approximately $25 million worth of these loans to a third party.

239.    JPMorgan satisfied its own interest and ignored the victims of Petters's fraud by stepping ahead of the victims and creditors to recover the nearly $20 million that Petters Group Worldwide allegedly owed under the credit line.

240.    The United States Attorney's Office for the District of Minnesota tried Petters and several coconspirators for their crimes. The trial started in October 2009.

241.    The testimony and exhibits used during that trial included discussion of Defendants' actions described in this complaint.

242.    In December 2009, a federal jury convicted Petters of 20 counts of wire fraud, mail fraud, conspiracy to commit mail and wire fraud, money laundering, and conspiracy to commit money laundering for his actions related to the fraudulent purchase-order-financing scheme. Petters was sentenced to 50 years in prison and is currently serving that sentence.

## V.    CONCEALMENT AND DISCOVERY ISSUES

243.    From the time of the FBI raid on Petters and Petters Company until at least 2013, Ritchie received almost none of the information required to unravel Defendants' role in the fraud. In 2013, information finally began to trickle into Ritchie. JPMorgan has concealed information in its possession documenting the illegal banking activity of Tom Petters, Petters Company, Petters Capital, Petters Consumer Brands, and every other Petters-controlled entity, legitimate or not, that conducted banking business at, with, or through JPMorgan.

244.    At all relevant times, up to and including the present day, JPMorgan and the other Defendants have engaged in efforts to conceal or delay the production of information in their possession documenting the frauds perpetrated by Tom Petters, Petters Company, Petters Capital, Petters Consumer Brands, and every other Petters-controlled entity, legitimate or not, that conducted business at, with, or through JPMorgan.

245.     On December 8, 2008, U.S. District Judge Montgomery enjoined all actions,

except by the Receiver, against Tom Petters, Petters Company, Petters Group Worldwide, and

the other defendants in the criminal prosecution of the Petters Ponzi scheme.[22]

246.     In May 2010, Ritchie served JPMorgan in New York with a subpoena *duces*

*tecum* issued by the U.S. Bankruptcy Court for the Southern District of New York commanding

JPMorgan to produce certain specified documents, including bank statements and related

documents for the accounts held in the names of the various Polaroid-related entities from which

the payments/transfers were made to JPMorgan as U.S. Administrative Agent for the Syndicated

lenders between February 1, 2008 and February 15, 2008 which were applied in satisfaction of

the $31 million debt and other obligations owed by Polaroid Holding Company and the other

"Borrowers" and "Subsidiary Guarantors" as of February 1, 2008. The plain purpose of

the subpoena *duces tecum* was to compel JPMorgan to produce copies of all the documents

relating to the payoff of the approximately $31 million that was owed by the Polaroid Holding

Company-related revolving-credit agreement Parties to the Syndicated Lenders as of February 1,

2008 when Ritchie Special Credit Investments, Ltd. made the first $31 million loan to Tom

Petters and Petters Group Worldwide in consideration for the execution and delivery, by Tom

Petters and Petters Group Worldwide, of a promissory note in the original principal amount of

$31 million dated February 1, 2008.

---

[22] *U.S. v. Petters, et. al.*, Case No. 08cv5348 (D. Minn.) Order, Document 127, p. 19 ("It is further ordered that, except by leave of this Court, during pendency of the receivership ordered herein, Defendants, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons (except the Receiver), are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the assets or documents of Defendants . . .").

247.    JPMorgan did not make a timely motion to quash the May 2010 subpoena. JPMorgan failed and refused, without legal justification, to obey commands of the United States Bankruptcy Court for the Southern District of New York set forth in the subpoena.

248.    On January 21, 2011, U.S. Bankruptcy Judge Kishel ordered a stay of discovery in all adversarial proceedings in the bankruptcy case of Petters Company. This Order precluded Ritchie from obtaining compulsory process for the production of documents and testimony.[23]

249.    In March of 2011, Ritchie filed a Motion for an Order of the US Bankruptcy Court for the Southern District of New York directing JPMorgan to show cause why it should not be held in contempt for its failure to obey the commands set forth in the subpoena. JPMorgan filed a Response in Opposition to the Motion, claiming falsely that it had made some sort of "agreement" with Ritchie's attorneys at the law firm of Sidley & Austin under which JPMorgan was allegedly excused from obeying the subpoena.

250.    Before a hearing could be held before the U.S. Bankruptcy Court for the Southern District of New York on Ritchie's Motion for an Order, JPMorgan filed a motion for a "Protective Order" from the U.S. Bankruptcy Court for the District of Minnesota in the *Stoebner v. RCM et al Adv. Pro.*—which was granted over Ritchie's objection.

251.    Additional efforts have been undertaken recently to seek the production of material non-confidential information regarding the payment of $31,000,000 to JPMorgan and the Syndicated Lenders. In January 2016, Plaintiffs, through counsel, sent a letter to counsel for the trustee for this information, which JPMorgan objected to, and as recently as September 26,

---

[23] *In re: Petters Company, Inc., et al.*, Case No. 08-45257 (Bankr. D. Minn.) Order Authorizing and Approving Case Management Procedures Governing Multiple Adversary Proceedings, Document 28-1. p. 8 ("the conduct of any and all discovery procedures in the Adversary Proceedings shall be stayed.").

2016, JPMorgan refused to allow the trustee for Polaroid to release the account tracing information to Ritchie. The non-disclosure of this material account information has prejudiced the rights of Ritchie and should estop any statute of limitations defense by the defendants, and toll any statute of limitations that may apply.

252.    On January 6, 2014 JPMorgan entered into a Deferred Prosecution Agreement with the U.S. Attorney for the Southern District of New York, arising from JPMorgan's involvement in the Madoff Ponzi scheme. Pursuant to that agreement, JPMorgan agreed to "bring to the Office's attention any administrative regulatory, civil, or criminal proceeding or investigation of JPMorgan relating to the Bank Secrecy Act." Plaintiffs' complaint here was filed during the operative two-year period of the deferred prosecution and includes allegations related to the Bank Secrecy Act, and, thus, JPMorgan should have brought this action and the underlying conduct of its employees to the attention of the U.S. Attorney.

253.    All the relevant deposit-account-control agreements, wire-transfer agreements, and related emails have been systematically concealed from Ritchie for almost 8 years. The operative stays, injunctions, and abstentions have made it impossible to discover the material facts constituting the fraud within the meaning of MUFTA (Minnesota Uniform Fraudulent Transfer Act) and the Minnesota Supreme Court's decision in *Finn v. Alliance Bank.*[24] The concealment of documents has been especially injurious to Ritchie's attempts to bring claims under MUFTA.

---

[24] 860 N.W.2d 638, 644 (Minn 2015).

254.    It was not until February 27, 2015, when Trustee John Stoebner filed his verified motion to allow him to file a timely proof of claim based upon newly discovered evidence,[25] that Ritchie was afforded the possibility of discovering that no transfer of funds was delivered on April 27, 2005 in exchange for the $125 million note payable by Polaroid to Petters Capital LLC. Prior to this discovery, Ritchie had no reason to question why JPMorgan sent its Subordinated Indebtedness Blockage Notice dated March 12, 2007, just days after installing Richter Consulting as a "consultant" to Polaroid Holding Company and its many subsidiaries and affiliates.

255.    Any temporal limitations, statutory or otherwise, on Ritchie's ability to bring the causes of action set forth below are equitably tolled by, among other things, the Defendants' breach of fiduciary duty in failing to disclose the fraud, the actions of the Defendants in concealing the fraud, and the actions of the Defendants in the ongoing concealment of documents.

256.    Due to the ongoing concealment of documents, records, and information by the Defendants in this action, Defendants are equitably estopped from asserting the affirmative defense of statute of limitations in this action.

257.    Because Ritchie's ability to further discovery further facts has been stayed through legal processes, all relevant statutes of limitations should be equitably tolled based on the doctrine of legal disability.

---

[25] *In re: Petters Company, Inc., et al*, Case 08-45257 (Bankr. D. Minn), Notice of Motion and Motion to Allow the PBE Trustee to File a Timely Proof of Claim, filed 02/27/15; *In re: Petters Company, Inc.,* Case 08-45257, Proof of Claim 93, filed 03/30/16 by Stoebner as Trustee for Polaroid Consumer Electronics, LLC.

# VI.   CAUSES OF ACTION

## A.   First Cause of Action: Aiding and Abetting Fraud (Against JPMorgan)

258.   Ritchie incorporates and re-alleges the foregoing allegations of the Complaint.

259.   In obtaining $189 million in loan proceeds from Ritchie, Petters—who has now been convicted of mail and wire fraud and money laundering—and his agents knowingly made several misrepresentations of material fact and material omissions necessary to cover up their fraud with the intent to induce Ritchie to loan money to Petters and his fraudulent enterprises.

260.   These misrepresentations and omissions included:

a) Statements that Petters Company was a solvent, legitimate business, when in fact it was a sham that operated a multi-billion dollar Ponzi scheme;

b) Statements that Polaroid and Petters Group Worldwide were solvent, legitimate businesses, when in fact they served as instruments of Petters's multi-billion dollar Ponzi scheme;

c) Failing to disclose that to stay in operation, Petters Group Worldwide borrowed over $396 million from Petters Company, substantially all of which was Ponzi-scheme money;

d) Failing to disclose all relevant liabilities to Ritchie, including the fact that in addition to Polaroid's debt to JPMorgan, Petters Group Worldwide owed an additional $20 million debt to JPMorgan;

e) Statements that an audit of Polaroid's financial statements was nearly complete, when in reality the auditor, by 2007 Deloitte & Touche had abandoned the audit because of an inability to issue an unqualified financial opinion on the integrity of Polaroid's financials;

    f)    Various misstatements in due-diligence documentation that Petters provided to Ritchie, including financials that materially overstated Polaroid's account receivables by counting as Polaroid inventory product that actually belonged to third parties (e.g., PNY); and

    g)    Statements that the $43 million that Ritchie lent to Petters Company in March and May of 2008 would finance the purchase of electronics equipment, when in fact the money was used to pay back loans with other Ponzi scheme investors and JPMorgan, and to otherwise further Petters's frauds.

261.    Ritchie reasonably and justifiably relied on these material misstatements and omissions to their detriment. Had Ritchie been aware of any of the fraudulent statements or omissions, Ritchie would not have loaned any money to Petters or his enterprises. As a result of Ritchie's reasonable and justifiable reliance on these fraudulent statements, Ritchie has suffered damage in excess of $150 million.

262.    JPMorgan had actual knowledge of Petters's fraudulent activity and money laundering operations. JPMorgan acquired this knowledge through multiple sources, including:

    a)    Information that GE Capital had previously terminated a $50 million credit line with Petters after discovering that he had fraudulently fabricated Costco purchase orders to induce GE Capital to loan about $45 million to purchase nonexistent goods for nonexistent orders;

    b)    JPMorgan's discovery that Polaroid Holding Company was making payments on an alleged debt owed to Petters Company—the $125 million note—when no actual loan was made and the note was a sham;

c)  JPMorgan's discovery that by 2007 Deloitte & Touche had to abandon its audit of Polaroid because it was unable to give an unqualified opinion as to the company's financial integrity;

d)  JPMorgan's discovery that Polaroid's finances were so dire that it was unable to obtain the loan from Jefferies & Company by August 15 as required under JPMorgan's forbearance agreements;

e)  JPMorgan's receiving and accepting substantial payments from Petters despite not having released its security interests (which was necessary for Petters and Polaroid to obtain alternate financing) and knowing that no new sales of Polaroid's assets had occurred;

f)  JPMorgan's knowledge of unmistakable signs of money laundering involving Petters's entities, such as circuitous movement of large amounts of money through various accounts at JPMorgan held for entities with no business operation, and the "round trip" banking transactions between Petters's companies and Bank One client Lancelot; and

g)  JPMorgan's knowledge that Petters's representatives made false statements to them during the due-diligence process related to the sale of Polaroid about, among other things, the source of funds, that certain lenders did not know they would be repaid once the deal closed, and Petters's false and unsubstantiated claim of $150 million in "built-in" equity in Petters Company that he was contributing to Polaroid.

263.  JPMorgan substantially assisted and encouraged Petters in executing his fraud, for example, by:

a) arranging Petters's use of his personal accounts at JPMorgan to funnel money from the Ponzi scheme at Petters Company to his other companies;

b) compiling, through its agent, Richter Consulting, the false and misleading due diligence upon which Ritchie relied;

c) assisting Petters, also through its agent Richter Consulting, in finding funding sources that could be used to repay JPMorgan knowing full well that whomever or whatever loaned money to Petters was loaning money to a thief;

d) giving Petters an ultimatum that there would be no more loan extensions and that it needed to be repaid by February 10, 2008, knowing that that Petters was engaged in fraud and irretrievably insolvent and that the source of JPMorgan's repayment would never be paid back;

e) arranging the blocked-account structure using European bank accounts at JPMorgan in the name of defunct Polaroid entities to obscure the sources of funds passing through those accounts, including money lent by Ritchie;

f) providing additional funding to Petters by increasing the revolving-credit agreement from $250 million to $325 million and the Petters Group Worldwide line of credit from $8 million to $20 million and then to $40 million knowing that Petters was committing fraud thereby increasing Petters's access to money to fuel his frauds;

g) assisting Petters in finding a source for repayment to protect JPMorgan's hundreds of millions of dollars of profits and fees;

h) for at least one of Ritchie's loans, monitoring Ritchie's bank account at JPMorgan so it would know the precise moment Ritchie paid Petters and, thus, that Petters would have the funds necessary to repay JPMorgan;

i) failing to inform authorities or anyone else that Petters was engaged in fraud; and

j) selling Polaroid to Petters initially which greatly expanded Petters's platform for fraud and enabled Petters to bury the debt related to his Ponzi scheme, of which JPMorgan was aware.

264. JPMorgan was motivated to assist Petters in finding additional funding to ensure that Polaroid could repay its debts to JPMorgan and the Syndicated Lenders. JPMorgan knew that if it foreclosed on the loans to Polaroid, Petters's fraud would be revealed and it would be required to disgorge those ill-gotten gains and fees and would have been exposed to liability from the Syndicated Lenders from its role as agent to the Syndicated Loan. Accordingly, JPMorgan knowingly encouraged and assisted Petters in defrauding Ritchie.

265. JPMorgan was also motivated to sell Polaroid to Petters despite clear evidence that Petters and his enterprises were insolvent and engaged in suspicious activities. JPMorgan earned substantial fees and profits for the multiple roles it played in the Polaroid transaction. JPMorgan was the: (1) seller, as it was the majority owner and controlled Polaroid; (2) financier, as it loaned more than $185 million to Polaroid immediately following the Merger; (3) syndicate manager, as it formed and managed a syndicate of banks that would participate in JPMorgan's loans to Polaroid; and (4) financial advisor, as it served as investment advisor on the transaction, generating millions in fees that were paid at the closing of Petters's acquisition of Polaroid, out of Polaroid's available cash. Although its roles as lender and investment advisor generated as much as $40 million in fees and interest for JPMorgan, that figure is dwarfed by the hundreds of

millions of dollars of profits JPMorgan earned by selling its Polaroid ownership stake to Petters. This sale of Polaroid to Petters and his insolvent entities gave Petters an international platform to perpetuate and grow his Ponzi scheme.

266.    JPMorgan's substantial assistance to Petters and his enterprises proximately caused all injuries to Ritchie resulting from Petters's fraud, which amount exceeds $150 million.

267.    Due to Defendants' ongoing fraudulent concealment in this action since Petters's arrest, Ritchie is continuing to learn new facts of what JPMorgan knew prior to Ritchie making its loans and how JPMorgan substantially assisted Petters, which should toll any statute of limitations.

**B.      Second Cause of Action: Aiding and abetting fraud (against Richter Consulting and vicariously against JPMorgan)**

268.    Ritchie incorporates and re-alleges the foregoing allegations of the Complaint.

269.    As alleged in paragraphs 168 through 181, 198, and 222 above, Petters and his agents knowingly made numerous false statements and omissions of material fact to induce Ritchie to loan approximately $189 million Petters and his enterprises. Ritchie reasonably and justifiably relied upon these false statements and omissions, and, as a result, has been damaged in excess of $150 million.

270.    When Richter Consulting began monitoring and examining Petters and his enterprises in early 2007, Richter Consulting gained actual knowledge of the fraudulent nature of Petters's enterprises and of the imminent financial collapse of Polaroid. Richter Consulting acquired this knowledge through its thorough and ongoing examination of the books, financial statements, and other records of Petters's enterprises, including Polaroid and Peters Group Worldwide. Through this examination, Richter Consulting learned that:

71

a) Polaroid's consumer electronics business was, in the words of Richter Consulting, "currently not viable," with "extremely thin margins and a heavily concentrated customer base" and no "plans to rationalize operations to reflect the current cash flow operations"—facts that Richer Consulting reported to JPMorgan in May of 2007;

b) Polaroid was being kept afloat by Petters Group Worldwide and Petters Company, including a $396 million loans from Petters Company to Petters Group Worldwide, as well as money funneled directly from Petters Company to Polaroid;

c) Polaroid Holdings Company was making payments on alleged debt to—the $125 million note—when no loan had actually been made and the note was a sham;

d) Auditors, such as Deloitte & Touche, had to abandon audits of Polaroid's financial because they were unable to give an unqualified opinion about the financial integrity of Polaroid; and

e) Polaroid could not get a loan from Jeffries & Company by the August 15, 2007 deadline required by JPMorgan's forbearance agreements.

271.    Before Ritchie made loans to Petters or his companies, Richter Consulting knew that Petters was irretrievably insolvent and was engaged in fraudulent activity. Richter Consulting, nevertheless, substantially assisted and encouraged Petters and his companies in defrauding other victims, including Ritchie. For example:

a) Under JPMorgan's mandate, Richter Consulting helped Polaroid prepare due-diligence materials for prospective lenders, including Ritchie. None of these materials truly disclosed the actual financial states of Petters or Petters Group

Worldwide. They materially overstated Polaroid's account receivables by counting a third-party's inventory, PNY's, as their own.

b) Richter Consulting helped Polaroid find and connect with potential capital lenders to replace JPMorgan as Polaroid's primary life line. This included Ritchie.

c) Richter Consulting helped Polaroid in misrepresenting the value of a Walmart receivable as $40 million when a $10-million discount had already been agreed to.

d) Richter Consulting failed to disclose that Polaroid had entered into a factoring agreement with Lancelot, which reduced the value of its receivables by 10%.

e) Richter Consulting helped Polaroid inflate its asset values in its due-diligence materials, including double counting inventory and overstating its count by including third-party inventory.

f) Richter Consulting failed to disclose that Polaroid was borrowing money for the benefit of ProView, a Chinese electronics manufacturer.

g) Richter Consulting helped Polaroid misrepresent in its due-diligence materials that Polaroid received cash for the sale of assets. This was an inflated statement of Polaroid's financial health.

272.    Richter Consulting was responsible for assembling and developing the due-diligence materials and was specifically retained to prepare these materials. Richter Consulting knew third parties such as Ritchie would rely on these due-diligence materials, and Ritchie relied upon the accuracy and truthfulness of the due-diligence materials prepared by or reviewed by Richter Consulting before making its loans.

273.    Richter Consulting's substantial assistance and encouragement to Petters and his enterprises proximately caused all injuries to Petters as a result of Petters's fraud, which amount exceeds $150 million.

274.    At all relevant times, Richter Consulting was working for the benefit of and under the direction and control of JPMorgan. Richter Consulting took its direction from JPMorgan, regularly reported to JPMorgan about Petters's progress in obtaining replacement financing for the JPMorgan loans, and regularly strategized with JPMorgan about potential lenders to target to replace the JPMorgan debt. Richter Consulting, therefore, was at all times acting as JPMorgan's agent for the benefit of JPMorgan and in the course and scope of that agency. As a consequence, in addition to its direct liability, JPMorgan is vicariously liable for Richter Consulting's actions in aiding and abetting Petters's fraud.

275.    Petters Company had no real assets, no accounts receivable, and no real operations. From February 2000 to September 2008 roughly $82 billion in cash moved, $41 billion in and $41 billion out. There were no real reliable accounting methods and control. Petters Group Worldwide lacked adequate capitalization. With Petters Company, no corporate formalities were followed. Petters had total control and would pay his personal AMEX bills off the top of the business funds received. Ritchie did not know any of these facts when its loans were made, and had it known these facts, Ritchie would never have loaned any money.

276.    Ritchie was never informed that Petters Group Worldwide owed Petters Company $396 million. Had Ritchie known Petters Group Worldwide owed $396 million to Petters Company, it would have never caused Plaintiffs to loan any money to Petters Group Worldwide, Petters Company, or Petters. The failure to disclose the loan balance owed by Petters Group

74

Worldwide to Petters Company constitutes fraud, and Richter Consulting had a duty to discover

and disclose these facts to third parties such as Plaintiffs.

277.     Since Richter, and JPMorgan vicariously through Richter, actively participated in

the commission of a tort, and encouraged and aided and abetted in its commission, and then

ratified it after it was done, they proximately caused money damages in an amount to be proven

at trial, which at present exceeds $150 million, and are jointly and severally liable for the

resulting injury.


**C.     Third Cause of Action: Aiding and abetting wrongful diversion of funds
(against JPMorgan)**

278.     Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

279.     JPMorgan knowingly completed acts with the purpose of aiding and abetting

Petters's illegal scheme. JPMorgan encouraged and helped Petters in his fraudulent scheme by,

among other things:

a)   orchestrating an international network of accounts, many of which were held in

the names of shell entities without any legitimate business operation, through

which his companies illegally laundered billions of dollars without investigating

any of the numerous suspicious activities;

b)   creating the blocked accounts in Europe to obscure the source of funds, by failing

and refusing to thoroughly investigate red flags that would have exposed Petters's

fraud on Ritchie and others;

c)   facilitating Petters's use of his personal accounts at JPMorgan to funnel money

from and to fraudulent and legitimate entities, and,

    d)   through its agent, Richter Consulting, by preparing materially false and misleading due-diligence materials.

280.    Petters diverted the funds into his various fraudulent schemes to further his underlying frauds.

281.    As a result of JPMorgan's conduct, Ritchie suffered damages in excess of $150 million.

### D.    Fourth Cause of Action: Aiding and abetting wrongful diversion of funds (against Richter Consulting)

282.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

283.    Richter Consulting knowingly completed acts with the purpose of aiding and abetting Petters's illegal scheme. The acts include but are not limited to encouraging and helping Petters find a financing source and preparing the false and misleading due-diligence materials provided to Ritchie.

284.    As a result of Richter Consulting's conduct, Ritchie suffered damages, including the loss in excess of $150 million, which was loaned to Petters and his companies and used by Petters to further this illegal scheme. Ritchie has recovered only a small portion of the money it loaned to Petters and his companies.

### E.    Fifth Cause of Action: Aiding and abetting conversion re March loan (against JPMorgan)

285.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

286.    As of December 31, 2007, Petters's companies owed JPMorgan between $20 million and $40 million under the terms of an agreement for a $40 million line of credit that JPMorgan had extended to Petters Group Worldwide.

287.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million. Petters falsely represented to Ritchie that he had an opportunity to purchase PlayStation units that had allegedly been presold to Costco. In fact, there were no such units. Nor was there any commitment to purchase merchandise.

288.    Ritchie and Petters created a joint venture under which the expected profits from the sale of PlayStation units to Costco would be shared by Ritchie and Petters Company.

289.    Ritchie then instructed JPMorgan to wire the agreed $31 million dollars from an account in the control of Ritchie. At the time of the transfer, Ritchie had ownership, custody, and control of these funds and authorized the transfer of funds for the exclusive purpose of purchasing the agreed PlayStation units.

290.    Shortly before that loan was made, Petters sent an email to one of his co-conspirators, stating, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit."

291.    Upon receiving the $31 million from Ritchie, Petters did not purchase PlayStation units, as promised. Instead, he immediately transferred the money to pay other debts. Petters caused $6.5 million of that amount to be transferred to JPMorgan in consideration for renewing the Petters Group Worldwide $40 Million Line of Credit.

292.    Petters converted the $31 million Ritchie loaned on March 21, 2008 by conveying a portion of it to JPMorgan and using the rest as part of his fraudulent schemes and for personal purposes. Ritchie authorized and intended the money to be used solely to purchase PlayStation units. Thus, Petters used and exercised dominion and control over the funds in an unauthorized manner to the exclusion of Ritchie's rights to the funds.

293.     As a result of Petters's conduct, Ritchie's funds were spent outside of proper business activities and, thus, Ritchie was not repaid.

294.     Defendants had actual knowledge of Petters's fraudulent activity and money laundering operations, and therefore knew that the conduct of Petters and the Petters-owned entities constituted tortious fraudulent conduct.

295.     JPMorgan substantially assisted and encouraged Petters by, among other things, knowingly wiring the money from Ritchie-controlled accounts through a network of Petters-controlled accounts, and ultimately to JPMorgan's own accounts, knowing that the money was the product of fraud. JPMorgan did so to ensure repayment of Petters's debt to JPMorgan.

### F.     Sixth Cause of Action: Commercial bad faith (against JPMorgan)

296.     Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

297.     Petters engaged in a fraudulent scheme that induced Ritchie to make loans to Petters, Petters Group Worldwide, and Petters Company between February and May 2008. In connection with those loans, Petters, who has now been convicted of mail fraud, wire fraud, money laundering and conspiracy, made material misrepresentations and omissions, intended to induce Ritchie to loan $189 million to Petters and his companies purportedly for the benefit of Polaroid. The misrepresentations and omissions include: (1) false statements that made it appear that Petters Company was a legitimate business, when it was in fact a fraud; (2) failing to tell Plaintiffs that Petters Company was a sham and used to conduct frauds; (3) failing to tell Plaintiffs that in addition to the JPMorgan loan to Polaroid that was repaid with the first loan from Plaintiffs, JPMorgan also had an outstanding $20 million loan to Petters Group Worldwide; (4) false statements that the proceeds of Ritchie's loans would be used for legitimate business purposes, when in fact Petters intended to use the proceeds illegally to further his frauds; and (5)

false statements that the proceeds of Ritchie's March and May loans would be used to acquire electronic equipment when, in fact, Petters never intended to purchase electronic equipment but rather intended to use, and in fact did use, the proceeds illegally to further his frauds.

298.    JPMorgan made transfers, both at Petters's direction and, under the blocked account agreements, at its own instructions, throughout its multiyear relationship with Petters.

299.    JPMorgan had actual knowledge of Petters's fraudulent activity and money laundering operations, and therefore knew that the conduct of Petters and the Petters-owned entities constituted tortious fraudulent conduct. Moreover, JPMorgan actively participated in the fraud by, among other things, assisting Petters in orchestrating a network of accounts through which he laundered the proceeds of his crimes, and assisting Petters in finding other lenders, including Ritchie, to buy out his debt to JPMorgan, knowing that Petters was securing that funding through fraudulent statements and omissions.

300.    JPMorgan's bad faith conduct proximately caused Ritchie's injuries, which exceed $150 million.

301.    Even though JPMorgan knew it was helping Petters's fraud, it continued to do so to preserve its valuable banking relationship with Petters, to avoid fraudulent-conveyance issues that could result from the sale of its ownership of Polaroid to Petters, and to get repaid on the debt owed to it by Petters. Accordingly, punitive damages should be awarded to Plaintiffs in an amount to be determined at trial.

**G.     Seventh Cause of Action: Aiding and abetting breach of fiduciary duty (against JPMorgan)**

302.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

303.   Regarding the March 21, 2008 loan to Petters, Ritchie and Petters created a joint venture under which the expected profits from the sale of PlayStation units to Costco would be shared by Ritchie and Petters Company and by virtue of which each joint venturer owed a fiduciary duty of good faith and fair dealing to the other.

304.   Petters breached this fiduciary duty to Petters because the transaction was a complete sham—there were no PlayStation units to sell to Costco, nor did Costco order any.

305.   JPMorgan was aware of the fiduciary relationship between Petters and Ritchie which arose from Petters and Ritchie's joint venture described in paragraph 288.

306.   Additionally, JPMorgan knew:

    a)   that Ritchie had been targeted for over $150 million in proceeds in part to pay back JPMorgan through a fraud that they had recently discovered;

    b)   that Petters was inducing Ritchie to loan money for the purchase of consumer electronics;

    c)   that the numbers in the due-diligence materials were inaccurate and materially misleading;

    d)   that Petters offered partnerships and profit-sharing to induce loans.

307.   JPMorgan had actual knowledge of Petters's fraudulent activity and money laundering operations, and therefore knew that the conduct of Petters and the Petters-owned entities constituted tortious fraudulent conduct, and a breach of the fiduciary duty owed to Petters by Ritchie.

308.   JPMorgan substantially assisted, encouraged, and aided and abetted this loan by, among other things, knowingly wiring the money from Ritchie-controlled JPMorgan accounts through a network of Petters-controlled accounts, and ultimately to JPMorgan's own accounts,

knowing that the money was the product of fraud. JPMorgan did so to ensure that Petters's debts to JPMorgan were repaid.

309.     Since JPMorgan actively participated in the commission of a tort, and assisted, encouraged, and aided and abetted in its commission, and then ratified it after it was done, they proximately caused Ritchie money damages in an amount to be proven at trial, which, at present, exceed $150 million.

### H.     Eighth Cause of Action: Uniform Fiduciaries Act (against JPMorgan)

310.     Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

311.     Minnesota has adopted the Uniform Fiduciaries Act at Minn. Stat. § 520.01, et seq. The statutes impose liability on banks in certain situations involving fiduciary relationships.

312.     Minn. Stat. § 520.02, regarding application of payments made to fiduciaries, states: "A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.'"

313.     Minn. Stat. § 520.07, regarding deposits in the name of a fiduciary as such, states: "If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of an obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith. If such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the

principal if the fiduciary in fact commits a breach of an obligation as fiduciary in drawing or delivering the check."

314.    Minn. Stat. § 520.08, regarding deposits in the name of a principal, states: "If a check is drawn upon the account of the principal in a bank by a fiduciary who is empowered to draw checks upon the principal's account, the bank is authorized to pay such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of an obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of an obligation as fiduciary in drawing or delivering the check."

315.    Minn. Stat. § 520.09, regarding deposits in a fiduciary's personal account states: "If a person who is a fiduciary makes a deposit in a bank to the person's personal credit of checks drawn by the person upon an account in the person's name as fiduciary, or of checks payable to the person as fiduciary, or of checks drawn by the person upon an account in the name of the principal if the person is empowered to draw checks thereon, or of checks payable to the principal and endorsed by the person, if empowered to endorse such checks, or if the person otherwise makes a deposit of funds held as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of an obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of

82

an obligation as fiduciary in making such deposit or in drawing such check, or with knowledge

of such facts that its action in receiving the deposit or paying the check amounts to bad faith."

316.    JPMorgan had actual knowledge of the relationship between Ritchie and Petters

in March 2008, which created a fiduciary duty.

317.    JPMorgan further had actual knowledge that Petters was engaged in fraud and

operating a Ponzi scheme and violating his fiduciary duties to Ritchie.

318.    Despite JPMorgan's actual knowledge, JPMorgan permitted Plaintiffs to transfer

money to Petters in furtherance of Petters's fraud. In multiple cases this money was transferred

from Ritchie's accounts at JPMorgan directly through a network of Petters's money laundering

accounts held at JPMorgan, and ultimately to JPMorgan's own accounts, where JPMorgan

accepted the fraudulent proceeds as payment for Petters's debts. JPMorgan accepted these

repayments in bad faith because it knew the proceeds were fraudulent.

319.    These actions by JPMorgan constitute violations of the Minnesota Uniform

Fiduciaries Act, Minn. Stat. § 520.01, et seq.

320.    Plaintiffs have been damaged as a direct result of JPMorgan's violation of the

Minnesota Uniform Fiduciaries Act, Minn. Stat. § 520.01, et seq. in excess of $150 million.


**I.      Ninth Cause of Action: Negligence (against JPMorgan and Richter
          Consulting)**

321.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

322.    Defendant JPMorgan has a duty to conduct its banking affairs with ordinary care.

323.    Because of its special relationship with Petters and Polaroid as seller of Polaroid

to Petters, investment advisor to Polaroid, lender to Petters and Polaroid, and agent to the

Syndicated Lenders, as well as investment advisor to Petters, JPMorgan had an additional duty to

Petters's other lenders and a duty to the public at large. Since 1925, our courts have recognized a duty on banks to the community in which they do business to use reasonable care in seeing that their depositors are not committing fraud upon the public.

324.   JPMorgan further had fiduciary duties to Ritchie as its investment advisor and due to the special banking relationship between JPMorgan and Ritchie.

325.   The extensive, special banking relationship between JPMorgan and Ritchie and the use of the wire-transfer system at JPMorgan to move the Ritchie money to Petters created an additional duty to act with care regarding Ritchie.

326.   Because of its extensive knowledge of Petters and Polaroid and its involvement in the due-diligence process, Richter Consulting had a duty to make appropriate disclosures to the recipients of the due diligence. Richter Consulting knew that third parties such as Plaintiffs would receive the due-diligence information and be influenced by the information that Richter Consulting supplied.

327.   To their detriment, Plaintiffs justifiably relied on the misleading due-diligence materials that Richter Consulting negligently supplied in the course of Richter Consulting's professional assistance to Polaroid to obtain a new lender.

328.   JPMorgan had a duty to formulate and follow due-diligence and know-your-customer policies concerning customers such as Petters and their accounts.

329.   JPMorgan had a duty to take reasonable precautions to prevent customers such as Petters from using the accounts as conduits for fraud and money-laundering activities.

330.   JPMorgan had a duty to inquire further into and report to authorities and regulators suspicious banking activity or financial transactions to which they were a party. This duty includes making SARs.

331.     Before complying with Ritchie's instructions to wire money from Ritchie's

JPMorgan accounts to a Petters Company account controlled by Petters, JPMorgan had a duty to

disclose to Ritchie its knowledge of Petters's fraud and had a duty to inform and warn Ritchie

that Petters was irretrievably insolvent and could not legally perform fulfill or perform his

obligations under the various loan agreements.

332.     The purpose of these duties and regulations are to prevent the sort of foreseeable

misuse of bank accounts to divert and launder funds that occurred in this case.

333.     JPMorgan and Richter Consulting breached these duties and otherwise their duty

of care. But for JPMorgan and Richter Consulting's breach of their duties, the frauds perpetrated

by Petters—including the defrauding of Ritchie—could not have been accomplished without

detection.

334.     JPMorgan and Richter Consulting's negligence was a proximate cause of the total

loss to Plaintiffs in the amount in excess of $150 million.

### J.     Tenth Cause of Action: Breach of fiduciary duty (against JPMorgan)

335.     Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

336.     Due to the special relationship, the investment advisor relationship and direct

customer and depositor relationship that existed between JPMorgan and Ritchie, JPMorgan had a

fiduciary duty to act honestly, in good faith and with fair dealing, and with the utmost trust,

loyalty and due care to Ritchie. This direct fiduciary relationship required JP Morgan to disclose

all material facts known to JPMorgan, and required JPMorgan to warn Ritchie in February 2008

or after, not to loan or transfer any money to Petters or his related entities. The fact that the

monies wired to Petters and his related entities by Ritchie originated from Ritchie's money on

deposit at JPMorgan which was then deposited back in the JP Morgan system heightens the

fiduciary duty owed by JP Morgan to take affirmative measures to protect Ritchie from the known fraud of one of its other customers.

337.    Ritchie relied upon JPMorgan's fiduciary duty to act honestly, and in good faith, and had a reasonable expectation that if JP Morgan knew one of its depositors was committing fraud that it would take affirmative measures to shut down the fraud and/or warn Ritchie that he was being defrauded by one of their depositors.

338.    JP Morgan breached their direct fiduciary duty to Ritchie which was a proximate cause of direct and consequential damages to Ritchie exceeding $150,000,000, and which further requires a forfeiture and disgorgement of all fees earned and interest collected by JP Morgan from Petters and his related entities from 2005 to 2008.


### K.    Eleventh Cause of Action: Unjust enrichment (against All Defendants)

339.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

340.    Between February 1, 2008 and February 15, 2008, JPMorgan and the Syndicated Lenders were enriched at Ritchie's expense in the amount of at least $43 million as a result of their receipt and acceptance of at least a portion of the money that Petters fraudulently induced Ritchie to loan to Petters, and then used to repay Polaroid's debt to JPMorgan and the Syndicated Lenders.

341.    JPMorgan was also enriched, at Ritchie's expense, by receiving the March 2008 Petters security interest, $6.5 million that Ritchie loaned to Petters on March 21, 2008 that Petters conveyed to JPMorgan with the intent to put it beyond Ritchie's reach, and the approximately $18 million of Petters's assets that JPMorgan obtained after September 30, 2008 by enforcing its security interests against Petters's assets.

342.    When JPMorgan learned about the September 24, 2008 raid of Petters's offices by federal agents, JPMorgan declared the Petters Group Worldwide credit line in default. On or about September 30, 2008, JPMorgan seized and began to liquidate the approximately $25 million in securities then held in Petters's personal investment accounts. At the time, JPMorgan claimed that Petters Group Worldwide owed $19,641,000 on its credit line.

343.    As of October 6, 2008, JPMorgan had seized and liquidated $18.1 million of the assets in Petters's investment accounts. By seizing and liquidating the investment-account assets, JPMorgan reduced the balance on the Petters Group Worldwide credit line to $1.5 million from a pre-raid balance of $19,641,000. Some of the asset sales by JPMorgan were not completed until after the October 3, 2008 Freeze Order issued in the receivership case.

344.    By seizing and liquidating Petters's investment accounts after news of the federal raid, JPMorgan stepped ahead of the fraud scheme's victims and creditors to recover the nearly $20 million that Petters Group Worldwide allegedly owed under the credit line.

345.    Richter Consulting was enriched by the fees it charged and received in connection with aiding and abetting Petters's fraud and the defrauding of Ritchie.

346.    The acceptance and retention of the benefits the Defendants received at Ritchie's expense would be unjust under the circumstances, particularly because (1) Defendants had actual knowledge of Petters's insolvency or consciously avoided such knowledge, and (2) Defendants had knowledge of or consciously avoided such knowledge, and substantially assisted in, Petters's fraudulent activity and money laundering operations. JPMorgan should not be allowed to profit from its own conduct which allowed its depositor Petters to commit further fraud upon the public so it could be paid in full and keep all the profit and fees it had received since 2005.

347.    The interests of equity require Defendants to disgorge all of the proceeds of the

loans that Ritchie made to Petters that they received after February 1, 2008 and equity further

requires that JPMorgan forfeit all profits and fees it collected on the Polaroid transaction, and

related Petters loans from 2005 to 2008.


**L.    Twelfth Cause of Action: Constructive fraudulent conveyance—February 4–6, 2008 transfers from Petters to JPMorgan (against all Defendants except Richter Consulting)**

348.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

349.    On or about February 1, 2008, Ritchie loaned Petters and Petters Group

Worldwide $31 million (the "February 1 Loan"). Petters transferred some portion of that $31

million to numerous different bank accounts.

350.    Within days Petters transferred the February 1 Loan through multiple accounts in

the United States and abroad, many of them at JPMorgan to obscure the source of the funds.

351.    Petters told Ritchie that he would use the proceeds of the February 1 Loan to

repay JPMorgan and that he would lose Polaroid if Ritchie did not extend the loan.

352.    Ultimately, JPMorgan received the following transfers:

    a)    February 4, 2008 – $3,880,643.78 paid out from an account controlled by Petters

        to JPMorgan.

    b)    February 6, 2008 – $28,227,214.40 paid out from an account controlled by Petters

        to JPMorgan.

353.    At all times until transferred to JPMorgan, Petters exercised control and dominion

over the funds conveyed to JPMorgan because of his ability to make decisions about the

accounts.

354.    Petters did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

355.    Petters was insolvent at the time of the transfers.

356.    The transfers to JPMorgan made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

357.    Accordingly, Petters's transfer of $31 million to JPMorgan between February 4-6, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

358.    As a result of the foregoing, Ritchie is entitled to a judgment (1) voiding the conveyance of $31 million to JPMorgan between February 4-6, 2008, (2) ordering the entry of a money judgment of $31 million in favor of Ritchie and against JPMorgan, and (3) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with voiding these fraudulent conveyances.

**M.    Thirteenth Cause of Action: Knowing fraudulent conveyance—February 4-6, 2008 transfers from Petters to JPMorgan (against all Defendants except Richter Consulting)**

359.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

360.    On or about February 1, 2008, Ritchie loaned Petters $31 million in consideration for a promissory note executed and delivered by Petters Group Worldwide and by Petters in his capacity as an individual. At Petters's direction, Ritchie Special Credit Investments, Ltd. instructed JPMorgan to wire-transfer funds from its account at JPMorgan to M&I Bank for the benefit of an account specified by Petters.

361.    Immediately after M&I Bank received the funds transferred to it under the wire-transfer-payment order Ritchie issued to JPMorgan, Petters issued a wire-transfer-payment order to M&I Bank directing the transfer of some portion of the $31 million to numerous different banks for the benefit of accounts owned or controlled by Petters and his coconspirators.

362.    Within days Petters transferred the February 1 Loan through multiple accounts in the United States and abroad, many of them at JPMorgan to obscure the source of the funds.

363.    Petters told Ritchie that he would use the proceeds of the February 1 Loan to repay JPMorgan and that he would lose Polaroid if Ritchie did not extend the loan.

364.    Ultimately, JPMorgan received the following transfers:

   a)  February 4, 2008 – $3,880,643.78 paid out from an account controlled by Petters to JPMorgan.

   b)  February 6, 2008 – $28,227,214.40 paid out from an account controlled by Petters to JPMorgan.

365.    Petters exercised control and dominion over the funds conveyed to JPMorgan because of his ability to make decisions about the accounts. Those funds were his assets that, but for the later transfers, would have been available to pay the debts he owed to Ritchie Special Credit Investments, Ltd. under the promissory note he executed and delivered to Ritchie on February 1, 2008 in consideration for a loan of $31 million.

366.    Petters did not receive fair consideration in exchange for this transfer to JPMorgan. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

367.    Petters was insolvent at the time of the transfers and made the transfers in furtherance of Petters Company's fraudulent purchase-order-financing scheme.

368.     Petters made the transfers to the numerous bank accounts and ultimately to JPMorgan with actual intent to hinder, delay, or defraud Ritchie whom he did not intend to repay. JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

369.     Within days, Petters transferred the February 1 Loan through multiple accounts in the United States and abroad, many of them at JPMorgan to obscure the source of the funds.

370.     To the extent JPMorgan is not an initial transferee of Petters's interest in the funds transferred to JPMorgan as set forth in the foregoing paragraphs, JPMorgan is a later transferee of the initial transferee of those funds. Because of its knowledge of Petters's insolvency and the Petters Company fraudulent purchase-order-financing scheme, JPMorgan cannot satisfy its burden of showing that it received any of these funds in good faith or for fair consideration.

371.     The transfers to JPMorgan made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

372.     Petters's transfer of $31 million to JPMorgan on or around February 4-6, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

373.     Ritchie is entitled to a judgment (1) voiding the conveyance of $31 million to JPMorgan between February 4-6, 2008, (2) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount of $31 million, and (3) ordering JPMorgan to pay pre-judgment and post-judgment interest, and to pay Ritchie's attorneys' fees and costs incurred in connection with voiding these fraudulent conveyances.

**N.      Fourteenth Cause of Action: Constructive fraudulent conveyance—transfer of $31 million from JPMorgan to the Syndicated Lenders (against all Defendants except Richter Consulting)**

374.     Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

91

375.     On or about February 8, 2008, JPMorgan transferred $31 million to the Syndicated Lenders. JPMorgan Chase Bank, N.A. received approximately $4,472,259.64; Wachovia Capital Finance received approximately $4,324,007.94; UBS Loan Finance LLC received approximately $3,336,397.54; Merrill Lynch Capital received approximately $3,326,397.54; LaSalle Business Credit received approximately $3,088,577.10; The CIT Group received approximately $3,088,577.10; PNC Bank, N.A. received approximately $2,375,115.79; Fifth Third Bank received approximately $1,899,474.92; Webster Business Credit received approximately $1,426,922.62; Associated Commercial Finance, Inc. received approximately $1,426,922.62; JPMorgan Europe Ltd. received approximately $1,704,894.56; and Wachovia Capital Finance (Europe) received approximately $426,223.54.

376.     At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds. It was his property because of his ability to make decisions about the accounts.

377.     Petters did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

378.     Petters was insolvent at the time of the transfers.

379.     Within one week, Petters transferred the February 1 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan. Petters represented to Ritchie that the money was going to be used to repay JPMorgan, which would have included the Syndicated Lenders.

380.     The transfers to the Syndicated Lenders made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

381.    JPMorgan's transfer of $31 million to the Syndicated Lenders on or around
February 8, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor
and Creditor Law § 273.

382.    Ritchie is entitled to a judgment (1) voiding the conveyance of $31 million to the
Syndicated Lenders on or about February 8, 2008, (2) ordering the entry of a money judgment in
favor of Ritchie and against JPMorgan and the Syndicated Lenders in an amount of $31 million,
and (3) ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred
in connection with voiding these fraudulent conveyances.

### O.    Fifteenth Cause of Action: Knowing fraudulent conveyance—transfer of $31 million from JPMorgan to the Syndicated Lenders (against all Defendants except Richter Consulting)

383.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

384.    On or about February 8, 2008, JPMorgan transferred $31 million to the
Syndicated Lenders. JPMorgan Chase Bank, N.A. received approximately $4,472,259.64;
Wachovia Capital Finance received approximately $4,324,007.94; UBS Loan Finance LLC
received approximately $3,336,397.54; Merrill Lynch Capital received approximately
$3,326,397.54; LaSalle Business Credit received approximately $3,088,577.10; The CIT Group
received approximately $3,088,577.10; PNC Bank, N.A. received approximately $2,375,115.79;
Fifth Third Bank received approximately $1,899,474.92; Webster Business Credit received
approximately $1,426,922.62; Associated Commercial Finance, Inc. received approximately
$1,426,922.62; JPMorgan Europe Ltd. received approximately $1,704,894.56; and Wachovia
Capital Finance (Europe) received approximately $426,223.54.

385.     At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds. It was his property as co-obligor of the loan from Ritchie and because of his ability to make decisions about the accounts.

386.     Petters did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

387.     Petters was insolvent at the time of the transfers.

388.     Within one week, Petters transferred the February 1 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan. Petters represented to Ritchie that the money was going to be used to repay JPMorgan, which would have included the Syndicated Lenders.

389.     Petters controlled all the accounts before this money was transferred to the Syndicated Lenders as part of an effort to defraud, delay, and hinder Ritchie's ability to collect its debts.

390.     Petters made the transfers to JPMorgan with actual intent to hinder, delay, or defraud Ritchie, whom he did not intend to repay. JPMorgan accepted the transfers and then transferred the funds to the Syndicated Lenders with actual intent to hinder, delay, or defraud Ritchie.

391.     The transfers to the Syndicated Lenders made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

392.     JPMorgan's transfer of $31 million to the Syndicated Lenders on or around February 8, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

393.    Ritchie is entitled to a judgment: (1) voiding the conveyance of $31 million to the
Syndicated Lenders on or about February 8, 2008; (2) ordering the entry of a money judgment of
$31 million in favor of Ritchie and against JPMorgan and the Syndicated Lenders; and (3)
ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in
connection with voiding these fraudulent conveyances.

**P.     Sixteenth Cause of Action: Constructive fraudulent conveyance—$12 million
         transfer from Petters to JPMorgan of part of Ritchie's loan on February 7,
         2008 (against all Defendants except Richter Consulting)**

394.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

395.    On or about February 7, 2008, Ritchie loaned Petters and Petters Group
Worldwide $16 million (the "February 7 Loan"). Petters transferred $12 million of that amount
to numerous different bank accounts and then, on or about February 12, 2008, to JPMorgan to
repay an additional loan JPMorgan made to Polaroid.

396.    At all times until transferred to JPMorgan, Petters exercised control and dominion
over the funds. It was his property as co-obligor of the loan from Ritchie and because of his
ability to make decisions about the accounts.

397.    Petters did not receive fair consideration in exchange for this transfer. The
repayment to JPMorgan was for a debt of Polaroid, not of Petters.

398.    Petters was insolvent at the time of the transfers.

399.    Petters transferred the February 7, 2008 Loan through numerous accounts in the
United States and abroad, many of them at JPMorgan. Petters controlled all the accounts before
this money was transferred to JPMorgan.

400.    The transfers to JPMorgan made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

401.    Petters's transfer of $12 million to JPMorgan on or around February 12, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor and Creditor Law § 273.

402.    Ritchie is entitled to a judgment (1) voiding the conveyance of $12 million to JPMorgan on or about February 12, 2008, (2) ordering the entry of a money judgment of $12 million in favor of Ritchie and against JPMorgan, and (3) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with voiding these fraudulent conveyances.

**Q.      Seventeenth Cause of Action: Knowing fraudulent conveyance—$12 million transfer from Petters to JPMorgan of part of Ritchie's loan on February 7, 2008 (against all Defendants except Richter Consulting)**

403.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

404.    On or about February 7, 2008, Ritchie loaned Petters and Petters Group Worldwide $16 million (the "February 7 Loan"). Petters transferred $12 million of that amount to numerous different bank accounts and then, on or about February 12, 2008, to JPMorgan to repay an additional loan JPMorgan made to Polaroid.

405.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds. It was his property as co-obligor of the loan from Ritchie and because of his ability to make decisions about the accounts.

406.    Petters did not receive fair consideration in exchange for this transfer. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

407.    Petters was insolvent at the time of the transfers.

408.    Petters transferred the February 7 Loan through numerous accounts in the United

States and abroad, many of them at JPMorgan. Petters controlled all the accounts before this

money was transferred to JPMorgan as part of an effort to delay and hinder Ritchie's ability to

collect Petters's debt.

409.    Petters made the transfers to the numerous bank accounts and ultimately to

JPMorgan with actual intent to hinder, delay, or defraud Ritchie, whom he did not intend to

repay. JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

410.    The transfers to JPMorgan made substantial funds controlled by Petters

unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including

Ritchie.

411.    Petters's transfer of $12 million to JPMorgan on or around February 12, 2008

constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law

§ 276.

412.    Ritchie is entitled to a judgment (1) voiding the conveyance of $12 million to

JPMorgan on or about February 12, 2008, (2) ordering the entry of a money judgment of $12

million in favor of Ritchie and against JPMorgan, and (3) ordering JPMorgan to pay Ritchie's

attorneys' fees incurred in connection with voiding these fraudulent conveyances.


**R.      Eighteenth Cause of Action: Constructive fraudulent conveyance—transfer
          of $12 million from JPMorgan to the Syndicated Lenders (against all
          Defendants except Richter Consulting)**

413.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

414.    On or about February 12, 2008, JPMorgan transferred $12 million of the

February 7 Loan to the Syndicated Lenders.

415.    Within one week, Petters transferred the February 12 Loan through numerous
accounts in the United States and abroad, many of them at JPMorgan. Petters controlled all the
accounts before this money was transferred to the Syndicated Lenders.

416.    At all times until transferred to JPMorgan, Petters exercised control and dominion
over the funds. It was his property as co-obligor of the loan from Ritchie and because of his
ability to make decisions about the accounts.

417.    Petters did not receive fair consideration in exchange for this transfer to
JPMorgan. The repayment to JPMorgan was for a debt of Polaroid, not of Petters.

418.    Petters was insolvent at the time of the transfers.

419.    The transfers to the Syndicated Lenders made substantial funds controlled by
Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors,
including Ritchie.

420.    JPMorgan's transfer of $12 million to the Syndicated Lenders on or around
February 12, 2008 constitutes a constructive fraudulent conveyance under the New York Debtor
and Creditor Law § 273.

421.    Ritchie is entitled to a judgment (1) voiding the conveyance of $12 million to the
Syndicated Lenders on or about February 12, 2008, (2) ordering the entry of a money judgment
of $12 million in favor of Ritchie and against JPMorgan and the Syndicated Lenders, and (3)
ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in
connection with voiding these fraudulent conveyances.

**S.    Nineteenth Cause of Action: Knowing fraudulent conveyance—transfer of
$12 million from JPMorgan to the Syndicated Lenders (against all
Defendants except Richter Consulting)**

422.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

423.    On or about February 12, 2008, JPMorgan transferred $12 million of the February 7 Loan to the Syndicated Lenders.

424.    Within one week, Petters transferred the February 7 Loan through numerous accounts in the United States and abroad, many of them at JPMorgan. Petters controlled all the accounts before this money was transferred to the Syndicated Lenders as part of an effort to delay and hinder Ritchie's ability to collect its debt.

425.    Petters made the transfers to the numerous bank accounts and ultimately to JPMorgan with actual intent to hinder, delay, or defraud Ritchie, whom he did not intend to repay. JPMorgan accepted and then made the transfers to the Syndicated Lenders with actual intent to hinder, delay, or defraud Ritchie.

426.    The transfers to the Syndicated Lenders made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

427.    JPMorgan's transfer of $12 million to the Syndicated Lenders on or around February 12, 2008 constitutes a knowing fraudulent conveyance under the New York Debtor and Creditor Law § 276.

428.    Ritchie is entitled to a judgment (1) voiding the conveyance of $12 million to the Syndicated Lenders on or about February 12, 2008, (2) ordering the entry of a money judgment of $12 million in favor of Ritchie and against JPMorgan and the Syndicated Lenders, and (3) ordering JPMorgan and the Syndicated Lenders to pay Ritchie's attorneys' fees incurred in connection with voiding these fraudulent conveyances.

**T.     Twentieth Cause of Action: Constructive fraudulent conveyance—repayment to JPMorgan of the $6.5 million in March 2008 and Petters's security interest (against JPMorgan)**

429.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

430.    As of December 31, 2007, Petters's companies owed JPMorgan between $20 million and $40 million under the terms of the agreement for a $40 million line of credit that JPMorgan had extended to Petters Group Worldwide.

431.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional $31 million. Shortly before that loan was made, Petters sent an email to one of his co-conspirators, stating, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out JPMorgan and renew the line of credit."

432.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on March 21, 2008, Petters caused $6.5 million of that amount to be transferred to JPMorgan in consideration for renewing the Petters Group Worldwide $40 Million Line of Credit.

433.    At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds. It was his property as co-obligor of the loan from Ritchie and because of his ability to make decisions about the accounts.

434.    On or about March 25, 2008, Petters executed and delivered a security agreement to JPMorgan granting a security interest in Petters's entire right, title, and interest in personal property, including money that had been deposited or was to be deposited in the future in certain bank accounts.

435.    The March 2008 Petters security interest and the $6.5 million transferred to JPMorgan constitute conveyances of Petters's property to JPMorgan under § 270 of the New York Debtor and Creditor law.

100

436.    Petters did not receive fair consideration in exchange for this transfer. The loans from JPMorgan were for the benefit of Petters Group Worldwide and Polaroid, not of Petters.

437.    Petters was insolvent at the time of the transfers.

438.    When JPMorgan learned about the September 24, 2008 raid of Petters's offices by federal agents, JPMorgan declared the Petters Group Worldwide credit line in default. On or about September 30, 2008, JPMorgan seized and began to liquidate the approximately $25 million in securities then held in Petters's personal investment accounts. At the time, JPMorgan claimed that Petters Group Worldwide owed $19,641,000 on its credit line.

439.    As of October 6, 2008, JPMorgan had seized and liquidated $18.1 million of the assets in Petters's investment accounts. By seizing and liquidating the investment account assets, JPMorgan reduced the balance on the Petters Group Worldwide credit line to $1.5 million from a pre-raid balance of $19,641,000. Some of the asset sales by JPMorgan were not completed until after the October 3, 2008 Freeze Order was issued in the receivership case.

440.    By seizing and liquidating Petters's investment accounts after news of the federal raid, JPMorgan stepped ahead of the fraud scheme's victims and creditors to recover the nearly $20 million that Petters Group Worldwide allegedly owed under the credit line.

441.    Under § 273 of the New York Debtor and Creditor Law, Ritchie is entitled to a judgment (1) voiding the conveyance of the March 2008 security interest and the March 2008 conveyance of $6.5 million of Petters's money to JPMorgan, (2) ordering the entry of a money judgment in favor of Ritchie and against JPMorgan in an amount equal to the sum of the value of the March 2008 security interest and $6.5 million, and (3) ordering JPMorgan to pay Ritchie's attorneys' fees incurred in connection with voiding these fraudulent conveyances.

U.    **Twentieth-First Cause of Action: Knowing fraudulent conveyance—
repayment to JPMorgan of the $6.5 million in March 2008 and Petters's
security interest (against JPMorgan)**

442.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

443.    As of December 31, 2007, Petters's companies owed JPMorgan between $20
million and $40 million under the terms of the agreement for a $40 million line of credit that
JPMorgan had extended to Petters Group Worldwide.

444.    On March 21, 2008, Petters fraudulently induced Ritchie to loan him an additional
$31 million. Shortly before that loan was made, Petters sent an email to one of his co-
conspirators, stating, "I need $6.5M of [the Ritchie March 2008 Loan] proceeds to take out
JPMorgan and renew the line of credit."

445.    Shortly after obtaining control over the $31 million Ritchie loaned to Petters on
March 21, 2008, Petters caused $6.5 million of that amount to be transferred to JPMorgan in
consideration for renewing the Petters Group Worldwide $40 Million Line of Credit. Petters
transferred this $6.5 million to JPMorgan with the actual intent to hinder, delay, or defraud
Ritchie. JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

446.    At all times until transferred to JPMorgan, Petters exercised control and dominion
over the funds. It was his property as co-obligor of the loan from Ritchie and because of his
ability to make decisions about the accounts.

447.    On or about March 25, 2008, Petters executed and delivered a security agreement
to JPMorgan granting a security interest in Petters's entire right, title, and interest to certain
personal property, including money that had been deposited or was to be deposited in the future
in certain bank accounts. JPMorgan knew that any money currently in those accounts, or to be

deposited in such accounts, was obtained by fraud or consciously avoided such knowledge. Petters granted this security interest with the actual intent to hinder, delay, or defraud Ritchie.

448.   The March 2008 Petters security interest and the $6.5 million transferred to JPMorgan constitute conveyances of Petters's property to JPMorgan under § 270 of the New York Debtor and Creditor law.

449.   Petters transferred the $6.5 million and the security interest to JPMorgan with actual intent to hinder, delay, or defraud Ritchie, whom he did not intend to repay. JPMorgan accepted the transfers with actual intent to hinder, delay, or defraud Ritchie.

450.   When JPMorgan learned about the September 24, 2008 raid of Petters's offices by federal agents, JPMorgan declared the Petters Group Worldwide credit line in default. On or about September 30, 2008, JPMorgan seized and began to liquidate the approximately $25 million in securities then held in Petters's personal investment accounts. At the time, JPMorgan claimed that Petters Group Worldwide owed $19,641,000 on its credit line.

451.   As of October 6, 2008, JPMorgan had seized and liquidated $18.1 million of the assets in Petters's investment accounts. By seizing and liquidating the investment account assets, JPMorgan reduced the balance on the Petters Group Worldwide credit line to $1.5 million from a pre-raid balance of $19,641,000. Some of the asset sales by JPMorgan were not completed until after the October 3, 2008 Freeze Order was issued in the receivership case.

452.   By seizing and liquidating Petters's investment accounts after news of the federal raid, JPMorgan stepped ahead of the fraud scheme's victims and creditors to recover the nearly $20 million that Petters Group Worldwide allegedly owed under the credit line.

453.   Under § 276 of the New York Debtor and Creditor Law, Ritchie is entitled to a judgment: (1) voiding the conveyance of the March 2008 security interest and the March 2008

conveyance of $6.5 million of Petters's money to JPMorgan; (2) ordering the entry of a money

judgment in favor of Ritchie and against JPMorgan in an amount equal to the sum of the value of

the March 2008 security interest and $6.5 million; and (3) ordering JPMorgan to pay Ritchie's

attorneys' fees incurred in connection with voiding these fraudulent conveyances.

### V.      Twenty-Second Cause of Action: Minnesota Uniform Fraudulent Transfer Act ("MUFTA") (against All Defendants except Richter Consulting)

454.    Ritchie incorporates and realleges all the foregoing allegations of the Complaint.

455.    Petters exercised dominion and control over the funds described above and made

transfers to Defendants, except Richter, in the form of purported repayment of loans and fees.

456.    The transfers were made with actual intent to hinder, delay, or defraud Plaintiffs

as creditors of Petters, as described in greater detail above, in violation of Minn. Stat.

§ 513.44(a)(1).

457.    The transfers were made without receiving reasonably equivalent value in

exchange and at a time where Petters and Petters Group Worldwide were engaged in or was

about to be engaged in a business or transaction for which the remaining assets were

unreasonably small in relation to the business or transaction, or Petters and Petters Group

Worldwide intended to incur, or believed or reasonably should have believed that Petters and

Petters Group Worldwide would incur debts beyond their ability to pay as they became due. The

transfers were therefore fraudulent as to Plaintiffs under Minn. Stat. § 513.44(a)(2).

458.    The following factors, among others, demonstrate actual intent to hinder, delay, or

defraud Plaintiffs under Minn. Stat. § 513.44(b):

    a)    Immediately after M&I Bank received the funds transferred to it under the wire-

transfer-payment order Ritchie issued to JPMorgan, Petters issued a wire-transfer-

payment order to M&I Bank directing the transfer some portion of the $31 million to numerous different banks for the benefit of accounts owned or controlled by Petters and his co-conspirators.

b)  On or about February 4-6, 2008, Petters transferred funds to JPMorgan to repay JPMorgan's loan to Polaroid, thus removing and concealing assets.

c)  At all times until transferred to JPMorgan, Petters exercised control and dominion over the funds. Those funds were his assets that, but-for the subsequent transfers, would have been available to pay the debts he owed to Plaintiffs. Thus Petters retained possession or control of the property.

d)  The transfers were of substantially all of Petters's assets.

e)  Petters was insolvent at the time of the transfers and made the transfers in furtherance of Petters Company's fraudulent purchase-order-financing scheme.

f)  Petters did not receive fair consideration in exchange for this transfer as the purported repayments were for a debt of Polaroid, not of Petters.

g)  Petters was operating a Ponzi scheme.

459.    The transfers to the Defendants made substantial funds controlled by Petters unavailable to Petters's creditors and, thus, worked to the detriment of those creditors, including Ritchie.

460.    The transfers were made without receiving reasonably equivalent value in exchange. Petters was insolvent at the time. Because Plaintiffs' claims regarding promissory notes arose before the transfers, the transfers were fraudulent as to Plaintiffs under Minn. Stat. § 513.45(a).

461.    The transfers are voidable under Minn. Stat. §§ 513.44(a)(1), (a)(2), (b) and

513.45(a). Plaintiffs are entitled to judgment against Defendants in the amount of the transfers

## VII.    <u>**RELIEF REQUESTED**</u>

Ritchie respectfully requests the following relief:

A.  compensatory damages of at least $150 million;

B.  exemplary damages;

C.  punitive damages;

D.  pre- and post-judgment interest;

E.  an order setting aside the February 4-6, 2008 fraudulent conveyances from Petters to
    JPMorgan and an award of compensatory damages of approximately $31 million;

F.  an order setting aside the February 8, 2008 fraudulent conveyances from JPMorgan to the
    Syndicated Lenders and an award of compensatory damages of approximately $31
    million;

G.  an order setting aside the fraudulent conveyances from Petters to JPMorgan of the
    proceeds of the February 7 Loan and an award of compensatory damages of
    approximately $12 million;

H.  an order setting aside the fraudulent conveyances from JPMorgan to the Syndicated
    Lenders of the proceeds of the February 7 Loan and an award of compensatory damages
    of approximately $12 million;

I.  an order setting aside the fraudulent conveyances from Petters to JPMorgan of the $6.5
    million and the security interest and an award of compensatory damages of
    approximately $24.5 million; and

J.  all other relief that this Court deems just and proper.

## VIII.   JURY DEMAND

The Plaintiffs demand a jury trial of all issues so triable.

Dated: October 21, 2016
New York, New York

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

James W. Halter (*pro hac vice*)
Jeffrey L. Liddle
Read K. McCaffrey (*pro hac vice*)
800 Third Avenue, 8th Floor
New York, NY 10022
Tel: (212) 687-8500
Fax: (212) 687-1505
*Attorneys for Plaintiffs*

Patrick H. O'Neill, Jr. (#0207950)
LARSON KING, LLP
30 East Seventh Street, Suite 2800
Saint Paul, Minnesota 55101
Tel: (651) 312-6500
Fax: (651) 312-6618
*Attorneys for Plaintiffs*

# EXHIBIT A

BANKONE          Fax:1-312-661-6929          Nov  6 2007  16:36      P.01

# CHASE

August 27, 2007

BY FACSIMILE AND OVERNIGHT DELIVERY

Polaroid Corporation
4400 Baker Road
Minnetonka, Minnesota 55343
Attention: Chief Financial Officer

Re:    Revolving Credit Facility Default Notice

Ladies and Gentlemen:

The undersigned writes as U.S. Administrative Agent (in such capacity, the "U.S. Administrative Agent") on behalf of the lenders (the "Lenders") under that certain Revolving Credit Agreement, dated as of April 28, 2005, as amended by that certain First Amendment to Revolving Credit Agreement and Consent, dated as of January 9, 2006, that certain Second Amendment to Revolving Credit Agreement and Consent, dated as of January 30, 2006, that certain Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of May 11, 2006, that certain Fourth Amendment to Revolving Credit Agreement and Amendment to Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of June 14, 2006, that certain Consent, Waiver and Fifth Amendment to Revolving Credit Agreement dated as of July 31, 2006, that certain Sixth Amendment to Revolving Credit Agreement, dated as of September 8, 2006, that certain Seventh Amendment to Revolving Credit Agreement, dated as of September 26, 2006, that certain Eighth Amendment to Revolving Credit Agreement, dated as of December 19, 2006, that certain Ninth Amendment to Revolving Credit Agreement, dated as of March 5, 2007, that certain Tenth Amendment to Revolving Credit Agreement, dated as of April 24, 2007, that certain Forbearance Agreement and Eleventh Amendment to Revolving Credit Agreement, dated as of April 24, 2007 and that certain Forbearance Agreement and Twelfth Amendment to Revolving Credit Agreement (the "Forbearance Agreement"), dated as of July 3, 2007 (as amended, supplemented, or otherwise modified from time to time, the "Revolving Credit Agreement"), among Polaroid Holding Company, a Delaware corporation, the subsidiaries of Parent party thereto, the Lenders, the U.S. Administrative Agent and JPMorgan Europe Limited, as European Administrative Agent. Capitalized terms used and not otherwise defined herein have the meanings given to such terms in the Revolving Credit Agreement.

You have previously informed the U.S. Administrative Agent that an Event of Default has occurred and is continuing under (i) clause (d) of Article VII of the Credit Agreement for

BHNKUNE                FdX:1-312-661-6929        Nov  6 2007  16:37      P.02

(1) a breach of Section 6.12(a) as of December 31, 2006, for the most recently-ended Fiscal Quarter, (2) a breach of Section 6.12(a) as of March 31, 2007, for the most recently-ended Fiscal Quarter, (3) a breach of Section 6.12(a) as of June 30, 2007, for the most recently-ended Fiscal Quarter, and (4) a breach of Section 6.12(c) and (ii) clause (e) of Article VII of the Credit Agreement for a breach of Section 5.01(a) with respect to the consolidated financial statements for the Fiscal Year of the Parent and its Subsidiaries ended December 31, 2006 (the "Existing Defaults").  Under the terms of the Forbearance Agreement, the Agents and Lenders agreed to forbear during the Forbearance Period (as defined in the Forbearance Agreement; as so defined, the "Forbearance Period") from exercising certain rights and remedies with respect to the Existing Defaults.

Under the terms of the Forbearance Agreement, you agreed to obtain by August 15, 2007 a commitment from Jefferies & Company, Inc. to refinance the Secured Obligations under the Credit Agreement with a new senior credit facility.  The U.S. Administrative Agent hereby notifies you that on August 15, 2007 an Event of Default occurred under clause (d) of Article VII of the Credit Agreement as a result of your failure to obtain such a commitment and that such Event of Default is continuing (the "Additional Default"; the Existing Defaults, together with the Additional Default, are the "Applicable Defaults").  The Forbearance Period ended on August 15, 2007 as a result of the occurrence of the Additional Default.

- Effective August 27, 2007, all Loans and other amounts outstanding under the Credit Agreement shall bear interest or accrue, as applicable, at the rates set forth in Section 2.15(f) of the Credit Agreement.

Additionally, the U.S. Administrative Agent reserves the right to exercise all of its rights and remedies at any time pursuant to the terms of any or all of the Loan Documents based on the Applicable Defaults, including, without limitation, the right to limit Availability by establishing additional Reserves. No failure or delay by any Administrative Agent, any Issuing Bank or any Lender in exercising any right or power under any Loan Document shall operate as a waiver thereof or of any Default or Event of Default, whether known or unknown, now existing or hereafter arising, nor shall any single or partial exercise of any such right or power (including, without limitation, the execution or delivery of this letter), or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power (including, without limitation, any rights or powers in connection with the Applicable Defaults and/or any other Default or Event of Default that may exist and is not described herein), all of which rights and powers the U.S. Administrative Agent hereby reserves. Without limiting the generality of the foregoing, (i) no action taken or omitted to be taken by any Administrative Agent, any Issuing Bank or any Lender (including, without limitation, the execution or delivery of this letter), shall operate as a waiver or modification of any term, condition, obligation, covenant or agreement contained in any Loan Document or

contained in any instrument or agreement referred to therein and (ii) the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of the Applicable Defaults and/or any other Default or Event of Default, regardless of whether any Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time.  Nothing herein shall be deemed to be (or to entitle any Loan Party to) a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Loan Documents in similar or different circumstances or of any Default or Event of Default that may have occurred and be continuing.

JPMORGAN CHASE BANK, N.A.,
as U.S. Administrative Agent under
the Revolving Credit Agreement

By: _____
Name: _Teresa M. Behle_
Title: _Vice President_

cc:    Robert J. McDonough
       David E. Baer, Esq.
       William M. Boyd, Esq.
       Owen C. Marx, Esq.
       Steven B. Fox

# EXHIBIT B

## SUPPORT GUARANTY

This Support Guaranty (as amended or otherwise modified from time to time, the "*Guaranty*") is dated as of October 24, 2007 and is entered into by and among Thomas J. Petters (the "*Investor*"), JPMorgan Chase Bank, N.A., as U.S. Administrative Agent, and J.P. Morgan Europe Limited, as European Administrative Agent (the European Administrative Agent and the U.S. Administrative Agent are referred to hereinafter each individually as an "*Agent*" and collectively as the "*Agents*").

## RECITALS

WHEREAS, Polaroid Holding Company, a Delaware corporation (the "*Parent*"), Polaroid Corporation, a Delaware corporation ("*Polaroid*"), the other subsidiaries of Parent party thereto, the Agents and the Lenders from time to time party thereto are parties to a Revolving Credit Agreement, dated as of April 28, 2005, as amended by that certain First Amendment to Revolving Credit Agreement and Consent, dated as of January 9, 2006, that certain Second Amendment to Revolving Credit Agreement and Consent, dated as of January 30, 2006, that certain Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of May 11, 2006, that certain Fourth Amendment to Revolving Credit Agreement and Amendment to Consent, Waiver and Third Amendment to Revolving Credit Agreement, dated as of June 14, 2006, that certain Consent, Waiver and Fifth Amendment to Revolving Credit Agreement dated as of July 31, 2006, that certain Sixth Amendment to Revolving Credit Agreement, dated as of September 8, 2006, that certain Seventh Amendment to Revolving Credit Agreement, dated as of September 26, 2006, that certain Eighth Amendment to Revolving Credit Agreement, dated as of December 19, 2006, that certain Ninth Amendment to Revolving Credit Agreement, dated as of March 5, 2007, that certain Tenth Amendment to Revolving Credit Agreement, dated as of April 24, 2007, that certain Forbearance Agreement and Eleventh Amendment to Revolving Credit Agreement, dated as of April 24, 2007, and that certain Forbearance Agreement and Twelfth Amendment to Revolving Credit Agreement, dated as of July 3, 2007 (as so amended and modified and the same as may be otherwise amended, supplemented, or otherwise modified from time to time, the "*Credit Agreement*;" capitalized terms used herein but not otherwise defined herein shall have the meanings given such terms in the Credit Agreement), pursuant to which the Agents and the Lenders have agreed, subject to the terms and conditions thereof, to make certain extensions of credit and other financial accommodations to or for the benefit of the Borrowers;

WHEREAS, the Investor desires to see the success of the Borrowers and whereas the Investor shall receive direct and/or indirect benefits from the extensions of credit made to or to be made pursuant to the Credit Agreement to the Borrowers;

WHEREAS, it is proposed that the Borrowers, the Agents and the Lenders enter into a forbearance agreement (the "*Forbearance Agreement*") whereby the Agents and the Lenders will agree to forbear from exercising certain remedies against the Borrowers with

respect to the Collateral as the result of certain existing events of default under the Credit Agreement;

WHEREAS, one of the conditions to the Lenders' performance under the Forbearance Agreement is that the Investor execute and deliver this Guaranty and make, or cause one or more of its Affiliates to make, the Investor Subordinated Loans (as defined below);

NOW, THEREFORE, in order to induce the Agents and the Lenders to enter into the Forbearance Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Investor, the parties hereto hereby agree as follows:

1.    Definitions.  The following capitalized terms used herein shall have the following meanings:

"*Bankruptcy Event*" shall mean the occurrence of any of the events specified in Section 7(h) or Section 7(i) of the Credit Agreement.

"*Investor Subordinated Loan*" shall mean each loan provided by the Investor or one or more Affiliates of the Investor to Polaroid pursuant to paragraph 2 below, *provided, that* each such loan is on terms satisfactory to the Agents and *provided, further,* that each such loan is deemed to be a "Second Priority Obligation" under and as defined in the Petters Intercreditor Agreement and is subordinated on the terms set forth in the Petters Intercreditor Agreement.

"*Investor Subordinated Loan Agreement*" shall mean each agreement entered into by the Investor and/or one or more of its Affiliates and Polaroid pursuant to which the Investor and/or one or more of its Affiliates makes Investor Subordinated Loans to Polaroid in accordance with the terms hereof.

"*Investor Subordinated Loan Date*" shall mean each of the dates set forth in paragraph 4 hereof.

"*Investor Subordinated Loan Amount*" shall mean each of the amounts set forth in paragraph 4 hereof.

"*Petters Intercreditor Agreement*" shall mean that certain Intercreditor Agreement, dated as of April 24, 2007, among JPMorgan Chase Bank, N.A., as First Priority Representative, Petters Company, LLC, as Second Priority Secured Party, Petters Capital, LLC, as Third Priority Party A, Petters Company, Inc., as Third Priority Party B, Thomas Petters Inc., as Third Priority Party C, and the Loan Parties party thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

2.    Guaranty.  The Investor hereby agrees that it is liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Guarantied Parties (as defined in the U.S. Guaranty), the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations

2

652995.05-Chicago Server 2A - MSW

(which Secured Obligations shall include any interest or entitlement to fees or expenses or other charges that accrue on such Secured Obligations after the commencement of any bankruptcy proceeding or other insolvency proceeding (or would accrue but for the commencement of a bankruptcy or other insolvency proceeding), whether or not allowed or allowable in any such bankruptcy or other proceeding) and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by any Guarantied Party in endeavoring to collect all or any part of any Secured Obligation from, or in prosecuting any action against, any Borrower, the Investor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "*Guaranteed Obligations*") *provided that* the maximum aggregate amount that the Investor shall be obligated to pay hereunder shall not exceed the Maximum Liability (as defined below). The Investor further agrees that the Guaranteed Obligations may be increased, extended, renewed or otherwise altered in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such increase, extension, renewal or alteration. All terms of this Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Guarantied Party that extended any portion of the Guaranteed Obligations. "*Maximum Liability*" shall mean an amount of Obligations not to exceed $20,000,000 minus the aggregate amount of any Investor Subordinated Loans made pursuant to paragraph 4 hereof.

       3.     <u>Guaranty of Payment</u>. This Guaranty is a guaranty of payment and not of collection. The Investor waives any right to require any Guarantied Party to sue any Borrower, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "*Obligated Party*"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

       4.     <u>Investor Subordinated Loans</u>. On or before each Investor Subordinated Loan Date set forth below, the Investor shall, or shall cause one or more of its Affiliates to, make a loan to Polaroid in an amount equal to the corresponding Investor Subordinated Loan Amount set forth below for such Investor Subordinated Loan Date:

| Investor Subordinated Loan Date | Investor Subordinated Loan Amount |
| --- | --- |
| October 22, 2007 | $4.0 million |
| October 29, 2007 | $6.0 million |
| November 5, 2007 | $5.0 million |
| November 12, 2007 | $5.0 million |

       5.     <u>Payments</u>. (a) The Investor shall, or shall cause one or more of its Affiliates to, make the Investor Subordinated Loans in the amounts and on the dates set forth in paragraph 4 above in U.S. Dollars and in immediately available funds by direct payment of the aggregate amount thereof (without reduction for or on account of any set-off, counterclaim, or other right that the Investor or any of its Affiliates may have against any Agent, any Borrower or any other Person or that any Borrower may have against any Agent, any Secured Party, or any other Person) to the account number 400999773, ABA 021000021, Account Name: "ASSET-BASED OPERATIONS," Reference "Polaroid" and established at JPMorgan Chase Bank, N.A. for application to repayment of the Loans pursuant to Section 2.13 of the Credit Agreement in

3

accordance with the Credit Agreement. No portion of an Investor Subordinated Loan shall be counted and the Investor shall not be deemed to have discharged its obligations for purposes of paragraph 4 hereof unless and until the gross amount thereof (net of any charges or deductions) shall have been received by the U.S. Administrative Agent in such account.

6.     (a)     The Investor's and its Affiliates' obligations under this Guaranty are and shall be absolute, irrevocable and unconditional and are not, and shall not be, subject to any defense or right of set-off, counterclaim, deduction, diminution, abatement, recoupment, defense, suspension, deferment, or reduction or any other legal or equitable defense that the Investor has or hereafter may have, against any other Person (including any Secured Party) for any reason whatsoever (including, without limitation, any circumstance which constitutes, or might be construed to constitute, equitable or legal discharge of any or all of the Borrowers' obligations under the Facilities or any other agreement relating thereto or to any Collateral or of the Investor under this Guaranty, in each case in bankruptcy or otherwise), including without limitation:

(i)     any lack of validity, enforceability, or value of any Loan Document, or any other agreement or instrument relating thereto or to any Collateral;

(ii)     any change in the time, manner or place of payment of, or in any other term of the Credit Agreement, or any amendment or waiver thereof (including without limitation any increase in the amounts payable in respect of any or all of the Secured Obligations or any extension of the time of payment, observance or performance, or any other amendment, supplement or modification of any of the other terms and provisions relating to the Secured Obligations), or any consent to departure from any of the foregoing agreements;

(iii)     any taking, exchange, release, or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from any credit support or guarantee for the Credit Agreement;

(iv)     any manner of application of any Collateral, or proceeds thereof, or any manner of sale or other disposition of any Collateral or any other assets of any Borrower;

(v)     any failure to pay any taxes which may be payable with respect to the performance of its obligations hereunder by the Investor or any of its Affiliates or failure to obtain any authorization or approval from or other action by, or to notify or file with, any governmental authority or regulatory body required in connection with the performance of such obligations;

(vi)     the occurrence or continuance of any default under or in respect of any Indebtedness of any Borrower or any acceleration or required prepayment of any Indebtedness of any Borrower as a result thereof or otherwise;

(vii)     the voluntary or involuntary liquidation, sale, or other disposition of all or any portion of the assets of the Parent, any Borrower or any

4

other Subsidiary of the Parent, or the receivership, insolvency, bankruptcy, reorganization, or similar proceedings affecting the Parent, any Borrower or any other Subsidiary of the Parent or their respective assets;

(viii)   any failure by the Parent, any Borrower or any other Loan Party to perform its obligations under the Credit Agreement or any other Loan Document to which it is a party or any release (whether by operation of law or otherwise) of any of them from its obligations under the Credit Agreement or any other Loan Document to which it is a party;

(ix)   the exercise or non exercise by the Parent or any Borrower of any of its rights and remedies under this Guaranty or any other Loan Document to which it is a party;

(x)   any sale, transfer or other disposition by the Investor or any of its Affiliates of any direct or indirect interest any of them may have in the Parent or any Borrower or any consolidation or merger of the Parent or any Borrower;

(xi)   any impossibility or impracticality of performance, *force majeure*, act of any governmental authority, or other circumstance that might constitute a defense available to, or a discharge of, the Investor, or a surety, or any other circumstance, event or happening whatsoever, whether foreseen or unforeseen and whether similar or dissimilar to anything referred to above in this paragraph; *provided* that the Investor shall be excused for the duration of any such *force majeure* or other condition described in this clause (xii) that prevents the Investor from performing its obligations hereunder; and

(xii)   the absence of any notice to, or knowledge by the Investor or any of its Affiliates of the existence or occurrence of any of the matters or events set forth in the foregoing clauses.

(b)   The obligations of the Investor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party of the Guaranteed Obligations or any part thereof.

(c)   Further, the obligations of the Investor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of any Guarantied Party to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security or collateral for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by any Guarantied Party with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default,

5

failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of the Investor or that would otherwise operate as a discharge of the Investor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

(d)    The obligations of the Investor under this Guaranty are for the benefit of the Secured Parties and, as such, shall be enforceable by the Agents on behalf of the Secured Parties, irrespective of the occurrence of an Event of Default under any of the clauses of the Credit Agreement or the financial condition of the Parent or the Borrowers.

7.    Rights of Subrogation.  The Investor will not assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties have fully performed all their obligations to each Guaranteed Party

8.    Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Borrower or otherwise, the Investor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not any Guarantied Party is in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the respective Guaranteed Obligations shall nonetheless be payable by the Investor forthwith on demand by the appropriate Agent.

9.    Direct Benefit; Information.  The Investor expressly represents and warrants to the Guarantied Parties that the extensions of credit under the Credit Agreement and any other financial accommodations by the Guarantied Parties are and will be of direct or indirect interest, benefit and advantage to the Investor.  The Investor further assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that the Investor assumes and incurs under this Guaranty, and agrees that no Guarantied Party shall have any duty to advise the Investor of information known to it regarding those circumstances or risks.

10.    Taxes.  The provisions of Section 2.19 of the Credit Agreement are hereby incorporated *mutatis mutandi* to apply to the Guaranteed Obligations, the Investor and any payments in connection with this Guaranty.

11.    Specific Performance.  The parties hereto agree and acknowledge that monetary damages may be an inadequate remedy for any breach of the provisions of this Guaranty and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief in order to enforce or prevent any violations of the provisions of this Guaranty.

6

12. <u>Representations</u>. The Investor hereby represents and warrants to the Agents and the Lenders as of the date of this Guaranty:

(a) It has all necessary power, authority, and legal right to execute, deliver, and perform fully and completely its obligations under this Guaranty; the execution, delivery, and performance by it of this Guaranty has been duly authorized by all necessary action on its part; and this Guaranty has been duly and validly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium, or similar laws of general applicability affecting the enforcement of creditors' rights and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) No authorizations, approvals, or consents of, and no filings or registrations with, any governmental authority (other than those already obtained), are necessary for (i) the execution, delivery, or performance by it of this Guaranty and (ii) the legality, validity, binding effect or enforceability hereof or thereof on or against the Investor.

(c) Neither the execution and delivery of this Guaranty by the Investor, nor its compliance with or performance of the terms and provisions hereof or thereof (i) will require the consent of or approval of any of its creditors or (ii) will contravene any applicable law or regulation, or any order, writ, injunction, or decree of any court or governmental authority or any contract or agreement to which it is a party or to which its assets are subject.

(d) The activities contemplated by the provisions of this Guaranty are commercial in nature rather than governmental or public, and therefore it acknowledges and agrees that it is not entitled to any right of immunity on the grounds of sovereignty or otherwise with respect to such activities or in any legal action or proceeding arising out of or relating to this Guaranty.

(e) No action, suit, other legal proceeding, arbitral proceeding, or investigation is pending by or before any domestic or foreign court or governmental authority or in any arbitral or other forum and as to which it has been served with process, or, to its knowledge, is threatened against it or any of its properties or rights that (A) relates to this Guaranty or (B) has, or could reasonably be expected to have, a material adverse effect on its ability to perform its obligations under this Guaranty.

(f) As of the date of this Guaranty, its obligations under this Guaranty are not subject to any offsets or defenses of any kind against the Collateral, any Secured Party or any Borrower.

(g) It is in compliance with all applicable law in respect of the conduct of its business and the ownership of its property, except where the failure to comply could not reasonably be expected to have a material adverse effect on its ability to perform its obligations under this Guaranty.

13. <u>Covenants</u>. The Investor hereby covenants and agrees with the Agents that until the Termination Date it shall promptly notify the Agents in writing of:

7

(a)    any litigation, arbitration, administrative or other proceedings current or, to its knowledge, threatened against it which, if adversely determined, could reasonably be expected to have a material adverse effect on its or any of its Affiliates' ability to perform its obligations under this Guaranty;

(b)    any notices, orders or directions given to it by any governmental authority which could reasonably be expected to have a material adverse effect on its any of its Affiliates' ability to perform its obligations under this Guaranty; and

(c)    any event of which it is aware and which could reasonably be expected to have a material adverse effect on its ability to perform its or any of its Affiliates' obligations under this Guaranty.

14.    <u>No Deemed Waivers; Remedies Cumulative</u>.  No failure or delay by either Agent in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agents hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Guaranty or consent to any departure by the Investor any of its Affiliates therefrom shall in any event be effective unless the same shall be permitted by paragraph 16 hereof, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

15.    <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Investor or any of its Affiliates, to 4400 Baker Rd., Minnetonka, MN 55343, Attention: David Baer, Telecopy No. 952-975-4047;

(b)    if to the Agents, to 120 S. LaSalle St., 8th Floor, Chicago, IL 60603, Attention: Teresa M. Bolick.

Any party hereto may change its address, telecopy number or electronic mail address for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Guaranty shall be deemed to have been given when transmitted by confirmed telecopier or electronic mail or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

16.    <u>Amendments</u>.  Neither this Guaranty nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the parties hereto.

17.    <u>Successors and Assigns</u>.  The provisions of this Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Investor may not assign or otherwise transfer any of its rights or obligations

8

hereunder without the prior written consent of the Agents (and any attempted assignment or transfer by the Investor without such consent shall be null and void). Subject to paragraph 6(d), nothing in this Guaranty, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, the Secured Parties and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Guaranty.

18. <u>Survival</u>. Except to the extent expressly provided by this Guaranty, all covenants, agreements, representations and warranties made by the Investor herein and in the certificates or other instruments delivered in connection with or pursuant to this Guaranty shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Guaranty.

19. <u>Severability</u>. Any provision of this Guaranty held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

20. <u>Continuing Guaranty; Irrevocability</u>. This Guaranty shall be a continuing guaranty and shall be operative and binding and the obligations and liabilities of the Investor hereunder shall be irrevocable until such time as all of the Obligations have been paid in full in cash and all Commitments and other obligations under the Credit Agreement have been terminated; provided that the obligations of the Investor under this Guaranty shall terminate upon the payment by the Investor of its obligations hereunder in full in cash.

21. <u>Governing Law; Submission to Jurisdiction; WAIVER OF JURY TRIAL</u>. (a) This Guaranty shall be construed in accordance with and governed by the law of the State of New York, except as otherwise required by mandatory provisions of law and except to the extent that remedies provided by the laws of any jurisdiction other than the State of New York are governed by the laws of such jurisdiction.

(b) Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any U.S. Federal or New York State court sitting in New York, New York in any action or proceeding arising out of or relating to this Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Guaranty shall affect any right that any Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Guaranty against the Investor in the courts of any jurisdiction.

(c) The Investor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this

9

Guaranty in any court referred to in clause (b) of this paragraph 21. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)　Each party to this Guaranty irrevocably consents to service of process in the manner provided for notices in paragraph 8. Nothing in this Guaranty will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.

(e)　**EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS GUARANTY AND FOR ANY COUNTERCLAIM THEREIN.**

22.　Counterparts. This Guaranty may be executed in two or more counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Guaranty constitutes the entire contract between and among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Guaranty shall become effective when it shall have been executed by each of the parties hereto and when the Agents shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto, the Secured Parties and their respective successors and assigns. Delivery of an executed counterpart of a signature page to this Guaranty by telecopy shall be effective as delivery of a manually executed counterpart of this Guaranty.

23.　Headings.　Section and paragraph headings used herein are for convenience of reference only, are not part of this Guaranty and shall not affect the construction of, or be taken into consideration in interpreting, this Guaranty.

24.　Expenses.　The Investor will, upon demand, pay to each Agent all reasonable fees and expenses, including attorney's fees and expenses, incurred by such Agent in connection with the exercise or enforcement of any of its rights or interests under this Guaranty.

25.　Loan Document.　The parties hereto agree that this Guaranty shall be a "Loan Document" for all purposes of the Credit Agreement and the other Loan Documents.

26.　Designation as Additional Second Priority Debt. Each of the First Priority Representative, the Second Priority Secured Party and each Third Priority Party hereby designates each Investor Subordinated Loan Agreement as an "Additional Second Priority Agreement" under and as defined in the Petters Intercreditor Agreement.

*(Remainder of page intentionally left blank)*

10

652995.05-Chicago Server 2A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THOMAS J. PETTERS

JPMORGAN CHASE BANK, N.A., as U.S.
Administrative Agent and as First Priority
Representative for purposes of paragraph [17]
hereof

By: _____
Name: _Teresa M. Blich_
Title: _Vice President_

J.P. MORGAN EUROPE LIMITED, as European
Administrative Agent

By: _____
Name:
Title:

ACKNOWLEDGED AND AGREED:

POLAROID CORPORATION

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THOMAS J. PETTERS

_____

JPMORGAN CHASE BANK, N.A., as U.S.
   Administrative Agent and as First Priority
   Representative for purposes of paragraph [17]
   hereof

By: _____
   Name:
   Title:

J.P. MORGAN EUROPE LIMITED, as European
   Administrative Agent

By: _____
   Name:  Tim Jacob
   Title:  Senior Vice President

ACKNOWLEDGED AND AGREED:

POLAROID CORPORATION

By: _____
   Name:
   Title:

652995.05-Chicago Server 2A - MSW

ACKNOWLEDGED AND AGREED FOR PURPOSES OF PARAGRAPH [17] HEREOF:

PETTERS COMPANY, LLC, as Second Priority Secured Party

By: _____
    Name:
    Title:

PETTERS CAPITAL, LLC, as a Third Priority Party

By: _____
    Name:
    Title:

PETTERS COMPANY, INC., as a Third Priority Party

By: _____
    Name:
    Title:

THOMAS PETTERS INC., as a Third Priority Party

By: _____
    Name:
    Title:

# EXHIBIT C

# UCC FINANCING STATEMENT

| A. NAME & PHONE OF CONTACT AT FILER (optional) | | | Filing Number: | 200811032956 |
|---|---|---|---|---|

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

UCC DIRECT SERVICES
2727 ALLEN PARKWAY, #1000

HOUSTON, TX 77019

Filing Date: 03/19/2008

Filing Time: 11:26 am

Processing Office: State of Minnesota
Secretary of State

Filed By: UCCOnlineFiling

## 1. DEBTOR'S EXACT FULL LEGAL NAME

INDIVIDUAL'S NAME

| Last Name PETTERS | First Name THOMAS | Middle Name | Suffix |
|---|---|---|---|
| Mailing Address 655 BUSHAWAY RD | City WAYZATA | State MN | Postal Code 55391 | Country USA |
| Tax ID #: SSN or EIN | | | | |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| Mailing Address | City | State | Postal Code | Country |
| Tax ID #: SSN or EIN | | | | |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)

ORGANIZATION'S NAME
JPMORGAN CHASE BANK, N.A.

| Mailing Address P. O. BOX 36648 | City LOUISVILLE | State KY | Postal Code 40233 | Country USA |
|---|---|---|---|---|

**4.** This FINANCING STATEMENT covers the following collateral :

This financing statement covers the following property:   1. All of Debtor's right, title and interest (but none of the obligations) of Debtor in and to all monies due and payable and hereafter becoming due and payable to the Debtor under (i) each limited partnership and/or limited liability company listed below (the "LP" or "LLC") in accordance with the governing agreement for such LP or LLC listed below, as it may be amended or otherwise modified from time to time (the "LP Agreement" or "LLC Agreement") and such monies due and payable and becoming due and payable (the "LP Income" or "LLC Income").   2. All claims and other monies and claims due or to become due to Debtor in respect of the LP Income and LLC Income and  the LP Agreement and the LLC Agreement. 3. All other rights of Debtor in respect of the LP and the LLC, the LP Agreement and the LLC Agreement and the LP Income and the LLC Income.   4. Any and all proceeds of any and all of the foregoing.   Name of each LP and LLC:        Date of such LP or LLC Agreement:   Highbridge Capital LP            December 30, 2006  Highbridge Statistically Enhanced  Equity Portfolio L.P.         August 22, 2005   REN Private Investors LLC          September 27, 2006

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Bailee/Bailor | ☐ Seller/Buyer | ☐ AG. Lien | ☐ Non-UCC Filing |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum (if applicable) | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE)   (optional) | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

**8.** OPTIONAL FILER REFERENCE DATA:

MN-0-29444332

1

Uniform Commercial Code
60 Empire Drive, Suite 100
Saint Paul, MN 55103
lccan01



**Mark Ritchie**
Secretary of State

### Office of the Secretary of State

---

MN UNIFORM COMMERCIAL CODE     **Debtor Search Report**                    December 10, 2013

Order Type:          **UCC Standard Search - with copies**

Document Number:     **71732210003**

Requester:           **STAWNYCHY GEARLDINE**

                     **4817 DIVISION AVE**

         **WHITE BEAR LAKE  MN**                **55110**                          USA

Requested    Individual      Debtor:    **THOMAS J PETTERS**

Requested City:      **Not Specified**

Search From Date:    **Not Specified**

Excludes Lapsed:     **NO**

Total Financing Statements:      **5**

Total Debtors Found:      **5**

                                                                 Page 1 of 3

---

Filing Office                        Original Filing #              Filing Type

**Secretary of State**               **2283114**                   **Original Filing**


File Date     File Time       Lapse Date

**12/18/2000  08:00AM     12/18/2015**

Debtor: Thomas J Petters, 6429 Margarets Ln, EDINA MN USA, 55439

Secured Party: Crown Bk, 6600 France Ave S #125, EDINA MN USA, 55435


Amendment Filing #      Filing Type                    File Date/Time

**2005184989**          **Continuation**              **10/24/2005  9:53 AM**

**20102205666**         **Continuation**              **11/05/2010 11:30 AM**

---

Filing Office                        Original Filing #              Filing Type

**Secretary of State**               **200811032956**              **Original Filing**

File Date     File Time       Lapse Date

**03/19/2008  11:26AM     03/19/2018**

Debtor: THOMAS PETTERS, 655 BUSHAWAY RD, WAYZATA MN USA, 55391

Secured Party: JPMORGAN CHASE BANK, N.A., P. O. BOX 36648, LOUISVILLE
KY USA, 40233 6648
Secured Party: JPMORGAN CHASE BANK NA, KY1-2514 PO BOX 33035,
LOUISVILLE KY USA, 40232

| Amendment Filing # | Filing Type | File Date/Time |
|---|---|---|
| 20123004653 | Continuation | 10/29/2012  12:29 PM |
| 20123041678 | Amend SP - Change | 12/04/2012  1:43 PM |

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **Secretary of State** | **200812572558** | **Original Filing** |

| File Date | File Time | Lapse Date |
|---|---|---|
| **07/21/2008** | **10:16AM** | **07/21/2013** |

Debtor: THOMAS PETTERS, 4400 BAKER ROAD, MINNETONKA MN USA,
55343 8684
Secured Party: CROWN BANK, 6600 FRANCE AVENUE SOUTH #125, EDINA
MN USA, 55435 1802

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **Secretary of State** | **200813309087** | **Original Filing** |

| File Date | File Time | Lapse Date |
|---|---|---|
| **09/24/2008** | **02:16PM** | **09/24/2013** |

Debtor: THOMAS PETTERS, 655 BUSHAWAY ROAD, WAYZATA MN USA,
55391
Secured Party: TED DEIKEL, 1001 CALIFORNIA STREET, 4TH FLOOR, SAN
FRANCISCO CA USA, 94108

| Filing Office | Original Filing # | Filing Type |
|---|---|---|
| **Secretary of State** | **200914843721** | **Original Filing** |

| File Date | File Time | Lapse Date |
|---|---|---|
| **02/04/2009** | **04:04PM** | **02/04/2014** |

# EXHIBIT D

From: Ritchie, Thane
Sent: Sunday, February 03, 2008 3:27:42 PM
To: CheeAwai, Camille
CC: mike@calibraxcap.com; aj@calibraxcap.com; Jeffries, Mary; OShaughnessy, Mike; Baer, David;
Petters, Tom
Subject: RE: JPM's ABL Is Over-Collateralized

this is helpful

Thanks


-----Original Message-----
From: CheeAwai, Camille [mailto:Camille.Chee-Awai@pettersgroup.com]
Sent: Sun 2/3/2008 8:41 AM
To: Ritchie, Thane
Cc: mike@calibraxcap.com; aj@calibraxcap.com; Jeffries, Mary; OShaughnessy, Mike; Baer, David;
Petters, Tom
Subject: RE:  JPM's ABL is Over-Collateralized


Thane

I believe that you will find the attached to be useful as it confirms
the extent to which JPM's facility is significantly over-collateralized.


We updated the capital structure of Polaroid as of Jan 31 2008.  It
shows that the outstanding balance of JPM's ABL facility fell from $55MM
(as of Dec 31 2007) to $31MM (as of Jan 31 2008).  This facility has a
lien on all assets of Polaroid which include the brand, IP, among others
assets with an estimated value of $779MM. (The list of assets currently
held is shown in the Summary Polaroid also attached.)

From the close of the Polaroid acquisition in April 2005 through March
2007, Polaroid sold $153.2MM of assets--listed below.  The sale
proceeds, other than $3.6MM which was sold under a note, were applied to
repay the term loan of $125MM.  However instead of releasing the liens
that applied to this term loan, Polaroid rolled them up into the ABL
facility. Assets sold were the following:

a.      Jan 06, $8.2mm, digital printing technology

b.      Feb 06, nominal amount, IP of the UK sub

c.      Jun 06, $69.4mm, Waltham, MA real estate (we understand that
you still possess a 50% interest in this real estate joint venture)

d.      Aug 06, $5.0mm, New Bedford, MA real estate

e.      Sep 06, $18.8mm, Netherlands real estate

f.      Feb 07, $8.2mm, intellectual property (please provide a
description)

g.      Mar 07, $40.0mm, sold the eyewear business

R_P_ADV006305

h.    Mar 07, $3.6mm, sold inventory and rights to the Sunbeam
license agreement

Thanks for your continued support
Camille
-----Original Message-----
From: Ritchie, Thane [mailto:TRitchie@ritchiecapital.com]
Sent: Saturday, February 02, 2008 10:47 PM
To: CheeAwai, Camille
Cc: mike@calibraxcap.com; aj@calibraxcap.com; Jeffries, Mary;
OShaughnessy, Mike; Baer, David; Petters, Tom
Subject: RE: Petters POL Due Diligence Info

thanks


-----Original Message-----
From: CheeAwai, Camille [mailto:Camille.Chee-Awai@pettersgroup.com]
Sent: Fri 2/1/2008 4:37 PM
To: Ritchie, Thane
Cc: mike@calibraxcap.com; aj@calibraxcap.com; Jeffries, Mary;
OShaughnessy, Mike; Baer, David; Petters, Tom
Subject: RE: Petters POL Due Diligence Info


Thane,

Subsequent to Mike Clofine's request, please see the attached
information on Polaroid. The information includes the following:

A) Draft of Polaroid's 2006 audited financial statements
B) Last financaial report sent to JPM reflecting financial performance
as of Nov 30 2007
C) Brand valuation prepared by Duff and Phelps
D) Summary of historical financials and capital structure of Polaroid.
. <<Draft Dec 2006 Fin Statements.pdf>>


<<Nov 07 Perf.pdf>> <<Polaroid Brand Valuation Presentation_Final 11
07.pdf>>

<<Summary PHC Financials 07.xls>>
Let me know if you need additional information.

Thanks for your support.

Camille


This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity to
which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that any dissemination, distribution or copying of this e-mail is
prohibited. If you have received this e-mail in error, please notify the

Confidential

R_P_ADV006306

sender by replying to this message and delete this e-mail immediately.

This e-mail, including attachments, may include confidential and/or proprietary information, and may be used only by the person or entity to which it is addressed. If the reader of this e-mail is not the intended recipient or his or her authorized agent, the reader is hereby notified that any dissemination, distribution or copying of this e-mail is prohibited. If you have received this e-mail in error, please notify the sender by replying to this message and delete this e-mail immediately.

Confidential

R_P_ADV006307

**Final Bank Draft**

**(unaudited)**

Polaroid Holding Company
Consolidated Statement of Operations
(in millions)

| | Year ended December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Net sales | $ 975.8 | $ 844.4 |
| Cost of goods sold | 818.1 | 693.7 |
| Gross Margin | 157.7 | 150.7 |
| Marketing, research, engineering and administrative expenses | 137.4 | 118.6 |
| Amortization of intangible assets (Note 7) | 9.2 | 5.9 |
| Business consolidation costs (Note 4) | 6.1 | 0.5 |
| Gain on sale and disposition of assets (Note 3) | (2.9) | — |
| Other costs (Note 3) | 3.5 | — |
| Total costs | 153.3 | 125.0 |
| Profit from operations | 4.4 | 25.7 |
| **Other income and (expense):** | | |
| Interest income | 0.7 | 2.1 |
| Foreign currency transaction gains/(losses) (Note 2) | (14.7) | 12.1 |
| Other income, net (Note 3) | 7.5 | 1.1 |
| Interest expense | (41.9) | (46.5) |
| Total other expense, net | (48.4) | (31.2) |
| Loss before income tax expense | (44.0) | (5.5) |
| Income tax expense (Note 6) | 8.6 | 7.7 |
| Net loss from continuing operations | (52.6) | (13.2) |
| Earnings from discontinued operations, net of tax (Note 3) | 3.4 | 1.1 |
| Net Loss | $ (49.2) | $ (12.1) |

See accompanying notes to consolidated financial statements

1

**Polaroid Holding Company**

**Consolidated Balance Sheet**

**(in millions, except share and per share amounts)**

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| **Assets** | | |
| **Current assets** | | |
| Cash and cash equivalents | $21.3 | $23.1 |
| Receivables, net of allowance of $18.2 in 2006 and $14.5 in 2005 (Notes 9 and 10) | 232.8 | 251.4 |
| Related party receivables (Note 17) | 1.9 | 3.4 |
| Inventories (Notes 8, 9 and 10) | 152.8 | 139.6 |
| Assets held for sale (Notes 2 and 3) | 43.2 | 4.8 |
| Deferred tax assets (Note 6) | 13.2 | 10.3 |
| Prepaid expenses and other assets (Notes 6 and 9) | 39.2 | 29.3 |
| **Total current assets** | 504.4 | 461.9 |
| Net property, plant and equipment (Notes 1 and 3) | 89.2 | 114.3 |
| Deferred tax assets (Note 6) | 3.4 | 9.5 |
| Goodwill (Notes 1, 6 and 7) | — | 5.8 |
| Intangible assets (Notes 1, 6 and 7) | 219.5 | 251.5 |
| Other non-current assets (Note 3) | 47.0 | 29.1 |
| **Total assets** | $863.5 | $872.1 |
| **Liabilities and stockholders' equity** | | |
| **Current liabilities** | | |
| Short-term debt and current portion of long-term debt (Notes 1, 9 and 10) | $130.1 | $116.5 |
| Related party short-term debt (Note 17) | 19.0 | 19.0 |
| Payables and accruals (Notes 1 and 11) | 185.3 | 97.8 |
| Pension liability (Note 13) | 17.7 | 13.8 |
| Deferred tax liability (Note 6) | — | 1.1 |
| Related party payables (Note 17) | 1.6 | 1.3 |
| Compensation and benefits (Notes 4 and 12) | 25.0 | 34.9 |
| Liabilities of discontinued operations (Note 3) | 17.6 | — |
| Income taxes payable (Note 6) | 1.5 | 9.0 |
| **Total current liabilities** | 397.8 | 293.4 |
| Pension liabilities (Note 13) | 46.8 | 53.2 |
| Deferred tax liabilities (Note 6) | 97.3 | 106.4 |
| Other non-current liabilities (Notes 2, 3 and 4) | 17.8 | 24.9 |
| Long-term debt (Note 10) | — | 121.9 |
| Related party long-term debt (Note 17) | 125.0 | 125.0 |
| Financing Obligation (Note 3) | 69.4 | — |
| **Common stockholders' equity** | | |
| Common Stock, $.001 par value per share, authorized 4,000 shares, of which 3,000 shares are issued and outstanding | — | — |
| Additional paid-in capital | 190.0 | 190.0 |
| Accumulated deficit | (81.5) | (32.3) |
| Accumulated other comprehensive income/(loss) (Note 2) | 0.9 | (10.4) |
| **Total common stockholders' equity** | 109.4 | 147.3 |
| **Total liabilities and stockholders' equity** | $863.5 | $872.1 |

See accompanying notes to consolidated financial statements.

**Polaroid Holding Company**

**Consolidated Statement of Cash Flows**

**(in millions)**

| | Year ended December 31, | |
| | 2006 | 2005 |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net loss | $(49.2) | $(12.1) |
| Depreciation of property, plant and equipment | 7.6 | 6.5 |
| Amortization of intangible assets (Note 7) | 9.2 | 5.9 |
| Gain on sale and disposition of assets (Note 3) | (2.9) | — |
| Deferred taxes (Note 6) | 13.4 | 6.2 |
| Effect of foreign currency translation (gains)/losses and other non-cash items (Note 3) | 20.1 | (8.5) |
| Increase in receivables | (8.0) | (132.7) |
| (Increase)/decrease in inventories | (21.9) | 29.0 |
| (Increase)/decrease in prepaids and other assets | (15.2) | 11.4 |
| Increase/(decrease) in payables and accruals | 91.3 | (18.3) |
| Decrease in compensation and benefits | (8.2) | (5.6) |
| Increase/(decrease) in income taxes payable | (6.8) | 9.2 |
| Net cash provided by/(used by) operating activities | 29.4 | (109.0) |
| **Cash flows from investing activities** | | |
| Acquisition of Polaroid Holding Company, net of cash acquired (Note 1) | — | (334.6) |
| Decrease in restricted cash | — | 22.4 |
| (Increase)/decrease in other assets | (9.0) | 0.2 |
| Proceeds from the sale of assets (Note 3) | 18.6 | 0.5 |
| Additions to property, plant and equipment | (0.8) | (3.9) |
| Net cash provided by/(used by) investing activities | 8.8 | (315.4) |
| **Cash flows from financing activities** | | |
| Net increase/(decrease) in short-term debt | (19.5) | 93.3 |
| Financing fees paid (Note 2) | (1.5) | (9.3) |
| Repayments of related party notes (Note 17) | — | (43.2) |
| Repayments of long-term debt (Note 10) | (19.5) | (1.8) |
| Proceeds from issuance of long-term debt (Notes 1, 10 and 17) | — | 250.0 |
| Proceeds from issuance of Common Stock (Note 1) | — | 150.0 |
| Net cash provided by/(used by) financing activities | (40.5) | 439.0 |
| Effect of exchange rate changes on cash | 0.5 | (1.1) |
| Net increase/(decrease) in cash and cash equivalents | (1.8) | 13.5 |
| Cash and cash equivalents at beginning of year | 23.1 | 9.6 |
| Cash and cash equivalents at end of year | $21.3 | $23.1 |

See accompanying notes to consolidated financial statements.

3

**Polaroid Holding Company**

**Consolidated Statement of Changes in Common Stockholders' Equity**

**(in millions, except number of shares)**

**Year ended December 31, 2006**

| | Number of Common Shares | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income/(Loss) | Preferred Stock | Total Common Stockholder's Equity |
|---|---|---|---|---|---|---|---|
| Balance at January 1, 2006 ............... | 3,000 | $— | $190.0 | $(32.3) | $(10.4) | $— | $147.3 |
| Comprehensive loss: | | | | | | | |
| Net loss from continuing operations ..................................... | | | | (52.6) | | | (52.6) |
| Net earnings from discontinued operations ..................................... | | | | 3.4 | | | 3.4 |
| Minimum pension liability adjustment............................... | | | | | 0.1 | | 0.1 |
| Foreign currency translation adjustments (Note 2) ................... | | | | | 11.2 | | 11.2 |
| Total comprehensive loss................... | | | | | | | (37.9) |
| Balance at December 31, 2006 .......... | 3,000 | $— | $190.0 | $(81.5) | $0.9 | $— | $109.4 |

**Year ended December 31, 2005**

| | Number of Common Shares | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Preferred Stock | Total Common Stockholder's Equity |
|---|---|---|---|---|---|---|---|
| Balance at January 1, 2005 ............... | ---- | $— | $10.0 | $(20.2) | $— | $30.0 | $19.8 |
| Recapitalization in connection with acquisition and merger on April 27, 2005 (Note 1) ........................ | 3,000 | — | 180.0 | | | (30.0) | 150.0 |
| Comprehensive loss: Net loss from continuing operations.................................... | | | | (13.2) | | | (13.2) |
| Net earnings from discontinued operations ............................. | | | | 1.1 | | | 1.1 |
| Minimum pension liability adjustment............................... | | | | | (0.1) | | (0.1) |
| Foreign currency translation adjustments (Note 2) ................... | | | | | (10.3) | | (10.3) |
| Total comprehensive loss................... | | | | | | | (22.5) |
| Balance at December 31, 2005 .......... | 3,000 | $— | $190.0 | $(32.3) | $(10.4) | $— | $147.3 |

See accompanying notes to consolidated financial statements.

4

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1.   Description of Business and Basis of Presentation

**Description of Business:**

Petters Consumer Brands, LLC ("PCB"), a wholly owned subsidiary of Petters Group Worldwide, LLC ("Petters") was founded in January 2003 to create relationships with global manufacturers to develop products and brand extensions, via licensing, partnerships and various other agreements, for distribution through retail, internet, catalog, and specialty channels.

On April 27, 2005, Petters, acting through PCB acquired a one hundred percent interest in Polaroid Holding Company ("PHC"), including the operations of PHC's wholly owned subsidiary Polaroid Corporation and its consolidated subsidiaries (collectively, "Polaroid") and merged PCB with and into Polaroid Holding Company which, directly or indirectly, holds all of the assets of the surviving company. As a result of the acquisition (the "Transaction"), Polaroid Holding Company and its consolidated subsidiaries (collectively, the "Company") became a subsidiary of Petters. All of the PCB and PHC stock outstanding immediately prior to the Transaction was cancelled in connection with the Transaction and PHC was capitalized with $150.0 million in exchange for 3,000 shares of PHC common stock. The name of the combined company after the merger remained Polaroid Holding Company. The merger of PCB with and into PHC will provide Petters with worldwide access to the Polaroid brand and provide growth opportunities in additional markets and products under the Polaroid name. In 2006, PCB, which was reorganized as a wholly-owned subsidiary of PHC following the Transaction, changed its name to Polaroid Consumer Electronics, LLC ("PCE"). All further references in this document to the operations of PCB will be to PCE for simplicity.

In addition to the operations of PCE, Polaroid manufactures and markets instant and digital imaging and related products. Polaroid sells its products directly to and through mass merchandisers; food, drug, discount and department stores; photo retail and specialty stores; wholesalers; original equipment manufacturers; independent agents; retail outlets; internet; and distributors. The Company's film and camera products are marketed worldwide; consumer electronics products were marketed primarily in the U.S. in 2005 and expanded into international markets in 2006. The Company also designs, develops, manufactures and/or markets photographic hardware accessories for the instant photography market. The Company also performs contract manufacturing for third parties and licenses its intellectual property to third parties. In March 2007, the Company sold certain assets and liabilities of its eyewear business (see Note 18).

The accompanying consolidated statements of operations, cash flows and changes in common stockholder's equity for 2005 reflect the operations of PCE for the twelve months ended December 31, 2005 and the operations of Polaroid for the period from April 28, 2005 to December 31, 2005.

**Acquisition of PHC:**

The Transaction consideration was $428.4 million and consisted of: cash consideration of $425.7 million, $4.3 million of professional fees and expenses directly related to the acquisition and the settlement of a royalty receivable of $1.6 million (see Note 16). The Transaction was recorded as a purchase. The purchase price was allocated to the acquired assets and liabilities based on their estimated fair value as of the date of the acquisition.

The purchase price was funded, in part, from the $150.0 million of proceeds from the issuance of PHC common stock, $125.0 million of proceeds from the issuance of a subordinated term loan to Petters Capital, LLC, a related party (see Note 17), and $125.0 million of proceeds from the issuance of a senior secured term loan (see Note 10) to a third party lender.

The following is a summary of the allocation of the purchase price to the assets and liabilities of PHC as of the date of the Transaction (in millions):

Assets and liabilities at fair value:

| | |
|---|---:|
| Cash | $95.4 |
| Accounts receivable | 67.9 |
| Inventories | 134.5 |
| Deferred tax assets | 10.7 |
| Other current assets | 28.8 |
| Assets held for sale | 4.8 |
| Property, plant and equipment | 117.9 |
| Goodwill | 9.7 |
| Intangible assets | 257.4 |
| Other non-current assets | 34.4 |
| Total assets acquired | 761.5 |
| | |
| Payables and accruals | 65.9 |
| Other current liabilities | 57.8 |
| Current portion of pension liabilities | 17.1 |
| Non-current pension liabilities | 66.4 |
| Deferred tax liabilities | 96.7 |
| Other non-current liabilities | 29.2 |
| Total liabilities assumed | 333.1 |
| | |
| Cost of acquisition | $428.4 |

The excess of the cost of the acquisition over the net of the amounts assigned to the fair value of the assets acquired and the liabilities assumed was recorded as goodwill, none of which is expected to be deductible for tax purposes.

## 2.   Significant Accounting Policies

**Accounting Principles and Basis of Presentation:**

The Company's consolidated financial statements and accompanying notes have been prepared in conformity with accounting principles generally accepted in the United States of America.

**Principles of Consolidation:**

The Company's consolidated financial statements include the accounts of domestic and foreign subsidiaries, all of which are wholly owned.  Intercompany transactions are eliminated.

**Related Parties:**

The Company considers entities with common ownership and/or management to Petters or that are subsidiaries of Petters to be related parties.

**Use of Estimates:**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires the management of the Company to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The Company bases its estimates on historical experience, actuarial estimates and other currently available information which it believes to be reasonable under the circumstances.  On an ongoing basis the Company evaluates its estimates, including those for the allowance for doubtful accounts, marketing programs, customer returns of certain products, impairments of tangible and intangible assets, income taxes, income tax valuation allowances, asset retirement obligations, incentive

compensation liabilities, pension liabilities, litigation liabilities, business consolidation liabilities, and other liabilities and contingencies. Actual results could differ from those estimates.

In connection with the Transaction, the Company was required to estimate the fair value of the acquired assets and liabilities as of April 27, 2005. In estimating these fair values, the Company obtained third party valuations for certain real estate and intangible assets, actuarial valuations for its defined benefit pension obligations, used recent market information for certain other assets, and used its own estimates for certain inventory and long-lived assets.

**Cash and Cash Equivalents:**

The Company considers all highly liquid investments with maturities of three months or less when purchased to be cash equivalents.

**Inventories:**

Inventories of the Company are valued on a first-in, first-out basis at the lower of cost or market value. The Company's inventories include certain finished goods from suppliers shipped free on board shipping point and certain finished goods shipped to customers free on board destination.

**Income Taxes:**

The Company's provision for income taxes includes amounts currently payable or recoverable and deferred taxes. Deferred taxes reflect the impact of temporary differences between the amounts of assets and liabilities recognized for financial reporting purposes and the amounts recognized for tax purposes as well as tax credit carryforwards and loss carryforwards. These deferred taxes are measured by applying enacted tax rates. A valuation allowance reduces deferred tax assets when it is considered more likely than not that some portion or all of the deferred tax assets will not be realized.

Provision for U.S. income taxes on the undistributed earnings of foreign subsidiaries is made by the Company only on those amounts in excess of the funds considered to be permanently reinvested.

**Property, Plant and Equipment:**

Property, plant and equipment is stated at depreciated cost. Depreciation and amortization for those assets are determined using the straight line method over the estimated useful lives of the assets. Maintenance and repairs are charged to expense as incurred; major renewals and betterments are capitalized.

**Assets Held for Sale:**

In March 2007, the Company sold certain assets and liabilities of its eyewear business (see Note 18). The Company has reported the results of operations of its eyewear business as discontinued operations on its accompanying consolidated statement of operations for 2006 and 2005 (see Note 3). The Company classified the total assets of its eyewear business of $43.2 million as assets held for sale at December 31, 2006.

In 2005, the Company made a decision to sell certain real estate and equipment located in New Bedford, Massachusetts with a carrying value of $4.8 million. These assets were designated as held for sale as of December 31, 2005 and were sold in 2006 (see Note 3).

**Goodwill and Other Intangible Assets:**

The Company's intangible assets consist of goodwill and other intangible assets (see Note 7). The Company amortizes its intangible assets with definite lives on a straight-line basis over the remaining estimated useful lives of those assets, which was approximately 2 years as of December 31, 2006.

The realization of a portion of the Company's deferred tax valuation allowance in 2006 resulted in the elimination of goodwill and a reduction in intangible assets of $14.8 million (see Notes 6 and 7).

7

The Company reviews its other intangible assets with indefinite lives for impairment annually and whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable. The fair value of the Company's intangible assets are estimated and compared to the carrying value. The Company estimates the fair value of these intangible assets using an undiscounted cash flow approach and recognizes an impairment loss when the estimated fair value of its intangible assets with indefinite lives is less than the carrying value. Other intangible assets subject to amortization are tested for impairment whenever events or circumstances indicate that a carrying value of an asset (asset group) may not be recoverable. As of December 31, 2006 and 2005, the Company determined that no impairments of its intangible assets existed.

**Long-Lived Assets:**

The Company evaluates its long-lived assets, such as property, plant and equipment and definite-lived intangible assets, for impairment as events or changes in circumstances indicate that the carrying value of those assets may not be fully recoverable. The Company evaluates the recoverability of long-lived assets to be held and used by estimating the undiscounted future cash flows associated with the expected use and eventual disposition of those assets and compares that amount to the carrying value of those assets. When these comparisons indicate that the carrying values of those assets are greater than the respective undiscounted future cash flows, the Company recognizes an impairment loss for the amount by which the carrying value exceeds the fair value.

The Company evaluates the recoverability of long-lived assets to be disposed of, whether by sale or abandonment, by comparing the carrying value of those assets to their estimated fair value less costs to sell them. If the carrying value of assets to be disposed of exceeds the respective fair value less expected costs to sell, the Company recognizes an impairment loss for the amount of that excess.

**Asset Retirement Obligations:**

In March 2005, the Financial Accounting Standards Board ("FASB") issued Financial Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations* ("FIN 47"). FIN 47 clarifies that the term "conditional asset retirement obligation" as used in FASB Statement of Financial Accounting Standards ("SFAS") No. 143, *Accounting for Asset Retirement Obligations*, refers to a legal obligation to perform an asset retirement activity in which the timing and/or method of settlement are conditional on a future event that may or may not be within the control of the Company. In addition, FIN 47 clarifies when a company would have sufficient information to reasonably estimate the fair value of an asset retirement obligation.

Prior to the Transaction, the Company had not recorded any significant asset retirement obligations. The Company has adopted FIN 47 and recorded liabilities for its asset retirement obligations. The asset retirement obligations arose from the legal requirement to remediate certain product materials, buildings, machinery and equipment used primarily in the Polaroid manufacturing operations at the time the Company disposes of them.

The Company's asset retirement obligations activity for 2006 and 2005 was as follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Balance as of January 1, 2006 and April 27, 2005, ............................................................... | $11.9 | $11.0 |
| Non-cash adjustment for sale of Property................ | (2.1) | — |
| Non-cash reduction in estimated expenses recorded in business consolidation costs.............. | (1.1) | — |
| Accretion expense recorded in business consolidation costs ................................................ | 1.2 | 0.9 |
| Cash payments .......................................................... | (0.3) | — |
| Balance at December 31........................................... | $9.6 | $11.9 |

The Company sold its manufacturing facilities located in New Bedford, Massachusetts in 2006 (see Note 3). Under the terms of the sale agreement, the Company was not required to perform certain environmental remediation work

related to those facilities. The Company reversed the related asset retirement obligation liability for this property and recognized a non-cash increase of $2.1 million in the net gain on the sale of its New Bedford facilities.

Approximately $5.5 million and $1.4 million of the asset retirement obligations as of December 31, 2006 and 2005, respectively, have been classified as a current liability on the Company's consolidated balance sheet with the remaining balance classified in other non-current liabilities.

**Foreign Currency Translation:**

Most of the Company's subsidiaries outside the United States use the local currency as the functional currency. Assets and liabilities denominated in foreign functional currencies are translated by the Company at the exchange rate as of the balance sheet date. The Company's translation adjustments are recorded in accumulated other comprehensive income/loss, a separate component of common stockholders' equity. Revenues, costs and expenses denominated in foreign functional currencies for the Company are translated at the weighted average exchange rate for the period.

Foreign exchange transaction losses of approximately $14.7 million in 2006 and transaction gains of approximately $12.1 million in 2005, resulting from the remeasurement to the functional currency from the currency in which the transaction was denominated, were reported in other income and expense.

**Revenue Recognition:**

The Company recognizes net sales when all of the following criteria have been met: evidence of an arrangement with the customer exists; the product has been shipped and title has passed to the customer; the sales price to the customer has been fixed or is determinable; and collectability of the sales price is reasonably assured. Provisions for estimated sales returns and allowances are made at the time the products are sold. To arrive at net sales, the Company records reductions to net sales for the cost of programs offered to customers that include cash and volume discounts and cooperative and other advertising allowances. The Company recognizes the liability for these programs at the time the related sales are recorded. The Company determines the cost of these programs based on the terms of the programs, estimates using its historical experience and internal and customer data. The Company adjusts net sales for the cost of price protection programs associated with customer inventories, as well as for the cost of promotional allowances and other fees and coupons, at the time it can reasonably estimate this cost.

Generally, there is no post-shipment obligation for the Company on product sold other than obligations in the normal, ordinary course of business and warranty on its consumer electronics and industrial film hardware products. The Company recognizes the liability for estimated returns and warranty credits as a reduction of net sales in the same period that the related revenues are recognized. The Company bases this estimate on prior experience, and it is at least reasonably possible that this estimate may change within the next year.

**Allowance for Doubtful Accounts:**

The Company regularly reviews the allowance for doubtful accounts. This allowance is based on a variety of factors including: a review of individual accounts receivable aging; individual account risk profiles which consider customer credit ratings and financial condition reviews; and new information that becomes available on specific customers, economic trends and changes in customer payment terms.

**Licensing and Royalty Fees:**

The Company is a party to various license agreements which provide the right to market certain of the Company's products under certain brand names and provide the various manufacturers, on whom the Company relies to manufacture its products, the ability to utilize certain patented technology in the products manufactured. The Company recognizes licensing and royalty fee expense when its products are sold to retail customers. The Company records licensing and royalty fee expense as a component of cost of sales.

**Shipping and Handling Costs:**

Shipping and handling costs related to the Company's consumer electronic products are recorded in cost of sales. Shipping and handling costs related to the Company's other products are recorded in marketing expenses. The

9

Company's shipping and handling costs recorded in marketing expenses in 2006 and 2005 were approximately $7.1 million and $7.0 million, respectively.

### Advertising Costs:

The Company expenses the cost of advertising in the year incurred (see Note 3).

### Research, Engineering and Development Costs:

The Company's research, engineering and development costs were expensed as incurred in 2005 (see Note 3). The Company did not incur any research, engineering and development costs in 2006.

### Deferred Financing Costs

The Company amortizes deferred financing costs on a straight line basis to interest expense over the term of the related debt. As of December 31, 2006 and 2005, the total carrying value of the Company's deferred financing costs were $7.6 million and $8.1 million, respectively. At December 31, 2006, $2.3 million of the total of the deferred financing costs was recorded in prepaid expenses and other assets, and $5.3 million was recorded in other non-current assets on the Company's consolidated balance sheet. At December 31, 2005, approximately $1.9 million of the total of the deferred financing costs was recorded in prepaid expenses and other assets, and $6.2 million was recorded in other non-current assets on the Company's consolidated balance sheet. In 2006, the Company paid $1.5 million of new financing costs related to an amendment to its credit agreement (see Notes 9 and 10). These costs were recorded on the Company's consolidated balance sheet as deferred financing costs and are being amortized to interest expense over the remaining term of the Company's revolving credit agreement (see Note 10). The non-cash charge related to the amortization of the Company's deferred financing costs was $2.0 million and $1.2 million in 2006 and 2005, respectively.

### Defined Benefit Pension Plans and Other Employee Benefits:

The Company has defined benefit plans that cover certain of its non-U.S. employees (see Note 13). In connection with its accounting estimates relative to these plans, the Company makes certain assumptions relating to the long-term rate of return on plan assets, discount rates used to measure future obligations and expenses, salary scale inflation rates and other assumptions. The accounting estimates related to these pension plans are highly susceptible to change from period to period based on the performance of plan assets, actuarial valuation changes, market conditions and contracted benefit changes. The selection of assumptions is based on historical trends and known economic and market conditions at the time of valuation. However, actual results may differ substantially from these assumptions.

Pension plan liabilities are revalued annually or when a significant event occurs during a fiscal year based on updated assumptions and information about the individuals covered by the plan. The pension plans accumulated gains and losses, that exceed 10 percent of the greater of projected benefit obligations or the market-related value of plan assets, and any prior service costs are amortized on a straight-line basis from the date recognized over the average remaining service period of active participants.

In addition to defined benefit plans, the Company maintains reserves for employee medical claims and workers' compensation claims. These reserves are regularly evaluated and revised, as needed, based on a variety of information including historical experience, third party actuarial estimates and current employee statistics.

### Business Consolidation Costs:

The Company estimates its liabilities for business consolidation activities by accumulating detailed estimates of costs reduced by asset sales proceeds, if any, for each business consolidation initiative. This includes the estimated costs of employee severance, pension and related benefits, impairment of property and equipment and other assets, including estimates of realizable value, contract termination payments for leases, contractual obligations and any other qualifying costs related to these plans. These estimated costs are grouped by specific projects within the overall plans and are then monitored on a monthly basis. These are the Company's best estimates, but require assumptions about the plans that may change over time. Changes in estimates for individual locations are evaluated

10

periodically to determine if a change in estimate is required for the overall plan. Subsequent changes to the original estimates are included in current period results of operations and identified as business consolidation costs (see Note 4).

**Reclassification:**

Certain prior year information has been reclassified to conform with current year presentation of data.

### 3.  Supplemental Information

|  | **Year ended December 31,** | |
|---|---|---|
| (in millions) | **2006** | **2005** |
| Research, engineering and development costs | $— | $8.0 |
| Advertising costs | $4.9 | $11.0 |
| Cash payments for: | | |
| Interest | $42.3 | $39.8 |
| Income taxes, net | $3.9 | $0.3 |

The cash payments for interest expense in 2006 do not include lease payments of approximately $2.1 million related to the financing obligation recorded in connection with the Waltham site contribution and lease transaction in 2006 (see Asset Sales and Dispositions section below).

The Company's research, engineering and development costs in 2005 were primarily related to the Company's instant digital printing program which was sold to a third party in January 2006 (see Asset Sales and Dispositions section below).

The Company's property, plant and equipment at December 31, 2006 and 2005 consisted of the following (in millions) :

|  | **2006** | **2005** |
|---|---|---|
| Land | $78.1 | $94.2 |
| Buildings | 9.6 | 13.4 |
| Machinery and equipment | 17.4 | 18.7 |
| Construction in progress | 0.1 | 2.6 |
| Total property, plant and equipment | 105.2 | 128.9 |
| Less: accumulated depreciation | 16.0 | 14.6 |
| Net property, plant and equipment | $89.2 | $114.3 |

**Other Non-current Assets:**

The Company's other non-current assets as of December 31, 2006 and 2005 were as follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Receivable related to Waltham, MA real estate LLC ..... | $3.0 | $— |
| Cash deposit restricted for capital call by Waltham, MA real estate LLC ...................................................... | 4.3 | — |
| Polaroid Collection of photographs and artwork............ | 8.8 | 8.8 |
| Receivable from sale of intellectual property.................. | 8.0 | — |
| Unamortized debt issuance costs ...................................... | 5.3 | 6.2 |
| Non-U.S. pension plan insurance contracts ..................... | 8.8 | 7.9 |
| Non-U.S. pension plan prepaid expense ......................... | 2.6 | — |
| Collateralized letters of credit and performance bonds.... | 3.8 | 3.7 |
| New Bedford, MA real estate LLC investment............... | 1.5 | 1.5 |
| Other ................................................................................ | 0.9 | 1.0 |
| Total.................................................................................. | $47.0 | $29.1 |

**Asset Sales and Dispositions:**

In January 2006, the Company sold and licensed certain of the intellectual property and other assets related to its instant digital printing technology to a private investor group for a purchase price of approximately $8.2 million. Effective as of the date of the sale, the Company recorded the $8.0 million carrying value of this intellectual property as a receivable which is included in other non-current assets on the Company's consolidated balance sheet as of December 31, 2006. Approximately $0.1 million of the purchase price was paid in both July 2006 and October 2006 with the remainder payable in quarterly installments after the date of the first commercial sale of products by the buyer, as defined in the sale agreement, with the entire purchase price payable no later than June 30, 2009.

Under the terms of this sale agreement and the related license agreement, the Company retained certain security interests and reversion rights to the intellectual property and other assets of its instant digital printing program. If the buyer were to fail to meet the payment or other compliance requirements defined in the sale agreement and related license agreement, the Company has the right to terminate the agreement and recover the ownership of the intellectual property and assets covered by agreement.

In February 2006, the Company sold certain assets and intellectual property of its U.K. subsidiary for a nominal amount to a third party consulting company that is owned by former managers of the Company's U.K. subsidiary. In connection with this sale, the Company made a cash investment in the new company of approximately $0.3 million in 2006 for an ownership interest of approximately twenty percent in the new company. This investment is recorded in other non-current assets in the Company's consolidated balance sheet as of December 31, 2006.

In June 2006, the Company entered into a joint venture with a third party related to a real estate development limited liability company ("LLC") established to develop the Company's property located in Waltham Massachusetts. The Company contributed all of its facilities located at that site, consisting of buildings and real estate, with a net carrying value of $78.9 million, to the LLC and made a cash capital contribution of $0.5 million to the LLC and received credit from the LLC for other capital-related payments of approximately $0.3 million. At the closing on this transaction, the Company received a net cash payment from the LLC of $69.4 million from the financing obtained by the LLC and a fifty percent ownership interest in the LLC. Under the terms of the LLC operating agreement, the third party received a fifty percent ownership interest in return for previously made capital-related payments of $0.8 million and certain loan guarantees. The third party will also act as the managing member with day to day operating responsibilities for the LLC. The Company may be required to fund additional capital calls by the LLC for up to a maximum of $4.3 million. The Company is not required to provide any guarantees or fund any operating losses of the LLC beyond its maximum capital contribution under the terms of the LLC operating agreement as described above.

The net amount received from the LLC at the closing was used by the Company to: repay approximately $64.3 million of the Company's secured term loan (see Note 10); to pay a prepayment fee to its lenders of $0.6 million; to reimburse it for approximately $0.2 million of related expenses it had incurred; and to fund a $4.3 million escrow account with the Company's lenders for any future capital calls on the Company under the terms of the LLC

operating agreement. Since these amounts were sent directly from the closing to the Company's lender, they are not reflected on the Company's consolidated statement of cash flows for 2006.

In connection with the LLC operating agreement, the Company entered into a net lease with the LLC, which became a related party as a result of the Company's investment described above, for the use of the Waltham facilities for a term of up to three years for an annual base rent payment of $4.0 million. Under the terms of the lease, the Company is responsible to pay certain occupancy-related costs and to pay the costs of asset retirement and exit costs to decommission the site, which the Company was responsible to pay prior to entering the LLC operating agreement. The lease agreement contains a provision under which the LLC will reimburse the Company for up to $3.0 million of certain environmental liabilities related to the Waltham site that the Company expects to incur. The Company recorded a receivable for this reimbursement as its non-current assets on its consolidated balance sheet and reduced its business consolidation costs (see Note 4) in 2006 by a similar amount. Under the terms of the lease, the Company may return certain portions of the Waltham site to the LLC, once certain conditions specified in the lease are met for a proportionate reduction in the lease payments.

The Company has determined the real estate LLC is a variable interest entity under the guidelines in FASB Interpretation No. 46(R), *Consolidation of Variable Interest Entities*, ("FIN 46(R)"). However, the Company also determined it is not the primary beneficiary of this variable interest entity based on the guidelines in FIN 46(R) and, as a result, will account for its investment in the LLC using the equity method of accounting.

SFAS No. 98, *Accounting for Leases*, ("SFAS 98") specifies the accounting by a seller-lessee for a sale-leaseback transaction involving real estate with equipment. The Company's contribution of its Waltham facilities to the LLC and lease of the facilities from the LLC is considered to be a sale-leaseback transaction within the scope of SFAS 98.

The lease of the Waltham facilities does not qualify for sale-leaseback accounting because of the Company's continuing involvement in the leased property. Specifically, the Company's participation in future profits of the LLC precludes sales-leaseback accounting and requires the contribution-lease to be accounted as a financing under the provisions of SFAS No. 66, *Accounting for Sales of Real Estate*.

Under the financing method of accounting, the Company continues to report the carrying value of approximately $80.0 million of the property contributed to the LLC in property, plant and equipment and the related financing obligation of $69.4 million on its consolidated balance sheet, even though the third party debt associated with this transaction has been repaid. The Company continues to record depreciation expense related to the Waltham facility in its consolidated statement of operations. In addition, the Company recorded the lease payments of approximately $2.1 million in 2006 under the Waltham lease as interest expense in its consolidated statement of operations.

In August 2006, the Company sold the assets, including real estate, machinery and equipment, and certain intellectual property, related to its coating operations located in New Bedford Massachusetts for $5.0 million in cash. These assets had been recorded as assets held for sale at December 31, 2005 (see Note 2). The Company incurred approximately $0.5 million of costs directly related to the sale. Under the terms of the sale agreement, the Company was no longer required to perform certain environmental remediation related to the New Bedford facilities and, as a result, the Company reversed the related asset retirement obligation liability of $2.1 million related to these costs and recorded this as part of the gain on the sale of these assets on its consolidated statement of operations. The Company recorded a net gain on this sale of $1.8 million in 2006.

The $5.0 million of proceeds received from this sale were used to repay a portion the amounts outstanding under the Company's secured term loan (see Note 10) and revolving credit agreement (see Note 9). Since these proceeds were sent directly from the closing to the Company's lender, they are not reflected on the Company's consolidated statement of cash flows for 2006. In connection with this sale, the Company entered into a supply agreement under which the buyer will provide the Company with its expected requirements of coated material at the same price that the Company expected to incur if it had continued to manufacture this material.

In September 2006, the Company sold its land and buildings located in Enschede, the Netherlands, with a net carrying value of approximately $17.7 million, to a real estate development company in return for a cash payment of $18.8 million and a nominal preferred stock investment in the real estate development company. The net gain of approximately $0.9 million on this asset disposition was recorded in profit from operations in 2006.

13

Approximately $18.2 million of the net proceeds received from the real estate development company were used to repay a portion of the amount outstanding on the Company's secured term loan (see Note 10). In connection with this transaction, the Company entered into a net lease for the use of the Enschede manufacturing facilities for a period of up to 39 months for an annual base rent payment of approximately $0.9 million and the payment of other occupancy-related costs. Under the terms of the lease, the Company may return space it no longer requires to the landlord in return for a proportionate reduction in its lease payments, once certain conditions specified in the lease are met, and is required to remove all of its manufacturing-related equipment before the termination date of the lease.

The Company's asset sale and disposition transactions in 2006 required the approval, in advance, of its lenders under the Company's credit agreements (see Notes 9 and 10).

**Discontinued Operations**

In March 2007, the Company sold certain assets and liabilities of its eyewear business to a third party (see Note 18). The significant components of the assets and liabilities of the Company's eyewear business that have been reclassified as assets held for sale (see Note 2) and liabilities of discontinued operation on the Company's consolidated balance sheet as of December 31, 2006 are as follows (in millions):

| | |
|---|---|
| Assets of discontinued operations classified as assets held for sale: | |
| Receivables, net of allowances ............ | $ 22.2 |
| Inventories ........................................... | 11.9 |
| Prepaid expenses and other assets ....... | 6.9 |
| Net property, plant and equipment ...... | 2.2 |
| Total assets held for sale...................... | $ 43.2 |
| | |
| Current liabilities classified as discontinued operations: | |
| Trade payables..................................... | $ 5.9 |
| Other liabilities ................................... | 11.7 |
| Total current liabilities classified as discontinued operations ........................... | $ 17.6 |
| | |
| Total non-current liabilities classified as discontinued operations included in other non-current liabilities...................................... | $ 0.4 |

The Company's results of operations for its eyewear business were reported within discontinued operations in the accompanying consolidated statements of operations for 2006. The Company's consolidated statement of operations for 2005 has been recast to conform with this presentation. Interest expense was not allocated to the Company's eyewear business and, therefore, all of the Company's interest expense is included within continuing operations.

The operating results for the Company's eyewear business operations, which have been reported as discontinued operations on the Company's consolidated statement of operations, are as follows (in millions):

| | 2006 | 2005 |
|---|---|---|
| Net Sales..................................................... | $ 48.8 | $26.7 |
| Earnings before income tax expense ........... | 4.2 | 2.0 |
| Income tax expense ..................................... | 0.8 | 0.9 |
| Net earnings from discontinued operations ............................................. | $ 3.4 | $ 1.1 |

14

**Other Non-cash Items:**

The other non-cash items in the Company's consolidated statement of cash flows for both 2006 and 2005 primarily relate to foreign currency translation adjustments.

**Other Costs:**

In 2006, the Company recorded other costs of $3.5 million in its consolidated statement of operations. These costs primarily relate to reserves established in 2006 for certain amounts receivable from PCE suppliers that the Company determined would not be recoverable based on all of the information available on these claims.

**Other Business Risks:**

The Company's instant film manufacturing capacity is concentrated in facilities in the United States, Europe, and Mexico. It is considered at least reasonably possible that the use of a facility located outside of the Company's home country could be disrupted in the near term. Due to the specialized nature of certain assets located at these facilities, it would not be possible to find replacement capacity quickly. Accordingly, the loss of any of these facilities would have a materially adverse impact on the Company.

4.   **Business Consolidation Activities**

The following table summarizes the Company's severance reserves, which are included in compensation and benefits, and its payables and accruals and non-current liabilities in its consolidated balance sheet, that were established for its business consolidation activities (in millions):

|  | Severance | Exit Costs | Total |
|---|---|---|---|
| Liabilities assumed or incurred in the Transaction | $31.5 | $17.7 | $49.2 |
| Costs | — | 0.5 | 0.5 |
| Cash payments | (16.5) | (0.5) | (17.0) |
| Balance at December 31, 2005 | $15.0 | $17.7 | $32.7 |
| Costs | 6.0 | 3.0 | 9.0 |
| Cash payments | (14.2) | (4.7) | (18.9) |
| Balance at December 31, 2006 | $6.8 | $16.0 | $22.8 |

In addition to an assumed severance liability of $7.3 million, in connection with the Transaction (see Note 1), the Company commenced its plan to downsize or exit certain activities and recorded a liability for compensation and benefits of $24.2 million for severance payments to employees to be terminated under several U.S. and non-U.S. severance programs, primarily in the Company's manufacturing, marketing and overhead groups and also recorded liabilities for approximately $17.7 million for exit costs related to certain facilities, primarily manufacturing operations.  As of December 31, 2006 the Company had made all of the cash payments relating to its assumed liability of $7.3 million for severance and had made approximately $17.7 million of the cash severance payments relating to its accrued liability of $24.2 million for severance recorded in connection with the Transaction (see Note 1).  Approximately $3.5 million and $5.1 million of the Company's liability for exit costs as of December 31, 2006 and 2005, respectively, have been classified as current accrued liabilities on the Company's consolidated balance sheet with the remaining balance classified in other non-current liabilities.

In 2006, the Company recorded severance costs of approximately $6.0 million to downsize or exit certain activities, primarily related to its instant film and camera operations and made $2.6 million of cash payments for exit costs related to the early termination of a lease for warehousing space located in Norton, Massachusetts. The Company

also recorded exit costs of approximately $0.4 and $0.5 million in 2006 and 2005, respectively, primarily for cash payments related to the liquidation of certain non-U.S. marketing subsidiaries.

In 2006, the Company entered a lease agreement for its Waltham site (see Note 3). Since the lease agreement contains a provision under which the landlord will reimburse the Company for up to $3.0 million of certain environmental liabilities related to the Waltham site that the Company expects to incur, the Company recorded a receivable for this reimbursement in non-current assets on its consolidated balance sheet and reduced its business consolidation costs in 2006 by a similar amount.

## 5.   Financial Instruments

### Fair Value:

The carrying amounts of cash, cash equivalents, trade accounts receivables, short-term debt, the current portion of long-term debt and trade accounts payable of the Company approximate fair value because of the short maturity of these financial instruments. The fair value of the Company's third party long-term debt approximates the carrying value because it carries a variable interest rate.

### Concentration of Credit Risk:

The Company primarily places its cash and cash equivalents in the financial institutions of its lenders as required under its Credit Agreement (see Note 9). The Company's cash and cash equivalents include financial instruments that potentially subject it to a concentration of credit risk. Most of the Company's cash balances are uninsured.

The Company markets a substantial portion of its products to customers in the retail industry, a market in which a number of companies are highly leveraged. The Company grants credit through its accounts receivable for amounts charged to customers for merchandise. The Company generally requires no collateral from its customers. Finance charges are assessed on certain balances based on customer agreements. Interest collected from customers is included in interest income on the Company's consolidated statement of operations. The Company evaluates the credit risk of its customers regularly and the Company believes that its allowances for doubtful accounts relative to trade accounts receivable are adequate.

The Company generates a substantial portion of its revenues in international markets, which subjects the Company's operations and cash flows to currency exchange rate fluctuations. The ability to counteract currency exchange rate movement of the Company is primarily dependent on pricing and sourcing of products and services in local markets. The Company has limited flexibility to increase prices in local currency to offset the adverse impact of foreign exchange rate fluctuations.

### Major Customers

During 2006, the Company had two major customers that comprised approximately 28% and 26%, respectively, of the Company's total net sales from continuing operations. During 2005, the Company had two major customers that comprised approximately 27% and 22%, respectively, of the Company's total net sales from continuing operations.

### Major Suppliers:

During 2006, the Company had three major international suppliers of finished goods that comprised approximately 41%, 32% and 11%, respectively, of the Company's total finished goods purchases of consumer electronic products. During 2005, the Company had three major international suppliers of finished goods that comprised approximately 55%, 23% and 14%, respectively, of the Company's total finished goods purchases of consumer electronic products.

**6.    Income Taxes**

An analysis of the Company's income tax expense from continuing operations for the years ended December 31, 2006 and 2005 follows (in millions):

|  | Current | Deferred | Total |
|---|---|---|---|
| **2006:** | | | |
| Federal | $ — | $ — | $ — |
| State | 0.5 | — | 0.5 |
| Foreign | (5.9) | 14.0 | 8.1 |
| Total | $(5.4) | $14.0 | $8.6 |
| **2005:** | | | |
| Federal | $— | $— | $— |
| State | — | — | — |
| Foreign | 2.0 | 5.7 | 7.7 |
| Total | $2.0 | $5.7 | $7.7 |

The combination of deferred tax assets, deferred tax liabilities, and valuation allowances reflected on the consolidated balance sheet of the Company resulted in a net deferred tax liability of $80.7 million and $87.7 million at December 31, 2006 and 2005, respectively. The significant components of the amounts shown on the Company's consolidated balance sheet as of December 31, 2006 and 2005 are as follows (in millions):

| | 2006 | 2005 |
|---|---|---|
| Deferred tax assets: | | |
| Receivables | $9.3 | $4.8 |
| Property, plant and equipment | 4.2 | 11.6 |
| Inventories | 11.5 | 11.7 |
| Compensation and benefits | 19.3 | 19.6 |
| Loss and credit carryforwards | 80.3 | 67.0 |
| All other | 1.4 | 2.0 |
| | 126.0 | 116.7 |
| Valuation allowance | (96.2) | (86.5) |
| Total deferred tax assets | 29.8 | 30.2 |
| Deferred tax liabilities: | | |
| Property, plant and equipment and trademarks | 106.1 | 115.6 |
| All other | 4.4 | 2.3 |
| Total deferred tax liability | 110.5 | 117.9 |
| Net deferred tax liability | $80.7 | $87.7 |

The Company had a valuation allowance of approximately $96.2 million and $86.5 million at December 31, 2006 and 2005, respectively, primarily associated with foreign and domestic net operating loss carryforwards. Approximately $47.4 million and $62.6 million of the Company's valuation allowances at December 31, 2006 and 2005, respectively, relate to the deferred tax assets at April 27, 2005, which if realized would result in the adjustment of goodwill and other non-current intangible assets. Subsequent to April 27, 2005, a portion of the Company's deferred tax valuation allowance was realized and resulted in a reduction of goodwill of $5.8 million and $3.9 million in 2006 and 2005, respectively, along with a reduction in other intangible assets of $14.8 million in 2006 (see Note 7). The valuation allowance was recorded because the Company determined that it was considered more likely than not that the majority of these deferred tax assets would not be realized over a reasonable period of time.

17

The domestic and foreign components of the Company's loss before income tax expense from continuing operations for the years ended December 31, 2006 and 2005 follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Domestic loss | $(72.0) | $(45.3) |
| Foreign earnings | 28.0 | 39.8 |
| Total | $(44.0) | $(5.5) |

A reconciliation of differences between income tax expense/(benefit) computed at the statutory U.S. federal income tax rate of 35% for 2006 and 2005 and the reported income tax expense from continuing operations for the years ended December 31, 2006 and 2005 follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Income tax benefit at U.S. statutory rate | $(15.4) | $(1.9) |
| State taxes | 0.1 | — |
| Nondeductible expenses and taxable income from foreign subsidiaries | 10.1 | 4.9 |
| Increase in valuation allowance for net operating loss and tax credit carryforwards not expected to be realized | 17.2 | 5.9 |
| Tax benefit from foreign activities taxed at lower rate | (9.5) | (4.5) |
| Decrease to valuation allowance established in a business combination | 13.8 | 3.6 |
| Resolution of prior period tax matters | (7.6) | — |
| Other | (0.1) | (0.3) |
| Reported income tax expense from continuing operations | $8.6 | $7.7 |

The Company has an income tax receivable of approximately $12.2 million primarily related to a foreign tax credit carryback, which is classified in prepaid and other current assets as of both December 31, 2006 and 2005.

As of December 31, 2006, the Company had U.S. Federal alternative minimum tax carryovers of approximately $2.5 million that do not expire, research credit carryovers of approximately $3.6 million that expire in various years beginning in 2023 through 2024, and a foreign tax credit carryover of approximately $5.6 million that expires beginning in 2014 and 2016. The company has loss carryforwards for U.S. federal income tax purposes of approximately $76.6 million, of which approximately $15.8 million relate to pre-acquisition PHC, that expire beginning in 2024. The Company also has loss carryforwards in international jurisdictions totaling approximately $128.2 million of which approximately $25.0 million does not expire and approximately $103.2 million that expire in various years beginning in 2007 through 2019.

The U.S. Internal Revenue Code of 1986, as amended, contains provisions that may limit the net operating loss ("NOL") and tax credit carryforwards available to be used in any given year upon the occurrence of certain events, including changes in the ownership interests of significant stockholders. In the event of a cumulative change of ownership in excess of 50% over a three-year period, the amount of the NOL carryforwards and tax credit carryforwards that the Company can utilize in any one-year may be limited. PCE acquired 100% of PHC on April 27, 2005. Since there has been a change in ownership, as defined, the annual limitation on the use of the existing NOL and tax credit carryforwards is equal to an amount determined by multiplying the value of PHC at the time of the ownership change by the Long-Term Tax-Exempt Rate of interest, as determined by the U.S. Internal Revenue Service. The Company has determined that the pre-acquisition PHC NOL's and tax credit carryforwards are subject to an annual limitation of approximately $7.0 million.

The Company has not provided for U.S. federal income and foreign withholding taxes on approximately $196.0 million of undistributed earnings from non-U.S. operations as of December 31, 2006 because such earnings are intended to be reinvested indefinitely outside of the United States. If these earnings were distributed to the Company or one of its U.S. subsidiaries, foreign tax credits may become available under current law to reduce or eliminate the resulting U.S. income tax liability.

The Company files its U.S. Corporation Income Tax Return as part of a consolidated group with its parent, Petters.

**7.   Goodwill and Other Intangible Assets**

The Company's intangible assets as of December 31, 2006 and 2005 were as follows (in millions):

**2006:**

| Category | Gross | Accumulated Amortization | Net |
|---|---|---|---|
| Definite-lived intangible assets: | | | |
| Customer lists | $  23.1 | $   10.5 | $   12.6 |
| License agreements | 6.3 | 4.6 | 1.7 |
| | $  29.4 | $  15.1 | 14.3 |
| Indefinite-lived intangible assets: | | | |
| Polaroid brand name | | | 205.2 |
| Total other intangible assets | | | $  219.5 |

**2005:**

| Category | Gross | Accumulated Amortization | Net |
|---|---|---|---|
| Goodwill | | | $5.8 |
| Definite-lived intangible assets: | | | |
| Customer lists | $  23.1 | $   4.2 | $   18.9 |
| License agreements | 6.3 | 1.7 | 4.6 |
| | $  29.4 | $   5.9 | 23.5 |
| Indefinite-lived intangible assets: | | | |
| Other intellectual property | | | 8.0 |
| Polaroid brand name | | | 220.0 |
| | | | 228.0 |
| Total other intangible assets | | | 251.5 |

In 2006, the Company sold certain intangible assets with a carrying value of $8.0 million related to its instant digital printing technology (see Note 3). As of December 31, 2006, the Company's intangible assets with finite lives have an average weighted average useful life of approximately 2 years.  The Company amortizes the value of its intangible assets with finite lives on a straight-line basis to administrative costs over the useful life of these assets. In 2006 and 2005, the non-cash amortization expense recorded in profit from operations related to finite-lived purchased intangible assets was approximately $9.2 million and $5.9 million, respectively.

Estimated future non-cash amortization expenses related to the Company's intangible assets with finite lives at December 31, 2006 were as follows (in millions):

| | |
|---|---|
| 2007 ......................................... | 7.1 |
| 2008 ......................................... | 7.2 |
| Total......................................... | $14.3 |

In 2006, a portion of the Company's deferred tax valuation allowance was realized and resulted in a reduction of goodwill and indefinite-lived intangible assets of $5.8 million and $14.8 million, respectively (see Note 6).

## 8. Inventories

The classification of the Company's inventories at December 31, 2006 and 2005 was as follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Raw materials | $   7.2 | $   8.7 |
| Work-in-process | 55.4 | 51.1 |
| Finished goods | 90.2 | 79.8 |
| Total | $152.8 | $139.6 |

## 9. Short-term Debt

### Commercial Financing:

On April 28, 2005 the Company and certain of its subsidiaries, acting as borrowers or guarantors, entered into a revolving credit and security agreement (the "RCA") with a group of lenders. The RCA contained a $250.0 million maximum aggregate commitment limit and a maturity date of April 27, 2010.

In September 2006, the Company negotiated an amendment to refinance the RCA under which the aggregate commitment limit under the RCA was increased to $325.0 million of which $315.0 million was available in the U.S. and $10.0 million was available in Europe, if certain requirements under the RCA were met by the Company. The Company's borrowing availability under the RCA is tied to a percentage of its eligible inventories and accounts receivable and includes provisions for letters of credit in lieu of borrowings. As of December 31, 2006 and 2005, the Company had approximately $8.3 million and $8.8 million, respectively, of unused letters of credit outstanding under the RCA. In connection with the refinancing of the RCA in 2006, the Company incurred approximately $1.5 million of bank fees which were recorded on its consolidated balance sheet as deferred financing costs (see Note 2) that are being amortized to interest expense over the remaining term of the RCA.

The RCA is secured by, among other things, substantially all of the Company's assets in the U.S. and certain of the assets of the Company's international subsidiaries, including a portion of the stock of certain of the non-U.S. subsidiaries. Under the provisions of the RCA, the Company is required to maintain certain insurance coverage and report inventory and receivables and financial information on a monthly basis, as well as periodic reporting of customer lists, accounts payable aging and other information.

Borrowings under the RCA, as amended in 2006, bear an interest rate referenced to market interest rates and an applicable margin of between 0.0% to 2.00%, dependent upon commitment utilization, and the baseline interest rate chosen by the Company (i.e., Prime Rate, Federal Funds Rate, or LIBOR). An applicable commitment fee rate of between 0.325% to 0.425% of the average unutilized commitment is also paid based on the unutilized percent of the aggregate amount. At December 31, 2006, the weighted average interest rate on the Company's outstanding borrowing under the RCA was approximately 8.1%.

The RCA contains certain covenants, including the requirement that the Company satisfy a minimum fixed charge coverage ratio, a minimum EBITDA for a portion of 2006, and a maximum borrowing limit, as defined in the RCA. The RCA also contains covenants restricting, among other things,  the Company's ability to borrow additional money, incur liens, pay dividends, sell assets, amend material agreements, as well as enter into various investments and transactions with affiliates unless permitted under the Company's senior secured debt agreement (see Note 10). For the reporting period ended December 31, 2006, the Company did not meet its minimum fixed charge coverage ratio, for the first quarter of 2007, it exceeded the maximum borrowing limit, and it did not deliver its audited financial statements for 2006 to the lenders by the required date as specified in the RCA. On April X, 2007, the Company entered a forbearance agreement with its lenders related to its lack of compliance with the minimum fixed charge coverage ratio and the maximum borrowing requirements along with the date the Company's audited financial statements for 2006 are due to the lenders under the terms of the RCA. Under the terms of the forbearance agreement, the maximum borrowing limit under the RCA is permanently reduced to $145 million, with a commensurate reduction in fees, and the Company is not permitted, among other things, to make cash interest payments to related parties (see Note 17) and will be required to report monthly on a new EBITDA covenant, as described in the agreement. [To be finalized]

The outstanding balance under the RCA as of December 31, 2006 was $95.2 million. Approximately $35.0 million of the aggregate commitment was available to be borrowed by the Company under the RCA as of December 31, 2006. Since the RCA has both a subjective acceleration clause and a lock-box requirement whereby remittances are utilized to pay down the debt outstanding, the balance outstanding under the RCA is classified as a current liability on the Company's consolidated balance sheet. No amounts had been drawn against the letters of credit as of December 31, 2006.

In the period from January 1 to April 27, 2005, PCE maintained a commercial financing agreement to finance pre-sold inventory on a transaction-by-transaction basis. On April 27, 2005, PCE repaid the note in full.

## 10. Long-term Debt

The Company's long-term debt as of December 31, 2006 and 2005 consisted of the following (in millions):

| 2006: | Senior secured | Related party senior subordinated (see note 17) | Total |
|---|---|---|---|
| Total outstanding amount of term loans | $34.9 | $125.0 | $159.9 |
| Less: current portion of term loans | (34.9) | — | (34.9) |
| Long-term portion of term loans | $— | $125.0 | $125.0 |

| 2005: | Senior secured | Related party senior subordinated (see note 17) | Total |
|---|---|---|---|
| Total outstanding amount of term loans | $123.2 | $125.0 | $248.2 |
| Less: current portion of term loans | (1.3) | — | (1.3) |
| Long-term portion of term loans | $121.9 | $125.0 | $246.9 |

On April 28, 2005 Polaroid Corporation entered into a senior secured term loan agreement (the "TLA") with a group of lenders.

The TLA contains an initial $125.0 million loan amount and a maturity date of April 28, 2011. The TLA bears interest based on a rate which, at the discretion of the borrower, is either generally Prime rate plus an additional margin of 5.75% or LIBOR rate plus an additional margin of 7.0%. Interest under the TLA is payable monthly. At December 31, 2006, the interest rate on the Company's outstanding borrowing under the TLA was approximately 12.4%.

The TLA contains various covenants including covenants related to the provision of monthly and annual financial statements and annual budgets, notice of material events, and a minimum fixed charge coverage ratio and a minimum EBITDA for a portion of 2006, which are both similar to the requirements under the RCA (see note 9). The TLA also contains covenants restricting, among other things, the Company's ability to borrow additional money, incur liens, sell assets, as well as enter into various investments and transactions with affiliates. For the reporting period ended December 31, 2006, the Company did not meet its minimum fixed charge coverage ratio and for the first quarter of 2007, it exceeded the maximum borrowing limit as specified in the RCA. As a result, the Company reported the entire outstanding balance under the RCA as short-term as of December 31, 2006.

The TLA is secured by, among other things, substantially all of the Company's assets in the U.S. and certain of the assets of the Company's non-U.S. subsidiaries, including a portion of the stock of certain of the non-U.S. subsidiaries.

In 2006, with the prior approval of its lenders, the Company repaid approximately $87.0 million of the outstanding balance of the TLA using the proceeds from the sale of certain assets and a return on its investment in a real estate LLC (see Note 3). In connection with the repayments of the TLA, the Company was required to make cash payments to its lenders for prepayment fees of approximately $0.9 million that were recorded in general and administrative expenses in the Company's consolidated statement of operations. In the first quarter of 2007, the Company repaid the entire amount outstanding under the TLA with the proceeds from certain asset sales (see Note 18).

## 11. Payables and Accruals

The following items are included in the Company's payables and accruals at December 31, 2006 and 2005 (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Trade accounts payable | $121.5 | $32.5 |
| Accrual for marketing programs | 9.7 | 12.9 |
| License fees payable | 2.8 | 11.4 |
| Interest payable | 3.9 | 6.7 |
| Accrual for asset retirement obligations | 5.5 | 1.4 |
| Accrual for exit costs | 3.5 | 5.1 |
| Accrual for sales returns | 8.1 | 3.2 |
| Accrual for state and local taxes | 15.2 | 6.3 |
| Other accrued expenses and current liabilities | 15.1 | 18.3 |
| Total | $185.3 | $97.8 |

## 12.  Incentive Compensation Plans

The Company had an incentive compensation program for the last six months of 2005 covering substantially all U.S. Polaroid employees, employees of its manufacturing subsidiary in the United Kingdom and certain key employees of its other non-U.S. subsidiaries. Compensation expense charged to operations in 2005 for this incentive program was approximately $4.0 million. The cash payments under this program were based on a comparison of the performance of the Company against established financial goals and were made in the first quarter of 2006.

In 2006, the Company changed its incentive compensation program covering substantially all U.S. Polaroid employees, certain key employees of its manufacturing subsidiary in the United Kingdom and its other non-U.S. subsidiaries. Payments under the new program were based on fixed amounts established by the Company. Compensation expense charged to operations in 2006 for this incentive program was approximately $10.4 million. Substantially all of the cash payments under this program were made in approximately equal installments in the third quarter of 2006 and the first quarter of 2007.

PCE maintains certain long-term incentive agreements with its founders that are based on the financial results of PCE's operations. These agreements are intended to provide incentives to these individuals for establishing core relationships and business strategies for the Company and are based on achievement of future operating results.

As of December 31, 2005, there were four individuals who were founders of PCE and involved in the long-term incentive agreements. In March 2006, the Company entered into a separate agreement with one of these founders to terminate the relevant long-term incentive agreement. As a result, the Company agreed to pay the founder approximately $2.5 million, of which approximately $0.6 million was paid in March 2006 with the balance of approximately $1.9 million paid in January 2007. These payments were recorded in general and administrative expenses in the Company's consolidated statement of operations.

As of December 31, 2006, there were three remaining founders of PCE involved in the long-term incentive agreements. In January 2007, the Company entered into a separate agreement with one of these individuals to terminate the relevant long-term incentive agreement. As a result, the Company agreed to pay the founder approximately $3.5 million, of which about $2.0 million was paid in January 2007 with the balance due no later than January 15, 2008. Since this agreement was being negotiated in late 2006 and was signed in January 2007, the Company recorded the related compensation expense in general and administrative expenses in its consolidated statement of operations in 2006.

22

The total amount of compensation expense charged to general and administrative expenses in the Company's consolidated statement of operations related to the founders' long-term incentive agreements was approximately $6.7 million and $4.7 million in 2006 and 2005, respectively, which include the expenses related to the separate agreements. Cash payments for these agreements were approximately $1.7 million in 2005, approximately $3.8 million in 2006, $3.9 million in January 2007, with approximately $0.5 million expected to be paid in the first half of 2007 and $1.5 million due no later than January 15, 2008.

PCE also maintains an incentive compensation program for substantially all of its non-founding employees. Payments under this program are based on a comparison of the performance of PCE against established financial goals. Compensation expense charged to operations in 2005 and recorded as an accrued compensation liability at December 31, 2005 under the program was approximately $3.6 million. In the first half of 2006, the Company made cash payments of $3.0 million and reversed $0.6 million of the accrued liability for the 2005 expense. In 2006, the Company charged compensation expense for approximately $0.2 million under this program and recorded this amount as an accrued liability in its consolidated financials statements as of December 31, 2006. The cash payments related to the 2006 expense were made in the first quarter of 2007.

## 13.   Benefit Plans

Polaroid and PCE have defined contribution plans operated pursuant to the provisions of Section 401(k) of the Internal Revenue Code ("Code") for the benefit of substantially all U.S. employees. In 2006 and 2005, Polaroid and PCE made combined cash contributions to these plans of approximately $1.5 million and $1.6 million, respectively, which represented the employer's match of eligible employee cash compensation. Neither Polaroid nor PCE have defined benefit pension plans for U.S. employees.

Employees of Polaroid's manufacturing subsidiaries in the United Kingdom and the Netherlands and certain non-U.S. marketing subsidiaries are covered by trusteed, defined benefit pension plans. The Company uses a measurement date of December 31 for its defined benefit pension plans. Employees of most of the Company's other non-U.S. subsidiaries are covered by insured or government pension plans. Related obligations and assets of these other plans are not material and therefore are not included in the information below. The Company has reflected the assets and obligations of these defined benefit pension plans in the reconciliation of pension plan assets and obligations below.

Components of the Company's net pension cost for the year ended December 31, 2006 and the period from the Transaction (see Note 1) through December 31, 2005 are as follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Service cost | $4.4 | $2.8 |
| Interest cost | 17.6 | 11.8 |
| Expected return on assets | (19.9) | (11.8) |
| Amortization of unrecognized prior service cost | (0.1) | — |
| Net periodic pension cost | 2.0 | 2.8 |
| Curtailment gain | (0.1) | — |
| Net pension cost | $1.9 | $2.8 |

The following table sets forth the plans' reconciliation of projected benefit obligations, plan assets and funded status to the amounts recognized in the consolidated balance sheet for the Company for the period from the Transaction through December 31, 2006 and 2005 (in millions):

| | 2006 | 2005 |
|---|---|---|
| Projected benefit obligation at beginning of period ..... | $380.5 | $391.0 |
| Service cost................................................................ | 4.4 | 2.8 |
| Interest cost............................................................... | 17.6 | 11.8 |
| Plan participants' contributions...................................... | 1.2 | 1.0 |
| Actuarial (gain)/loss ................................................... | (25.6) | 18.8 |
| Plan amendment .......................................................... | (0.7) | — |
| Curtailment gain ......................................................... | (0.1) | (0.1) |
| Benefits paid............................................................... | (12.6) | (7.8) |
| Foreign currency exchange rate change........................ | 45.4 | (37.0) |
| Projected benefit obligation at end of period................ | $410.1 | $380.5 |
| | | |
| Fair value of plan assets at beginning of period ........... | $311.5 | $307.1 |
| Actual return on plan assets ......................................... | 11.7 | 28.2 |
| Employer contributions................................................. | 14.8 | 12.1 |
| Plan participants' contributions...................................... | 1.2 | 1.0 |
| Benefits paid............................................................... | (12.6) | (7.8) |
| Foreign currency exchange rate change........................ | 38.1 | (29.1) |
| Fair value of plan assets at end of period...................... | $364.7 | $311.5 |
| | | |
| Plan assets below projected benefit obligation.............. | $(45.4) | $(69.0) |
| Unrecognized prior service cost..................................... | (0.6) | — |
| Unrecognized net (gain)/loss ........................................ | (15.9) | 2.1 |
| Net accrued liability recognized at end of period......... | $(61.9) | $(66.9) |

Amounts recognized in the Company's consolidated balance sheet at December 31, 2006 and 2005 are as follows (in millions):

| | 2006 | 2005 |
|---|---|---|
| Accrued benefit liability................................................. | $(64.5) | $(67.0) |
| Prepaid benefit cost ..................................................... | 2.6 | — |
| Accumulated other comprehensive loss ......................... | — | 0.1 |
| Net accrued liability recognized at end of year ............ | $(61.9) | $(66.9) |

The accumulated benefit obligation for the Company's non-U.S. pension plans as of December 31, 2006 and 2005 is as follows (in millions):

| | 2006 | 2005 |
|---|---|---|
| Accumulated Benefit Obligation ....................................... | $402.7 | $369.2 |

The projected benefit obligation and fair value of plan assets for the Company's non-U.S. pension plans with projected benefit obligations in excess of plan assets as of December 31, 2006 and 2005 are as follows (in millions):

| | 2006 | 2005 |
|---|---|---|
| Projected benefit obligation............................. | $223.4 | $198.6 |
| Fair value of plan assets.................................. | $159.9 | $127.4 |

24

The accumulated benefit obligation and fair value of plan assets for the Company's non-U.S. pension plans with accumulated benefit obligations in excess of plan assets as of December 31, 2006 and 2005 are as follows (in millions):

|  | 2006 | 2005 |
|---|---|---|
| Accumulated benefit obligation..... | $217.2 | $189.9 |
| Fair value of plan assets ................. | $159.9 | $127.4 |

As of December 31, 2006 and 2005, the Company had approximately $8.8 million and $7.9 million, respectively, of insurance investments that were purchased to offset a portion of the obligations of one of the defined benefit pension plans. Since the Company could use these investments for other purposes, they may not be included as assets in the information on the assets of the Company's defined benefit plans listed above. These assets are included in other non-current assets and are considered by the Company to be available to fund the liabilities of this pension plan.

In 2005, the Company recorded a charge of $0.1 million in accumulated other comprehensive loss in common stockholder's equity related to a pension plan with accumulated benefit obligations in excess of the fair value of plan assets. There was no tax effect associated with this charge since realization of this benefit was not considered to be more likely than not. In 2006, the Company determined this charge was not longer required and, as a result, it reversed the charge to accumulated other comprehensive loss in common stockholder's equity.

The weighted average assumptions used by the Company for its defined benefit pension plans which have a significant effect on the amounts reported for pension expense for the years ended December 31, 2006 and 2005 were as follows:

|  | 2006 | 2005 |
|---|---|---|
| Weighted average discount rate............ | 4.4% | 4.9% |
| Weighted average rate of increase in compensation levels......................... | 3.2% | 3.4% |
| Weighted average expected long-term rate of return on assets ... | 6.0% | 6.0% |

The assumptions used by the Company which have a significant effect on the amounts reported for the Company's pension obligations as of December 31, 2006 and 2005 follow:

|  | 2006 | 2005 |
|---|---|---|
| Weighted average discount rate....... | 4.9% | 4.4% |
| Weighted average rate of increase in compensation levels............... | 3.2% | 3.2% |

The Company's weighted-average target and actual asset allocations for the Company's defined benefit pension plans as of December 31, 2006 and 2005 follow:

| Plan Asset Category | Target Allocation | Actual Allocation |
|---|---|---|
| **2006:** |  |  |
| Equity securities............................. | 32% | 37% |
| Real estate ...................................... | 4% | 3% |
| Debt securities................................. | 64% | 60% |
| Total ............................................... |  |  |
|  | 100% | 100% |

| | Target Allocation | Actual Allocation |
|---|---|---|
| **2005:** | | |
| Equity securities | 41% | 41% |
| Real estate | 4% | — |
| Debt securities | 55% | 59% |
| Total | 100% | 100% |

The Company's major defined benefit pension plans are governed by local boards of trustees that include members elected by employees and retirees along with representatives appointed by the Company. The trustees have adopted investment policies for the pension plan assets designed to meet the expected rate of return on plan assets assumption with an investment mix and risk profile consistent with the obligations of the plan. To achieve this goal, the pension plans retain professional investment managers who invest plan assets in equity and fixed income securities.

Within the equity securities asset class, the investment policies provide for investments in a broad range of publicly traded securities and indexed funds designed to match the performance of the domestic and international equity markets. Within the fixed income securities asset class, the investment policies provide for investments in government and corporate debt securities with high quality credit ratings and in indexed funds designed to match the performance of long-dated and index-linked issues. Periodic studies are undertaken to determine the asset mix that will meet pension obligations at a reasonable cost and risk and that are consistent with the fiduciary requirements of local pension regulations.

The approach used to determine the expected rates of return on plan assets for the Company's defined benefit pension plans was to generally apply an asset allocation policy to the expected real returns for the plans' equity and fixed income investments. On a periodic basis, the trustees review the historical returns for the plans and consult with their investment managers to determine the expected long-term rates of return. The expected real rates of return are then weighted based on the specific asset allocation mix and adjusted for inflation. The horizon for this exercise is generally 5-10 years. This approach resulted in a weighted average expected rate of return on plan assets assumption of approximately 6.0% for both 2006 and 2005.

The Company expects to contribute approximately $18.9 million to its defined benefit pension plans in 2007. In general, the Company's policy is to fund these pension plans through agreement with local pension plan trustee boards in accordance with local statutory funding regulations and taking into consideration local labor agreements, practices and economic conditions. The Company's policy is to contribute sufficient cash to its defined benefit pension plans in order to meet at least the minimum contribution requirements, as established by local funding, government and taxing authorities.

The Company estimates that the future benefits payable for its defined benefit pension plans at December 31, 2006 are as follows:

| | |
|---|---|
| 2007 | $14.1 |
| 2008 | 14.9 |
| 2009 | 15.6 |
| 2010 | 16.3 |
| 2011 | 17.3 |
| 2012 to 2016 | 104.3 |

26

**14.   Rental Expense and Lease Commitments**

The Company's minimum annual rental commitments at December 31, 2006, under non-cancelable leases, principally for real estate, are payable as follows (in millions):

| | |
|---|---|
| 2007 | $10.5 |
| 2008 | 6.2 |
| 2009 | 2.8 |
| 2010 | 2.1 |
| 2011 | 1.3 |
| 2012 and thereafter | 0.4 |
| Total minimum lease payments | $23.3 |

The Company's minimum annual rental commitments listed above include payments required under the lease for the Waltham, Massachusetts site that will be recorded as interest expense in connection with the required accounting for the Waltham site contribution and lease transaction in 2006 (see Note 3).

Minimum payments have not been reduced by minimum sublease rentals of approximately $4.4 million due in the future under non-cancelable subleases. Many of the leases contain renewal options and some contain escalation clauses that require payments of additional rent to the extent of increases in the related operating costs.

Rental and lease expenses for the year ended December 31, 2006 and 2005 were approximately $13.1 million and $7.5 million, respectively. The amount for the Company's rental and lease expenses for 2006 include payments required under the lease for the Waltham site that was recorded as interest expense in connection with the required accounting for the Waltham site contribution and lease transaction in 2006 (see Note 3). Sublease income for the Company amounted to approximately $1.0 million and $0.5 million for 2006 and 2005, respectively.

Since as of December 31, 2006, the Company had agreed to terminate its lease for warehouse space located in Norton, Massachusetts in March 2007 (see Note 18) and was working to finalize the sale of its Eyewear business which occurred in March 2007 (see Note 18), the Company's non-cancellable lease commitments as of December 31, 2006 listed above do not reflect lease information related to the Norton lease or the Eyewear business beyond February 2007.

**15.   Contingencies**

The Company is involved in legal proceedings and claims arising in the normal course of business. The Company does not believe that resolution of any of these proceedings or claims will have a material adverse effect on its financial position or results of operations.

The Company operates facilities that are subject to certain federal, state and local laws and regulations relating to environmental protection, including those governing the investigation and remediation of contamination resulting from releases of hazardous substances. Certain of these laws and regulations may impose joint and several liabilities on the Company for the costs of investigation or remediation of such contamination, regardless of fault or the legality of the disposal. In 2006 and 2005, the Company recorded certain amounts related to its liabilities for asset retirement obligations related to environmental remediation liabilities (see Note 2).

The Company's consumer electronics business has numerous intellectual property disputes, some of which are in litigation. The Company vigorously defends its intellectual property against infringement. The Company takes seriously all claims against it made by third parties for infringement of their intellectual property. It is possible that some or all of the claims of infringement made by third parties of their intellectual property could be resolved adversely to the Company. The impact of such claims cannot be measured but the Company believes some or all of these claims could be reimbursed to it by its manufacturers. The unfavorable resolution of these claims could, in the aggregate or individually, have a material adverse impact on the Company's financial position or results of operations.

In April 2006, PCE made a formal communication with the US Consumer Products Safety Commission (CPSC) with respect to a retrofit that PCE intended to commence on all Sunbeam branded gas ranges which required a recall under the voluntary recall program of the CPSC. Since PCE had indemnification and cooperation from its

27

manufacturers, this recall did not have a material impact on the Company's financial position or results of operations. This matter was resolved in 2006.

**16.    Long-Term Obligations and Commitments**

**License Agreements:**

As of January 1, 2005, PCE had a patent portfolio license agreement with the owners of certain technologies utilized in selected products that the Company sells. Under the terms of this agreement, the Company was responsible for the payment of an accrued royalty of $2.7 milion as of January 1, 2005 for products sold in prior periods. The agreement requires semi annual cash payments of approximately $0.3 million including imputed interest at 15%, from March 2005 through September 2008.

The maturities of the Company's long-term obligations under its patent portfolio license agreement as of December 31, 2006 are as follows (in millions):

| | |
|---|---|
| 2007 | $0.7 |
| 2008 | 0.7 |
| Total obligations | 1.4 |
| Less: Amount representing interest | 0.2 |
| Present value of obligations | 1.2 |
| Less: Current portion of license agreement obligations | 0.7 |
| Long-term license agreement obligations at present value | $0.5 |

During 2005, the Company entered into agreements with two of its product manufacturers to recover approximately $1.9 million of the total obligation. The Company recovered approximately $0.2 million in both 2006 and 2005 and the remaining amount of approximately $1.5 million is recorded as a receivable on the Company's consolidated balance sheet as of December 31, 2006.

In 2006, the Company was served with a lawsuit whereby Positive Technologies, Inc. alleged infringement by the Company of certain of its patents relating to LCD and plasma televisions. In January 2007, the Company reached settlement of all claims relating to this matter and paid Positive Technologies, Inc. approximately $1.5 million with an additional payment of approximately $0.8 million due in November 2007. Based on the information available relative to the full amount of this settlement, the Company recorded a liability for it as of December 31, 2006. Since the Company believes the full amount of this settlement is recoverable from its product manufacturers under PCE's manufacturing agreements, the Company recognized the settlement amount in miscellaneous accounts receivable on the its consolidated balance sheet as of December 31, 2006.

**Royalty Agreements:**

Prior to the Transaction, PCE had an agreement with PHC for exclusive rights to market and distribute a specific line of products. Royalty expense under this agreement was $1.6 million for the period from January 1, 2005 to April 27, 2005.

In December 2005, PCE entered into a license agreement with Koninklijke Philips Electronics, N. V. ("Philips") to sell products including certain technologies patented by Philips. Under the terms of the agreement, PCE agreed to pay Philips approximately $14.1 million for royalties associated with products sold by PCE from January 1, 2003 to November 30, 2005, that were unpaid to Philips by PCE's third party product manufacturers, as contractually required. PCE made payments under this agreement totaling $6.1 million and $8.0 million in 2006 and 2005, respectively. The full $14.1 million was subsequently charged to the product manufacturers as per PCE's manufacturing agreements and recognized as a receivable on the Company's consolidated balance sheet. In 2006, PCE recovered approximately $11.4 million of this receivable and recorded a reserve of approximately $1.2 million against the remaining accounts receivable and recorded the related charge in other costs in the Company's consolidated statement of operations. At

28

December 31, 2006, the Company had a net receivable for the amounts charged to the product manufacturers of $1.5 million.

In addition, PCE has agreed to pay a per unit sold royalty fee upon sales of products using the Philips technologies beginning December 1, 2005 and ending December 31, 2007. The royalty fees for the full year 2006 and the period from December 1 through December 31, 2005 of approximately $0.6 million in each period were charged to the product manufacturer contractually responsible for paying these license fees to Philips.

PCE entered into an agreement with a related party, Asia Procurement Specialists, LLC, in March 2005 to use the Emerson Trademark on certain specified consumer electronics products. The license agreement to utilize the Emerson Trademark was originally entered into between Asia Procurement Specialists, LLC and Emerson effective March 1, 2005. PCE's agreement with Asia Procurement Specialists, LCC provides PCE the right to the trademark through December 31, 2009. Based upon the license agreement and the agreement with Asia Procurement Specialists, LLC, PCE has agreed to pay a royalty fee determined as a percent of net sales of products using the Emerson Trademark. License fees expensed under this agreement were approximately $0.3 million and $ 0.5 million in 2006 and 2005, respectively. The amount of future minimum payments due under this agreement are approximately $0.4 million, $0.4 million, and $0.5 million for the years ended December 31, 2007, 2008, and 2009, respectively.

As of January 1, 2005, PCE had a licensing agreement with Sunbeam Products, Inc. to use the Sunbeam Trademark with certain specified floor care products. The agreement provides PCE with the right to the trademark through December 31, 2006 with two renewal options through 2012 if certain performance conditions are achieved. PCE has agreed to pay a royalty fee determined as a percentage of net sales of products using the Sunbeam Trademark. Payments under the agreement are due quarterly. License fees expensed under this agreement were approximately $0.3 million in both 2006 and 2005. In March 2007, the Company assigned the Sunbeam license and sold certain assets related to its non Polaroid branded business (see Note 18).

PCE also had a licensing agreement as of January 1, 2005 with Sunbeam Products, Inc. to use the Sunbeam Trademark with certain specified home appliance products. The agreement provides the Company with the right to the trademark through December 31, 2006 with three renewal options through 2019 if certain performance conditions are achieved. PCE has agreed to pay a royalty fee determined as a percentage of net sales of products using the Sunbeam Trademark. An advance royalty payment of $1.0 million was paid prior to January 1, 2005 and represents the minimum royalty payment required for the initial contract period. This minimum royalty payment was amortized on a straight line basis to cost of goods sold over the initial contract period. The amount charged to cost of goods sold in 2006 and 2005 under this agreement was approximately $0.4 million and $0.6 million, respectively. In March 2007, the Company assigned the Sunbeam license and sold certain assets related to its non Polaroid branded business (see Note 18).

## 17.   Related Party Transactions

**Shared Services:**

In 2006 and 2005, the Company paid approximately $6.3 million and $4.6 million, respectively, to Petters for management advisory and other support services and expenses performed on behalf of the Company and recorded the related expenses in general and administrative expenses in its consolidated statement of operations.

**Waltham Lease:**

In June 2006, the Company entered into a joint venture with a third party and contributed all of it property located in Waltham Massachusetts to a real estate development LLC and entered into a lease with the LLC for the use of the Waltham property for a period of up to three years for an annual base rent payment of $4.0 million (see Note 3). Since the Company received a 50 percent ownership interest in the LLC, the payments under this lease are related party transactions.

**Subordinated Term Loan Agreement:**

On April 27, 2005 Polaroid Corporation entered into a senior subordinated term loan agreement (the "SLA") with Petters Capital, LLC, a related party (see Note 10).

The SLA contains an initial $125.0 million loan amount and a final maturity date of October 26, 2011. The SLA bears an interest rate of 15% per annum which is payable monthly.

The SLA contains various covenants including informational covenants related to, but not limited to, monthly and annual financial statements as well as annual budgets. The SLA additionally contains covenants restricting the Company's ability to borrow additional money, incur liens, sell assets, as well as enter into various investments and transactions with affiliates, among other things, unless permitted by the TLA (see Note 10). The SLA is subordinate and junior in right of payment to the TLA and the RCA.

Except for certain defined asset sales, no principal pay downs are to be made until the maturity date under the SLA. In 2006 and 2005, $18.8 million and $12.8 million, respectively, of interest expense was recorded under the SLA. In 2006 and 2005, the Company made approximately $18.8 and $11.9 million, respectively, of cash interest payments to Petters Capital LLC in connection the TLA. The outstanding balance under the SLA as of December 31, 2006 and 2005 was $125.0 million.

**Demand Notes:**

As of January 1, 2005, PCE had a demand note with Thousands Lakes, LLC, a related party, with an outstanding balance of $42.0 million. In conjunction with the Transaction, the Company repaid this note and the related interest, in full, on April 27, 2005.

As of January 1, 2005, PCE had a demand note with Tom Petters, Inc., a related party, which totaled $20.0 million. In conjunction with the Transaction, the Company repaid $10.0 million of this note on April 27, 2005. On April 28, 2005, the demand note between the Company and Tom Petters Inc., was amended and restated. The amended note pays interest at 14% per annum. Under the terms of the RCA (see Note 9), the Company cannot repay the interest (see Note 18) or the principal amount due under this demand note until the RCA terminates. At both December 31, 2006 and 2005, $10.0 million was outstanding under this note.

On March 31, 2005, PCE entered into a demand note with Petters Company Inc., a related party. This note pays interest at 14% per annum and is payable on demand. If no demand is made all accrued interest and unpaid principal is due on the date the note matures, which is March 31, 2012. Under the terms of the RCA, the Company cannot repay the interest (see Note 18) or the principal amount due under this demand note until the RCA terminates. As of December 31, 2006 and 2005, $9.0 million remained outstanding under this note.

Interest expense relative to the Company's related party demand notes was $2.7 and $8.5 million in 2006 and 2005, respectively.

During 2006 and 2005, the Company sold merchandise to the following related parties (in millions):

| Entity | 2006 | | 2005 |
|---|---|---|---|
| Broadsign USA, LLC | $ | 0.5 | $ | 2.3 |
| uBid, Inc. | | 0.7 | | 1.4 |
| RedtagBiz, Inc. | | -- | | 0.6 |
| Fingerhut Direct Marketing, Inc. | | 0.3 | | 0.6 |
| Petters Warehouse Direct | | 0.1 | | -- |
| Petteres Group Worldwide, LLC | | 0.1 | | -- |
| Petters Company, LLC | | 0.1 | | 0.5 |
| | $ | 1.8 | $ | 5.4 |

During 2006 the Company did not purchase any merchandise from related parties. In 2005, the Company purchased approximately $0.3 million of merchandise from Petters Company, LLC, a related party.

The Company's receivables from and (payables to) related parties as of December 31, 2005 were as follows (in millions):

| Entity | 2006 | 2005 |
|---|---|---|
| BroadSign USA, LLC | $ 0.1 | $ 1.1 |
| Celine Countryman, LLC | -- | 0.1 |
| Fingerhut Direct Marketing, Inc. | 0.3 | 0.3 |
| Petters Company International, LLC | 0.3 | 0.3 |
| Petters Group Worldwide, LLC | 0.5 | 0.5 |
| SoniqCast, LLC | 0.3 | 0.7 |
| Petters Company, LLC | -- | 0.4 |
| Petters Company, Inc. | (1.3) | (1.2) |
| Ubid, Inc. | 0.1 | -- |
| Asia Procurement Specialists, LLC | 0.0 | (0.1) |
| | $ 0.3 | $ 2.1 |

The Company leases certain office facilities in Minnetonka, Minnesota from a related party, on a month-to-month basis (see Note 14). Rental expense for these facilities was approximately $0.4 million and $0.3 million in 2006 and 2005, respectively.

## 18. Subsequent Events

In February 2007, with the approval of its lenders, the Company sold certain intellectual property to a third party for net proceeds of approximately $8.2 million. The net proceeds from this sale were required to be used to prepay a portion of the outstanding balance of the Company's TLA (see Note 10).

In March 2007, the Company terminated its lease for warehouse space located in Norton, Massachusetts with no further obligations related to the leased space.

In March 2007, with the approval of its lenders, Polaroid Corporation sold the stock of certain of its subsidiaries along with certain assets and liabilities relating to the Company's eyewear business to a third party buyer for approximately $40.0 million in cash. In connection with this transaction, Polaroid Corporation entered into a joint venture (the "JV") with the third party buyer and licensed certain intellectual property related to the operations of the eyewear business to the JV in return for a fifty percent share in any distributions made by the JV. The intellectual property was licensed to the JV and in turn sub-licensed to the new eyewear company in return for a net royalty payment of approximately 4% of the gross revenue of the new eyewear company, net of sales taxes, duties and similar amounts, as defined in the licensing agreement between the joint venture and the new eyewear business.

The proceeds from the sale, net of directly related expenses, of approximately $38.9 million were used to repay the remaining $26.8 million outstanding amount of the Company's TLA (see Note 10) and to pay a prepayment.fee of $0.3 million to the lenders. In addition, the Company contributed approximately $5.0 million of the cash proceeds to one of its non-U.S. pension plans and repaid approximately $6.8 million of the outstanding balance under its RCA (see Note 9).

In March 2007, with the approval of its lenders, the Company sold certain non Polaroid brand assets, consisting of inventory and the rights to the Company's Sunbeam license agreement (see Note 17) to a related party to operate the non Polaroid branded business. The proceeds from the sale of approximately $3.6 million consisted of $1.5 million of cash that was paid at closing and a promissory note for $2.1 million that bears interest at an annual rate of 5 percent and has a maximum term of 5 years. The cash proceeds from this sale were used to repay a portion of the outstanding balance under the RCA.

In March 2007, the Company entered into a demand note with Petters Company, Inc., a related party, in return for a cash payment of $20.0 million. This note bears interest at a rate of [x.x%], has a maturity date of [March XX, 2008], and is redeemable without penalty prior to maturity with the approval of the lenders under the RCA. [To be finalized]

On April X, 2007, the Company entered a forbearance agreement with its lenders related to its lack of compliance with the minimum fixed charge coverage ratio and its maximum borrowing requirements along with the date the Company's audited financial statements for 2006 are due to the lenders under the terms of the RCA (see Note 9). Under the terms of the forbearance agreement, the maximum borrowing limit under the RCA is permanently reduced to $145 million, with a commensurate reduction in fees, and the Company is not permitted, among other things, to make cash interest payments to related parties (see Note 17) and will be required to report monthly on a new EBITDA covenant, as described in the agreement. [To be finalized].

# Polaroid Holding Company
## A Petters Group Worldwide Company

## Nov, 2007
## Performance

Company Confidential


Polaroid
A PETTERGROUP WORLDWIDE COMPANY

# Agenda

## Performance

| | Pages |
|---|---|
| • Polaroid | 3 - 13 |
| • Consumer Electronics | 14 - 25 |
| • Instant (includes Monetization) | 26 - 40 |
| • New Business (includes IP) | 41 - 43 |
| • Other (includes PGW fee, Eyewear and PPA) | 44 - 46 |

Company Confidential
2

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

Nov Performance.xls
1/8/2008

# Polaroid Holding Company
## Summary
## Nov, 2007
## Performance

Note: With the exception of page 3, the forecast reference in the attached schedules is fcst 8 and not the October re-forecast

Company Confidential
3

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

Nev Performance.xls
10/2006

# Polaroid Operating Profit Summary by Segment

| | Nov. 2007 | | | | Nov. QTD | | | | Nov. 2007 YTD | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | FCST (RA) | Actual | Plan | Fcst | FCST (RA) | Actual | Plan | Fcst | FCST (RA) | Actual |
| **Polaroid (excl. PCB)** | | | | | | | | | | | | |
| Consumer Electronics | 10.6 | 7.2 | 1.8 | (15.2) (2) | 17.3 | 7.6 | (0.3) | (13.6) | 27.9 | (8.4) | (19.5) | (28.9) |
| Instant (inc monetization) (1) | 2.2 | 2.4 | 1.5 | 4.5 | 4.6 | 4.4 | 3.8 | 9.3 | 16.0 | 33.5 | 33.8 | 40.4 |
| New Business | 0.6 | (1.7) | (1.7) | 0.3 | 2.3 | (3.3) | (2.3) | 0.1 | (2.1) | (6.3) | (4.0) | (1.2) |
| Other | (1.1) | (1.0) | (1.0) | 0.6 | (2.2) | (2.1) | (2.2) | (2.3) | (11.3) | (11.3) | (15.4) | (11.1) |
| **Total Adjusted Operating Profit** | 12.4 | 6.8 | 0.6 | (9.8) | 21.9 | 6.7 | (2.0) | (6.5) | 30.6 | 9.5 | (5.6) | (0.9) |
| **PCB** | - | - | (0.0) | (0.0) | - | - | - | (0.1) | - | - | - | (3.1) |
| **Total Polaroid** | | | | | | | | | | | | |
| **Total Adjusted Operating Profit** | 12.4 | 6.8 | 0.6 | (9.9) | 21.9 | 6.7 | (2.0) | (6.6) | 30.6 | 9.5 | (5.6) | (4.1) |

**Notes:**

(1) Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results

(2) Includes approximately $ 8.7 M of vendor / other settlements - some of these to be pushed back to 2006 results

| | |
|---|---|
| Sterlite | 0.9 |
| Wandita | 1.7 |
| Preview | 3.0 |
| Europe | 1.2 |
| Florencia | 1.5 |
| Service Cart | 0.4 |
| | 6.1 |

# Polaroid Operating Profit by Segment

($ Millions)

| | Nov, 2007 | | | Nov, QTD | | | Nov, 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Plan** | **Fcst** | **Actual** | **Plan** | **Fcst** | **Actual** | **Plan** | **Fcst** | **Actual** |
| **Consumer Electronics** | | | | | | | | | |
| Revenue | 131.4 | 137.9 | 79.0 | 235.2 | 231.1 | 175.7 | 794.6 | 666.2 | 565.5 |
| Margin | 15.5 | 11.6 | 2.5 | 28.6 | 19.0 | 8.6 | 85.7 | 45.4 | 28.3 |
| Expense (2) | (4.9) | (4.5) | (17.7) | (11.3) | (11.2) | (22.2) | (57.9) | (51.9) | (62.2) |
| Total Operating Profit | 10.6 | 7.2 | (15.2) | 17.3 | 7.8 | (13.6) | 27.9 | (6.4) | (33.9) |
| Mgn % | 11.8% | 8.4% | 3.2% | 12.2% | 8.2% | 4.9% | 10.9% | 6.8% | 4.7% |
| Exp % | -3.7% | -3.2% | -22.4% | -4.8% | -4.9% | -12.6% | -7.4% | -7.8% | -10.4% |
| **Instant (inc. monetization)** | | | | | | | | | |
| Revenue | 16.0 | 17.9 | 18.2 | 34.4 | 36.8 | 41.2 | 185.6 | 211.4 | 216.0 |
| Margin | 6.9 | 6.9 | 7.7 | 15.2 | 14.2 | 16.8 | 74.1 | 88.2 | 92.2 |
| Expense (1) | (4.7) | (4.5) | (3.2) | (10.5) | (9.9) | (7.5) | (58.1) | (54.7) | (51.9) |
| Total Operating Profit | 2.2 | 2.4 | 4.5 | 4.6 | 4.4 | 9.3 | 16.0 | 33.5 | 40.4 |
| Mgn % | 43.1% | 38.6% | 42.2% | 44.0% | 38.6% | 40.8% | 39.9% | 41.7% | 42.7% |
| Exp % | -29.5% | -25.4% | -17.8% | -30.6% | -26.8% | -18.2% | -31.3% | -25.9% | -24.0% |
| **New Business** | | | | | | | | | |
| Revenue | 18.1 | 0.4 | 0.9 | 45.3 | 1.0 | 1.7 | 65.4 | 3.8 | 4.6 |
| Margin | 1.6 | 0.0 | 0.6 | 4.2 | 0.2 | 1.0 | 7.6 | 2.4 | 3.4 |
| Expense | (0.8) | (1.7) | (0.3) | (1.9) | (3.5) | (0.9) | (9.7) | (8.7) | (4.6) |
| Total Operating Profit | 0.8 | (1.7) | 0.3 | 2.3 | (3.3) | 0.1 | (2.1) | (6.3) | (1.2) |
| **Other** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | - | - | - |
| Margin | (0.2) | (0.2) | (0.2) | (0.4) | (0.3) | (0.4) | 0.7 | 3.1 | 2.9 |
| Expense | (0.9) | (0.9) | (0.8) | (1.8) | (1.8) | (1.9) | (12.0) | (14.4) | (14.1) |
| Total Operating Profit | (1.1) | (1.0) | 0.6 | (2.2) | (2.1) | (2.3) | (11.3) | (11.3) | (11.1) |
| **Total Polaroid (exc. PCB)** | | | | | | | | | |
| Revenue | 165.5 | 156.2 | 98.2 | 314.9 | 268.9 | 218.6 | 1041.3 | 891.6 | 828.3 |
| Margin | 23.8 | 18.4 | 10.5 | 47.5 | 33.1 | 25.9 | 168.1 | 139.1 | 126.8 |
| Expense | (11.4) | (11.6) | (20.4) | (25.6) | (26.4) | (32.5) | (137.6) | (129.7) | (132.6) |
| Total Operating Profit | 12.4 | 6.8 | (9.8) | 21.9 | 6.7 | (6.5) | 30.6 | 9.5 | (5.9) |
| Mgn % | 14.4% | 11.8% | 10.7% | 15.1% | 12.3% | 11.9% | 16.1% | 15.6% | 15.4% |
| Exp % | -6.9% | -7.4% | -20.7% | -8.1% | -9.8% | -14.9% | -13.2% | -14.5% | -16.1% |
| **PCB** | | | | | | | | | |
| Revenue | - | - | (0.0) | - | - | (0.0) | - | 2.5 | 2.4 |
| Margin | - | - | 0.0 | - | - | (0.0) | - | (1.8) | (1.8) |
| Expense | - | - | (0.0) | - | - | (0.1) | - | (1.1) | (1.2) |
| Total Operating Profit | - | - | (0.0) | - | - | (0.1) | - | (2.9) | (3.1) |

**Notes:**

(1) Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results





Polaroid

# Polaroid Operating Profit by Segment - YOY Comparison

($ Millions)

| | YTD, Nov | | | |
|---|---|---|---|---|
| | Nov - 06 | Nov - 07 | Change | % change |
| **Consumer Electronics** | | | | |
| Revenue | 616.5 | 595.5 | (21.0) | -3% |
| Margin | 38.0 | 28.3 | (9.7) | -26% |
| Expense | (40.9) | (62.2) | (21.3) | -52% |
| Total Operating Profit | (2.9) | (33.9) | (31.0) | -1069% |
| Mgn % | 6.2% | 4.7% | | |
| Exp % | -6.6% | -10.4% | | |
| **Instant (inc monetization)** | | | | |
| Revenue | 278.9 | 216.0 | (62.9) | -23% |
| Margin | 116.4 | 92.2 | (24.2) | -21% |
| Expense | (81.1) | (51.9) | 29.2 | 36% |
| Total Operating Profit | 35.3 | 40.4 | 5.1 | 14% |
| Mgn % | 41.7% | 42.7% | | |
| Exp % | -29.1% | -24.0% | | |
| **New Business** | | | | |
| Revenue | 2.9 | 4.6 | 1.7 | 59% |
| Margin | 2.9 | 3.4 | 0.5 | 17% |
| Expense | (1.8) | (4.6) | (2.8) | -157% |
| Total Operating Profit | 1.1 | (1.2) | (2.3) | -213% |
| **Other (inc Eyewear)** | | | | |
| Revenue | 39.6 | 10.3 | (29.3) | -74% |
| Margin | 18.3 | 3.0 | (15.3) | -84% |
| Expense | (31.0) | (14.1) | 16.9 | 54% |
| Total Operating Profit | (12.7) | (11.1) | 1.6 | 12% |
| **Total Polaroid (exc. PCB)** | | | | |
| Revenue | 937.9 | 826.3 | (111.6) | -12% |
| Margin | 175.6 | 126.8 | (48.8) | -28% |
| Expense | (154.8) | (132.8) | 22.0 | 14% |
| Total Operating Profit | 20.8 | (5.9) | (26.7) | -128% |
| Mgn % | 18.7% | 15.4% | | |
| Exp % | -16.5% | -16.1% | | |

Company Confidential
6

Polaroid

# Polaroid Profit and Loss (statutory tie out)

($ Millions)

| | Nov, 2007 | | | Nov, QTD | | | Nov, 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| **Total Polaroid** | | | | | | | | | |
| Net Sales | 166.5 | 156.2 | 98.2 | 314.9 | 268.9 | 218.6 | 1,041.3 | 894.1 | 828.7 |
| Margin | 24.0 | 18.6 | 10.8 | 47.9 | 33.4 | 26.4 | 170.5 | 139.5 | 127.1 |
| Expenses (1) | (10.5) | (10.7) | (19.8) | (23.8) | (24.6) | (30.7) | (127.6) | (120.5) | (123.4) |
| **Total Operating Profit** | **13.5** | **7.9** | **(9.0)** | **24.2** | **8.8** | **(4.4)** | **42.9** | **19.0** | **3.7** |
| Mgn % | 14.5% | 11.9% | 11.0% | 15.2% | 12.4% | 12.1% | 16.4% | 15.6% | 15.3% |
| Exp % | -6.3% | -6.9% | -20.1% | -7.5% | -9.1% | -14.0% | -12.3% | -13.5% | -14.9% |
| POW Service Fee | (0.3) | (0.3) | (0.5) | (0.5) | (0.5) | (0.5) | (2.8) | (3.3) | (3.5) |
| Purchase Price Accounting | (0.3) | (0.3) | (0.8) | (1.7) | (1.6) | (1.7) | (9.6) | (9.2) | (9.2) |
| **Adjusted Operating Profit** | **12.4** | **6.8** | **(9.9)** | **21.9** | **6.7** | **(6.6)** | **30.6** | **6.5** | **(9.1)** |
| Restructure | (20.8) | (0.2) | (0.4) | (20.9) | (0.3) | (0.7) | (23.7) | (19.2) | (19.8) |
| Other Income / (Expense) | - | - | (1.3) | - | - | (3.7) | 0.4 | (5.5) | (8.2) |
| Gain / (Loss) on Asset Sales | - | - | - | - | - | - | 22.3 | 16.8 | 16.8 |
| Interest Income / (Expense) (1) | (2.6) | (3.3) | (3.5) | (5.8) | (7.1) | (7.9) | (30.3) | (34.7) | (35.3) |
| **Profit Before Tax** | **(11.0)** | **3.3** | **(15.1)** | **(4.8)** | **(0.7)** | **(18.8)** | **(0.7)** | **(36.1)** | **(56.6)** |
| Tax | (0.3) | (0.3) | (0.3) | (0.6) | (0.6) | (0.6) | (3.3) | (3.3) | (3.8) |
| **Profit After Tax** | **(11.3)** | **3.0** | **(15.4)** | **(5.4)** | **(1.3)** | **(19.4)** | **(4.0)** | **(39.4)** | **(60.4)** |

(1) Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results

Nov Performance.xls
12/6/2006

Company Confidential
7

Polaroid

Nov Performance.xls
Pol Balance Sheet

## Polaroid - Balance Sheet versus Plan

($ Millions)

| | Dec-06 Act | Q1 Plan | Q1 Actual | Q2 Plan | Q2 Actual | Q3 Plan | Q3 Actual | October Plan | October Actual | November Plan | November Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash & Securities | 21.4 | 22.0 | 15.3 | 22.0 | 14.6 | 22.0 | 10.6 | 22.0 | 12.3 | 22.0 | 9.8 |
| Receivables - Instant / Eyewear* | 64.6 | 26.1 | 34.4 | 27.3 | 32.9 | 26.0 | 30.5 | 21.2 | 37.1 | 22.1 | 36.0 |
| Receivables - PCE* | 190.4 | 116.7 | 85.6 | 145.8 | 112.8 | 154.7 | 101.3 | 169.5 | 123.2 | 226.4 | 170.3 |
| Receivables - New Business* | — | — | — | — | — | 7.2 | — | 12.0 | 18.0 | 18.0 | 18.0 |
| Intercompany Receivables | 62.1 | 61.8 | 32.4 | 61.8 | 28.1 | 61.8 | 25.5 | 61.8 | 27.5 | 61.8 | 38.1 |
| Related Party Receivables | 1.9 | 1.4 | 2.1 | 2.1 | 2.1 | 2.8 | 2.8 | 3.0 | 3.0 | 3.2 | 3.2 |
| Inventories - Instant / Eyewear* | 85.6 | 74.6 | 78.5 | 61.2 | 67.1 | 50.8 | 57.0 | 45.7 | 50.2 | 41.5 | 44.7 |
| Inventories - New Business* | — | — | 1.4 | 4.6 | 2.1 | 15.3 | 2.8 | 22.0 | 3.0 | 19.0 | 3.2 |
| Inventories - PCE* | 79.1 | 96.4 | 47.5 | 73.5 | 86.4 | 108.4 | 124.5 | 137.9 | 117.3 | 105.0 | 103.6 |
| Assets Held for Sale | — | — | 3.4 | — | 3.4 | — | 3.4 | — | 3.4 | — | 3.4 |
| Deferred Tax Assets | 3.4 | 9.5 | 11.0 | 9.5 | 10.0 | 9.5 | 9.8 | 9.5 | 9.5 | 9.5 | 9.4 |
| Prepaids - Inst / Eye Operations * | 17.8 | 9.2 | 8.9 | 7.7 | 6.3 | 10.2 | 7.4 | 9.7 | 9.5 | 9.4 | 9.4 |
| Prepaids - PCE * | 15.5 | 4.8 | 4.8 | 5.0 | 5.0 | 6.3 | 6.9 | 6.9 | 8.6 | 6.0 | 8.0 |
| Prepaid Taxes | 26.0 | 22.2 | 28.0 | 22.2 | 26.0 | 22.2 | 28.0 | 22.2 | 28.6 | 28.0 | 28.0 |
| Total Current Assets | 567.8 | 443.3 | 351.7 | 440.6 | 392.6 | 448.3 | 438.9 | 440.4 | 418.1 | 432.0 | 463.2 |
| Net Fixed Assets | 91.1 | 87.9 | 87.8 | 87.9 | 86.6 | 86.7 | 85.7 | 85.5 | 85.5 | 85.6 | 85.6 |
| Other Assets | 268.4 | 217.3 | 268.2 | 212.9 | 266.3 | 215.8 | 264.9 | 288.9 | 264.6 | 288.4 | 264.4 |
| Total Non-Current Assets | 359.4 | 305.2 | 356.0 | 300.8 | 352.9 | 302.5 | 350.6 | 395.2 | 350.1 | 384.0 | 349.9 |
| Total Assets | 927.2 | 748.4 | 707.7 | 741.4 | 745.5 | 750.8 | 749.5 | 835.6 | 768.3 | 844.4 | 803.1 |
| | | | | | | | | | | | |
| **Liabilities & Equity** | | | | | | | | | | | |
| Note Payable Related Party | 19.0 | 19.0 | 39.0 | 19.0 | 39.0 | 19.0 | 39.0 | 19.0 | 52.3 | 19.0 | 63.1 |
| Term Loan | 34.9 | — | — | — | — | — | — | — | — | — | — |
| Subord Term Loan (Petters) | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| Revolver | 95.3 | 62.3 | 13.6 | 71.4 | 33.8 | 77.5 | 41.0 | 80.3 | 34.7 | 86.2 | 66.2 |
| Total Debt | 274.2 | 206.3 | 177.5 | 215.4 | 197.7 | 221.5 | 205.0 | 224.3 | 226.1 | 230.2 | 255.0 |
| Trade Payables - Instant / Eyewear | 16.4 | 9.3 | 8.5 | 13.4 | 9.1 | 23.6 | 7.4 | 29.8 | 6.5 | 28.8 | 7.8 |
| Trade Payables - PCE | 111.0 | 79.4 | 45.1 | 74.5 | 89.5 | 111.7 | 94.8 | 149.1 | 101.3 | 142.5 | 97.3 |
| Total Payables | 127.4 | 88.7 | 53.6 | 87.9 | 98.6 | 135.3 | 102.2 | 178.9 | 107.8 | 171.3 | 105.1 |
| Accrued Liabilities | 74.7 | 62.3 | 58.8 | 62.7 | 58.1 | 63.9 | 63.7 | 63.7 | 61.4 | 64.2 | 62.5 |
| Total AP and Accruals | 202.1 | 151.0 | 112.4 | 150.6 | 156.7 | 199.2 | 174.5 | 242.6 | 189.2 | 236.5 | 167.6 |
| Comp & Ben - Operations * | 38.0 | 20.0 | 30.6 | 21.6 | 32.2 | 20.0 | 31.5 | 20.2 | 32.0 | 20.5 | 31.9 |
| Comp & Ben - Severance | 6.6 | 5.0 | 4.8 | 6.8 | 4.2 | 4.9 | 2.6 | 1.3 | 0.6 | 0.5 | 0.6 |
| Total Comp & Benefits | 44.6 | 25.0 | 35.4 | 28.4 | 36.4 | 24.9 | 32.1 | 21.5 | 32.6 | 21.0 | 32.5 |
| Intercompany Payable | 62.9 | 60.7 | 2.2 | 60.7 | 29.2 | 60.7 | 25.5 | 60.7 | 27.5 | 60.7 | 38.1 |
| Accrued Income Tax | 6.6 | 9.5 | 2.2 | 9.5 | 3.6 | 9.5 | 3.6 | 9.5 | 3.8 | 9.5 | 4.5 |
| Total Current Liabilities | 589.6 | 452.5 | 389.9 | 462.9 | 423.6 | 515.7 | 460.5 | 558.5 | 479.2 | 578.8 | 528.1 |
| Deferred Taxes | 97.3 | 106.4 | 97.5 | 106.4 | 97.3 | 106.4 | 97.3 | 106.4 | 97.3 | 106.4 | 97.3 |
| Post Employment - LT | 69.4 | — | 69.4 | — | 69.4 | — | 69.4 | — | 69.4 | — | 69.4 |
| Financing Obligation | — | — | — | — | — | — | — | 47.2 | 45.8 | 47.0 | 45.7 |
| Other Non-Current | 64.4 | 62.3 | 57.6 | 55.9 | 50.3 | 50.9 | 42.9 | — | — | — | — |
| Total Non-current Liabilities | 231.1 | 168.7 | 224.5 | 162.3 | 217.1 | 157.3 | 208.6 | 153.6 | 210.5 | 153.4 | 210.4 |
| Total Liabilities | 820.7 | 621.2 | 614.4 | 625.2 | 640.7 | 673.0 | 670.1 | 712.1 | 689.7 | 732.2 | 738.5 |
| Equity | 106.5 | 127.2 | 93.3 | 116.2 | 104.8 | 117.7 | 79.5 | 123.5 | 78.6 | 112.3 | 64.6 |
| Total Liabilities & Equity | 927.2 | 748.4 | 707.7 | 741.4 | 745.5 | 790.8 | 749.5 | 835.6 | 768.3 | 844.4 | 803.1 |
| | | | | | | | | | | | |
| * Working Capital (unadj, See note a) | 212.9 | 156.8 | 130.3 | 152.9 | 128.4 | 159.7 | 124.9 | 162.1 | 144.9 | 190.5 | 173.1 |
| Net Cash / (Debt) | (252.8) | (184.3) | (162.3) | (193.4) | (183.1) | (199.6) | (194.4) | (202.3) | (213.8) | (208.2) | (255.2) |

(a) Working capital defined as receivables, inventory, prepaid expenses minus accounts payable, accrued liabilities and comp & benefit liabilities from operations.

(b) Working capital defined as receivables, inventory, prepaid expenses minus accounts payable, accrued liabilities and comp & benefit liabilities from operations.

**Polaroid**

# Polaroid Net Change in Cash and Debt

($ Millions)

| | 2007 | | | | | | | | | | YTD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | | Q2 | | Q3 | | October | | November | | | |
| | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Act |
| Operating Profit | (1.7) | 8.3 | (0.8) | (7.4) | 11.6 | (0.4) | 9.2 | 3.3 | 12.4 | (9.9) | 30.7 | (6.1) |
| PPA | 2.1 | 2.0 | 2.0 | 2.0 | 2.0 | 1.8 | 0.6 | 0.6 | 0.7 | 0.6 | 7.5 | 7.1 |
| Depreciation | 1.0 | 1.4 | 1.0 | 1.4 | 1.0 | 1.4 | 0.4 | 0.3 | 0.3 | 0.4 | 3.5 | 5.0 |
| Capital Expenditures | - | (0.1) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | - | (0.1) |
| Free Cash Flow | 1.3 | 11.7 | 2.2 | (4.0) | 14.5 | 2.8 | 10.2 | 4.3 | 13.4 | (8.9) | 41.7 | 5.8 |
| Change in WC (adjusted) | 66.4 | 82.5 | 3.9 | 1.9 | 6.8 | 3.5 | (2.4) | (20.0) | (28.5) | (28.2) | 32.6 | 39.7 |
| Restructuring Payments | (2.1) | (2.2) | (0.4) | (1.9) | (1.3) | (0.8) | (3.7) | (0.4) | (0.2) | (0.6) | (7.6) | (5.8) |
| Asset Sales | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Expense | (7.4) | (8.9) | (7.6) | (6.9) | (7.6) | (8.0) | (3.0) | (4.4) | (2.4) | (3.5) | (28.1) | (31.7) |
| Other Income / (Expense) | 0.1 | (0.6) | 0.1 | (1.9) | 0.1 | (3.0) | 0.0 | 1.2 | 0.0 | 0.1 | 0.4 | (4.2) |
| Dividends | - | - | - | - | - | - | - | - | - | - | - | - |
| Stock Repurchase | - | - | - | - | - | - | - | - | - | - | - | - |
| Intercompany | - | 0.8 | - | 0.0 | - | (0.0) | - | (0.0) | - | (0.0) | - | 0.7 |
| Related Party | - | 0.1 | - | (0.7) | - | (0.7) | - | (0.2) | - | (0.3) | - | (1.7) |
| Pension | (8.3) | (7.9) | (3.3) | (2.6) | (3.3) | (0.5) | (3.3) | (0.2) | - | (0.2) | (18.2) | (11.4) |
| Cash Escrow / Restriction | - | 0.5 | - | (0.1) | - | (0.0) | - | - | - | (0.0) | 0.4 | 0.4 |
| Taxes | (0.5) | (0.9) | (0.5) | (0.9) | (0.5) | (0.9) | (0.2) | (0.3) | 12.1 | (0.3) | 10.6 | (3.3) |
| Proceeds from Waltham RE Transfer | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from other Monetization Events | 22.4 | 16.7 | - | 0.1 | - | - | - | - | - | - | 22.4 | 16.8 |
| All Other | (3.4) | (1.3) | - | (3.9) | (1.3) | (3.7) | (0.6) | 0.6 | (0.3) | 0.6 | (9.1) | (7.7) |
| Subtotal Other | 67.2 | 78.9 | (11.3) | (16.8) | (20.6) | (14.1) | (13.0) | (23.7) | (19.3) | (32.5) | 2.8 | (8.2) |
| Net Change in Cash and Debt | 68.5 | 90.6 | (9.1) | (20.8) | (6.1) | (11.3) | (2.8) | (19.4) | (6.0) | (41.4) | 44.5 | (2.4) |
| Net Change in Cash and Debt - Ops | 46.1 | 73.9 | (9.1) | (20.9) | (6.1) | (11.3) | (2.8) | (19.4) | (6.0) | (41.4) | 22.2 | (19.2) |
| Net Change in Cash and Debt - Monetization | 22.4 | 16.7 | - | 0.1 | - | - | - | - | - | - | 22.4 | 16.8 |

**Notes:**

Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results

2007 Monetization events: IP - $8.3m, Eyewear - $6.3m, PCB - $2.2m


Polaroid

# Polaroid - Working Capital versus Plan

($ Millions)

|  | Dec 06 Act | Q1 Plan | Q1 Actual | Q2 Plan | Q2 Actual | Q3 Plan | Q3 Actual | October Plan | October Actual | November Plan | November Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Receivables - Instant | 42.2 | 26.1 | 34.3 | 27.3 | 32.9 | 26.0 | 30.5 | 21.2 | 37.1 | 22.1 | 36.0 |
| Receivables - Eyewear | 22.4 | - | - | - | - | - | - | - | - | - | - |
| Receivables - PCE | 190.4 | 116.7 | 85.6 | 145.8 | 112.8 | 154.7 | 101.3 | 169.5 | 123.2 | 226.4 | 170.3 |
| Receivables - New Business |  |  |  |  |  | 7.2 | - | 12.0 | - | 18.0 | - |
| Inventories - Instant | 75.0 | 74.6 | 78.5 | 61.2 | 67.1 | 50.8 | 57.0 | 45.7 | 50.2 | 41.5 | 44.7 |
| Inventories - Eyewear | 10.6 | - | - | - | - | - | - | - | - | - | - |
| Inventories - Eyewear | - | - | - | - | - | - | - | - | - | - | - |
| Inventories - New Business |  |  |  | 4.6 |  | 15.3 |  | 22.0 |  | 19.0 |  |
| Inventories - PCE | 79.1 | 96.4 | 47.5 | 73.5 | 86.4 | 103.4 | 124.5 | 137.9 | 117.3 | 105.0 | 103.6 |
| Prepaid Expenses - Inst / Eye | 17.8 | 9.2 | 11.0 | 7.7 | 10.0 | 10.2 | 9.8 | 9.7 | 9.5 | 9.2 | 9.4 |
| Prepaid Expenses - PCE | 15.5 | 4.8 | 16.4 | 5.0 | 8.1 | 6.3 | 7.4 | 6.9 | 8.6 | 6.0 | 8.5 |
| Payables and Accruals |  |  |  |  |  |  |  |  |  |  |  |
| Trade Payables - Inst / Eye | 16.4 | 9.3 | 8.5 | 13.4 | 9.1 | 23.6 | 7.4 | 29.8 | 6.5 | 26.8 | 7.8 |
| Trade Payables - PCE | 111.0 | 79.4 | 45.1 | 74.5 | 89.5 | 111.7 | 94.8 | 149.1 | 101.3 | 145.2 | 97.3 |
| Other Payables/Accruals | 74.7 | 62.3 | 58.8 | 62.7 | 58.1 | 63.9 | 72.1 | 63.7 | 61.4 | 64.2 | 62.5 |
| Accrued Interest Exp | - | - | - | - | - | - | - | - | - | - | - |
| Total Accounts Payable | 202.1 | 151.0 | 112.4 | 150.6 | 156.7 | 199.2 | 174.3 | 242.6 | 169.2 | 236.2 | 167.6 |
| Comp & Ben - Ops | 38.0 | 20.0 | 30.6 | 21.6 | 32.2 | 20.0 | 31.5 | 20.2 | 32.0 | 20.5 | 31.9 |
| Tot Working Capital (a) | 212.9 | 156.8 | 130.2 | 152.9 | 128.4 | 159.7 | 124.9 | 162.1 | 144.9 | 190.5 | 173.1 |

(a) Working capital defined as receivables, inventory, prepaid expenses minus accounts payable, accrued liabilities and comp & benefit liabilities from operations.

Nov Performance.xls
Pol Working Capital


Polaroid

## Polaroid - Cash and Debt versus Plan

*($ Millions)*

| | Dec 06 | Q1 | | Q2 | | Sept/Q3 (2007) | | October | | November | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual |
| **Cash** | 21.4 | 22.0 | 15.3 | 22.0 | 14.6 | 22.0 | 10.6 | 22.0 | 12.3 | 22.0 | 9.8 |
| Note Payable - Related Party (1) | (19.0) | (19.0) | (39.0) | (19.0) | (39.0) | (19.0) | (39.0) | (19.0) | (52.3) | (19.0) | (63.1) |
| Term Loan - JP Morgan | (34.9) | - | - | - | - | - | - | - | - | - | - |
| Subordinated Term Loan (Petters Capital) (1) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (139.1) | (125.0) | (140.7) |
| Revolver Paydown / (Borrowing) | (95.3) | (62.3) | (13.5) | (71.4) | (33.7) | (77.5) | (41.0) | (80.3) | (34.7) | (86.2) | (61.3) |
| **Net (Debt)** | (274.2) | (206.3) | (177.5) | (215.4) | (197.7) | (221.5) | (205.0) | (224.3) | (226.1) | (230.2) | (265.0) |
| **Net Cash and (Debt)** | (252.8) | (184.3) | (162.3) | (193.4) | (183.1) | (199.5) | (194.4) | (202.3) | (213.8) | (208.2) | (255.2) |
| **Net Cash / (Debt) Changes:** | | | | | | | | | | | |
| Quarter 1 | | 68.5 | 90.6 | 68.5 | 90.6 | 68.5 | 90.6 | 68.5 | 90.6 | 68.5 | 90.6 |
| Quarter 2 | | | | (9.1) | (20.8) | (9.1) | (20.8) | (9.1) | (20.8) | (9.1) | (20.8) |
| Quarter 3 | | | | | | (6.1) | (11.3) | (6.1) | (11.3) | (6.1) | (11.3) |
| Quarter 4 | | | | | | | | (2.8) | (19.4) | (8.8) | (60.8) |
| Year to Date | | 68.5 | 90.6 | 59.4 | 69.7 | 53.4 | 58.4 | 50.5 | 39.0 | 44.6 | (2.4) |
| ***Memo Interest Expense:*** | | | | | | | | | | | |
| Monthly | | 3,047 | 3,445 | 2.6 | 2,873 | 2,577 | 3,130 | 6,204 | 4,358 | 1,144 | 3,533 |
| Year to Date | | 8,000 | 9,334 | 16.2 | 18,274 | 24,415 | 27,904 | 30,619 | 32,262 | 31,763 | 35,271 |



Company Confidential
11



## Polaroid - Debt Profile

*($ Millions)*

|  | Dec-06 Act | 2007 Q1 Plan | Q1 Actual | Q2 Plan | Q2 Actual | Q3 Plan | Q3 Actual | Oct Plan | Oct Actual | Nov Plan | Nov Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revolver** | | | | | | | | | | | |
| *Cumulative Paydown / (Borrowing) under Revolver* | (95.3) | (62.3) | (13.5) | (71.4) | (33.7) | (77.5) | (41.0) | (80.3) | (34.7) | (86.2) | (61.3) |
| Average Revolver Interest Rate (Libor + 2.25% or Prime + 1%) | 7.57% | 8.00% | 8.12% | 8.00% | 8.76% | 8.00% | 11.55% | 8.00% | 11.25% | 8.00% | 11.00% |
| **Term Loan (JP Morgan)** | | | | | | | | | | | |
| Paydown to date | 90.1 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| Outstanding Balance | (34.9) | - | - | - | - | - | - | - | - | - | - |
| Average Interest Rate (Libor + 7.0%) | 12.38% | | | | | | | | | | |
| **Subordinated Term Loan (Petters Capital, LLC)** | | | | | | | | | | | |
| Paydown | - | - | - | - | - | - | - | - | - | - | - |
| Outstanding Balance | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (125.0) | (139.1) | (125.0) | (140.7) |
| Interest Rate | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% |
| Note Payable - Related Party | (19.0) 24.00% | (19.0) 24.00% | (39.0) 19.00% | (19.0) 24.00% | (39.0) 19.00% | (19.0) 24.00% | (39.0) 19.00% | (19.0) 24.00% | (52.3) 19.00% | (19.0) 24.00% | (63.1) 19.00% |
| **Net Debt** | | | | | | | | | | | |
| Polaroid Cash (Balance Sheet Cash + Paydown of Revolver) | (73.9) | (40.3) | 1.7 | (49.4) | (19.1) | (55.5) | (30.4) | (58.3) | (22.4) | (84.2) | (51.4) |
| Net Cash / (Debt) (Term + Subordinated Debt + Related Party Note) | (252.8) | (184.3) | (162.3) | (193.4) | (183.1) | (199.5) | (194.4) | (202.3) | (213.8) | (208.2) | (255.2) |

## Polaroid Population

| | Dec 06 | Q1 | Q2 | July | August | September | October | Plan | Act |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **November** | |
| US Mfg Operations (Incl Flex Pkg) | 241 | 206 | 182 | 176 | 170 | 163 | 159 | 166 | 153 |
| Purchasing | 20 | 17 | 17 | 16 | 15 | 15 | 15 | 15 | 10 |
| Repair & Tech Support | - | - | - | - | - | - | - | - | - |
| RE & Security | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 8 | 10 |
| Total Operations - U.S. | 271 | 233 | 209 | 202 | 195 | 188 | 184 | 189 | 173 |
| Total Corp Mktg | 15 | 14 | 12 | 12 | 11 | 11 | 11 | 16 | 11 |
| Core Prod Development | - | - | - | - | - | - | - | - | - |
| Licensing | - | - | - | - | - | - | - | - | - |
| Total Mktg & Core Dvp-U.S. | 15 | 14 | 12 | 12 | 11 | 11 | 11 | 16 | 11 |
| Total Americas | 74 | 60 | 61 | 60 | 60 | 60 | 59 | 50 | 59 |
| Ensekde Mfg (NL) | 175 | 163 | 159 | 159 | 158 | 158 | 158 | 162 | 158 |
| Vale of Leven Mfg (UK) | 101 | 3 | - | - | - | - | - | - | - |
| Mexico Mfg | 88 | 83 | 82 | 81 | 74 | 74 | 72 | 72 | 68 |
| China Mfg | - | - | - | - | - | - | - | - | - |
| Hong Kong / Japan | 1 | 1 | - | - | - | - | - | 1 | - |
| Subtotal Int'l Mfg | 365 | 250 | 241 | 240 | 232 | 232 | 230 | 235 | 226 |
| Ensekde Logistics | 28 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Ensekde S&OP | - | - | - | - | - | - | - | - | - |
| Total Int'l Operations | 393 | 275 | 266 | 265 | 257 | 257 | 255 | 260 | 251 |
| Total Int'l Sales | 91 | 73 | 74 | 72 | 70 | 68 | 68 | 79 | 69 |
| Total Instant | 844 | 655 | 622 | 611 | 593 | 584 | 577 | 594 | 563 |
| Consumer Electronics - USA | 87 | 79 | 88 | 92 | 89 | 84 | 79 | 92 | 79 |
| Consumer Electronics - Shanghai | - | 24 | 24 | 26 | 26 | 27 | 28 | 27 | 28 |
| Total Consumer Electronics | 87 | 103 | 112 | 118 | 115 | 111 | 107 | 119 | 107 |
| Human Resources | 8 | 6 | 7 | 8 | 6 | 6 | 6 | 6 | 6 |
| Legal Operations | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Corp Finance | 25 | 41 | 40 | 40 | 40 | 39 | 36 | 30 | 37 |
| CRO & Comm | 5 | 9 | 7 | 5 | 5 | 5 | 5 | 11 | 5 |
| Information Technology | 73 | 76 | 77 | 77 | 73 | 66 | 65 | 68 | 65 |
| Total Shared Services | 118 | 139 | 138 | 137 | 131 | 123 | 119 | 122 | 120 |
| Total New Product/Bus Devel | 1 | 12 | 14 | 15 | 13 | 12 | 10 | 20 | 10 |
| Total | 1,103 | 909 | 886 | 881 | 852 | 830 | 813 | 855 | 800 |
| **Summary** | | | | | | | | | |
| Domestic | 557 | 525 | 510 | 506 | 487 | 466 | 450 | 477 | 440 |
| International | 546 | 384 | 376 | 375 | 365 | 364 | 363 | 378 | 360 |
| WW Total | 1,103 | 909 | 886 | 881 | 852 | 830 | 813 | 855 | 800 |

Note: Starting 2007, data includes Consumer Electronics employees. January has been adjusted to include Shanghai CE.
July actuals include 17 summer interns

Polaroid

# Consumer Electronics (CE)

Company Confidential
14



# CE  Operating Profit

($ Millions)

|  | | November | | | November QTD | | | November YTD | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| **Total Consumer Electronics** | | | | | | | | | |
| Net Sales | $ 131.4 | $ 137.9 | $ 79.0 | $ 235.2 | $ 231.1 | $ 175.7 | $ 784.6 | $ 666.2 | $ 595.5 |
| Margin | $ 15.5 | $ 11.6 | $ 2.5 | $ 28.6 | $ 19.0 | $ 8.6 | $ 85.7 | $ 45.4 | $ 28.3 |
| Expenses (1) | $ (4.9) | $ (4.5) | $ (17.7) | $ (11.3) | $ (11.2) | $ (22.2) | $ (57.9) | $ (51.9) | $ (62.2) |
| Total Operating Profit | $ 10.6 | $ 7.2 | $ (15.2) | $ 17.3 | $ 7.8 | $ (13.6) | $ 27.9 | $ (6.4) | $ (33.9) |
| | | | | | | | | | |
| Margin % | 11.8% | 8.4% | 3.2% | 12.2% | 8.2% | 4.9% | 10.9% | 6.8% | 4.7% |
| Exp % | -3.7% | -3.2% | -22.4% | -4.8% | -4.9% | -12.6% | -7.4% | -7.8% | -10.4% |

Notes:
(1) - November includes duplicate Target Coop accruals (approx $1.7m), corrected in Dec
Reflects A YTD shared services true up ~ $1.7m
Includes approx $8.7m of vendor settlements

Nov Performance.xls
1/8/2008

Polaroid

# CE - Operating Profit by Region

($ Millions)

| | November | | | November QTD | | | November YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| USA (1) | $ 9.4 | $ 7.0 | $ (10.7) | $ 16.7 | $ 7.3 | $ (6.9) | $ 36.2 | $ 6.9 | $ (10.9) |
| Mexico / LA | $ 2.3 | $ 1.7 | $ (0.5) | $ 3.6 | $ 2.9 | $ (0.8) | $ 7.9 | $ 2.9 | $ (1.8) |
| EMEA | $ 0.7 | $ 0.3 | $ (0.2) | $ 0.7 | $ 1.6 | $ (0.7) | $ 1.8 | $ 3.6 | $ (0.8) |
| Japan | $ 0.4 | $ 0.1 | $ 0.1 | $ 0.4 | $ 0.1 | $ (0.1) | $ 1.2 | $ (0.6) | $ (0.8) |
| Asia Pacific | $ 0.0 | $ (0.0) | $ (0.0) | $ 0.3 | $ (0.0) | $ (0.0) | $ 0.9 | $ (0.2) | $ 0.2 |
| Shared Services | $ (2.1) | $ (1.9) | $ (3.8) | $ (4.3) | $ (4.0) | $ (5.1) | $ (20.0) | $ (18.9) | $ (19.4) |
| Total - Consumer Electronics | $ 10.6 | $ 7.2 | $ (15.2) | $ 17.3 | $ 7.8 | $ (13.6) | $ 27.9 | $ (6.4) | $ (33.9) |

Polaroid

# CE - Operating Profit US/Int'l

($ Millions)

| | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Total US** | | | | | | | | | |
| Net Sales | $ 94.3 | $ 102.0 | $ 56.4 | $ 172.3 | $ 163.7 | $ 134.8 | $ 567.5 | $ 512.3 | $ 474.2 |
| Margin | $ 11.0 | $ 8.4 | $ 0.9 | $ 21.5 | $ 12.3 | $ 6.6 | $ 63.7 | $ 31.1 | $ 21.8 |
| Expenses | $ (1.6) | $ (1.4) | $ (11.6) | $ (4.9) | $ (5.0) | $ (13.5) | $ (27.5) | $ (24.2) | $ (32.6) |
| Total Operating Profit | $ 9.4 | $ 7.0 | $ (10.7) | $ 16.7 | $ 7.3 | $ (6.9) | $ 36.2 | $ 6.9 | $ (10.9) |
| *Mgn%* | *11.7%* | *8.2%* | *1.6%* | *12.5%* | *7.5%* | *4.9%* | *11.2%* | *6.1%* | *4.6%* |
| *Exp%* | *-1.7%* | *-1.4%* | *-20.5%* | *-2.8%* | *-3.0%* | *-10.0%* | *-4.8%* | *-4.7%* | *-6.9%* |
| **Total International** | | | | | | | | | |
| Net Sales | $ 37.2 | $ 35.9 | $ 22.6 | $ 62.9 | $ 67.4 | $ 40.9 | $ 217.0 | $ 153.9 | $ 121.3 |
| Margin | $ 4.5 | $ 3.3 | $ 1.6 | $ 7.0 | $ 6.7 | $ 2.0 | $ 22.1 | $ 14.3 | $ 6.5 |
| Expenses | $ (1.1) | $ (1.1) | $ (2.3) | $ (2.1) | $ (2.2) | $ (3.7) | $ (10.4) | $ (8.7) | $ (10.1) |
| Total Operating Profit | $ 3.3 | $ 2.1 | $ (0.7) | $ 4.9 | $ 4.5 | $ (1.7) | $ 11.7 | $ 5.6 | $ (3.6) |
| *Mgn%* | *12.1%* | *9.1%* | *7.1%* | *11.1%* | *10.0%* | *4.9%* | *10.2%* | *9.3%* | *5.4%* |
| *Exp%* | *-3.1%* | *-3.2%* | *-10.2%* | *-3.4%* | *-3.3%* | *-8.9%* | *-4.8%* | *-5.7%* | *-8.4%* |
| **Shared Services** | | | | | | | | | |
| Net Sales | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Margin | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Expenses | $ (2.1) | $ (1.9) | $ (3.8) | $ (4.3) | $ (4.0) | $ (5.1) | $ (20.0) | $ (18.9) | $ (19.4) |
| Total Operating Profit | $ (2.1) | $ (1.9) | $ (3.8) | $ (4.3) | $ (4.0) | $ (5.1) | $ (20.0) | $ (18.9) | $ (19.4) |
| **Total** | | | | | | | | | |
| Net Sales | $ 131.4 | $ 137.9 | $ 79.0 | $ 235.2 | $ 231.1 | $ 175.7 | $ 784.6 | $ 666.2 | $ 595.5 |
| Margin | $ 15.5 | $ 11.6 | $ 2.5 | $ 28.6 | $ 19.0 | $ 8.6 | $ 85.7 | $ 45.4 | $ 28.3 |
| Expenses | $ (4.9) | $ (4.5) | $ (17.7) | $ (11.3) | $ (11.2) | $ (22.2) | $ (57.9) | $ (51.9) | $ (62.2) |
| Total Operating Profit | $ 10.6 | $ 7.2 | $ (15.2) | $ 17.3 | $ 7.8 | $ (13.6) | $ 27.9 | $ (6.4) | $ (33.9) |

Nov Performance.xls
1/8/2008

Polaroid

# CE - Operating Profit by Int'l Region

($ Millions)

| | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Mexico / LA** | | | | | | | | | |
| Net Sales | $ 14.7 | $ 13.7 | $ 2.6 | $ 24.2 | $ 23.9 | $ 7.8 | $ 76.1 | $ 55.4 | $ 37.4 |
| Margin | $ 2.5 | $ 2.0 | $ (0.3) | $ 4.1 | $ 3.5 | $ (0.4) | $ 10.5 | $ 5.7 | $ 0.8 |
| Expenses | $ (0.3) | $ (0.3) | $ (0.2) | $ (0.5) | $ (0.6) | $ (0.4) | $ (2.6) | $ (2.8) | $ (2.6) |
| Total Operating Profit | $ 2.3 | $ 1.7 | $ (0.5) | $ 3.6 | $ 2.9 | $ (0.8) | $ 7.9 | $ 2.9 | $ (1.8) |
| Mgn% | 17.3% | 14.9% | -11.1% | 16.9% | 14.8% | -4.8% | 13.9% | 10.2% | 2.1% |
| Exp% | -1.8% | -2.1% | -8.7% | -2.2% | -2.4% | -5.7% | -3.5% | -5.1% | -6.9% |
| **EMEA** | | | | | | | | | |
| Net Sales | $ 17.6 | $ 18.0 | $ 17.8 | $ 28.9 | $ 36.7 | $ 30.5 | $ 97.6 | $ 83.0 | $ 72.9 |
| Margin | $ 1.4 | $ 1.0 | $ 1.7 | $ 2.0 | $ 2.8 | $ 2.2 | $ 7.7 | $ 7.9 | $ 5.2 |
| Expenses | $ (0.7) | $ (0.7) | $ (1.9) | $ (1.3) | $ (1.3) | $ (2.9) | $ (6.0) | $ (4.3) | $ (6.0) |
| Total Operating Profit | $ 0.7 | $ 0.3 | $ (0.2) | $ 0.7 | $ 1.6 | $ (0.7) | $ 1.8 | $ 3.6 | $ (0.8) |
| Mgn% | 7.9% | 5.4% | 9.3% | 6.8% | 7.7% | 7.1% | 7.9% | 9.5% | 7.1% |
| Exp% | -4.0% | -3.6% | -10.7% | -4.5% | -3.4% | -9.4% | -6.1% | -5.2% | -8.2% |
| **Japan** | | | | | | | | | |
| Net Sales | $ 4.3 | $ 3.3 | $ 1.2 | $ 6.7 | $ 5.4 | $ 1.4 | $ 28.7 | $ 12.4 | $ 8.1 |
| Margin | $ 0.5 | $ 0.2 | $ 0.2 | $ 0.7 | $ 0.3 | $ 0.2 | $ 2.4 | $ 0.5 | $ 0.3 |
| Expenses | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.2) | $ (0.2) | $ (0.2) | $ (1.3) | $ (1.1) | $ (1.1) |
| Total Operating Profit | $ 0.4 | $ 0.1 | $ 0.1 | $ 0.4 | $ 0.1 | $ (0.1) | $ 1.2 | $ (0.6) | $ (0.8) |
| Mgn% | 11.5% | 6.7% | 14.8% | 9.7% | 5.4% | 10.9% | 8.5% | 4.1% | 4.2% |
| Exp% | -2.9% | -4.1% | -10.3% | -3.4% | -4.4% | -17.7% | -4.5% | -9.1% | -14.0% |
| **Asia Pacific** | | | | | | | | | |
| Net Sales | $ 0.5 | $ 1.0 | $ 1.0 | $ 3.0 | $ 1.4 | $ 1.2 | $ 14.7 | $ 3.0 | $ 2.8 |
| Margin | $ 0.1 | $ 0.0 | $ 0.0 | $ 0.3 | $ 0.3 | $ 0.0 | $ 1.4 | $ 0.2 | $ 0.2 |
| Expenses | $ (0.1) | $ (0.1) | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.5) | $ (0.5) | $ (0.4) |
| Total Operating Profit | $ 0.0 | $ (0.0) | $ (0.0) | $ 0.3 | $ (0.0) | $ (0.0) | $ 0.9 | $ (0.2) | $ (0.2) |
| Mgn% | 12.6% | 4.3% | 11.3% | 11.3% | 5.5% | 3.5% | 9.3% | 8.2% | 7.5% |
| Exp% | -8.2% | -5.7% | -4.6% | -2.9% | -8.6% | -7.5% | -3.2% | -16.0% | -15.1% |
| **Total** | | | | | | | | | |
| Net Sales | $ 37.2 | $ 35.9 | $ 22.6 | $ 62.9 | $ 67.4 | $ 40.9 | $ 217.0 | $ 153.9 | $ 121.3 |
| Margin | $ 4.5 | $ 3.3 | $ 1.6 | $ 7.0 | $ 6.7 | $ 2.0 | $ 22.1 | $ 14.3 | $ 6.5 |
| Expenses | $ (1.1) | $ (1.1) | $ (2.3) | $ (2.1) | $ (2.2) | $ (3.7) | $ (10.4) | $ (8.7) | $ (10.1) |
| Total Operating Profit | $ 3.3 | $ 2.1 | $ (0.7) | $ 4.9 | $ 4.5 | $ (1.7) | $ 11.7 | $ 5.6 | $ (3.6) |
| **% of Net Sales:** | | | | | | | | | |
| Margin | 12.1% | 9.1% | 7.1% | 11.2% | 10.0% | 4.9% | 10.2% | 9.3% | 5.4% |
| Expense | -3.1% | -3.2% | -10.2% | -3.4% | -3.3% | -8.9% | -4.8% | -5.7% | -8.4% |
| Operating Profit | 9.0% | 5.9% | -3.1% | 7.8% | 6.7% | -4.1% | 5.4% | 3.6% | -3.0% |

Nov Performance.xls
1/8/2008

Polaroid

# CE - Gross Sales by Customer / Region

| ($ Millions) | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **CE - US Gross Sales** | | | | | | | | | |
| Wal-Mart | $ 58.7 | $ 88.4 | 41.2 | $ 119.4 | $ 133.2 | $ 96.6 | $ 439.1 | $ 426.2 | 380.6 |
| Target | $ 13.8 | $ 24.9 | 18.4 | $ 20.9 | $ 44.0 | $ 39.5 | $ 65.8 | $ 109.1 | 102.8 |
| Circuit City | $ 6.8 | $ 0.5 | 0.3 | $ 11.9 | $ 1.8 | $ 2.9 | $ 55.4 | $ 25.7 | 22.6 |
| K-Mart | $ 14.4 | $ 2.4 | 2.7 | $ 24.0 | $ 5.9 | $ 6.6 | $ 48.4 | $ 14.4 | 13.5 |
| Costco | $ 2.2 | $ 1.4 | - | $ 10.6 | $ 1.4 | - | $ 41.2 | $ 2.4 | - |
| Sears | $ 18.8 | $ 1.1 | 0.7 | $ 23.8 | $ 4.8 | $ 2.9 | $ 47.4 | $ 12.0 | 8.6 |
| Other | $ (1.8) | $ 2.4 | 7.1 | $ (4.4) | $ 3.5 | $ 14.5 | $ (19.4) | $ 21.6 | 38.0 |
| Total CE-US Gross Sales | $ 113.0 | $ 121.1 | 70.3 | $ 206.2 | $ 194.5 | $ 162.9 | $ 678.0 | $ 611.3 | 566.1 |
| CE-US Allowances / Returns | $ (18.7) | $ (19.1) | (13.9) | $ (33.9) | $ (30.8) | $ (28.1) | $ (110.5) | $ (99.0) | (91.9) |
| Total CE-US Net Sales | $ 94.3 | $ 102.0 | 56.4 | $ 172.3 | $ 163.7 | $ 134.8 | $ 567.5 | $ 512.3 | 474.2 |
| **CE - Int'l Gross Sales** | | | | | | | | | |
| CE-LA/Mexico | $ 16.2 | $ 15.2 | 3.0 | $ 26.7 | $ 26.5 | $ 9.1 | $ 84.1 | $ 63.5 | 43.7 |
| CE-EMEA | $ 18.5 | $ 19.7 | 19.5 | $ 30.4 | $ 40.3 | $ 33.9 | $ 103.5 | $ 90.6 | 81.9 |
| CE-Japan | $ 4.3 | $ 3.3 | 1.2 | $ 6.6 | $ 5.6 | $ 1.5 | $ 28.1 | $ 13.1 | 8.9 |
| CE-Asia | $ 0.5 | $ 1.0 | 1.0 | $ 3.0 | $ 1.4 | $ 1.2 | $ 14.8 | $ 3.0 | 2.8 |
| Total CE-Int'l Gross Sales | $ 39.5 | $ 39.2 | 24.7 | $ 66.8 | $ 73.8 | $ 45.6 | $ 230.4 | $ 170.2 | 137.3 |
| CE-Int'l Allowances / Returns | $ (2.4) | $ (3.3) | (2.1) | $ (3.9) | $ (6.4) | $ (4.7) | $ (13.4) | $ (16.3) | (16.1) |
| Total CE-Int'l Net Sales | $ 37.2 | $ 35.9 | 22.6 | $ 62.9 | $ 67.4 | $ 40.9 | $ 217.0 | $ 153.9 | 121.3 |
| **Total CE - Net Sales** | $ 131.4 | $ 137.9 | 79.0 | $ 235.2 | $ 231.1 | $ 175.7 | $ 784.6 | $ 666.2 | 595.5 |

# CE Current Month - Gross Sales to Operating Profit by Region

Nov 2007

($ Millions)

| | Total CE | | | CE US | | | CE Latin America/Mexico | | | CE EMEA | | | CE Japan | | | CE Asia | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| **Sales** | | | | | | | | | | | | | | | | | | |
| Net Invoice Sales | 152.6 | 160.3 | 95.0 | 113.6 | 121.1 | 70.3 | 16.2 | 15.2 | 3.0 | 18.5 | 16.7 | 19.5 | 4.3 | 3.3 | 1.2 | 0.5 | 1.0 | 1.0 |
| Returns | (14.9) | (15.4) | (7.7) | (13.0) | (14.3) | (9.7) | (0.4) | (1.5) | (0.1) | (0.6) | (0.9) | (0.8) | (0.1) | (0.2) | (0.0) | (0.0) | | |
| Allowances/Discounts | (0.4) | (7.0) | (8.2) | (5.1) | (4.0) | (7.2) | (1.1) | | (0.3) | (0.3) | (1.7) | (0.9) | 0.1 | 0.1 | 0.0 | (0.0) | | |
| Net Sales | 137.4 | 137.9 | 79.0 | 94.3 | 102.0 | 56.4 | 14.7 | 13.7 | 2.6 | 17.6 | 18.3 | 17.8 | 4.3 | 3.3 | 1.2 | 0.5 | 1.0 | 1.0 |
| **COGS** | | | | | | | | | | | | | | | | | | |
| World Wide Cost of Sales | (119.8) | (131.6) | (75.1) | (88.7) | (100.4) | (56.0) | (11.8) | (11.8) | (2.2) | (15.5) | (15.6) | (14.5) | (3.7) | (3.0) | (1.0) | (0.5) | (0.8) | (1.0) |
| Returns | 11.6 | 12.3 | 6.6 | 12.7 | 11.6 | 6.1 | 0.3 | 0.3 | 0.1 | 0.5 | 0.5 | 0.4 | 0.0 | 0.2 | 0.0 | 0.0 | | |
| Duties | (1.8) | (1.6) | (1.3) | (1.1) | (0.6) | (0.5) | (0.3) | (0.3) | | (0.3) | (1.1) | (1.2) | (0.0) | (0.2) | (0.0) | (0.0) | | |
| Freight In | (1.6) | (1.9) | (1.1) | (1.3) | (1.0) | (0.7) | (0.1) | (0.3) | | (0.3) | (0.9) | (0.8) | (0.0) | (0.0) | (0.0) | (0.0) | | |
| License Fees | (0.6) | (0.4) | (0.1) | (0.4) | (0.3) | (0.1) | (0.1) | (0.1) | | (0.0) | (0.0) | (0.3) | (0.1) | (0.1) | (0.0) | (0.0) | | |
| Warranty Service | (2.0) | (1.5) | (1.1) | (1.1) | (1.1) | (1.9) | (0.2) | (0.2) | | (0.6) | (0.6) | (0.2) | (0.1) | (0.1) | (0.0) | (0.0) | | |
| Freight Out | (0.3) | (2.5) | (0.4) | (0.9) | (0.4) | (0.1) | (0.2) | (0.2) | | (0.1) | (0.1) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | | |
| Fulfillment/Storage | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) | (0.4) | (0.1) | (0.1) | | (0.0) | (0.0) | (0.0) | (0.0) | | | | | |
| Other Cost of Goods Sold | (0.5) | (0.4) | (0.0) | (0.3) | (0.5) | (1.8) | (0.0) | | | (0.1) | (0.1) | (0.2) | (0.1) | (0.1) | (0.0) | (0.0) | | |
| COGS | (115.9) | (126.3) | (76.5) | (82.2) | (93.0) | (54.5) | (12.2) | (11.8) | (2.2) | (16.2) | (17.0) | (16.2) | (3.8) | (3.2) | (1.0) | (0.9) | (0.9) | (0.0) |
| **First Margin** | 32.7 | 34.3 | 16.8 | 24.3 | 25.7 | 15.9 | 4.7 | 3.8 | 0.8 | 3.0 | 4.1 | 5.3 | 0.6 | 0.4 | 0.2 | 0.0 | 0.0 | 0.0 |
| First Margin % of Gross Sales | 21.5% | 20.5% | 20.5% | 27.6% | 21.1% | 18.7% | 28.2% | 22.6% | 20.9% | 16.2% | 20.2% | 26.9% | 11.7% | 11.7% | 16.8% | 8.2% | 3.7% | 2.2% |
| **Gross Margin** | 18.5 | 11.6 | 2.5 | 11.0 | 8.4 | 0.9 | 2.5 | 2.0 | (0.3) | 1.4 | 1.0 | 1.7 | 0.5 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 |
| Gross Margin % of Gross Sales | 12.2% | 7.3% | 2.6% | 9.6% | 8.9% | 3.2% | 15.7% | 12.4% | -8.8% | 7.2% | 4.9% | 8.9% | 11.7% | 6.0% | 14.9% | 12.5% | 4.3% | 4.3% |
| **Operating Expenses:** | | | | | | | | | | | | | | | | | | |
| Total Operating Expenses | (2.8) | (2.5) | (13.9) | (1.6) | (1.4) | (11.6) | (0.3) | (0.3) | (0.2) | (0.7) | (0.7) | (1.9) | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.0) |
| Operating Profit by Region | 12.7 | 9.1 | (11.4) | 9.4 | 7.0 | (10.7) | 2.3 | 1.7 | (0.5) | 0.7 | 0.3 | (0.2) | 0.4 | 0.1 | 0.1 | 0.0 | (0.0) | (0.0) |
| Shared Services | (2.1) | (1.9) | (3.8) | (2.1) | (1.9) | (3.8) | | | | | | | | | | | | |
| **Total Operating Profit** | 10.5 | 7.2 | (15.2) | 7.3 | 5.0 | (14.5) | 2.3 | 1.7 | (0.5) | 0.7 | 0.3 | (0.2) | 0.4 | 0.1 | 0.1 | 0.0 | (0.0) | (0.0) |

CE - Current Month - Gross Sales to Operating Profit (% of Gross Invoice Sales)

NOV 2007

| ($ Millions) | Total CE | | | CE US | | | CE Latin America/Mexico | | | CE EMEA | | | CE Japan | | | CE Asia | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| **Sales** | | | | | | | | | | | | | | | | | | |
| Net Invoice Sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Returns | -9.6% | -9.0% | -8.1% | -12.0% | -11.9% | -9.5% | -2.0% | 0.0% | -4.4% | -3.4% | -4.8% | -1.5% | -1.0% | -4.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Allowances/Discounts | -4.2% | -4.4% | -8.7% | -4.0% | -4.0% | -10.2% | -8.6% | -10.7% | -9.3% | -3.5% | -3.5% | -4.6% | -2.9% | 2.5% | 3.8% | -0.9% | 0.0% | -0.9% |
| Net Sales | 86.2% | 86.6% | 83.2% | 84.0% | 84.2% | 80.2% | 90.0% | 90.0% | 86.3% | 96.5% | 91.6% | 91.9% | 101.8% | 97.5% | 101.0% | 100.0% | 100.0% | 99.1% |
| **DODS:** | | | | | | | | | | | | | | | | | | |
| World Wide Cost of Sales | -78.6% | -82.1% | -79.5% | -70.8% | -82.9% | -80.3% | -78.6% | -74.0% | -83.8% | -78.1% | -76.1% | -74.5% | -85.8% | -88.7% | -81.6% | -90.9% | -97.0% | -87.0% |
| Returns | 7.6% | 7.6% | 9.6% | 1.6% | 8.5% | 8.7% | 0.0% | 2.9% | 2.9% | 2.8% | 2.8% | 2.1% | 0.9% | 4.8% | 2.9% | 5.3% | 0.0% | 0.0% |
| Duties | -1.2% | -1.0% | -1.4% | -1.2% | -0.4% | -0.4% | -1.5% | -1.5% | -1.1% | -1.6% | -1.6% | -2.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Freight In | -1.1% | -1.2% | -0.9% | -1.2% | -1.3% | -0.9% | -1.6% | -1.6% | -1.1% | -1.2% | -1.3% | -1.9% | -0.7% | -2.4% | -1.1% | -0.1% | 0.0% | 0.0% |
| License Fees | -0.4% | -0.3% | -0.1% | -0.4% | -0.3% | -0.1% | 0.0% | 0.0% | -0.3% | 0.0% | -0.1% | -0.1% | -2.5% | -1.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Warranty Service | -1.3% | -1.0% | -2.6% | -1.0% | -0.8% | -2.0% | -1.3% | 0.0% | -18.8% | -2.9% | -2.5% | -1.3% | -5.0% | -4.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| Freight Out | -0.3% | -0.3% | -0.1% | -0.3% | -0.3% | -0.1% | -0.4% | 0.0% | -0.3% | -2.5% | -1.3% | 0.0% | -0.7% | -0.3% | -0.5% | -0.2% | 0.0% | -0.3% |
| Fulfillment/Storage | -0.4% | -0.4% | -0.5% | -0.5% | -0.5% | -0.5% | -0.5% | -1.7% | -0.6% | 0.0% | -0.5% | -0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% |
| Other Cost of Goods Sold | -0.2% | -0.2% | -0.4% | -0.3% | -0.5% | -0.5% | 0.0% | 0.0% | -0.5% | 0.0% | -0.1% | -1.1% | -0.7% | -0.5% | 0.7% | 0.0% | 0.0% | 3.2% |
| COGS | -76.0% | -76.8% | -80.1% | -73.7% | -77.2% | -74.0% | -74.4% | -76.5% | -45.9% | -87.5% | -86.5% | -83.0% | -91.0% | -91.0% | -86.5% | -85.7% | -44.9% | 3.0% |
| **First Margin** | 21.4% | 17.8% | 2.6% | 21.6% | 17.1% | 19.7% | 26.2% | 23.4% | 26.0% | 16.2% | 4.9% | 8.5% | 14.2% | 11.3% | 18.5% | 3.7% | 3.7% | 2.2% |
| First Margin % of Gross Sales | | | | | | | | | | | | | | | | | | |
| **Gross Margin** | 10.2% | 7.3% | 2.6% | 9.9% | 6.0% | 1.3% | 15.7% | 13.4% | -8.9% | 7.5% | 4.9% | 8.5% | 11.7% | 6.5% | 14.9% | 12.5% | 4.5% | 4.5% |
| Gross Margin % of Gross Sales | | | | | | | | | | | | | | | | | | |
| **Operating Expenses:** | | | | | | | | | | | | | | | | | | |
| Total Operating Expenses | -1.9% | -1.8% | -14.0% | -1.5% | -1.2% | -16.4% | -1.6% | -1.9% | -7.9% | -3.6% | -3.3% | -8.9% | -3.0% | 4.0% | -10.4% | -5.7% | -4.6% | |
| Operating Profit by Region | 8.4% | 5.7% | -12.0% | 8.3% | 5.6% | -15.2% | 11.5% | -17.6% | 0.0% | 3.6% | 1.5% | -1.2% | 8.7% | 2.9% | 4.6% | -1.4% | -1.4% | -0.4% |
| Shared Services | -1.4% | -1.7% | -4.0% | -1.0% | 0.0% | -6.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Profit** | 7.0% | 4.9% | -16.0% | 0.0% | 4.2% | -20.8% | 14.0% | 11.5% | -17.0% | 3.6% | 1.6% | 8.7% | 2.3% | 4.6% | -1.4% | -0.4% | | |

## CE - YTD Gross Sales to Operating Profit by Region

($ Millions)

Nov Preformance.xls
YtK Gross Sale to Gross Mgn YTD

| | | Total CE | | | CE US | | | CE Latin America/Mexico | | | CE EMEA | | | CE Japan | | | CE Asia | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| **Sales** | | | | | | | | | | | | | | | | | | | | |
| Net Invoice Sales | $ | 906.5 | 781.5 | 703.4 | 678.0 | 611.3 | 596.1 | 84.1 | 63.5 | 43.7 | 90.6 | 90.6 | 61.9 | 28.1 | 13.1 | 8.9 | 14.6 | 3.0 | 2.8 |
| Returns | $ | (86.9) | (81.0) | (73.8) | (80.5) | (73.5) | (64.7) | (2.2) | (2.0) | (2.7) | (4.0) | (4.6) | (3.5) | (0.2) | (0.3) | (0.8) | (0.1) | 0.0 | 0.0 |
| Allowances/Discounts | $ | (37.0) | (34.3) | (34.2) | (30.8) | (25.5) | (27.2) | (5.1) | (6.0) | (3.6) | (2.9) | (2.9) | (3.3) | 0.6 | 0.2 | 0.0 | 0.1 | 0.0 | 0.0 |
| Net Sales | $ | 784.6 | 666.2 | 595.5 | 567.6 | 512.3 | 474.2 | 76.7 | 55.4 | 37.4 | 97.6 | 83.0 | 72.0 | 12.4 | 12.4 | 8.1 | 14.7 | 3.0 | 2.8 |
| | | | | | | | | | | | | | | | | | | | | |
| **Gross Margin** | | | | | | | | | | | | | | | | | | | | |
| Work/ Work Cost of Sales | $ | (723.1) | (647.4) | (581.3) | (537.0) | (514.3) | (474.5) | (92.2) | (49.1) | (33.7) | (98.5) | (89.3) | (82.5) | (24.0) | (7.9) | (7.0) | (13.2) | (2.6) | (2.6) |
| Returns | $ | 69.1 | 83.6 | 82.1 | 63.9 | 63.3 | 65.7 | 1.6 | 1.6 | 2.1 | 3.3 | 2.6 | 3.4 | 0.2 | 0.9 | 0.9 | 0.0 | - | - |
| Duties | $ | (11.3) | (11.5) | (11.6) | (8.3) | (6.4) | (7.0) | (1.4) | (1.8) | (0.8) | (2.2) | (4.2) | (0.7) | (0.2) | (0.0) | (0.0) | (0.0) | - | 0.0 |
| Freight In | $ | (8.0) | (11.0) | (9.0) | (5.3) | (8.3) | (6.9) | (1.3) | (1.1) | (1.1) | (1.3) | (1.2) | (1.8) | (0.1) | (0.2) | (0.2) | (0.0) | - | 0.0 |
| License Fees | $ | (3.6) | (2.3) | (2.3) | (2.7) | (1.9) | (1.9) | (0.4) | (0.9) | (0.4) | (0.3) | (0.3) | (0.0) | (0.2) | (0.1) | (0.1) | (0.0) | - | (0.0) |
| Warranty Service | $ | (10.7) | (8.5) | (8.1) | (8.0) | (7.1) | (7.6) | (1.1) | (0.3) | (0.3) | (1.7) | (1.4) | (1.4) | (0.6) | (0.0) | (0.3) | (0.0) | - | (0.0) |
| Freight Out | $ | (2.1) | (3.1) | (3.0) | (2.0) | (2.5) | (2.3) | (0.3) | (0.3) | (0.4) | (2.7) | (0.0) | (0.3) | (0.1) | (0.0) | (0.0) | (0.0) | - | (0.0) |
| Fulfillment/Storage | $ | (3.7) | (3.8) | (2.4) | (3.3) | (3.1) | (1.8) | (0.4) | (0.4) | (0.2) | (0.3) | (0.3) | (0.3) | 0.1 | (0.1) | (0.1) | 0.1 | - | 0.0 |
| Other Cost of Goods Sold | $ | (3.5) | (1.7) | (1.6) | (1.7) | (1.2) | (1.5) | (0.2) | (0.2) | 0.2 | (0.5) | (0.5) | (0.2) | (0.8) | 0.2 | 0.1 | 0.1 | - | 0.1 |
| COGS | $ | (696.9) | (606.6) | (547.2) | (503.9) | (491.2) | (452.1) | (95.5) | (48.6) | (30.7) | (99.8) | (75.1) | (87.7) | (26.2) | (11.9) | (7.6) | (7.0) | (2.6) | (2.6) |
| | | | | | | | | | | | | | | | | | | | | |
| First Margin | $ | 166.4 | 154.1 | 122.2 | 141.0 | 97.0 | 97.6 | 21.9 | 14.4 | 16.0 | 17.8 | 21.3 | 19.4 | 3.3 | 1.2 | 0.9 | 1.5 | 0.2 | 0.2 |
| First Margin % Gross Sales | | 22.4% | 17.2% | 17.3% | 20.8% | 15.9% | 19.2% | 23.5% | 22.8% | 27.9% | 17.0% | 23.2% | 24.7% | 11.6% | 8.2% | 10.4% | 10.5% | 6.0% | 8.7% |
| | | | | | | | | | | | | | | | | | | | | |
| Gross Margin | $ | 55.7 | 46.4 | 28.3 | 63.7 | 34.1 | 21.8 | 10.5 | 5.7 | 0.8 | 7.7 | 7.9 | 5.2 | 0.5 | 0.5 | 0.3 | 1.4 | 0.2 | 0.2 |
| Gross Margin % of Gross Sales | | 8.4% | 5.8% | 4.0% | 8.4% | 5.1% | 3.8% | 12.5% | 8.5% | 1.5% | 7.9% | 8.7% | 6.5% | 8.7% | 3.9% | 3.8% | 8.7% | 6.4% | 7.6% |
| | | | | | | | | | | | | | | | | | | | | |
| **Operating Expenses:** | | | | | | | | | | | | | | | | | | | | |
| Total Operating Expenses | $ | (27.8) | (32.9) | (42.8) | (27.4) | (24.2) | (30.8) | (2.6) | (2.8) | (2.8) | (6.0) | (4.3) | (6.0) | (1.3) | (1.1) | (1.1) | (0.6) | (0.6) | (0.4) |
| | | | | | | | | | | | | | | | | | | | | |
| Operating Profit by Region | $ | 47.9 | 13.5 | (14.5) | 36.2 | 6.9 | (10.9) | 7.9 | 2.9 | 11.8 | 1.8 | 3.6 | (0.8) | (0.8) | (0.6) | (0.8) | 0.8 | (0.3) | (0.2) |
| | | | | | | | | | | | | | | | | | | | | |
| Shared Services | $ | (20.0) | (18.9) | (19.4) | (20.0) | (18.9) | (19.4) | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| **Total Operating Profit** | $ | 27.9 | (6.4) | (33.9) | 16.2 | (12.0) | (30.3) | 7.9 | 2.9 | 11.8 | 1.8 | 3.6 | (0.8) | (0.8) | (0.6) | (0.8) | 0.8 | (0.3) | (0.2) |

Nov Performance(a)
YTD Gross Sales to O/A YTD %

# CE - YTD Gross Sales to Operating Profit (% of Gross Invoice Sales)

NOV YTD 2007

$ Millions

| | Total CE | | | CE-US | | | CE Latin America/Invoice | | | CE EMEA | | | CE Japan | | | CE Asia | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PLAN | F/CST | ACTUAL | PLAN | F/CST | ACTUAL | PLAN | F/CST | ACTUAL | PLAN | F/CST | ACTUAL | PLAN | F/CST | ACTUAL | PLAN | F/CST | ACTUAL |
| **Sales:** | | | | | | | | | | | | | | | | | | |
| Mdl Invoice Sales | 906.5 | 781.5 | 705.4 | 678.0 | 613.3 | 586.1 | 84.1 | 63.5 | 42.7 | 103.5 | 90.6 | 81.9 | 28.1 | 13.1 | 8.9 | 14.8 | 3.0 | 2.6 |
| Returns | (89.5) | (81.0) | (73.8) | (68.0) | (73.0) | (69.4) | (2.2) | (2.0) | (2.7) | (4.0) | (4.6) | (5.5) | (0.2) | (0.3) | (0.6) | 0.0 | 0.0 | 0.0 |
| Allowances/Discounts | (27.0) | (34.0) | (34.2) | (36.5) | (26.5) | (27.2) | (5.7) | (6.1) | (3.6) | (2.0) | (2.9) | (3.5) | 0.8 | 0.0 | 0.1 | (0.1) | 0.0 | (0.0) |
| Net Sales | 764.6 | 666.2 | 599.5 | 567.5 | 512.3 | 476.2 | 76.1 | 55.4 | 37.4 | 97.6 | 72.9 | 72.9 | 28.7 | 12.4 | 8.1 | 14.7 | 3.0 | 2.6 |
| **COGS:** | | | | | | | | | | | | | | | | | | |
| World Wide Cost of Sales | (723.1) | (647.4) | (561.3) | (537.0) | (474.9) | (92.2) | (48.1) | (33.7) | (85.8) | (69.3) | (62.5) | (24.8) | (11.9) | (7.9) | (13.2) | (2.8) | | |
| Returns | 69.1 | 82.8 | 62.1 | 63.9 | 55.7 | 1.6 | 1.8 | 2.1 | 3.3 | 2.8 | 3.4 | 0.2 | 0.9 | 0.9 | 0.0 | | | |
| Duties | (11.0) | (11.1) | (11.1) | (8.3) | (7.5) | (1.4) | (0.5) | (0.3) | (2.2) | (4.2) | (3.7) | (0.2) | (0.0) | (0.0) | (0.0) | | | |
| Freight In | (8.1) | (8.9) | (8.5) | (6.7) | (6.0) | (1.2) | (0.6) | (0.5) | (1.3) | (1.5) | (1.5) | (0.1) | (0.2) | (0.0) | (0.0) | | | |
| License Fees | (3.8) | (2.3) | (2.3) | (2.7) | (1.9) | (0.4) | (0.1) | (0.2) | (1.3) | (0.0) | (0.1) | (0.2) | (0.2) | (0.1) | (0.0) | | | |
| Warranty Service | (10.7) | (8.5) | (10.0) | (6.6) | (7.6) | (1.9) | (0.5) | (1.0) | (2.7) | (1.7) | (1.4) | (0.8) | (0.4) | (0.3) | (0.0) | | | |
| Freight Out | (6.5) | (2.0) | (2.0) | (2.3) | (1.9) | (0.1) | (0.5) | (0.0) | (0.3) | (0.0) | (0.0) | (0.0) | (0.3) | 0.0 | (0.0) | | | |
| Fulfillment/Storage | (3.7) | (3.1) | (2.4) | (3.1) | (1.8) | (0.4) | (0.2) | (0.3) | (0.6) | (0.5) | (0.6) | (0.5) | (0.1) | (0.1) | (0.1) | | | |
| Other Cost of Goods Sold | (3.0) | (3.6) | (6.0) | (1.2) | (2.6) | (0.2) | (0.2) | (0.3) | (0.1) | (0.0) | (0.0) | (0.5) | (0.0) | (0.1) | (0.0) | | | |
| COGS | (1.7) | (1.7) | | | | | | | (1.5) | (0.3) | | | | | (2.6) | | | |
| **Total Cost of Goods Sold** | (698.0) | (603.9) | (547.2) | (503.0) | (462.4) | (91.6) | (49.9) | (36.7) | (89.8) | (75.1) | (67.2) | (26.2) | (11.9) | (7.8) | (13.3) | (2.6) | | |
| **Gross Margin** | 164.4 | 134.1 | 152.2 | 545.0 | 97.0 | 21.9 | 14.4 | 10.0 | 17.6 | 21.3 | 19.4 | 3.3 | 1.2 | 0.0 | 1.5 | 0.2 | 0.2 | |
| Gross Margin % of Gross Sales | 20.1% | 17.2% | 17.2% | 20.0% | 16.2% | 21.0% | 22.6% | 22.2% | 17.2% | 23.5% | 22.7% | 11.6% | 9.2% | 10.6% | 9.2% | 4.6% | 8.7% | |
| **Operating Expenses:** | | | | | | | | | | | | | | | | | | |
| Total Operating Expenses | (37.6) | (22.9) | (42.8) | (27.5) | (24.2) | (32.6) | (2.6) | (2.6) | (0.0) | (4.3) | (6.0) | (1.3) | (1.1) | (1.1) | (0.5) | (0.5) | (0.4) | |
| Operating Profit by Region | 47.9 | 12.5 | 12.9 | 34.2 | 6.9 | (10.9) | 2.9 | 2.9 | 1.8 | 1.8 | 3.6 | 1.2 | (0.0) | (0.0) | 6.9 | (0.5) | (0.2) | (0.4) |
| Shared Services | (20.0) | (18.0) | (19.4) | (20.0) | (18.9) | (19.4) | | | | | | | | | | | | |
| **Total Operating Profit** | 27.9 | (6.4) | (6.5) | 14.2 | (12.0) | (30.3) | 7.9 | 2.9 | (1.0) | 1.8 | 1.8 | 3.6 | 1.2 | (0.6) | 1.4 | 0.2 | 0.2 | (0.2) |

## CE - Operating Expenses

| ($ Millions) | November | | | November QTD | | | November YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| USA - ACP (1) | (0.2) | (0.7) | (3.8) | (1.5) | (3.2) | (4.0) | (11.1) | (9.7) | (9.6) |
| USA - SGA | (0.5) | - | (1.2) | (1.1) | - | (2.4) | (5.3) | (2.7) | (6.2) |
| Total USA Marketing | (0.7) | (0.7) | (5.0) | (2.6) | (3.2) | (6.3) | (16.4) | (12.4) | (15.9) |
| International - ACP | (0.4) | (0.2) | (0.4) | (0.6) | (0.3) | (0.6) | (2.2) | (0.6) | (0.7) |
| International - SGA | (0.8) | (0.9) | (0.7) | (1.6) | (1.8) | (1.9) | (8.1) | (7.9) | (8.2) |
| Total International Marketing | (1.1) | (1.1) | (1.1) | (2.1) | (2.1) | (2.4) | (10.3) | (8.4) | (8.8) |
| CEO | (1.0) | (1.0) | (2.8) | (1.9) | (2.0) | (3.1) | (6.2) | (5.4) | (5.7) |
| Legal | (0.2) | (0.1) | (0.1) | (0.4) | (0.2) | (0.1) | (1.8) | (1.5) | (1.4) |
| Corporate Finance | (0.6) | (0.6) | (0.6) | (1.3) | (1.3) | (1.2) | (7.3) | (7.2) | (7.2) |
| Corporate IT | (0.4) | (0.4) | (0.4) | (0.8) | (0.8) | (0.8) | (4.3) | (4.3) | (4.3) |
| Corporate HR | (0.0) | (0.0) | (0.0) | (0.1) | (0.1) | (0.1) | (0.4) | (0.4) | (0.4) |
| Total Shared Service (2) | (2.2) | (2.1) | (3.8) | (4.4) | (4.3) | (5.2) | (20.0) | (18.7) | (19.0) |
| Corporate | 0.0 | 0.2 | 0.0 | 0.1 | 0.3 | 0.1 | (0.0) | (0.2) | (0.5) |
| Sales & Operations | (0.8) | (0.6) | 1.0 | (1.9) | (1.5) | (0.5) | (3.2) | (9.5) | (8.0) |
| Regional Logistics | (0.0) | (0.1) | (0.0) | (0.0) | (0.1) | (0.0) | (0.1) | (0.6) | (0.5) |
| Vendor Settlement (3) | - | - | (8.8) | - | - | (8.8) | - | - | (8.8) |
| Profit Sharing | (0.2) | (0.1) | - | (0.4) | (0.3) | 1.0 | (1.8) | (1.9) | (0.6) |
| DAC | - | - | (0.0) | - | - | (0.0) | - | (0.1) | (0.1) |
| Total CE - Operating Expenses | (4.9) | (4.5) | (17.7) | (11.3) | (11.2) | (22.2) | (57.9) | (51.8) | (62.1) |
| *Back-up to Corporate* | | | | | | | | | |
| Communications | - | - | - | - | - | - | - | - | - |
| Fringe | 0.0 | 0.2 | 0.0 | (0.0) | - | (0.1) | (0.0) | (0.4) | (0.4) |
| Payroll Accrual | - | 0.2 | 0.0 | 0.2 | 0.3 | 0.2 | - | 0.2 | (0.0) |
| Corporate | 0.0 | 0.2 | 0.0 | 0.1 | 0.3 | 0.1 | (0.0) | (0.2) | (0.5) |

Notes:
(1) November includes duplicate Target Coop accrual (approx $1.7m), corrected in Dec
(2) Reflects A YTD true up - $1.7m
(3) Sterlite $.9, Warifold $1.7, Proview $3.0, Europe - $1.2; Flextronics -$1.5, Service Craft - $.4

New Performance.xls
CEopEX

Polaroid

Nov Performance.xls
CE Mgt WC-2006vs Plan

# CE - Working Capital versus Plan

*($ Millions)*

| | Dec 06 Act | 2007 Q1 Plan | Q1 Actual | Q2 Plan | Q2 Actual | Q3 Plan | Q3 Actual | October Plan | October Actual | November Plan | November Actual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Receivables | 190.4 | 116.7 | 85.6 | 145.8 | 112.8 | 154.7 | 101.3 | 169.5 | 123.2 | 226.4 | 170.3 |
| DSO (layered consumption) | 72 | 73 | 63 | 61 | 64 | 65 | 61 | 59 | 62 | 60 | 61 |
| Inventories | 79.1 | 96.4 | 47.5 | 73.5 | 86.4 | 108.4 | 124.5 | 137.9 | 117.3 | 105.0 | 103.6 |
| Prepaid Expenses | 15.5 | 4.8 | 16.4 | 5.0 | 8.1 | 6.3 | 7.4 | 6.9 | 8.6 | 6.0 | 8.5 |
| Payables and Accruals | | | | | | | | | | | |
| Trade Payables | 111.0 | 79.4 | 45.1 | 74.5 | 89.5 | 111.7 | 94.8 | 149.1 | 101.3 | 145.2 | 97.3 |
| Other Payables/Accruals | 26.6 | 23.9 | 22.5 | 25.7 | 15.9 | 27.7 | 17.0 | 29.4 | 15.4 | 29.8 | 17.1 |
| Accrued Interest Exp | - | - | - | - | - | - | - | - | - | - | - |
| Total Accounts Payable | 137.6 | 103.3 | 67.6 | 100.2 | 105.4 | 139.4 | 111.8 | 178.5 | 116.7 | 175.0 | 114.4 |
| Comp & Ben. - Ops | 7.1 | - | 3.7 | - | 4.0 | - | 3.6 | - | 3.0 | - | 3.1 |
| Tot Working Capital (a) | 140.3 | 114.6 | 78.1 | 124.1 | 97.9 | 130.0 | 117.8 | 135.8 | 129.4 | 162.5 | 165.0 |

(a) Working capital defined as receivables, inventory, prepaid expenses minus accounts payable, accrued liabilities and comp & benefit liabilities from operations.

**Polaroid**

Nov Performance.xls
1/8/2008

# Instant (includes Monetization)

Company Confidential
26

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

# Instant - Operating Profit (inc monetization)

($ Millions)

| | November | | | November QTD | | | November YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| Instant (includes monetization) | | | | | | | | | |
| Revenue | $ 16.0 | $ 17.9 | $ 18.2 | $ 34.4 | $ 36.8 | $ 41.2 | $ 185.6 | $ 211.4 | $ 216.0 |
| Margin | $ 6.9 | $ 6.9 | $ 7.7 | $ 15.2 | $ 14.2 | $ 16.8 | $ 74.1 | $ 88.2 | $ 92.2 |
| Expenses | $ (4.7) | $ (4.5) | $ (3.2) | $ (10.5) | $ (9.9) | $ (7.5) | $ (58.1) | $ (54.7) | $ (51.9) |
| Total Operating Profit | $ 2.2 | $ 2.4 | $ 4.5 | $ 4.6 | $ 4.4 | $ 9.3 | $ 16.0 | $ 33.5 | $ 40.4 |
| Mgn% | 43.1% | 38.6% | 42.2% | 44.0% | 38.6% | 40.8% | 39.9% | 41.7% | 42.7% |
| Exp% | -29.5% | -25.4% | -17.8% | -30.6% | -26.8% | -18.2% | -31.3% | -25.9% | -24.0% |

Company Confidential
27

Polaroid

# Instant - Operating Profit

($ Millions)

**Instant**

| | | PLAN | | November FCST | | ACTUAL | | PLAN | | November QTD FCST | | ACTUAL | | PLAN | | November YTD FCST | | ACTUAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 16.0 | $ | 17.9 | $ | 18.2 | $ | 34.4 | $ | 36.8 | $ | 41.2 | $ | 185.6 | $ | 211.4 | $ | 216.0 |
| Margin | $ | 7.1 | $ | 7.0 | $ | 7.8 | $ | 15.7 | $ | 14.4 | $ | 17.0 | $ | 76.7 | $ | 89.8 | $ | 93.8 |
| Expenses | $ | (4.2) | $ | (3.5) | $ | (2.7) | $ | (9.8) | $ | (8.3) | $ | (6.3) | $ | (52.4) | $ | (48.7) | $ | (46.2) |
| Total Operating Profit | $ | 2.9 | $ | 3.5 | $ | 5.1 | $ | 6.0 | $ | 6.1 | $ | 10.7 | $ | 24.3 | $ | 41.1 | $ | 47.6 |

**% of Net Sales:**

| | PLAN | November FCST | ACTUAL | PLAN | November QTD FCST | ACTUAL | PLAN | November YTD FCST | ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| *Margin* | 44.5% | 39.2% | 42.7% | 45.6% | 39.2% | 41.3% | 41.4% | 42.5% | 43.4% |
| *Expense* | -26.5% | -19.8% | -14.8% | -28.3% | -22.6% | -15.3% | -28.2% | -23.0% | -21.4% |
| *Operating Profit* | 18.1% | 19.4% | 27.8% | 17.3% | 16.6% | 26.0% | 13.1% | 19.5% | 22.0% |

# Instant Film Revenue

| ($ Millions) | November | | | November QTD | | | November YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL | PLAN | FCST | ACTUAL |
| **Americas** | | | | | | | | | |
| US - Instant | $ 9.1 | $ 10.8 | $ 11.1 | $ 21.0 | $ 23.0 | $ 24.3 | $ 98.1 | $ 117.0 | $ 118.6 |
| Canada | 0.2 | 0.3 | 0.3 | 0.5 | 0.5 | 0.6 | 3.0 | 3.6 | 3.9 |
| Latin America | 0.9 | 0.3 | 0.5 | 1.8 | 0.6 | 1.2 | 10.8 | 8.7 | 9.9 |
| Total | $ 10.2 | $ 11.4 | $ 11.8 | $ 23.3 | $ 24.1 | $ 26.1 | $ 111.9 | $ 129.3 | $ 132.4 |
| **International** | | | | | | | | | |
| Europe | $ 2.9 | $ 2.9 | $ 2.7 | $ 5.2 | $ 5.9 | $ 7.4 | $ 36.2 | $ 39.7 | 40.9 |
| Japan | 1.5 | 1.4 | 1.7 | 2.9 | 2.9 | 3.5 | 17.7 | 19.1 | 20.2 |
| Asia | 0.5 | 1.0 | 0.9 | 1.1 | 1.4 | 1.7 | 8.3 | 11.7 | 12.2 |
| Total | $ 4.9 | $ 5.2 | $ 5.3 | $ 9.2 | $ 10.2 | $ 12.6 | $ 62.1 | $ 70.5 | 73.3 |
| **Total Regions** | $ 15.1 | $ 16.6 | $ 17.1 | $ 32.5 | $ 34.3 | $ 38.7 | $ 174.1 | $ 199.9 | 205.8 |
| **Other** | | | | | | | | | |
| Comm ID | $ 0.3 | $ 0.3 | $ 0.2 | $ 0.6 | $ 0.6 | $ 0.4 | $ 3.3 | $ 2.5 | 2.2 |
| Contract Mfg | 0.6 | 0.4 | 0.4 | 1.2 | 0.8 | 1.0 | 5.5 | 4.6 | 4.9 |
| Other | (0.1) | — | 0.0 | (0.2) | — | 0.0 | 2.1 | 0.7 | 0.1 |
| Total Other | $ 0.8 | $ 0.7 | $ 0.6 | $ 1.6 | $ 1.4 | $ 1.5 | $ 10.9 | $ 7.8 | 7.2 |
| FX - Marketing | 0.1 | 0.6 | 0.5 | 0.3 | 1.2 | 1.0 | 0.6 | 3.7 | 3.1 |
| **Total Instant** | $ 16.0 | $ 17.9 | $ 18.2 | $ 34.4 | $ 36.8 | $ 41.2 | $ 185.6 | $ 211.4 | 216.0 |

Nov Performance.xls
1/8/2008

Company Confidential
29

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

# Instant Film Margin

| ($ Millions) | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Americas** | | | | | | | | | |
| US - Instant | $ 4.7 | $ 5.6 | $ 6.0 | $ 10.8 | $ 11.7 | $ 12.8 | $ 49.6 | $ 59.5 | $ 61.1 |
| Canada | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.4 | $ 1.7 | $ 2.1 | $ 2.3 |
| Latin America | $ 0.3 | $ 0.1 | $ 0.2 | $ 0.6 | $ 0.2 | $ 0.5 | $ 3.5 | $ 3.1 | $ 3.7 |
| Total | $ 5.1 | $ 5.9 | $ 6.4 | $ 11.7 | $ 12.2 | $ 13.6 | $ 54.9 | $ 64.7 | $ 67.1 |
| **International** | | | | | | | | | |
| Europe | $ 1.5 | $ 1.5 | $ 1.7 | $ 2.7 | $ 3.0 | $ 4.3 | $ 18.0 | $ 21.4 | $ 22.3 |
| Japan | $ 0.8 | $ 0.8 | $ 1.1 | $ 1.6 | $ 1.6 | $ 2.2 | $ 10.0 | $ 11.0 | $ 12.0 |
| Asia | $ 0.2 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.8 | $ 0.9 | $ 3.3 | $ 5.1 | $ 5.5 |
| Total | $ 2.5 | $ 2.8 | $ 3.4 | $ 4.7 | $ 5.4 | $ 7.4 | $ 31.2 | $ 37.5 | $ 39.8 |
| **Total Regions** | $ 7.6 | $ 8.7 | $ 9.7 | $ 16.4 | $ 17.6 | $ 21.0 | $ 86.1 | $ 102.2 | $ 106.9 |
| Margin % | 50% | 52% | 57% | 50% | 51% | 54% | 49% | 51% | 52% |
| **Manufacturing** | $ (0.8) | $ (1.5) | $ (1.2) | $ (1.3) | $ (2.7) | $ (2.6) | $ (13.5) | $ (14.9) | $ (14.2) |
| **Other** | | | | | | | | | |
| Comm ID | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.1 | $ 1.1 | $ 0.7 | $ 0.6 |
| Contract Mfg | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.4 | $ 0.2 | $ 0.3 | $ 1.6 | $ 1.4 | $ 1.5 |
| Other | $ (0.1) | $ - | $ 0.0 | $ (0.2) | $ 0.0 | $ 0.0 | $ 0.8 | $ 0.4 | $ 0.1 |
| Total Other | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.4 | $ 0.4 | $ 0.5 | $ 3.5 | $ 2.5 | $ 2.2 |
| FX - Marketing | $ 0.1 | $ 0.4 | $ 0.5 | $ 0.3 | $ 0.7 | $ 1.0 | $ 0.6 | $ 2.9 | $ 3.1 |
| FX - Manufacturing | $ - | $ (0.8) | $ (1.4) | $ - | $ (1.7) | $ (2.8) | $ - | $ (2.9) | $ (4.2) |
| **Total Instant** | $ 7.1 | $ 7.0 | $ 7.8 | $ 15.7 | $ 14.4 | $ 17.0 | $ 76.7 | $ 89.8 | $ 93.8 |
| Margin % | 45% | 39% | 43% | 46% | 39% | 41% | 41% | 42% | 43% |
| **Manufacturing Details** | | | | | | | | | |
| Volume Variance | $ 0.1 | $ (0.2) | $ 0.0 | $ - | $ (0.3) | $ 0.0 | $ - | $ 1.6 | $ 2.3 |
| Spending Variance | $ 0.1 | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.4 | $ 1.5 | $ 1.3 | $ 1.2 |
| Inventory Reval | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (0.1) | $ (0.1) |
| Inventory Write Offs / Obsol. | $ 0.1 | $ (0.1) | $ (0.1) | $ 0.1 | $ (0.1) | $ (0.0) | $ (2.2) | $ (1.1) | $ (1.1) |
| All Other Variances | $ (1.0) | $ (1.4) | $ (1.3) | $ (1.6) | $ (2.6) | $ (3.0) | $ (12.8) | $ (16.5) | $ (16.5) |
| Total Manufacturing (before Exchange) | $ (0.8) | $ (1.5) | $ (1.2) | $ (1.3) | $ (2.7) | $ (2.6) | $ (13.5) | $ (14.9) | $ (14.2) |
| **Total Instant Margin @ERR** | $ 7.1 | $ 7.0 | $ 7.8 | $ 15.7 | $ 14.4 | $ 17.0 | $ 76.7 | $ 89.8 | $ 93.8 |

# Instant - Non-Standard Mfg/Procurement Cost

($ Millions)

|  | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Manufacturing & Procurement** | | | | | | | | | |
| Volume Variance | - | (0.2) | 0.0 | - | (0.3) | 0.0 | - | 1.6 | 2.3 |
| Spending Variance | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 1.5 | 1.3 | 1.2 |
| Yield Variance | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | 0.0 | 0.7 | 0.4 | 0.2 |
| Substitution Variance | (0.1) | - | 0.0 | (0.2) | (0.1) | 0.0 | (1.1) | (0.0) | (0.0) |
| PPV | (0.1) | (0.1) | (0.1) | (0.0) | (0.1) | (0.2) | 0.3 | 1.2 | 1.1 |
| Period Costs | (0.7) | (1.4) | (1.3) | (1.2) | (2.6) | (2.7) | (14.9) | (18.0) | (18.0) |
| Mfg Development | - | - | - | - | - | - | - | - | - |
| Total Incurred | (0.8) | (1.5) | (1.1) | (1.3) | (2.7) | (2.4) | (13.5) | (13.6) | (13.2) |
| Operational Deferrals | - | 0.0 | (0.0) | - | 0.0 | (0.0) | - | 0.1 | (0.1) |
| Sourcing | - | - | - | - | - | - | - | - | - |
| Revaluations | - | - | - | - | - | - | - | (0.1) | (0.1) |
| Total Accounting | - | 0.0 | (0.0) | - | 0.0 | (0.0) | - | (0.1) | (0.2) |
| Total Mfg & Procure before FX | (0.8) | (1.5) | (1.2) | (1.3) | (2.7) | (2.4) | (13.5) | (13.7) | (13.4) |
| Corporate Non-Standard | - | - | (0.0) | - | - | (0.2) | - | (1.2) | (0.8) |
| Total Non Std before FX | (0.8) | (1.5) | (1.2) | (1.3) | (2.7) | (2.6) | (13.5) | (14.9) | (14.2) |
| Manufacturing Exchange | - | (0.8) | (1.4) | - | (1.7) | (2.8) | - | (2.9) | (4.2) |
| Total Non Std after FX | (0.8) | (2.3) | (2.6) | (1.3) | (4.3) | (5.4) | (13.5) | (17.8) | (18.4) |
| **Period Cost Detail** | | | | | | | | | |
| Freight | - | (0.3) | (0.3) | - | (0.7) | (0.9) | - | (3.8) | (4.0) |
| Inventory Write Offs / Obsol | 0.1 | (0.1) | (0.1) | 0.1 | (0.1) | (0.0) | (2.2) | (1.1) | (1.1) |
| Underutilization | (0.6) | (0.6) | (0.6) | (1.0) | (1.0) | (1.0) | (9.6) | (9.6) | (9.6) |
| Auxiliary / Spending | (0.2) | (0.4) | (0.3) | (0.3) | (0.7) | (0.7) | (3.1) | (3.5) | (3.3) |
| Total Period Costs | (0.7) | (1.4) | (1.3) | (1.2) | (2.6) | (2.7) | (14.9) | (18.0) | (18.0) |

Nov Performance.xls
1/8/2008


Polaroid

## Instant - Operating Expenses

($ Millions)

| | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| Americas-ACP | $ (0.1) | $ (0.0) | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.0) | $ (0.4) | $ (0.4) | $ (0.3) |
| -SGA | $ (0.6) | $ (0.6) | $ (0.5) | $ (1.4) | $ (1.4) | $ (1.2) | $ (7.7) | $ (7.4) | $ (6.8) |
| International-ACP | $ (0.1) | $ (0.0) | $ 0.0 | $ (0.2) | $ (0.0) | $ (0.0) | $ (1.2) | $ (0.7) | $ (0.9) |
| -SGA | $ (0.8) | $ (0.8) | $ (0.7) | $ (1.6) | $ (1.6) | $ (1.2) | $ (9.3) | $ (9.5) | $ (8.9) |
| Total Regions | $ (1.6) | $ (1.5) | $ (1.1) | $ (3.4) | $ (3.1) | $ (2.5) | $ (19.2) | $ (18.0) | $ (16.9) |
| WW IT | $ (0.6) | $ (0.7) | $ (0.6) | $ (1.5) | $ (1.7) | $ (1.5) | $ (7.8) | $ (8.1) | $ (7.8) |
| Corporate Finance | $ (0.3) | $ (0.3) | $ (0.2) | $ (0.6) | $ (0.7) | $ (0.5) | $ (3.2) | $ (3.3) | $ (3.1) |
| CEO | $ (0.2) | $ (0.1) | $ (0.0) | $ (0.3) | $ (0.2) | $ (0.2) | $ (1.8) | $ (1.7) | $ (1.7) |
| Legal | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.2) | $ (0.3) | $ (0.2) | $ (1.1) | $ (1.4) | $ (1.1) |
| Corp HR | $ (0.0) | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.7) | $ (0.6) | $ (0.7) |
| Total Shared Service | $ (1.2) | $ (1.2) | $ (1.0) | $ (2.7) | $ (2.9) | $ (2.5) | $ (14.6) | $ (15.0) | $ (14.4) |
| Commercial ID-SGA | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.7) | $ (0.8) | $ (0.9) |
| Regional Logistics | $ (0.6) | $ (0.6) | $ (0.6) | $ (1.2) | $ (1.3) | $ (1.4) | $ (6.2) | $ (6.8) | $ (7.0) |
| Corporate Marketing-SGA | $ (0.1) | $ - | $ (0.1) | $ (0.2) | $ - | $ (0.2) | $ (1.2) | $ (0.8) | $ (1.1) |
| Corporate | $ (0.0) | $ 0.6 | $ 0.4 | $ (0.6) | $ 0.8 | $ 0.7 | $ (2.8) | $ 0.6 | $ 0.2 |
| Profit Sharing / Variable Comp | $ (0.6) | $ (0.6) | $ (0.5) | $ (1.2) | $ (1.2) | $ (1.1) | $ (6.6) | $ (6.2) | $ (6.4) |
| Management Adjustment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| FX | $ (0.1) | $ (0.2) | $ 0.3 | $ (0.2) | $ (0.5) | $ 0.7 | $ (1.2) | $ (1.6) | $ 0.1 |
| Total Instant Film Operating Expenses @ ERR | $ (4.2) | $ (3.5) | $ (2.7) | $ (9.6) | $ (8.3) | $ (6.3) | $ (52.4) | $ (48.7) | $ (46.2) |
| **Back-up to Corporate** | | | | | | | | | |
| Communications | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (0.5) | $ - |
| Fringe | $ 0.3 | $ 0.3 | $ 0.4 | $ (0.1) | $ (0.1) | $ 0.5 | $ (0.7) | $ 0.0 | $ 0.2 |
| Payroll Accruals | $ - | $ - | $ 0.0 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.1 | $ 0.0 | $ 0.0 |
| Idle Space / Security / Other | $ (0.3) | $ 0.3 | $ 0.0 | $ (0.7) | $ 0.6 | $ (0.0) | $ (2.2) | $ 1.1 | $ (0.0) |
| Corporate | $ (0.0) | $ 0.6 | $ 0.4 | $ (0.6) | $ 0.8 | $ 0.7 | $ (2.8) | $ 0.6 | $ 0.2 |

Nov Performanoexls
11/92006

Polaroid

## Monetization Earnings Before Interest and Tax

($ Millions)

| Monetization | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| Revenue | - | - | - | - | - | - | - | - | - |
| Margin | (0.2) | (0.1) | (0.1) | (0.4) | (0.2) | (0.2) | (2.6) | (1.6) | (1.6) |
| Expense (1) | (0.5) | (1.0) | (0.5) | (1.0) | (1.5) | (1.2) | (5.7) | (6.0) | (5.7) |
| Total Operating Profit | (0.7) | (1.1) | (0.6) | (1.4) | (1.7) | (1.4) | (8.3) | (7.6) | (7.2) |
| Restructure | (20.8) | (0.2) | (0.4) | (20.8) | (0.3) | (0.7) | (23.7) | (19.2) | (19.8) |
| Other Income / (Expense) | - | - | (1.3) | - | - | (3.7) | 0.4 | (5.5) | (9.2) |
| Gain / (Loss) on Asset Sales | - | - | - | - | - | - | 22.3 | 16.8 | 16.8 |
| Earnings Before Interest and Tax | (21.5) | (1.3) | (2.3) | (22.3) | (2.1) | (5.8) | (9.3) | (15.5) | (19.4) |

| Restructure Components | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| Severance | (20.8) | (0.1) | (0.4) | (20.9) | (0.3) | (0.7) | (23.2) | (18.7) | (19.1) |
| ARO | (0.0) | (0.0) | - | (0.0) | (0.0) | - | (0.5) | (0.5) | (0.7) |
| Plant / Lease Exit | - | - | - | - | - | - | - | - | - |
| Total Restructure | (20.8) | (0.2) | (0.4) | (20.9) | (0.3) | (0.7) | (23.7) | (19.2) | (19.8) |

| Other Income / (Expense) Components | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| 3rd Party other income | - | - | 0.0 | - | - | 0.1 | - | 0.3 | 0.4 |
| 3rd Party interest income | - | - | 0.1 | - | - | 0.2 | 0.4 | 0.6 | 0.8 |
| Exchange Translation | - | - | (1.5) | - | - | (4.0) | - | (6.7) | (10.7) |
| Exchange Conversion | - | - | 0.0 | - | - | 0.0 | - | 0.3 | 0.3 |
| Total Other Income | - | - | (1.3) | - | - | (3.7) | 0.4 | (5.5) | (9.2) |

(1) Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results

Company Confidential
33

Polaroid

# Monetization Non-Standard Cost and Expense Detail

($ Millions)

| | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| **Non-Standard Cost** | | | | | | | | | |
| Norwood | - | - | - | - | - | (0.0) | - | - | - |
| New Bedford | - | - | - | - | - | (0.0) | - | - | - |
| R5 Battery | - | - | - | - | - | | - | - | |
| Chemical Operations | - | - | - | - | - | | - | - | |
| Waltham Occupancy (ARO) | - | - | - | - | - | | - | - | |
| Instant Exit Cost Spending | - | (0.1) | - | (0.1) | (0.2) | (0.1) | (0.9) | (1.2) | (0.9) |
| Vale | (0.1) | (0.1) | (0.0) | (0.1) | | (0.1) | (0.9) | (0.5) | (0.7) |
| Enschede | (0.1) | - | (0.1) | (0.1) | - | (0.0) | (0.9) | 0.1 | 0.1 |
| Int'l decommissioning | (0.1) | | 0.0 | (0.2) | | 0.0 | (0.8) | | |
| **Total Non-Standard Cost** | (0.2) | (0.1) | (0.1) | (0.4) | (0.2) | (0.2) | (2.6) | (1.6) | (1.8) |
| | | | | | | | | | |
| **Expense** | | | | | | | | | |
| Finance NRE | 0.0 | (0.1) | (0.1) | 0.1 | (0.1) | (0.2) | (0.1) | (0.6) | (0.7) |
| IT NRE | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.6) | (0.6) | (0.6) |
| HR/Legal NRE | (0.1) | (0.1) | (0.1) | (0.2) | (0.1) | (0.2) | (0.9) | (0.8) | (0.9) |
| Idle Spaces (1) | (0.3) | (0.3) | (0.3) | (0.6) | (0.6) | (0.6) | (3.5) | (3.5) | (3.5) |
| Dist NRE | - | - | - | - | - | (0.0) | (0.1) | (0.1) | (0.1) |
| Plan timing adj | (0.1) | (0.5) | 0.0 | (0.2) | (0.6) | (0.1) | 0.0 | (0.5) | (0.0) |
| Data Center | | | | | | - | (0.5) | | - |
| **Total Expense** | (0.5) | (1.0) | (0.5) | (1.0) | (1.5) | (1.2) | (5.7) | (6.0) | (5.7) |

(1) Plan adjusted to reflect the accounting for the Main Street lease payments ($333k/month) as interest expense in the actual results

Nov Performance.xls
1/8/2008

Polaroid

# Instant - YTD Variances To Plan

($ Millions)

| | Revenue | Margin | % Margin | Expense | Op Profit |
|---|---|---|---|---|---|
| Actual | $ 216.0 | $ 93.8 | 43.4% | $ (46.2) | $ 47.6 |
| Plan | $ 185.6 | $ 76.7 | 41.4% | $ (52.4) | $ 24.3 |
| Variance to Plan | $ 30.4 | $ 17.0 | 2.1% | $ 6.2 | $ 23.3 |
| | | | % Pts. | | |
| **Causes:** | | | | | |
| Regions | $ 31.7 | $ 20.8 | 2.5% | | $ 20.8 |
| Mfg Costs (Core) | | $ (4.9) | -0.6% | | $ (4.9) |
| Commercial ID | $ (1.1) | $ (0.5) | -0.1% | | $ (0.5) |
| Contract Mfg | $ (0.6) | $ (0.1) | 0.0% | | $ (0.1) |
| FX | $ 2.4 | $ 2.4 | 0.3% | | $ 2.4 |
| Other | $ (2.0) | $ (0.7) | -0.1% | | $ (0.7) |
| Subtotal | $ 30.4 | $ 17.0 | 2.1% | $ - | $ 17.0 |
| Americas | | | | $ 1.6 | $ 1.6 |
| International | | | | $ 0.7 | $ 0.7 |
| Total Regions | | | | $ 2.3 | $ 2.3 |
| Total Corporate | | | | $ 2.6 | $ 2.6 |
| Mgmt adj. | | | | $ - | $ - |
| FX | | | | $ 1.3 | $ 1.3 |
| Expense | | | | $ 6.2 | $ 6.2 |
| Total | | | | $ 30.4 $ 17.0 | $ 23.3 |

Polaroid

# Instant - YTD Variances To Fcst

*($ Millions)*

| | Revenue | Margin | % Margin | Expense | Op Profit |
|---|---|---|---|---|---|
| Actual | $ 216.0 | $ 93.8 | 43.4% | $ (46.2) | $ 47.6 |
| Forecast | $ 211.4 | $ 89.8 | 42.5% | $ (48.7) | $ 41.1 |
| Variance to Forecast | $ 4.6 | $ 4.0 | 0.9% | $ 2.5 | $ 6.5 |

| **Causes:** | Revenue | Margin | % Pts. | Expense | Op Profit |
|---|---|---|---|---|---|
| Regions | $ 5.9 | $ 4.7 | 1.1% | | $ 4.7 |
| Mfg Costs (Core) | | $ (0.6) | -0.1% | | $ (0.6) |
| Commercial ID | $ (0.3) | $ (0.1) | 0.0% | | $ (0.1) |
| Contract Mfg | $ 0.3 | $ 0.1 | 0.0% | | $ 0.1 |
| FX | $ (0.6) | $ 0.2 | 0.0% | | $ 0.2 |
| Other | $ (0.7) | $ (0.3) | -0.1% | | $ (0.3) |
| Subtotal | $ 4.6 | $ 4.0 | 0.9% | $ - | $ 4.0 |
| Americas | | | | $ 0.7 | $ 0.7 |
| International | | | | $ 0.5 | $ 0.5 |
| Total Regions | | | | $ 1.1 | $ 1.1 |
| Total Corporate | | | | $ (0.3) | $ (0.3) |
| Mgmt adj. | | | | $ - | $ - |
| FX | | | | $ 1.7 | $ 1.7 |
| Expense | | | | $ 2.5 | $ 2.5 |
| Total | $ 4.6 | $ 4.0 | | $ 2.5 | $ 6.5 |

Nov Performance.xls
1/8/2008



Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Instant - Working Capital versus Plan

($ Millions)

| | Dec 06 | Q1 | | Q2 | | Q3 | | October | | November | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Plan | Act | Plan | Act | Plan | Act | Plan | Act | Plan | Act |
| Receivables - Instant | 40.9 | 26.1 | 34.3 | 27.3 | 32.9 | 26.0 | 30.5 | 21.2 | 37.1 | 22.1 | 36.0 |
| DSO (layered construction) | 38 | 33 | 40 | 31 | 43 | 38 | 43 | 38 | 43 | 39 | 39 |
| Receivables - Eyewear | 22.5 | - | - | - | - | - | - | - | - | - | - |
| Receivables - CE | - | - | - | - | - | - | - | - | - | - | - |
| Receivables - New Business | | | | | | 7.2 | | 12.0 | 18.0 | 18.0 | |
| Inventories - Instant | 76.0 | 74.6 | 78.5 | 61.2 | 67.1 | 50.8 | 57.0 | 45.7 | 50.2 | 41.5 | 44.7 |
| Inventories - Eyewear | 9.6 | - | - | - | - | - | - | - | - | - | - |
| Inventories - CE | - | - | - | - | - | - | - | - | - | - | - |
| Prepaid Expenses | 17.8 | 9.2 | 11.0 | 7.7 | 10.0 | 10.2 | 9.8 | 9.7 | 9.5 | 9.2 | 9.4 |
| Prepaid Expenses - CE | - | - | - | - | - | - | - | - | - | - | - |
| Payables and Accruals | | | | | | | | | | | |
| Trade Payables | 16.4 | 9.3 | 8.5 | 13.4 | 9.1 | 23.6 | 7.4 | 29.8 | 6.5 | 26.8 | 7.8 |
| Trade Payables - CE | - | - | - | - | - | - | - | - | - | - | - |
| Other Payables/Accruals | 48.1 | 38.4 | 36.4 | 37.0 | 42.2 | 36.2 | 55.0 | 34.3 | 46.0 | 34.4 | 45.4 |
| Accrued Interest Exp | - | - | - | - | - | - | - | - | - | - | - |
| Total Accounts Payable | 64.5 | 47.7 | 44.9 | 50.4 | 51.3 | 59.8 | 62.5 | 64.1 | 52.5 | 61.2 | 53.2 |
| Comp & Ben. - Ops | 30.9 | 20.0 | 26.8 | 21.6 | 28.2 | 20.0 | 27.9 | 20.2 | 28.9 | 20.5 | 28.8 |
| Tot Working Capital (1) | 71.4 | 42.2 | 52.1 | 24.2 | 30.5 | 14.4 | 7.0 | 4.3 | 15.4 | 9.1 | 8.1 |

(1) Working capital defined as receivables, inventory, prepaid expenses minus accounts payable, accrued liabilities and comp & benefit liabilities from operations.

Polaroid

# Instant - Accounts Receivable versus Plan

*($ Millions)*

| | Dec 06 | Q1 | | Q2 | | Q3 | | Oct | | Nov | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual |
| Instant Film | | | | | | | | | | | |
| US | 16.4 | 10.4 | 14.5 | 11.8 | 14.5 | 12.1 | 15.5 | 10.2 | 16.2 | 11.5 | 16.0 |
| Canada | 0.4 | 0.3 | 0.4 | 0.3 | 0.4 | 0.3 | 0.5 | 0.3 | 0.4 | 0.2 | 0.4 |
| Latin America | 2.9 | 1.0 | 2.4 | 0.9 | 1.1 | 0.8 | 0.4 | 0.8 | 0.5 | 0.8 | 0.3 |
| Americas | 19.7 | 11.7 | 17.3 | 13.0 | 16.0 | 13.1 | 16.4 | 11.2 | 17.1 | 12.5 | 16.7 |
| Europe | 9.3 | 5.3 | 4.9 | 6.0 | 7.2 | 6.0 | 5.6 | 4.4 | 7.0 | 4.6 | 6.3 |
| Japan | 3.7 | 3.9 | 3.0 | 4.1 | 2.8 | 3.7 | 2.6 | 2.7 | 2.0 | 2.6 | 2.1 |
| Asia | 2.1 | 1.4 | 2.7 | 1.4 | 2.2 | 1.1 | 1.7 | 1.1 | 1.2 | 0.9 | 1.4 |
| International | 15.2 | 10.6 | 10.6 | 11.5 | 12.2 | 10.9 | 9.9 | 8.2 | 10.2 | 8.2 | 9.8 |
| Comm ID | 0.4 | 0.4 | 0.3 | 0.6 | 0.4 | 0.6 | 0.4 | 0.6 | 0.4 | 0.5 | 0.4 |
| Subtotal | 35.3 | 22.7 | 28.2 | 25.0 | 28.6 | 24.6 | 26.7 | 20.0 | 27.7 | 21.2 | 26.9 |
| Enactrace / Other | 5.6 | 3.4 | 6.1 | 2.3 | 4.3 | 1.4 | 3.8 | 1.2 | 9.4 | 0.9 | 9.1 |
| Total Instant Film | 40.9 | 26.1 | 34.3 | 27.3 | 32.9 | 26.0 | 30.5 | 21.2 | 37.1 | 22.1 | 36.0 |

2007

Nov Performacc.xls
1/8/2008

Company Confidential
38

Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Instant - DSO versus Plan (exc. Enschede Foundation)

2007

| DSO | Dec 2006 Act | Q1 Plan | Q1 Act | Q2 Plan | Q2 Act | Q3 Plan | Q3 Act | Oct Plan | Oct Act | Nov Plan | Nov Act |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US | 33 | 26 | 36 | 27 | 38 | 29 | 39 | 29 | 40 | 33 | 38 |
| Canada | 32 | 27 | 27 | 25 | 25 | 21 | 32 | 42 | 36 | 28 | 29 |
| Latin America | 51 | 27 | 54 | 29 | 29 | 21 | 20 | 29 | 25 | 23 | 19 |
| Europe | 47 | 26 | 37 | 22 | 54 | 45 | 55 | 47 | 55 | 51 | 49 |
| Japan | 37 | 81 | 47 | 70 | 35 | 70 | 37 | 55 | 39 | 57 | 38 |
| Asia Pacific | 51 | 46 | 60 | 46 | 50 | 49 | 41 | 55 | 44 | 52 | 50 |
| Commercial ID | 47 | 64 | 56 | 55 | 50 | 48 | 47 | 53 | 49 | 52 | 58 |
| Instant DSO | 38 | 33 | 40 | 31 | 43 | 38 | 43 | 38 | 43 | 39 | 39 |

Total Instant DSO restated to exclude impact of Enschede Foundation receivable



Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Instant – Inventory versus Plan

($ Millions)

| | Dec 06 | Q1 | | Q2 | | Q3 | | Oct | | Nov | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual | Plan | Actual |
| Raw/WIP | 89.0 | 87.3 | 82.3 | 65.2 | 57.6 | 39.2 | 44.5 | 33.0 | 38.4 | 28.8 | 33.9 |
| Reserves | (32.8) | (29.2) | (20.1) | (19.4) | (5.6) | (5.0) | (3.3) | (5.1) | (3.2) | (5.0) | (3.6) |
| Total Raw/WIP | 56.2 | 58.1 | 62.2 | 45.8 | 52.0 | 34.2 | 41.2 | 27.9 | 35.2 | 23.8 | 30.3 |
| Finished Goods: | | | | | | | | | | | |
| Cameras | 5.8 | 2.4 | 1.9 | 2.1 | 2.2 | 2.5 | 3.4 | 1.8 | 2.3 | 1.0 | 1.1 |
| Film | 16.3 | 16.5 | 13.6 | 15.1 | 12.1 | 16.0 | 11.5 | 17.7 | 12.4 | 18.4 | 12.3 |
| Other | 4.2 | 1.6 | 4.3 | 1.3 | 3.0 | 0.8 | 3.4 | 0.8 | 2.8 | 0.6 | 3.3 |
| Subtotal | 26.3 | 20.5 | 19.8 | 18.5 | 17.3 | 19.3 | 18.3 | 20.3 | 17.5 | 20.0 | 16.7 |
| Reserves | (6.5) | (4.0) | (3.4) | (3.1) | (2.2) | (2.7) | (2.5) | (2.5) | (2.5) | (2.3) | (2.3) |
| Total Finished Goods | 19.8 | 16.5 | 16.4 | 15.4 | 15.1 | 16.6 | 15.8 | 17.8 | 15.0 | 17.7 | 14.4 |
| Total Inventory (Instant) | 76.0 | 74.6 | 78.6 | 61.2 | 67.1 | 50.8 | 57.0 | 45.7 | 50.2 | 41.5 | 44.7 |

2007

# New Business (includes IP & Hospitality)

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

# New Business - Earnings Before Interest and Tax

*($ Millions)*

| New Business | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| Revenue | 18.1 | 0.4 | 0.9 | 45.3 | 1.0 | 1.7 | 65.4 | 3.8 | 4.6 |
| Margin | 1.6 | 0.0 | 0.6 | 4.2 | 0.2 | 1.0 | 7.6 | 2.4 | 3.4 |
| Expense | (0.8) | (1.7) | (0.3) | (1.9) | (3.5) | (0.9) | (9.7) | (8.7) | (4.6) |
| Total Operating Profit | 0.8 | (1.7) | 0.3 | 2.3 | (3.3) | 0.1 | (2.1) | (6.3) | (1.2) |

Company Confidential
42

Polaroid

# New Business - Operating Profit by Segment

| ($ Millions) | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Total New Business** | | | | | | | | | |
| Revenue | $ 18.1 | $ 0.4 | $ 0.9 | $ 45.3 | $ 1.0 | $ 1.7 | $ 65.4 | $ 3.8 | $ 4.6 |
| Margin | $ 1.6 | $ 0.0 | $ 0.6 | $ 4.2 | $ 0.2 | $ 1.0 | $ 7.6 | $ 2.4 | $ 3.4 |
| Expenses | $ (0.8) | $ (1.7) | $ (0.3) | $ (1.9) | $ (3.5) | $ (0.9) | $ (9.7) | $ (8.7) | $ (4.6) |
| Total Operating Profit | $ 0.8 | $ (1.7) | $ 0.3 | $ 2.3 | $ (3.3) | $ 0.1 | $ (2.1) | $ (6.3) | $ (1.2) |
| Mgm% | 8.7% | 3.1% | 61.6% | 9.2% | 18.8% | 58.3% | 11.6% | 63.4% | 73.3% |
| Exp% | -4.6% | -100.1% | -33.3% | -4.2% | -352.5% | -55.1% | -14.8% | -228.6% | -100.2% |
| **New Business Opps** | | | | | | | | | |
| Revenue | $ 18.0 | $ - | $ 0.5 | $ 45.0 | $ - | $ - | $ 63.3 | $ - | $ - |
| Margin | $ 1.5 | $ - | $ 0.5 | $ 3.9 | $ - | $ (0.0) | $ 5.5 | $ (0.0) | $ (0.0) |
| Expenses | $ (0.7) | $ (1.6) | $ (0.1) | $ (1.7) | $ (3.3) | $ (0.2) | $ (8.4) | $ (7.3) | $ (3.1) |
| Total Operating Profit | $ 0.8 | $ (1.6) | $ (0.2) | $ 2.2 | $ (3.3) | $ (0.6) | $ (2.9) | $ (7.3) | $ (3.1) |
| Mgm% | 8.3% | #DIV/0! | 8.7% | 8.7% | #DIV/0! | 8.7% | 8.7% | #DIV/0! | #DIV/0! |
| Exp% | -4.0% | #DIV/0! | #DIV/0! | -3.8% | #DIV/0! | #DIV/0! | -13.3% | #DIV/0! | #DIV/0! |
| **IP** | | | | | | | | | |
| Revenue | $ 0.1 | $ - | $ 0.5 | $ 0.3 | $ 0.2 | $ 0.7 | $ 2.1 | $ 2.3 | $ 3.0 |
| Margin | $ 0.1 | $ - | $ 0.5 | $ 0.3 | $ 0.2 | $ 0.7 | $ 2.1 | $ 2.3 | $ 3.0 |
| Expenses | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.2) | $ (0.2) | $ (0.2) | $ (1.3) | $ (1.3) | $ (1.3) |
| Total Operating Profit | $ (0.0) | $ (0.1) | $ 0.4 | $ 0.1 | $ (0.1) | $ 0.5 | $ 0.8 | $ 1.0 | $ 1.8 |
| **Hospitality** | | | | | | | | | |
| Revenue | $ - | $ 0.4 | $ 0.5 | $ - | $ 0.8 | $ 1.0 | $ - | $ 1.5 | $ 1.6 |
| Margin | $ - | $ 0.0 | $ 0.1 | $ - | $ 0.0 | $ 0.3 | $ - | $ 0.1 | $ 0.4 |
| Expenses | $ - | $ - | $ (0.0) | $ - | $ - | $ (0.1) | $ - | $ (0.1) | $ (0.3) |
| Total Operating Profit | $ - | $ 0.0 | $ 0.1 | $ - | $ 0.0 | $ 0.2 | $ - | $ 0.0 | $ 0.1 |
| Mgm% | #DIV/0! | 3.1% | 23.2% | #DIV/0! | 3.1% | 29.5% | #DIV/0! | 6.4% | 23.6% |
| Exp% | #DIV/0! | 0.0% | -7.1% | #DIV/0! | 0.0% | -11.1% | #DIV/0! | -6.1% | -17.3% |

Polaroid

# Other (includes Purchase Price Accounting, PGW Fee and non allocated Shared Service Charges)

Company Confidential
44



# Other - Operating Profit by Segment

($ Millions)

| | November PLAN | November FCST | November ACTUAL | November QTD PLAN | November QTD FCST | November QTD ACTUAL | November YTD PLAN | November YTD FCST | November YTD ACTUAL |
|---|---|---|---|---|---|---|---|---|---|
| **Total Other (Excludes PCB)** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | 5.7 | 10.3 | 10.3 |
| Margin | (0.2) | (0.2) | (0.2) | (0.4) | (0.3) | (0.4) | 0.7 | 3.1 | 3.0 |
| Expenses | (0.9) | (0.9) | 0.8 | (1.8) | (1.8) | (1.8) | (12.0) | (14.4) | (14.1) |
| Total Operating Profit | (1.1) | (1.0) | 0.6 | (2.2) | (2.1) | (2.3) | (11.3) | (11.3) | (11.1) |
| **PGW Service Fee** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | - | - | - |
| Margin | (0.3) | (0.3) | - | (0.5) | (0.5) | (0.5) | (2.8) | (3.3) | (3.5) |
| Expenses | - | - | - | - | - | - | - | - | - |
| Total Operating Profit | (0.3) | (0.3) | - | (0.5) | (0.5) | (0.5) | (2.8) | (3.3) | (3.5) |
| **Purchase Price Accounting** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | - | - | - |
| Margin | (0.2) | (0.2) | (0.2) | (0.4) | (0.3) | (0.4) | (2.3) | (2.2) | (2.2) |
| Expenses | (0.6) | (0.6) | (0.6) | (1.3) | (1.3) | (1.3) | (7.3) | (7.0) | (7.1) |
| Total Operating Profit | (0.8) | (0.8) | (0.8) | (1.7) | (1.6) | (1.7) | (9.6) | (9.2) | (9.2) |
| **Shared Service / Other** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | - | - | - |
| Margin | - | - | (0.0) | - | - | (0.0) | - | (0.1) | (0.2) |
| Expenses | - | - | 1.5 | - | - | (0.1) | - | (0.3) | 0.3 |
| Total Operating Profit | - | 0.0 | 1.5 | - | 0.0 | (0.1) | - | (0.4) | 0.1 |
| **Eyewear** | | | | | | | | | |
| Revenue | - | - | - | - | - | - | 5.7 | 10.3 | 10.3 |
| Margin | - | - | (0.0) | - | - | (0.0) | 3.0 | 5.4 | 5.4 |
| Expenses | - | - | (0.0) | - | - | (0.0) | (1.9) | (3.8) | (3.8) |
| Total Operating Profit | - | - | (0.0) | - | - | (0.0) | 1.1 | 1.5 | 1.6 |

Polaroid

# Purchasing Price Accounting - Non-Standard Cost Expense Detail

($ Millions)

| | Nov. 2007 | | | QTD | | | Nov. 2007 YTD | | |
|---|---|---|---|---|---|---|---|---|---|
| | Plan | Fcst | Actual | Plan | Fcst | Actual | Plan | Fcst | Actual |
| **Non-Standard Cost** | | | | | | | | | |
| US depreciation expense | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.2) | (0.1) | (0.1) |
| Int'l depreciation expense | (0.2) | (0.2) | (0.2) | (0.4) | (0.3) | (0.4) | (2.2) | (2.1) | (2.1) |
| Total Non-Standard Cost | (0.2) | (0.2) | (0.2) | (0.4) | (0.3) | (0.4) | (2.3) | (2.2) | (2.2) |
| **Expense** | | | | | | | | | |
| Marketing depreciation expense | (0.1) | - | (0.0) | (0.1) | - | (0.1) | (0.6) | (0.6) | (0.6) |
| Amortization of Intangibles | (0.6) | (0.6) | (0.6) | (1.2) | (1.3) | (1.2) | (6.7) | (6.4) | (6.5) |
| Total Expense | (0.7) | (0.6) | (0.6) | (1.3) | (1.3) | (1.3) | (7.3) | (7.0) | (7.1) |

CONFIDENTIAL



# Polaroid

## BRAND VALUATION

November 7, 2007

DUFF&PHELPS

# Statement of Limiting Conditions

- Petters Group Worldwide ("PGW") management has engaged Duff & Phelps to perform a valuation of the Polaroid brand (the "Brand") for internal planning purposes as of October 1, 2007 (the "Valuation Date").

- The work product prepared by us is based upon the information provided by, and on behalf of, PGW and Polaroid Corporation (the "Company"). We assume no responsibility and make no representations with respect to the accuracy or completeness of this information, provided that we will use our best efforts to accurately set forth the work product. Our analysis is based on projections developed by Polaroid management ("Management"). There will usually be differences between estimated and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

- Industry data and market information were key inputs to our analysis, however, some of the data for the analysis are subjective assessments derived from information collected by Duff & Phelps from Management.

- By its very nature, valuation work cannot be regarded as an exact science and the conclusions arrived at in many cases will of necessity be subjective and dependent on the exercise of individual judgment. There is, therefore, no indisputable single value and we therefore express our estimate as falling within a likely range.

- Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the Services that are provided. Notwithstanding anything to the contrary herein you shall not provide such report to any third party. You shall not refer to us either directly or indirectly as an independent valuation service provider (or by any other indirect reference or description), or to the Services, whether in any public filing or other document, without our prior written consent, which we may at our discretion grant, withhold, or grant subject to conditions. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

- Duff & Phelps has made numerous assumptions with respect to industry performance, general business, market and economic conditions and other matters, many of which are beyond the control of any party involved in the Proposed Valuation. Our analysis is necessarily based upon market, economic, financial and other conditions as they exist and can be evaluated as of the date hereof.

- We assumed that there has been no material adverse change in the assets, financial condition, business, or prospects of Polaroid since the date of the most recent financial statements and other information made available to us.

- We assumed that any estimates, evaluations and projections furnished to Duff & Phelps were reasonably prepared and based upon the last currently available information and good faith judgment of the person furnishing the same.

- We relied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions and representations obtained from public sources or provided to it from private sources, including Company management, and did not attempt to independently verify such information.

- The Report or any results of our Services shall not constitute a Solvency Opinion, a Fairness Opinion or a Collateral Valuation and may not be relied upon by you or any other party as such. Furthermore, any analyses we perform should not be taken to supplant any procedures that you should undertake in your consideration of any transaction contemplated in connection with this engagement or any other transaction, and you acknowledge and agree that any decision relating to, or whether or not to enter into, a transaction is solely the responsibility of PGW and the Company.

CONFIDENTIAL

**DUFF&PHELPS**

# Table of Contents

I.  Executive Summary

II. Overview of Polaroid

III. Valuation Analysis

IV. Appendices

   i.   Weighted Average Cost of Capital ("WACC")

   ii.   Description of Selected Public Companies

CONFIDENTIAL

DUFF&PHELPS

CONFIDENTIAL

# 1. Executive Summary

4

DUFF&PHELPS

CONFIDENTIAL

# Executive Summary

## Engagement Overview

- Duff & Phelps, LLC ("Duff & Phelps") has been engaged by Petters Group Worldwide ("PGW") to assist in the valuation of the Polaroid Brand (the "Brand") for internal management planning purposes.

- Duff & Phelps applied various methodologies to value the Brand

  - Income Approach
    - Relief From Royalty
    - Excess Earnings

  - Market Approach

| POLAROID CORPORATION<br>BRAND VALUATION RANGE<br>AS OF OCTOBER 1, 2007<br>CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED) | LOW RANGE | HIGH RANGE |
|---|---|---|
| Relief From Royalty | 390.0 | 440.0 |
| Excess Earnings | 280.0 | 390.0 |
| Market Approach | 250.0 | 320.0 |
| Concluded Brand Value Range | 310.0 | 380.0 |

**DUFF&PHELPS**

CONFIDENTIAL

# 1.

# Overview of Polaroid

DUFF&PHELPS

# Petters Group Worldwide

- PGW is a privately held company located in Minnetonka, Minnesota and is a recognized leader in creating, developing, financing and investing in companies that manufacture, procure and market merchandising solutions in key growth markets.

- The Company's investments operate in a wide range of markets including merchandising solutions, emerging technologies, media and marketing, entertainment and real estate.

- PGW has a successful 18-year history of investing in consumer retail and wholesale companies and currently invests or wholly owns approximately 60 businesses throughout the World, and actively manages over 20 of those. These companies span the entire consumer goods and services space, including product development, manufacturing, marketing, retailing and distribution services.

- In addition to growing and managing this global portfolio of consumer goods and service companies, PGW has proven strength in creating partnerships with manufacturers, often through brand licensing agreements, to develop products and brand extensions for distribution and other service and content providers through retail, Internet, catalog, and specialty channels.

- The PGW companies fall into four general categories, including consumer branded goods, consumer products and services, manufacturing and first-to-market technologies. PGW owns several key brands including Polaroid and Master Craft, and has licensing agreements with several others such as Emerson and Sunbeam

- PGW initially licensed the Polaroid brand name in 2003 and 2004 for DVD players.

- In April 2005 PGW bought 100% of the equity of Polaroid Corporation for $426 million from One Equity Partners LLC.

CONFIDENTIAL









DUFF&PHELPS

# Overview of Polaroid

- The Polaroid brand has a storied 70-year history, with significant consumer brand recognition and an association with technological innovation

- The Brand is synonymous with photography and cameras and the Company's history dates back to the 1930s

- Today, Polaroid is a leading global marketer of branded consumer electronics and imaging products, including LCD televisions, digital cameras, portable DVD players, and film and instant cameras

- The Company has leveraged the strength of this brand over a diverse consumer electronics and imaging product portfolio, and plans to introduce new technology-based products in the digital imaging and digital home and mobile markets shortly

- Polaroid has established relationships with several of the top-tier retailers in North America, including Circuit City, Wal-Mart, and Target

- The Company has an extensive network of foreign retailers and has increased its presence in Continental Europe and UK

| Financial Snapshot(USD mm) | 2005A | 2006(1) | 2007P |
|---|---|---|---|
| Revenue | 844.5 | 975.8 | 924.2 |
| *Growth* | *n/a* | *15.5%* | *(5.3%)* |
| COGS | 693.7 | 818.1 | 797.4 |
| *% of Revenue* | *82.1%* | *83.8%* | *86.3%* |
| GM | 150.8 | 157.7 | 126.7 |
| *% of Revenue* | *17.9%* | *16.2%* | *13.7%* |
| Operating Profit | 25.7 | 4.4 | nm |
| *% Margin* | *3.0%* | *0.5%* | *n/a* |

*(1) Un-Audited 2006 Financials*
*Projected financials for 2007 from Management*







CONFIDENTIAL

8

DUFF&PHELPS

# Overview of Polaroid

- The Company expects to shortly launch a host of products in Digital Imaging /Digital Home space with Digital Printers, Home Set-Top Box, and Mobile Printers

- The Company is in the process of exiting the production of certain essential product components for its legacy instant photography and film business

- Its strategy going forward in the consumer electronics segment is to outsource research and development, manufacturing, after-sales support, warehousing and logistics and focus on technology tie ups and distribution

- The Company has a partnership with a leading firm (known for its numerous IPs around new technology) and has the first to market rights for their Digital high speed printers

- The Company also has a first to market right with a firm to market the mobile printing technology under the Polaroid brand





CONFIDENTIAL

9

**DUFF&PHELPS**

CONFIDENTIAL

# Polaroid has 100% Brand Awareness

## Awareness vs. Consumer Electronics Brands (%)



| Brand | % |
|---|---|
| Polaroid | 100 |
| Kodak | 100 |
| Panasonic | 100 |
| IBM | 100 |
| SONY | 100 |
| SAMSUNG | 99 |
| PHILIPS | 99 |
| SHARP | 98 |
| MAGNAVOX | 97 |
| LG | 90 |
| Westinghouse | 88 |
| VIZIO | 50 |

*International Insights Brand Study, 2007

DUFF&PHELPS

# Polaroid has significant Brand equity

Polaroid has been synonymous with leadership in the instant photography business. However, Polaroid has leveraged the Polaroid Brand to significantly diversify its product portfolio successfully into the consumer electronics category:

- #1 in digital cameras under $200 through the food, mass and drug channels in North America in 2006 (NPD Group)

- #2 in portable DVD player sales in North America in 2006 (TWICE)

- #5 in LCD TV shipments in North America in the second quarter of 2007 (Display Search)

- #6 in LCD TV shipments in Latin America in the second quarter of 2007 (Display Search)

- #10 in LCD TV shipments in Western Europe in the second quarter of 2007 (Display Search)



Regard

Brand Awareness / Recognition

Based on a recent study conducted by International Insights

Brand Regard is a function of Brand reputation, favoriteness, momentum, differentiation and Innovation

CONFIDENTIAL

11

DUFF&PHELPS

CONFIDENTIAL

# Polaroid is improving its Brand Positioning

- The Polaroid brand is currently positioned as a value oriented brand

- The Company has successfully used the Brand to diversify into a significant number of categories in the consumer electronics market

- The Company's strategy is to build Polaroid into a premium Brand.

- This strategy is driven by the ability to introduce innovative products in various product categories such as Digital Printers, Home Set-Top Box, Mobile Printers.

- These products are technologically advanced and provide opportunities to diversify the Brand into a feature rich, technology driven, premium priced, market leading Brand



Product Price

Commands Premium Price, little Brand Loyalty

Feature Intensive Premium Products, Commanding Brand Awareness

Value Driven Products, Commodities

❖ **Polaroid**

Value Oriented, Strong Brand Loyalty

Brand Awareness/Loyalty

12

DUFF&PHELPS

# Polaroid Brand has successfully transformed across market segments



**1950 - 2002**

**Instant Imaging**

Instant Camera's

Instant Films

**2003 - 2007**

**Consumer Electronics**

LCD Televisions

Portable DVD Players

Digital Cameras

Personal Media Players

GPS

Digital Frames

**2008 Onwards**

**Digital Imaging/ Digital Home**

High Speed Printers

Home Set Top Box

Digital Instant

Mobile Printing

Successful extension of the Brand across Consumer Electronics Products Category

CONFIDENTIAL

DUFF&PHELPS

CONFIDENTIAL

# The Polaroid Brand has been driven by a strong distribution network

- The Company has established relationships with 12 of the top 15 consumer electronic retailers in North America

- Some of the big retailers who stock the Company's products include Wal-Mart, Circuit City, Staples, Target, OfficeMax, Radio Shack, Costco, Office Depot, Sam's Club, Sears, and Kmart

- The Company plans to further strengthen its relationships with certain of its retail partners by developing products specifically targeted and branded for the shopper demographic at a specific retailer (e.g. Target)

- Polaroid also has substantial relationships with major retailers internationally, demonstrated by the increase in their international revenue

## US Distributors



## European Distributors



14

DUFF&PHELPS

CONFIDENTIAL

# III. Valuation Analysis

DUFF&PHELPS

CONFIDENTIAL

# Valuation Methodologies

■ Income Approach

| The discounted cash flow ("DCF") analysis determines the net present value of future free cash flows using a weighted average cost of capital for the discount rate.

| Duff & Phelps utilized two variations of the DCF namely, the Relief From Royalty ("RFR") approach and the Excess Earnings ("EE") approach to determine the value of the Polaroid Brand

■ Market Approach

| The Market Approach determines the value of an asset or a company based on a comparison of the specific asset or company to the observed market values of comparable assets or companies.

| Duff & Phelps estimated the value of the Polaroid Brand by determining the market based premium attributed to branded businesses as compared to similar non-branded or generic businesses.

| Duff & Phelps also identified transactions involving the sale of companies or assets that were considered similar to Polaroid, in whole or in part.

DUFF&PHELPS

# Relief From Royalty - Approach and Key Assumptions

- The RFR approach quantifies the economic benefits associated with the ownership and use of an intangible asset. The RFR approach calculates the amount by which the owner of the intellectual property is relieved (by virtue of ownership) from paying a royalty to a hypothetical licensor over the economic life of the asset. This "royalty savings" on an after-tax basis is discounted to present value at a discount rate that reflects all risks inherent in achieving the projections over the economic life of the asset.

- As part of the RFR approach, we applied the following steps:

- **Step 1 – Determined an appropriate royalty rate to apply to the product sales**

  - Duff & Phelps performed an extensive search for licensing agreements involving the licensing of consumer based brand names between unrelated third parties

  - Based on the observed royalty rates in the identified licensing agreements, selected a royalty rate of 3% for the Polaroid Brand

- **Step 2 – Determined total sales for the Polaroid Brand over its life**

  - Polaroid management provided detailed projections for the period 2008 through 2012 for each product in its portfolio

  - Assumed that all sales are Polaroid branded sales.

  - The products consisted of currently marketed products and products that were currently in various stages of development

  - Beyond 2012, Duff & Phelps extrapolated the projections by trending the growth rates to a long-term sustainable rate

  - Polaroid has additional opportunities for revenues in the pipeline however, other revenue streams including Polaroid Health, Digital Signage, Hospitality and other consumer electronics product extensions were excluded for the purposes of this Valuation

CONFIDENTIAL

17

**DUFF&PHELPS**

CONFIDENTIAL

# Relief From Royalty - Approach and Key Assumptions

- **Step 3 – Determined the appropriate cash flows and value associated with the Polaroid Brand**

  - ⱽ Determined the cash flows by multiplying the appropriate royalty rate with the Net Product Sales for the period 2008 through 2014

  - ⱽ Licensing Revenue associated with Out-licensing the Brand to certain third parties was removed from the Net Products Sales but was added back to the cash flows

  - ⱽ Tax affected the royalty savings by a 40% tax rate

  - ⱽ Calculated a terminal value to capture the value of the royalty savings beyond 2014. The terminal value was based on capitalizing the 2014 royalty savings by a long term growth rate of 3% and a discount rate of 12%

  - ⱽ The discount rate of 12% was based on rates of return for comparable companies to Polaroid

  - ⱽ Present valued the after-tax royalty savings and the terminal value by the discount rate

  - ⱽ Performed sensitivity analysis on discount rates and the royalty rates

18

**DUFF&PHELPS**

CONFIDENTIAL

# Projection Assumptions

**POLAROID CORPORATION**
**MANAGEMENT BUSINESS PLAN**
**AS OF OCTOBER 1, 2007**
**CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Net Sales | 907.9 | 899.2 | 1,042.9 | 1,408.8 | 1,954.8 | 2,212.4 | 2,400.8 | 2,555.4 |
| *Growth* | | (1.0%) | 16.0% | 35.1% | 38.8% | 13.2% | 8.5% | 6.4% |
| Royalty Income | 0.0 | 2.5 | 3.0 | 3.5 | 3.8 | 4.1 | 4.4 | 4.8 |
| Net Sales (including Royalty Income) | 907.9 | 901.6 | 1,045.9 | 1,412.3 | 1,958.6 | 2,216.5 | 2,405.3 | 2,560.2 |
| *Growth* | | (0.7%) | 16.0% | 35.0% | 38.7% | 13.2% | 8.5% | 6.4% |
| Cost of Sales | 782.1 | 781.3 | 949.8 | 1,269.1 | 1,729.3 | 1,920.5 | 2,079.2 | 2,208.9 |
| *% of Revenue* | 86.1% | 86.7% | 90.8% | 89.9% | 88.3% | 86.6% | 86.4% | 86.3% |
| Gross Margin | 125.8 | 120.3 | 96.1 | 143.1 | 229.3 | 296.0 | 326.0 | 351.3 |
| *% of Revenue* | 13.9% | 13.3% | 9.2% | 10.1% | 11.7% | 13.4% | 13.6% | 13.7% |
| SG&A | 139.3 | 99.6 | 64.5 | 87.7 | 126.0 | 144.2 | 161.3 | 176.0 |
| *% of Revenue* | 15.3% | 11.0% | 6.2% | 6.2% | 6.4% | 6.5% | 6.7% | 6.9% |
| Operating Profit | (13.5) | 20.7 | 31.6 | 55.4 | 103.3 | 151.8 | 164.7 | 175.3 |
| *% of Revenue* | (1.5%) | 2.3% | 3.0% | 3.9% | 5.3% | 6.8% | 6.8% | 6.8% |

Notes:
$ in millions

**DUFF&PHELPS**

# Selected Tradename License Agreements

CONFIDENTIAL

## POLAROID CORPORATION

### SELECTED TRADENAME ROYALTY AGREEMENTS
### AS OF OCTOBER 1, 2007
### CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)

| Date of Agreement | Licensor | Licensee | ROYALTY RATE Low | ROYALTY RATE High | Description of Agreement |
|---|---|---|---|---|---|
| March 5, 2007 | Polaroid Corp. | Stylemark Inc. | 5.0% | 5.0% | The Licensee entered into a perpetual trademark license agreement for the exclusive use of Polaroid brand name in the eyewear category (defined as: sunglasses, eyeglasses, reading glasses and prescription glasses; sunglass lenses, ophthalmic lenses, clip-on sunglasses; contact lenses; eyeglass, sunglass and spectacle frames; sports eyewear and goggles; and optical accessories). |
| June 30, 2003 and August 1, 2005 | Koss Corp. | Sonigem Products, Inc. | 1.0% | 1.0% | Exclusive trademark license to use the Koss trademark to sell video products such as televisions using cathode ray tube, LCD, plasma and projection technology. The agreement was amendmended in 2005 to include DVD, VCR and mobile video. |
| August 26, 2002 | Polaroid Corp. | Concord Camera | 3.0% | 3.0% | The license agreement provides the licensee with the exclusive, worldwide use of the the Polaroid trademark for use with the sale of single-use and traditional film based cameras. The agreement does not include instant or digital cameras |
| May 1, 2002 | Hyundai Corp. | Chigo (China) | 5.0% | 5.0% | The license agreement allows the Chinese air conditioner manufacturer non-exclusive rights to the Hyundai logo and brand name for use with its products |

**Notes:**
Source: Royalty Stat and Royalty Source

20

**DUFF&PHELPS**

# Selected Tradename License Agreements

CONFIDENTIAL

**POLAROID CORPORATION**
**SELECTED TRADENAME ROYALTY AGREEMENTS**
**AS OF OCTOBER 1, 2007**
**CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)**

| Date of Agreement | Licensor | Licensee | Royalty Rate Low | Royalty Rate High | Description of Agreement |
|---|---|---|---|---|---|
| December 31, 2000 | Koss Corp. | Jiangsu Electronics Industries Ltd | 1.5% | 1.5% | Exclusive trademark license to use the KOSS trademarks to sell audio systems with a CD player |
| July 1, 2000 | uniView Technologies Corp. | Avmark Inc | 1.0% | 1.0% | Avmark to sell direct view, projection and digital television sets, VCR's, DVD players and all categories of audio products under the uniView name. The agreement is for 1.0 percent of net costs of the licensed products sold by Avmark |
| January 1, 1998 | Smith & Wesson Corp | Safari Enterprises Inc. | 5.0% | 5.0% | Smith & Wesson granted Safari Enterprises Inc an exclusive trademark license to sell still cameras under the Smith & Wesson name. In addition to 5.0 percent of net sales the licensee agreed to certain milestone based payments |
| August 10, 1997 | Digital Equipment Corp. | Genicom Corp. | 5.0% | 5.0% | Non-exclusive agreement for use of the Digital logo and DEC trademarks to sell printers and printer related products |
| August 16, 1996 | Binney & Smith Inc. | Advanced Concepts | 8.0% | 8.0% | The license agreement is for the exclusive right to sell calculators using the Crayola trademark |
| 1996 | International Jensen Inc. | IJI Acquisition Corp | 1.0% | 5.0% | International Jensen Inc agreed to allow IJI to have exclusive rights to use the Trademark for speaker equipment sold to vehicular OEM. The agreement is one to two percent using the Jensen Mark and 5 percent for any item using the Jensen Trademark |
| **Mean:** | | | 3.6% | 4.0% | |
| **Median:** | | | 4.0% | 5.0% | |
| **High:** | | | 8.0% | 8.0% | |
| **Low:** | | | 1.0% | 1.0% | |

Notes:
Source: Royalty Stat and Royalty Source

**DUFF&PHELPS**

# Relief From Royalty

CONFIDENTIAL

## POLAROID CORPORATION
### BRAND VALUATION - RELIEF FROM ROYALTY
### AS OF OCTOBER 1, 2007
### CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Terminal Year |
|---|---|---|---|---|---|---|---|---|---|
| Net Sales excluding Royalty Income | 907.9 | 889.2 | 1,042.9 | 1,406.8 | 1,954.8 | 2,212.4 | 2,400.8 | 2,555.4 | 2,632.1 |
| Growth | | (1.0%) | 16.0% | 35.1% | 38.8% | 13.2% | 8.5% | 6.4% | 3.0% |
| Savings Attributable to Brand @ 3.0% | 27.2 | 27.0 | 31.3 | 42.3 | 58.6 | 66.4 | 72.0 | 76.7 | 79.0 |
| Royalty Income | 0.0 | 2.5 | 3.0 | 3.5 | 3.8 | 4.1 | 4.4 | 4.8 | 4.9 |
| Total Savings | 27.2 | 29.4 | 34.3 | 45.8 | 62.4 | 70.5 | 76.4 | 81.4 | 83.9 |
| Taxes @ 40.0% | 10.9 | 11.8 | 13.7 | 18.3 | 25.0 | 28.2 | 30.6 | 32.6 | 33.6 |
| After Tax Royalty Savings | 16.3 | 17.7 | 20.6 | 27.5 | 37.5 | 42.3 | 45.9 | 48.9 | 50.3 |
| Present Value Factor @ 12.0% | 0.99 | 0.92 | 0.82 | 0.73 | 0.65 | 0.58 | 0.52 | 0.47 | |
| Present Value of Cash Flows | 4.0 | 16.2 | 16.9 | 20.1 | 24.5 | 24.7 | 23.9 | 22.7 | |

| | | |
|---|---|---|
| Sum of Present Value of Cash Flows | 153.0 | |
| Present Value of Terminal Cash Flows | 260.2 | |
| **Fair Value of Polaroid Brand** | **410.0** | |

| | |
|---|---|
| Terminal Cash Flow | 50.3 |
| Terminal Growth Rate | 3.0% |
| Discount Rate | 12.0% |
| Capitalization Rate | 9.0% |
| Terminal Value | 559.2 |
| Terminal Value Factor | 0.47 |
| Present Value of Terminal | 260.2 |

**Value of Polaroid Brand**

| Royalty Rate | Discount Rate | | | | |
|---|---|---|---|---|---|
| | 11.0% | 11.5% | 12.0% | 12.5% | 13.0% |
| 2.5% | 400.0 | 370.0 | 350.0 | 330.0 | 310.0 |
| 3.0% | 470.0 | 440.0 | 410.0 | 390.0 | 370.0 |
| 3.5% | 540.0 | 510.0 | 480.0 | 450.0 | 430.0 |

Notes:
$ in millions
Royalty derived from selected licensing agreements
2007/2008 Includes Legacy Instant Business

DUFF&PHELPS

# Excess Earnings Approach – Methodology and key assumptions

Duff & Phelps also utilized the Excess Earnings ("EE") Approach to determine the value of the Polaroid Brand. The EE Approach is based on isolating the after-tax earning from a business that are attributable to a specific intangible asset. The after-tax EE are discounted to present value at a discount rate that reflects all risks inherent in achieving the projections over the economic life of the asset.

As part of the EE we applied the following steps:

**Step 1 – Calculated the operating profit attributable to the Polaroid business**

∀  Management provided revenue and operating profit projections for Polaroid for the period 2008 through 2012

∀  Royalty Income included in net sales

∀  Tax affected the operating profit by a 40% tax rate

**Step 2 – Calculated the EE's attributable to the Polaroid business**

∀  Calculated and subtracted an after-tax return on the Company's net tangible assets ("NTA") to reflect the appropriate return on working capital and fixed assets from the after-tax operating profit of Polaroid.

∀  The remaining earning represented EE's attributable to the intangible assets of the Company

∀  Based on as assessment by Polaroid management, approximately 45% to 55% of the EE's were attributed to the Polaroid Brand

**Step 3 – Determined the appropriate cash flows and value associated with the Polaroid Brand**

∀  A terminal value was calculated to capture the value of the EE's beyond 2014. The terminal value was based on capitalizing the 2014 EE's by a long term growth rate of 3% and a discount rate of 12%

∀  The discount rate of 12% was based on rates of return for comparable companies to Polaroid

∀  Present valued the after-tax EE's attributable to the Polaroid Brand and the terminal value by the discount rate

∀  Performed sensitivity analysis on discount rates and earnings attributable to the Brand

CONFIDENTIAL

23

DUFF&PHELPS

# Excess Earnings – Valuation

CONFIDENTIAL

**POLAROID CORPORATION**
**BRAND VALUATION - EXCESS EARNINGS**
**AS OF OCTOBER 1, 2007**
**CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Terminal Year |
|---|---|---|---|---|---|---|---|---|---|
| Net Sales Including Royalty Income | 907.9 | 901.6 | 1,045.9 | 1,412.3 | 1,958.6 | 2,216.5 | 2,406.3 | 2,560.2 | 2,637.0 |
| *Growth* | | *(0.7%)* | *16.0%* | *35.0%* | *38.7%* | *13.2%* | *8.5%* | *6.4%* | *3.0%* |
| Operating Profit | (13.5) | 20.7 | 31.6 | 55.4 | 103.3 | 151.8 | 164.7 | 175.3 | 180.5 |
| *% of Total Revenue* | *(1.5%)* | *2.3%* | *3.0%* | *3.9%* | *5.3%* | *6.8%* | *6.8%* | *6.8%* | *6.8%* |
| Taxes @ 40.0% | 0.0 | 8.3 | 12.6 | 22.2 | 41.3 | 60.7 | 65.9 | 70.1 | 72.2 |
| After Tax Income | (13.5) | 12.4 | 18.9 | 33.3 | 62.0 | 91.1 | 98.8 | 105.2 | 108.3 |
| Less After Tax Charge to Working Capital | 5.8 | 5.8 | 6.7 | 9.1 | 12.6 | 14.2 | 15.4 | 16.4 | 18.9 |
| Less After Tax Charge to Fixed Assets | 0.3 | 0.3 | 0.3 | 0.5 | 0.6 | 0.7 | 0.8 | 0.8 | 0.9 |
| Net Income after Charges | (19.7) | 6.3 | 11.9 | 23.7 | 48.8 | 76.1 | 82.6 | 87.9 | 90.5 |
| Net Income Attributable to Brand @ 50% | (9.8) | 3.2 | 5.9 | 11.9 | 24.4 | 38.0 | 41.3 | 43.9 | 45.3 |
| Present Value Factor @ 12.0% | 0.99 | 0.92 | 0.82 | 0.73 | 0.65 | 0.58 | 0.52 | 0.47 | |
| Present Value of Cash Flows | (2.4) | 2.9 | 4.9 | 8.7 | 15.9 | 22.2 | 21.5 | 20.5 | |

| | |
|---|---|
| Sum of Present Value of Cash Flows | 94.2 |
| Present Value of Terminal Cash Flows | 234.1 |
| **Fair Value of Polaroid Brand** | **330.0** |

| | |
|---|---|
| Terminal Cash Flow | 45.3 |
| Terminal Growth Rate | 3.0% |
| Discount Rate | 12.0% |
| Capitalization Rate | 9.0% |
| Terminal Value | 503.0 |
| Terminal Value Factor | 0.47 |
| Present Value of Terminal | 234.1 |

**Excess Earnings Attributable to Brand**

**Value of Polaroid Brand**

| | Discount Rate | | | | |
|---|---|---|---|---|---|
| | 11.0% | 11.5% | 12.0% | 12.5% | 13.0% |
| 4.50% | 340.0 | 320.0 | 300.0 | 280.0 | 260.0 |
| 5.00% | 380.0 | 350.0 | 330.0 | 310.0 | 290.0 |
| 5.50% | 420.0 | 390.0 | 360.0 | 340.0 | 320.0 |

Notes:
$ in millions
Income Attributable to Brand derived from Brand Analysis and discussions with Management
2007/2008 includes Legacy Instant business

24

**DUFF&PHELPS**

# Market Approach

Duff & Phelps also performed a valuation of the Polaroid Brand based on a comparison of the values associated with Branded Companies versus Non-Branded Companies.

## Step 1 – Identified Branded vs. Non-Branded Companies

✓ Identified publicly traded Branded and Non-Branded companies across numerous industries and calculated valuation multiples for both sets of companies

✓ In addition to Consumer Electronic companies, a list of well known branded companies were used to compare the difference between Branded and Non-Branded companies

✓ While several of these companies do not operate in the same segment or industry as Polaroid, they all share a powerful brand name and are very well known within their industry

✓ The non branded companies that were chosen operate in nearly identical industries as the branded companies but have limited to no brand awareness

✓ Calculated the difference in valuation multiples between both sets of companies. The difference in multiples represents the valuation premium attributable to Branded companies

## Step 2 – Established criteria for the difference in valuations between Branded vs. Non-Branded Companies

✓ Based on discussions with management, identified various criteria that would justify the premiums attributed to the Branded Companies. The criteria were – Brand, Distribution, Technology, Product Diversity and Financial Strength

✓ Compared Polaroid to some if its key peers on each of the criteria on a scale of 1 to 5 to determine a rating for Polaroid

✓ Adjusted the premium to reflect the metrics for Polaroid

✓ Adjusted the premium to reflect the relative importance of the Brand to the Polaroid business

## Step 3 – Determine the appropriate value of the Polaroid Brand

✓ Applied the adjusted premium to the 2008 and 2009 total revenues of Polaroid to arrive at the value of the Polaroid Brand

CONFIDENTIAL

DUFF&PHELPS

# Valuation Metrics

- **Brand**

  – A company's Brand is its identity and is determined by several factors including the Brand's awareness with the consumers and within the industry, positive association and quality of the product

- **Distribution Network**

  – The distribution network determines how well a company can sell its products and is a function of the relationships that the company has with various channel participants

- **Technology**

  – Technology is the strength of a company's future product pipeline. A company that has a richer product pipeline has a competitive advantage over its peers. It allows a company to position itself as a leader in the categories it operates in.

- **Product Diversity**

  – If a company has a diverse product portfolio, it can withstand competition and consistently maintain a leadership position.

- **Financial Strength**

  – Financial Strength determines a company's ability to grow by investing in new opportunities, meet its financial obligations and withstand downturns in the market.

CONFIDENTIAL

26

**DUFF&PHELPS**

CONFIDENTIAL

# Valuation Multiples – Branded vs Non-Branded Companies

**POLAROID CORPORATION**
**SELECTED BRANDED COMPANY COMPARISONS**
**AS OF OCTOBER 1, 2007**
**CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)**

| COMPANY NAME (Ticker) | Enterprise Value | LTM Revenue | LTM EBITDA | LTM EBITDA Margin | 2007 Projected Revenue | 2007 Projected EBITDA | 2007 Projected EBITDA Margin | 2008 Projected Revenue | 2009 Projected Revenue | EV/2007 Projected Revenue | EV/2008 Projected Revenue | EV/2009 Projected Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sony Corp. (TSE:6769) | ¥ 5,681,652.6 | ¥ 8,527,969.0 | ¥ 517,850.0 | 6.1% | ¥ 8,195,722.6 | 498,670.0 | 6.1% | ¥ 8,793,859.5 | ¥ 9,070,590.0 | 0.7x | 0.6x | 0.6x |
| Victor Co. of Japan Ltd. (TSE:6792) | ¥ 92,290.4 | ¥ 806,900.0 | ¥ 17,163.0 | 2.1% | ¥ 769,855.6 | 13,950.0 | 1.8% | ¥ 719,988.9 | ¥ 727,142.9 | 0.1x | 0.1x | 0.1x |
| SABMiller plc (LSE:SAB) | $ 21,797.9 | $ 14,882.0 | $ 3,994.0 | 26.9% | $ 18,750.8 | 4,121.5 | 22.0% | $ 20,496.3 | $ 22,159.2 | 1.2x | 1.1x | 1.0x |
| National Beverage Corp. (NasdaqNM:FIZZ) | $ 421.8 | $ 540.7 | $ 43.4 | 8.0% | $ 547.4 | 46.7 | 8.5% | $ 552.8 | $ 576.2 | 0.8x | 0.8x | 0.7x |
| International Business Machines Corp. (NYSE:IBM) | $ 161,923.2 | $ 96,177.0 | $ 19,044.0 | 19.8% | $ 90,796.6 | 17,998.1 | 19.8% | $ 97,463.1 | $ 101,532.4 | 1.8x | 1.7x | 1.6x |
| Diebold Inc. (NYSE:DBD) | $ 3,000.9 | $ 2,911.0 | $ 248.1 | 8.5% | $ 2,883.7 | 293.3 | 10.2% | $ 2,922.3 | $ 3,128.0 | 1.0x | 1.0x | 1.0x |
| Yum! Brands Inc. (NYSE:YUM) | $ 17,912.8 | $ 10,170.0 | $ 1,840.0 | 18.1% | $ 9,444.0 | 1,740.3 | 18.4% | $ 10,129.5 | $ 10,288.2 | 1.9x | 1.8x | 1.7x |
| Treehouse Foods Inc. (NYSE:THS) | $ 878.6 | $ 1,049.6 | $ 100.8 | 9.6% | $ 952.2 | 87.1 | 9.1% | $ 1,094.6 | $ 1,156.8 | 0.9x | 0.8x | 0.8x |
| Nike Inc. (NYSE:NKE) | $ 29,820.2 | $ 16,786.9 | $ 2,495.7 | 14.9% | $ 16,314.8 | 2,459.3 | 15.1% | $ 17,954.2 | $ 19,525.7 | 1.8x | 1.7x | 1.5x |
| Wolverine World Wide Inc. (NYSE:WWW) | $ 1,494.7 | $ 1,183.3 | $ 153.7 | 13.0% | $ 1,133.6 | 141.8 | 12.5% | $ 1,209.9 | $ 1,303.4 | 1.3x | 1.2x | 1.1x |
| Merck & Co. Inc. (NYSE:MRK) | $ 113,724.0 | $ 23,999.9 | $ 8,095.8 | 33.7% | $ 21,943.8 | 8,158.2 | 37.2% | $ 24,248.3 | $ 24,416.6 | 5.2x | 4.7x | 4.7x |
| Mylan, Inc. (NYSE:MYL) | $ 4,105.2 | $ 1,802.0 | $ 680.6 | 36.3% | $ 1,611.0 | 646.9 | 40.2% | $ 2,362.1 | $ 3,837.6 | 2.5x | 1.7x | 1.1x |
| Church & Dwight Co. Inc. (NYSE:CHD) | $ 3,080.4 | $ 2,105.5 | $ 339.3 | 16.1% | $ 1,928.7 | 310.1 | 16.1% | $ 2,171.7 | $ 2,260.5 | 1.6x | 1.4x | 1.4x |
| McBride plc (LSE:MCB) | $ 311.3 | $ 592.0 | $ 51.7 | 8.7% | $ 591.1 | 54.1 | 9.3% | $ 695.0 | $ 716.8 | 0.5x | 0.4x | 0.4x |
| **Average Difference** | | | | | | | | | | 1.0x | 1.0x | 1.0x |
| **Median Difference** | | | | | | | | | | 0.7x | 0.6x | 0.6x |

Notes:
$ in millions except per share data
LTM = Last Twelve Months
Enterprise Value = (Market Capitalization) + (Debt + Preferred Stock + Minority Interest) - (Cash & Equivalents)
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization
Source: Capital IQ, Bloomberg Estimates, and Duff & Phelps, LLC.

DUFF&PHELPS

CONFIDENTIAL

# Market Approach

- The following matrix was created in consultation with the Company Management

- Five companies, including Polaroid, were rated based on certain chosen criteria and ranked.

- Each of the selected companies were rated in each category on a scale from 1 to 5.

- Based on the ratings, Polaroid scored a total of 3.5 out of a possible 5, implying a possible 70% relative premium



**POLAROID CORPORATION**
**AS OF OCTOBER 1, 2007**
**BRAND VALUATION**
**MARKET APPROACH**

| METRIC | <LOW - HIGH> | | | | | | METRIC WEIGHTING | POLAROID SCORE |
|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | | |
| **BRAND** | Sony / Samsung / Polaroid / LG / Kodak | | | | | | 40% | 1.6 |
| **DISTRIBUTION NETWORK** | Sony / Samsung / Polaroid / LG / Kodak | | | | | | 20% | 0.6 |
| **TECHNOLOGY** | Sony / Samsung / Polaroid / LG / Kodak | | | | | | 20% | 0.8 |
| **PRODUCT DIVERSITY** | Sony / Samsung / Polaroid / LG / Kodak | | | | | | 10% | 0.3 |
| **FINANCIAL STRENGTH** | Sony / Samsung / Polaroid / LG / Kodak | | | | | | 10% | 0.2 |
| | | | | | | | **Total Polaroid Score** | **3.5 / 5.0** |

**DUFF&PHELPS**

# Market Approach - Valuation

## Selected Company Valuation Metrics

- Forward Multiples between branded and generic companies were calculated

- Based on the market valuation, 70 percent of the observed average premium was applied to Polaroid

- 46 Percent of the adjusted Polaroid multiple was then attributed to the brand as per the market valuation

### POLAROID CORPORATION
### BRAND VALUATION - MARKET MULTIPLES
### AS OF OCTOBER 1, 2007
### CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)

| | 2008 Multiples | | 2009 Multiples | |
|---|---|---|---|---|
| | Low | High | Low | High |
| Premium Multiple (Branded vs. Un-Branded) | 0.8x | 1.0x | 0.8x | 1.0x |
| % Attributable to Polaroid Company | 70.0% | 70.0% | 70.0% | 70.0% |
| Premium Polaroid Multiple | 0.6x | 0.7x | 0.6x | 0.7x |
| % Attributable to Polaroid Brand | 46% | 46% | 46% | 46% |
| Premium Brand Multiple | 0.3x | 0.3x | 0.3x | 0.3x |
| Revenue | 901.6 | 901.6 | 1,045.9 | 1,045.9 |
| Brand Value | 230.0 | 280.0 | 270.0 | 350.0 |

| Brand Value | 250.0 - 320.0 |
|---|---|

**Notes:**
$ in millions except multiple data
Percent to Brand derived from Brand Analysis and discussions with Management
Source: Capital IQ, Bloomberg Estimates, and Duff & Phelps, LLC.

CONFIDENTIAL

DUFF&PHELPS

CONFIDENTIAL

# Brand Value - Conclusion

## POLAROID CORPORATION
### BRAND VALUATION RANGE
### AS OF OCTOBER 1, 2007
### CURRENCY IN MILLIONS (UNLESS OTHERWISE NOTED)

| | LOW RANGE | HIGH RANGE |
|---|---|---|
| Relief From Royalty | 390.0 | 440.0 |
| Excess Earnings | 280.0 | 390.0 |
| Market Approach | 250.0 | 320.0 |
| Concluded Brand Value Range | 310.0 | 380.0 |

DUFF&PHELPS

CONFIDENTIAL

# Tax Amortization Benefit

- In a scenario where the Brand is monetized by PWG through a sale of the Brand to a third party ("Buyer"), there is a potential for the Buyer to amortize the purchase price of the Brand over 15 years for tax purposes. This will provide the Buyer with a tax benefit over 15 years.

- The tax amortization benefit is calculated by discounting the tax-effected amortization to present value assuming a 40% tax rate and a discount rate of 12.0 percent.

- This can result in the tax amortization yielding a benefit of approximately 20% of the purchase price.

- The amount of the Buyers tax amortization benefit that PWG could realize would depend on negotiations between PWG and the Buyer.

**DUFF&PHELPS**

CONFIDENTIAL

# IV. Appendix

DUFF&PHELPS

# Market Approach – WACC

**POLAROID CORPORATION**
**BOARD VALUATION**
**as of October 01, 2007**
**WEIGHTED AVERAGE COST OF CAPITAL (WACC)**

## Assumptions

### Global Assumptions

| | | | |
|---|---|---|---|
| Pre-Tax, Required Return on Debt Capital | Rr | = | 6.61% |
| Risk-Free Rate | Rf | = | 4.68% |
| Equity Risk Premium | Rp | = | 6.00% |
| Small Stock Premium | Ssp | = | 1.76% |

S&P BBB Rate as of October 01, 2007, Bloomberg
20 year T-Bill Rate as of October 01, 2007, Bloomberg
Comparable
BBB Valuation Edition 2007 Yearbook

### Tax Assumptions

| | | | |
|---|---|---|---|
| Target Effective Tax Rate | t | = | 40.00% |

## Industry Capital Structure

### Comparable Companies

| | Total Debt (D) | = | Common Shares Price | x | Common Shares Outstanding | = | Market Value of Equity (E) | = | Total Capital (D+E) |
|---|---|---|---|---|---|---|---|---|---|
| LG Electronics Inc. (KOSE:A066570) | 3,830.0 | | 33,800.0 | | 143.9 | | 12,071,623.8 | | 12,071,623.8 |
| Koninklijke Philips Electronics NV (ENXTAM:PHIA) | 100,000.0 | | 570,000.0 | | 1,597.0 | | 94,322.7 | | 73,779,264.2 |
| Samsung Electronics Co. Ltd. (KOSE:A005930) | 100,000.0 | | 570,000.0 | | 128.8 | | 73,779,264.2 | | 73,779,264.2 |
| Eastman Kodak Co. (NYSE:EK) | 1,624.0 | | 27.6 | | 287.9 | | 7,943.5 | | 9,078.5 |
| Olympus Corp. (TSE:7733) | 468,026.0 | | 4,410.0 | | 275.5 | | 1,215,075.0 | | 1,786,371.3 |
| Nikon Corp. (TSE:7731) | 112,196.0 | | 3,950.0 | | 398.4 | | 1,569,745.0 | | 1,681,977.3 |
| Sharp Corp. (TSE:6753) | 625,167.0 | | 2,115.0 | | 1,090.7 | | 2,351,333.4 | | 2,930,536.4 |
| Symbol-Zebra Corporation (Nasdaq) | | | 4.1 | | 95.5 | | | | |
| Matsushita Electric Industrial Co. Ltd. (TSE:6752) | 428,592.0 | | 2,155.0 | | 2,128.9 | | 4,579,354.8 | | 5,005,946.8 |
| Hewlett-Packard Co. (NYSE:HPQ) | 8,612.0 | | 51.0 | | 2,675.1 | | 136,010.1 | | 140,001.5 |
| Lexmark International Inc. (NYSE:LXK) | 154.1 | | 47.1 | | 84.7 | | 3,989.4 | | 4,047.3 |
| Sony Corp. (TSE:6758) | 1,170,218.0 | | 6,950.0 | | 1,002.1 | | 5,851,532.5 | | 6,951,938.5 |

## Industry Data

### Comparable Companies

| | Projected Beta | | Debt to Equity Capital | | Debt to Total Capital | | Income Tax Rate (t) | | Unlevered Beta |
|---|---|---|---|---|---|---|---|---|---|
| LG Electronics Inc. (KOSE:A066570) | 1.52 | | 0.0% | | 0.0% | | 40.0% | | 1.52 |
| Koninklijke Philips Electronics NV (ENXTAM:PHIA) | 1.47 | | 0.1% | | 0.1% | | 40.0% | | 1.38 |
| Samsung Electronics Co. Ltd. (KOSE:A005930) | 1.27 | | 0.1% | | 0.1% | | 40.0% | | 1.27 |
| Eastman Kodak Co. (NYSE:EK) | 1.86 | | 20.4% | | 17.9% | | 40.0% | | 1.69 |
| Olympus Corp. (TSE:7733) | 0.24 | | 38.3% | | 26.2% | | 40.0% | | 0.38 |
| Nikon Corp. (TSE:7731) | 0.79 | | 7.1% | | 6.7% | | 40.0% | | 0.75 |
| Sharp Corp. (TSE:6753) | 0.73 | | 27.2% | | 21.4% | | 40.0% | | 0.63 |
| Symbol-Zebra Corporation (Nasdaq) | 1.28 | | 20.7% | | 17.1% | | 40.0% | | 1.17 |
| Matsushita Electric Industrial Co. Ltd. (TSE:6752) | 0.79 | | 9.3% | | 8.5% | | 40.0% | | 0.69 |
| Hewlett-Packard Co. (NYSE:HPQ) | 1.52 | | 6.9% | | 6.1% | | 40.0% | | 1.45 |
| Lexmark International Inc. (NYSE:LXK) | 1.65 | | 4.0% | | 3.8% | | 40.0% | | 1.60 |
| Sony Corp. (TSE:6758) | 0.65 | | 20.7% | | 17.1% | | 40.0% | | 0.59 |

| Industry Median | 1.29 | | 9.93% | | 9.03% | | | | 1.22 |

### Preferred Equity Cost of Capital

| | Required Return |
|---|---|
| Median Unlevered Beta | 1.22 |
| Industry Debt to Equity (rounded) | 9.95% |
| Effective Income Tax Rate | 40.00% |
| Relevered Beta (β) | 1.30 |

### Weighted Average Cost of Capital

| | Required Return | | Weight (rounded) | | WACC |
|---|---|---|---|---|---|
| Required Return on Debt Capital (Rr * (1-t)) | 3.97% | | 9.00% | | 0.36% |
| Required Return on Common Equity Capital (Rf + (β*Rp) + Ssp) | 13.21% | | 91.00% | | 12.03% |
| | | | | | |
| | | | Concluded WACC (rounded) | | 12.00% |

**NOTES:**
Projected Betas as of September 2007 provided by BARRA, Inc.

CONFIDENTIAL

**DUFF&PHELPS**

CONFIDENTIAL

# Market Approach – Non-Branded Company Descriptions

## POLAROID CORPORATION
### SELECTED NON-BRANDED COMPANY DESCRIPTIONS
### AS OF OCTOBER 1, 2007

| COMPANY: | DESCRIPTION |
| --- | --- |
| Victor Co of Japan Ltd. | Victor Company of Japan, Limited, through its subsidiaries, engages in the development, manufacture, and sale of audio, visual, computer-related consumer, professional electronics and software, and media products. It operates in four segments. Consumer Electronics, Professional Electronics, Components & Devices, and Software & Media. The Consumer Electronics segment offers consumer audio and visual products, such as LCD televisions, digital video cameras, DVD players/recorders, audio systems, and videocassette recorders, as well as car audiovisual systems. The Professional Electronics segment provides video surveillance equipment, audio and video equipment, and projectors. The Components & Devices segment manufactures various products, including motors for hard disk drives, optical pickups for car CD receivers, high-density and multilayer printed wiring boards, and deflection yokes. The Software & Media segment offers recordable media, and prerecorded audio and visual software, including CDs, DVDs, and videotapes. Victor Company of Japan has a partnership agreement with Millestone Systems A/S for the technology development and marketing of IP security solutions. The company operates in Japan, the Americas, Europe, and Asia. Victor Company of Japan was founded in 1927 and is headquartered in Yokohama, Japan. |
| National Beverage Corp. | National Beverage Corp., through its subsidiaries, engages in the development, manufacture, marketing, and distribution of soft drinks, juice drinks, water, sparkling waters, and specialty beverages in the United States. The company offers flavoured drinks under the Shasta and Faygo brand names; juice and juice-based products under the Everfresh, Home Juice, and Mr. Pure brand names; flavored and spring water products under the LaCroix, Mt. Shasta, Crystal Bay, and ClearFruit brand names; energy drinks and powdered beverage products under the St. Rip It, Rip It Chic, FREEK, and PowerBlast brands; fruit-flavored drinks under the Ohana brand name; and holiday soft drinks under the Nick's brand name. It also develops and produces soft drinks for retailers and beverage companies. The company distributes its products to the national and regional grocery stores, warehouse clubs, mass-merchandisers, wholesalers and dollar stores, convenience stores, gas stations, other smaller 'up-and-down-the-street' accounts, hospitals, schools, military bases, airlines, hotels, and food-service wholesalers. National Beverage Corp. was founded in 1985 and is based in FL Lauderdale, Florida. |
| Diebold Inc. | Diebold, Incorporated engages in the development, manufacture, sale, installation, and service of automated self-service transaction systems, electronic and physical security systems, and election systems and software worldwide. It offers self-service banking products and automated teller machines. Remote teller systems, vaults, safe deposit boxes and safes, drive-up banking equipments, and electronic voting systems. The company's integrated security solutions provide sales, service, installation, project management, and monitoring of original equipment manufacturer electronic security products to financial, government, retail, and commercial customers. Diebold also offers software solutions and services, which include applications to process events and transactions, and professional services to assist in implementation of software solutions, such as communication network review, systems integration, custom software, and project management. In addition, the company offers software and various products that are used to equip bank facilities and electronic voting terminals. It serves banks and financial institutions, public libraries, government agencies, utilities, and various retail outlets. The company sells its products directly to customers through sales personnel, manufacturers' representatives, and distributors. Diebold was founded in 1859 and is headquartered in North Canton, Ohio. |

34

# Market Approach – Non-Branded Company Descriptions

CONFIDENTIAL

## POLAROID CORPORATION

### SELECTED NON-BRANDED COMPANY DESCRIPTIONS

### AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
|---|---|
| Treehouse Foods Inc. | TreeHouse Foods, Inc. operates as a food manufacturer primarily servicing the retail grocery, foodservice, and industrial markets in the United States. It produces and sells pickles, peppers, relishes, and related products. These products include whole pickles, sliced pickles, pickle relish, peppers, and other products in various flavor formulations. The company supplies private label pickles to supermarkets and mass merchandisers, and sells pickle products to foodservice customers, including relish and hamburger pickle slices, and sells pickle products to retailers under its own brands, which include Farmans, Nalley's Peter, Piper, and Steinfeldm. It also sells sauces and syrups to retail grocers under Bennett's, Hoffman House, and Roddenberry's Northwoods brand names. In addition, the company produces and sells nondairy powdered creamer, which is used as a coffee creamer or whitener, as well as an ingredient in baking, beverage, and gravy mixes. It sells these products under private labels and under its Cremora brand name to the retail grocery and foodservice markets. Further, it sells nondairy powdered creamer to industrial customer base for repackaging in portion control packages and for use as an ingredient by other food manufacturers. Additionally, the company produces and sells aseptic cheese sauces and puddings for the foodservice market; Mocha Mix, a nondairy liquid creamer; Second Nature, a liquid egg substitute; and salad dressings. TreeHouse Foods also exports its products primarily to South America and Canada. The company was founded in 1862 and is based in Westchester, Illinois. |
| Wolverine World Wide | Wolverine World Wide, Inc. engages in designing, manufacturing, sourcing, marketing, and distributing a range of footwear, apparel, and accessories to the retail sector in the United States and internationally. It primarily offers casual shoes, dress shoes, performance outdoor footwear, boots, uniform shoes, work shoes, slippers, moccasins, and apparel and accessories. The company offers its products primarily under the Bates, Cat, Harley-Davidson, Hush Puppies, HyTest, Merrell, Patagonia, Sebago, and Wolverine brands. It also licenses its brands for use on non-footwear products including apparel, eyewear, headwear, watches, socks, gloves, handbags, and plush toys. The company also operates a pigskin tannery, and purchases and cures raw pigskins. Wolverine World Wide, Inc. distributes its products through company-owned retail stores, as well as to department stores, footwear chains, catalogs, specialty retailers, mass merchants, and internet retailers in the United States; and through wholesale operations, licensees, and distributors in Canada, the United Kingdom, Austria, Finland, France, Germany, Italy, The Netherlands, Spain, Sweden, and Switzerland. As of December 30, 2006, it operated 82 retail stores. The company was founded in 1883 and is based in Rockford, Michigan. |
| Mylan, Inc. | Mylan, Inc. and its subsidiaries engage in the development, manufacture, marketing, licensing, and distribution of generic, brand, and branded generic pharmaceutical products, as well as active pharmaceutical ingredients. The company offers its products in various therapeutic areas, including cardiovascular, central nervous system, dermatology, gastrointestinal, endocrine and metabolic, and renal and genitourinary. It markets its generic products directly to wholesalers, distributors, retail pharmacy chains, mail order pharmacies, group purchasing organizations; and indirectly to independent pharmacies, managed care organizations, hospitals, nursing homes, pharmacy benefit management companies, and government entities in the United States. Mylan sells its active pharmaceutical ingredients primarily to generic finished dosage form manufacturers worldwide. The company was founded in 1961 and is based in Canonsburg, Pennsylvania. |
| McBride plc | McBride plc produces private label household and personal care products in Europe. It offers laundry detergents; fabric softeners; household cleaners; dishwashing products; aircare products; and personal hair, body, oral, and skin care products and aerosols. The company was founded in 1898 and is based in Buckinghamshire, the United Kingdom. |

35

**DUFF&PHELPS**

# Market Approach – Branded Company Descriptions

CONFIDENTIAL

## POLAROID CORPORATION
## SELECTED BRANDED COMPANY DESCRIPTIONS
## AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
|---|---|
| Sony Corp. | Sony Corporation operates in the Electronics, Game, Entertainment, and Financial Services sectors. In the Electronics segment, the company engages in the development, design, manufacture and sale of various kinds of electronic equipment, instruments, and devices for consumer and professional markets. It offers home portable audio systems, LCD televisions, projection televisions, CRT-based televisions, personal players/recorders, digital/analog recording systems, LCD and CCD semiconductors, optical pickups, batteries, audio/video/data recording media and data recording systems. Its Game segment develops, produces, markets, and distributes PSP (PlayStation Portable), PlayStation 2, and the PLAYSTATION 3 computer entertainment systems. In the Entertainment segment, Sony engages in motion picture, television, and home entertainment production, acquisition, and distribution; television broadcasting; digital content creation and distribution; and development of new entertainment products and services, and operation of a studio facility. In the Financial Services segment, the company offers individual life insurance and non-life insurance, credit financing and banking services in Japan. Sony also operates as a 50:50 partner in the Sony BMG Music Entertainment and Sony Ericsson Mobile Communications joint ventures. It markets its electronic and game products directly via the Internet, as well as through sales subsidiaries and local distributors worldwide. The company was founded in 1946 as Tokyo Telecommunications Engineering Corporation and changed its name to Sony Corporation in 1958. Sony Corporation is headquartered in Tokyo, Japan. |
| SABMiller plc. | SABMiller plc, through its subsidiaries, brews and sells beer and other beverage products worldwide. It produces malt beverages, carbonated soft drinks, water, and fruit juices, as well as brews sorghum. The company offers its products under Peroni Nastro Azzurro, Pilsner Urquell, Miller Genuine Draft, Castle Lager, Miller Lite, Aguila, Tyskie, and Snow brand names. It also operates as a bottler of Coca-Cola products outside the United States. SABMiller operates in approximately 60 countries worldwide. The company has strategic alliance with Castel Group through which it owns brewing interests in 18 countries. SABMiller is headquartered in London, the United Kingdom. |
| International Business Machines Corp. | International Business Machines Corporation (IBM) engages in the development and manufacture of the advanced information technologies, including computer systems, software, storage systems, and microelectronics. It operates in three segments: Systems and Financing, Software, and Services. Systems and Financing segment offers servers; data storage products, including disk, tape, optical, and storage area networks; microprocessors and integrated circuits; system and component design services, and technology and manufacturing consulting services; printing systems, including production and on-demand print solutions, enterprise print technologies, and related software; and point-of-sale retail systems. This segment also offers short-term inventory and accounts receivable financing; leases and loan financing; and sells and leases used equipment. Software segment provides information management software for database, content management, and information integration; lotus software for collaboration, messaging, and social networking; rational software, a process automation tool; Tivoli software for infrastructure management, including security and storage management; Websphere software for Web-enabled applications; product lifecycle management software; and operating system software. Services segment offers business process outsourcing, consulting, and systems integration; strategic outsourcing services; integrated technology services; IT infrastructure maintenance services, application management services for packaged software and custom and legacy applications, and applications on demand services. IBM serves banking, insurance, education, government, healthcare, life sciences, aerospace and defense, automotive, chemical and petroleum, electronics, distribution, and communication markets. The company was founded in 1910 as Computing-Tabulating-Recording Co. and changed its name to International Business Machines Corporation in 1924. IBM is based in Armonk, New York. |

DUFF&PHELPS

CONFIDENTIAL

# Market Approach – Branded Company Descriptions

## POLAROID CORPORATION
### SELECTED BRANDED COMPANY DESCRIPTIONS
### AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
| --- | --- |
| Yum! Brands Inc. | YUM! Brands, Inc. operates as a quick service restaurant company. It develops, operates, franchises, and licenses a system of restaurants, which prepare, package, and sell various priced food items. The company operates various restaurant brands, including KFC, Pizza Hut, Taco Bell, Long John Silver's, and A&W All-American Food Restaurants. Its restaurants specialize in chicken, pizza, Mexican-style food, quick-service seafood, and seafood categories. As of December 31, 2006, it operated approximately 34,000 restaurants in 100 countries and territories. The company was founded in 1997. It was formerly known as TRICON Global Restaurants, Inc. and changed its name to YUM! Brands, Inc. in 2002. YUM! Brands, Inc. is headquartered in Louisville, Kentucky. |
| Nike Inc. | NIKE, Inc., a consumer products company, engages in the design, development, and marketing of footwear, apparel, equipment, and accessory products worldwide. It designs athletic, casual, and leisure footwear for men, women, and children. The company's footwear products include running, training, basketball, soccer, sport-inspired urban shoes, and children's shoes. It also markets shoes designed for tennis, golf, baseball, football, lacrosse, walking, outdoor activities, skateboarding, bicycling, volleyball, wrestling, cheerleading, aquatic activities, and other athletic and recreational uses. The company also offers apparel for licensed college and professional team and league logos. It also sells a line of performance equipment under the NIKE brand name, including bags, socks, sport balls, eyewear, timepieces, electronic devices, bats, gloves, protective equipment, and other equipment designed for sports activities. In addition, NIKE provides licenses to produce and sell NIKE brand swimwear, cycling apparel, children's clothing, school supplies, electronic devices, eyewear, golf accessories, and belts. Further, it manufactures and distributes ice skates, skate blades, protective gear, hockey sticks, licensed apparel and accessories. The company sells its products to retail accounts, through its owned retail stores, and through a mix of independent distributors and licensees, as well as through Internet Web site, nike.com, nikestore.com, and through a mix of independent distributors and licensees in the United States and 232 retail stores internationally. The company was founded in 1964 and is headquartered in Beaverton, Oregon. |
| Merck & Co. Inc. | Merck & Co., Inc. engages in the discovery, development, manufacture, and marketing of various products for human and animal health. It offers Singulair for the chronic treatment of asthma and relief of symptoms of allergic rhinitis; Cozaar/Hyzaar and Fosamax and Fosamax Plus D for the treatment and prevention of osteoporosis; Zocor, an atherosclerosis product; Primaxin and Cancidas, anti-bacterial/anti-fungal products; Cosopt and Trusopt, the ophthalmological products; Proscar, an urology product for the treatment of symptomatic benign prostate enlargement; Maxalt, an acute migraine product; Propecia for the treatment of male pattern hair loss. The company offers Vioxx, Arcoxia and Gardasil; M-M-R II, for the treatment of measles, mumps, and rubella; ProQuad, a pediatric combination vaccine against measles, mumps, rubella, and varicella; Gardasil for the prevention of cervical cancer and genital warts; Pneumovax for the prevention of pneumococcal diseases; RotaTeq for the protection against rotavirus gastroenteritis in infants and children; and Zostavax, a vaccine for the prevention of shingles. It markets its products either directly or through joint ventures to drug wholesalers and retailers, hospitals, government agencies, and managed health care providers, such as health maintenance organizations and other institutions. Merck & Co. has agreements with Neuromed Pharmaceuticals, Ltd. to research, develop, and commercialize compounds for treating pain and other neurological disorders; NicOx S.A. to develop new antihypertensive drugs; TorreyPines Therapeutics, Inc. for atherosclerosis; and AstraZeneca, Inc. to develop a biomarker and pharmacogenomic test for cancer clinical trials. The company was founded in 1891 and is headquartered in Whitehouse Station, New Jersey. |
| Church & Dwight Co. Inc. | Church & Dwight Co., Inc., together with its subsidiaries, engages in the development, manufacture, and marketing of a range of household, personal care, and specialty products in the United States and internationally. Its household products include baking soda, carpet, room, and refrigerator deodorizers; cat litter and other pet care products; soap and disposable cleaning pads; bathroom and shower cleaners; powder and liquid laundry detergent; liquid fabric softener sheets; washing soda; and other cleaning products. The company's personal care products consist of condoms, deodorants, home pregnancy and ovulation test kits, lotions, creams, waxes, antiperspirants, toothpastes and powder, and battery-operated toothbrushes. Church & Dwight's specialty products comprise sodium bicarbonate, potassium carbonate, and potassium bicarbonate, used in various grades and granulations for use in industrial and agricultural markets. Its sodium bicarbonate is used by other manufacturing companies as a leavening agent for commercial baked goods, as antacid in pharmaceuticals, as a carbon dioxide release agent in fire extinguishers, as an alkaline agent in swimming pool chemicals, and as a buffer in kidney dialysis. The company also sells animal nutrition products, including sodium bicarbonate, sodium sesquicarbonate, and feed grade potassium carbonate to the animal feed market for use by dairy cattle, and specialty cleaners consisting of cleaning and deodorizing products for use in commercial and industrial applications, such as office buildings, hotels, restaurants, and other facilities. It sells various personal care products, over-the-counter, and household products in international markets, including France, the United Kingdom, Canada, Mexico, Australia, Spain, and Brazil. Church & Dwight sells its products through supermarkets, drug stores, mass merchandisers, and distributors. The company was founded in 1846 and is based in Princeton, New Jersey. |

37

CONFIDENTIAL

# Market Approach – Comparable Company Descriptions

## POLAROID CORPORATION
## SELECTED COMPARABLE COMPANY DESCRIPTIONS
## AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
|---|---|
| Eastman Kodak | Eastman Kodak Company engages the in development, manufacture, and marketing of digital and traditional imaging products, services, and solutions worldwide. The company's Consumer Digital Imaging group offers digital cameras, home imaging accessory products, home printers and printer media, and digital picture frames; and kiosks, digital imaging services, and imaging sensors. It also provides an online merchandise and sharing service that enables consumers to view, store, and share photos with friends and family, as well as receive prints, photo books, frames, and calendars. Eastman Kodak Company's Film and Photofinishing Systems group offers films, film cameras, color photographic papers, photographic processing chemicals, wholesale photofinishing services, event imaging solutions, and equipment service and support used to create motion pictures, capture and print photographs, and for professional and commercial imaging applications. Its Graphic Communications group offers prepress consumables, workflow and proofing software, electrophotographic equipment and consumables, inkjet printing systems, document scanners, micrographic peripherals, and micrographic films for the creative, in-plant, data center, commercial printing, packaging, newspaper, and digital service bureau markets. The company was founded in 1880 and is headquartered in Rochester, New York. |
| Olympus | Olympus Corporation and its subsidiaries engage in the manufacture and sale of precision machineries and instruments worldwide. It operates in five segments: Imaging Systems Business, Medical Systems Business, Life Science Business, Information and Communication Business, and Others. The Imaging Systems Business segment offers film cameras, digital cameras, and voice recorders. The Medical Systems Business segment provides medical endoscopes, surgical endoscopes, endo-therapy devices, and ultrasound endoscopes. The Life Science Business segment offers diagnostic systems, biological microscopes, analytical services of genomic information, and industrial microscopes. The Information and Communication Business segment provides mobile terminals, mobile solutions, mobile content services, network infrastructure systems, system development, semiconductor devices, and electric equipment. The Others segment offers industrial endoscopes, nondestructive testing equipment, printers, bar code data processing equipment, and software development equipment. Olympus was founded in 1919 and is headquartered in Tokyo, Japan. |
| Nikon | Nikon Corporation engages in the manufacture and sale of camera-related products. It operates in four segments: Precision Equipment, Imaging Products, Instruments, and Other. The Precision Equipment segment offers IC steppers and LCD steppers. The Imaging Products segment provides digital cameras, cameras, and interchangeable camera lenses. The Instruments segment offers microscopes, measuring instruments, and inspection equipment. The Other segment provides sport optics products, such as binoculars/telescopes, laser rangefinders, digiscoping systems, and loupes; ophthalmic frames; and surveying instruments. Nikon has operations in North America, Europe, and Japan and other Asian countries. The company was founded in 1917 as Nippon Kogaku K.K. and changed its name to Nikon Corporation in 1988. Nikon is headquartered in Tokyo, Japan. |

38

**DUFF&PHELPS**

CONFIDENTIAL

# Market Approach – Comparable Company Descriptions

## POLAROID CORPORATION
## SELECTED COMPARABLE COMPANY DESCRIPTIONS
## AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
|---|---|
| LG Electronics Inc. | LG Electronics, Inc., together with its subsidiaries, engages in the manufacture and sale of electronics, and information and communications products worldwide. It operates in five divisions: Digital Display, Digital Media, Mobile Communications, and LCD division. The Digital Display division offers a range of televisions, plasma display panels, monitors, and other related products. The Digital Media division provides various audio systems, VCRs, CD-ROM products, and personal computers. The Mobile Appliance division offers refrigerators, washing machines, air conditioners, microwave ovens, vacuum cleaners, and other products. The Mobile Communications division supplies CDMA handsets, UMTS handsets, wireless telephones, WLL handsets, mobile telecommunications transmitters, switchboards, keyphone systems, and other related products. The LCD division provides thin film transistor liquid crystal displays and other related products. LG Electronics also manufactures and sells a range of electronics, electrics, and machinery components. The company was founded in 1959 and is based in Seoul, South Korea. |
| Koninklijke Philips Electronics NV | Koninklijke Philips Electronics N.V. operates as an electronics company with activities in the domains of healthcare, lifestyle, and technology. It operates in four segments: Medical Systems, Domestic Appliances and Personal Care, Consumer Electronics, and Lighting. Medical Systems segment offers X-ray, magnetic resonance, and computed tomography products; nuclear medicine; patient monitoring and ultrasound systems; defibrillators and other cardiac care technologies; picture archiving and communications systems; medical transcription services; and customer services. Domestic Appliances and Personal Care segment provides shaving and beauty, domestic appliances, health and wellness, and oral healthcare products. Consumer Electronics segment offers flat TV; home theater in a box systems; DVD, DVD+HW, and hard-disc recording systems; voice over Internet protocol (VoIP) cordless digital phones; HD and Internet protocol TV set-top boxes, and remote controls. This segment also provides mobile phones, such as audio players, peripherals, accessories, and MSN. Lighting segment provides incandescent and halogen lamps, amBX peripherals—accessories; and VoIP phone with Skype and MSN. Lighting segment provides incandescent and halogen lamps, compact and normal fluorescent lamps, gas-discharge and special lamps, automotive lighting products, luminaires, electromagnetic and electronic ballasts, and solid-state components, modules, and systems. The company sells its products to customers primarily in Europe and Africa, North America, Latin America, and the Asia Pacific. Koninklijke Philips was founded in 1891 as Philips & Co. and changed its name to N.V. Philips Gloeilampenfabrieken in 1912. Further, it changed its name to Philips Electronics N.V. in 1994 and to Koninklijke Philips Electronics N.V. in 1998. The company is based in Amsterdam, the Netherlands. |
| Samsung Electronics Co. Ltd | Samsung Electronics Co., Ltd., through its subsidiaries, engages in the manufacture and sale of semiconductors, telecommunication products, home appliances, and digital media products. The company operates in five segments: Digital Media, Telecommunication Network, Digital Appliance, Semiconductor, and LCD. The Digital Media segment offers color televisions, monitors, MP3 players, DVD Combo Players, PDP television, LCD television, home theater system, digital camcorder, laser printer, and laptops. The Telecommunication Network segment provides CDMA handsets, GSM based PDAs, mobile intelligent terminals, and satellite receivers. The Digital Appliance segment provides refrigerators, air conditioners, air purifiers, microwave oven, and vacuum cleaners. The Semiconductor segment provides dynamic random access memory, static random access memory, NAND-flash memory, multichip packages, optical disk drives, system in packages, smart cards, system on chips, and static random access memory. The company also engages in the thin film transistor-LCDs for handheld devices, monitors, notebook personal computers, and televisions. The company also engages in the operation or service centers for electronic goods; the distribution and sale of electronic goods and semiconductors; and information system research and development. It has operations in North America, South America, Asia Pacific, Europe, and Middle East Africa. Samsung Electronics has strategic alliances with various companies, primarily Sony Corporation, IBM Corp., Microsoft Corp., Arava, Inc., Hewlett Packard, Sun Microsystems, Mitsubishi, Dell, and MTI Micro-Fuel Cells, Inc. The company was founded by Byung-Chull Lee in 1938. It was formerly known as Samsung Electronics Manufacturing and changed its name to Samsung Electronics Co., Ltd. in 1984. Samsung Electronics is headquartered in Seoul, South Korea. Samsung Electronics Co., Ltd. operates as a subsidiary of Samsung Group. |

DUFF&PHELPS

# Market Approach – Comparable Company Descriptions

CONFIDENTIAL

## POLAROID CORPORATION
### SELECTED COMPARABLE COMPANY DESCRIPTIONS
### AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
|---|---|
| Sharp Corp | Sharp Corporation, through its subsidiaries, manufactures and sells electronic products worldwide. The company operates in two segments, Consumer/Information Products and Electronic Components. The Consumer/Information Products segment offers audio-visual and communication equipment. Its audio-visual and communication equipment includes color LCD TVs, color TVs, TV/VCR combos, LCD projectors, digital broadcast receivers, DVD players, VCRs, 1-bit digital audio products, MD players, CD component systems, facsimiles, telephones, mobile phones, and PHS phones. Home appliances comprise refrigerators, microwave ovens, superheated steam ovens, air conditioners, washing machines, vacuum cleaners, kerosene heaters, electric heaters, humidifiers, air purifiers, dehumidifiers, and small cooking appliances. Information equipments include personal computers, personal digital assistants, mobile communications handsets, electronic dictionaries, calculators, POS systems, handy data terminals, electronic cash registers, LCD color monitors, information displays, electrostatic copier/printers, electrostatic copiers, FA equipment, and ultrasonic cleaners. The Electronic Components segment offers LSIs, including flash memories, combination memories, CCD/CMOS imagers, LSIs for LCDs, and microcomputers; TFT LCD modules, duty LCD modules, and system LCD modules; and other devices, such as RF modules, satellite broadcasting, terrestrial digital tuners, RF components, laser diodes, LEDs, optical sensors, optical communication components, regulators, switching power supplies, and analog ICs. Sharp Corporation was founded in 1912. It was formerly known as Hayakawa Metal Works Institute Co, and changed its name to Sharp Corporation in 1970. The company is headquartered in Osaka, Japan. |
| Syntax-Brillian Corporation | Syntax-Brillian Corporation engages in the design, development, and distribution of high-definition televisions (HDTVs) utilizing liquid crystal display (LCD) and liquid crystal on silicon (LCoS) technologies. It offers LCD HDTVs in various screen sizes under Olevia brand name and LCoS HDTVs utilizing its proprietary LCoS microdisplay technology. The company also supplies a range of digital imaging products including digital and film cameras, and audio equipment, as well as notebook PCs and ruggedized notebook PCs, PC peripherals, mobile phones, cameras, multimedia players, flash units, binoculars, projectors, and camera accessories. In addition, Syntax-Brillian offers LCoS microdisplay products and subsystems, including LCoS display imagers and associated application specific integrated circuits that provide driver, controller, and converter functions; imager products with SXGA to 720p and 1080p resolutions; and optical modules that include illumination, prisms, color separators and other lenses. Further, it provides head-mounted monocular or binocular headsets and viewers for industrial, medical, military, commercial, and consumer applications; and SVGA imagers, display modules, and reference designs for microdisplay market. This company serves high-end audio/video manufacturers, distributors of high-end consumer electronics products, and consumer electronics retailers in North America, Asia, and Europe. Syntax-Brillian was founded in 2003 and is headquartered in Tempe, Arizona. |
| Matsushita Electric Industrial Co., Ltd. | Matsushita Electric Industrial Co., Ltd., through its subsidiaries, produces and sells electronic and electric products for consumer, business, and industrial uses. It operates in six segments: Audiovisual and Computer Products (AVC) Networks, Home Appliances, Components and Devices, MEW and Panahome, JVC, and Other. AVC Networks segment offers televisions, DVD recorders and players, SD memory cards, digital and video cameras, and audio equipment, as well as notebook PCs and ruggedized notebook PCs, PC peripherals, mobile phones, cordless telephones and facsimile equipment, network cameras and TV door intercom systems, automotive electronics, optical pickups, collection terminals, and product tracking systems and payment terminals. Home Appliances segment offers washing machines, vacuum cleaners, dishwasher/dryers, rice cookers, microwave ovens, induction-heating cooking equipment, refrigerators, room air conditioners, water heating systems, and compressors, as well as healthcare systems, lighting, and environmental systems. Components and Devices segment provides semiconductors, electronic devices, batteries, and electric motors that are used primarily in AV equipment, information and communication devices, home appliances, and industrial equipments. MEW and Panahome segment manufactures electrical construction materials, home appliances, building products, electronic and plastic materials, and automation controls, as well as engages in detached housing, home remodeling, and asset- and property-management businesses. JVC segment manufactures recordable media and components. Other segment provides optimal solutions in electronic component mounting, semiconductor mounting, and manufacturing processes to develop circuit manufacturing technology. The company was founded in 1918 and is headquartered in Osaka, Japan. |

40

DUFF&PHELPS

CONFIDENTIAL

# Market Approach – Comparable Company Descriptions

## POLAROID CORPORATION
### SELECTED COMPARABLE COMPANY DESCRIPTIONS
### AS OF OCTOBER 1, 2007

| COMPANY | DESCRIPTION |
| --- | --- |
| Sony Corp | Sony Corporation operates in the Electronics, Game, Entertainment, and Financial Services sectors. In the Electronics segment, the company engages in the development, design, manufacture, and sale of various kinds of electronic equipment, instruments, and devices for consumer and professional markets. It offers home and portable audio equipment, video cameras, digital still cameras, DVD-video players/recorders, digital-broadcasting receiving systems, LCD televisions, projection televisions, CRT-based televisions, personal computers, printers, broadcast and professional use audio/video monitors, LCD and CCD semiconductors, optical pickups, batteries, audio/video data recording media, and data recording systems. Its Game segment develops, produces, markets, and distributes PSP (PlayStation Portable), PlayStation 2, and the PLAYSTATION 3 computer entertainment systems. In the Entertainment segment, Sony engages in motion picture, television, and home entertainment production, acquisition, and distribution; television broadcasting; digital content creation and distribution; and development of new entertainment products and services, and operation of a studio facility. In the Financial Services segment, the company offers individual life insurance and nonlife insurance, credit financing, and banking services in Japan. Sony also operates as a 50/50 partner in the Sony BMG Music Entertainment and Sony Ericsson Mobile Communications joint ventures. It markets its electronic and game products directly via the Internet, as well as through sales subsidiaries and local distributors worldwide. The company was founded in 1946 as Tokyo Telecommunications Engineering Corporation and changed its name to Sony Corporation in 1958. Sony Corporation is headquartered in Tokyo, Japan. |
| Hewlett-Packard Co. | Hewlett-Packard Company provides various products, technologies, solutions, and services to consumers, businesses, and governments worldwide. The company's Enterprise Storage and Servers segment provides storage and server solutions, including industry standard servers and business critical systems, as well as storage products, including area networks, network attached storage, storage management software, virtualization technologies, tape drives, tape libraries, optical archival storage, and various types of arrays. Hewlett-Packard's HP Services segment offers multi-vendor information technology (IT) services, including technology, consulting and integration, and managed services. The company's Software segment offers management software solutions that allow enterprise customers to manage their IT infrastructure, operations, applications, IT services, and business processes, as well as delivers carrier-grade software platforms for developing and deploying voice, data, and converged services to network and home environments. Its Personal Systems Group segment provides commercial personal computers (PC), consumer PCs, workstations, handheld computing devices, digital entertainment systems, calculators, software, and services for the commercial and consumer markets. The company's Imaging and Printing Group segment provides inkjet printers, digital photography and entertainment products, laserjet printers, graphics and imaging products, and printer supplies. Its HP Financial Services segment offers leasing, financing, utility programs, and asset recovery and financial asset management services for enterprise customers. In addition, the company sells network infrastructure products, including Ethernet switch products that enhance computing and enterprise solutions under the brand ProCurve Networking, as well as the licensing of specific HP technology to third parties. The company was founded in 1939 and is headquartered in Palo Alto, California. |
| Lexmark International Inc. | Lexmark International, Inc. engages in the development, manufacture, and supply of printing and imaging solutions for offices and homes. Its products include laser printers, inkjet printers, multifunction devices, and associated supplies, services, and solutions. The company also sells dot matrix printers for printing single and multi-part forms for business users, as well as develops, manufactures, and markets various enter office imaging products. In addition, it offers maintenance, consulting, systems integration, and distributed fleet management services. The company serves resellers, retailers, and distributors operating in various industries, such as finance, manufacturing, retail, public sector, and health care. It sells its products in North and South America, Europe, the Middle East, Africa, Asia, the Pacific Rim, and the Caribbean through its distributor network, retail outlets, alliances, and OEM arrangements. The company was founded in 1990 and is headquartered in Lexington, Kentucky. |

41

DUFF&PHELPS

# Polaroid Corporation

## Financing

January 4, 2008



# Financing Initiatives

- Long Term
  - Project Rainbow

- Short Term
  - Loan on Brand (P. Traub / Lazard)
  - Factor Trade Receivables
  - Inventory Financing

January 2008
Company Confidential



# Objectives

- Pay off JP Morgan Loan

  – $25k weekly penalty for every week loan is outstanding beyond January 10, 2008

  – Loan must be paid in full by February 10, 2008

- Reduce Petters Debt

- Provide Working Capital Financing

January 2008
Company Confidential

Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Loan on Brand

- Obtain Loan using Brand as collateral as bridge to permanent credit facility

- Discussions with Jeffries and Silver Point Finance

- Waivers signed to release Duff & Phelps Brand Valuation

- In discussions with Lazard to expand scope of discussions to include additional lenders

- Arrange short term facility

  - Pay off JP Morgan            $40 million
  - Reduce Petters debt          $40 million
  - Provide working capital      $40 million

- No prepayment penalty

  - Willing to pay higher rate for flexibility

January 2008
Company Confidential


**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY

# Factor Trade Receivables

- Objective is to factor trade receivables from Wal-Mart and Target to provide short term financing

- As of mid-December, there were approximately $90 million of trade receivables from Wal-Mart and Target

- Discussions with GMAC and ABN Amro

- NDA's executed

- Provided financial statements (2005 and 2006) and financial detail on trade receivables to both institutions

- Both institutions will only factor under an annual agreement (no spot factoring)

- Preliminary contact with Lancelot to gauge their interest in factoring trade receivables

January 2008
Company Confidential

Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Inventory Financing

- Lending against inventory is an available option

- To meet the February 10th deadline, we would have to

  — Contact aggressive lenders and

  — Start by Monday, January 7th.

- No work had been done on this option and no contacts have been made

January 2008
Company Confidential

Polaroid
A PETTERS GROUP WORLDWIDE COMPANY

# Communications

- Richter is consulting on factoring initiatives

  - They are assisting with the 2008 plan, including a cash flow projection

- Paul Traub is either informed or directly involved in the initiatives

- JP Morgan has been updated on the various initiatives being pursued

  - The lender group will receive an update on Monday, January 7th

**Polaroid**
A PETTERS GROUP WORLDWIDE COMPANY